# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

SHAUN MICHAEL BOSSE,      )
                                  )

         Petitioner,          )
                                  )

v.                             )      Case No. CIV-18-204-R
                                  )

MIKE CARPENTER, Warden,   )
Oklahoma State Penitentiary,   )
                                  )

        Respondent.       )

---

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## PURSUANT TO 28 U.S.C. § 2254

---

**MICHAEL W. LIEBERMAN**
**SARAH M. JERNIGAN**
**Assistant Federal Public Defenders**
**Western District of Oklahoma**
**215 Dean A. McGee, Suite 707**
**Oklahoma City, OK 73102**
**Telephone:  (405) 609-5975**
**Facsimile:  (405) 609-5976**
**Michael_Lieberman@fd.org**
**Sarah_Jernigan@fd.org**

**COUNSEL FOR PETITIONER,**
**SHAUN MICHAEL BOSSE**

February 22, 2019

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3


## GROUND ONE
BECAUSE JURISDICTION FOR INDIAN COUNTRY CRIMES RESTS EXCLUSIVELY IN FEDERAL COURT, OKLAHOMA LACKED JURISDICTION TO PROSECUTE BOSSE, AND HIS CONVICTIONS ARE VOID *AB INITIO*. . . . . . . . . . . . . . . . . . . . 8

A.    Principles Set Forth in the Anti-Terrorism and Effective Death Penalty Act (AEDPA) (Such As Exhaustion and Deference) Do Not Apply.. . . . . . . . . . . . . . 9
B.    Federal Law Provides for Exclusive Federal Jurisdiction over Murders Committed by or Against Indians in Indian Country... . . . . . . . . . . . . . . . . . . . . 11
C.    The Victims Were Members of the Chickasaw Tribe. . . . . . . . . . . . . . . . . . . . . 12
D.    This Crime, Which Occurred in McClain County, Oklahoma, Was Committed Within the Original Undiminished Boundaries of the Chickasaw Reservation, and Thus, Occurred in Indian Country. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
E.    The 1866 Chickasaw Reservation Was Never Disestablished or Diminished by Congress... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
F.    The Chickasaw Nation's Treaty History.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
G.    Application of the *Solem/Parker* Factors Demonstrates That the Chickasaw Reservation Has Not Been Diminished or Disestablished. . . . . . . . . . . . . . . . . . 19
    1.    Step One – Statutory Text. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    2.    Step Two - Events Surrounding the Enactment of the Allotment Act. . . . 21
    3.    Step Three – Events Subsequent to Enactment of the Allotment Act. . . . . 24
H.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

## GROUND TWO

COUNSEL WERE INEFFECTIVE FOR FAILING TO ADEQUATELY INVESTIGATE BOSSE'S LIFE HISTORY, AND FAILING TO ADEQUATELY PREPARE WITNESSES, WHICH DEPRIVED HIM OF A FAIR AND RELIABLE SENTENCING. DIRECT-APPEAL AND POST-CONVICTION COUNSEL WERE ALSO INEFFECTIVE FOR FAILING TO RAISE THAT ISSUE. THESE FAILINGS ALL VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A.    Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
B.    This Court Should Reach the Merits of This Claim. . . . . . . . . . . . . . . . . . . . . 30
C.    Factual Background for Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      1.    Family Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      2.    Background of Legal Representation. . . . . . . . . . . . . . . . . . . . . . . . . . 37
D.    At Every Stage Counsel Were Ineffective for Failing to Adequately Investigate
      Bosse's Full Background and Life History or Raise the Issue on Appeal. . . . . . 43
      1.    Counsel's Failures Began Immediately and Continued Throughout
            the Entire Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      2.    Bosse Was Prejudiced by Counsel's Inadequate Investigation. . . . . . . . . 48
E.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## GROUND THREE

THE ADMISSION OF CUMULATIVE AND HIGHLY PREJUDICIAL PHOTOGRAPHS DURING THE GUILT AND PENALTY PHASES VIOLATED BOSSE'S RIGHTS TO DUE PROCESS AND A RELIABLE SENTENCING AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.    The Photographs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
      1.    Katrina Griffin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
      2.    Christian Griffin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
      3.    Chasity Hammer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
B.    The Due Process Violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
      1.    Treatment of the Issue Below. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
      2.    Denial of Due Process and Reliable Sentencing. . . . . . . . . . . . . . . . . . . 60
C.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## GROUND FOUR

THE IMPROPER ADMISSION OF VICTIM IMPACT TESTIMONY REQUESTING SENTENCES OF DEATH, VIOLATED BOSSE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A.     Argument and Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
B.     Constitutional Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
C.     State Court Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
D.     Harmless Error Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## GROUND FIVE

THE EVIDENCE SUPPORTING THE "MURDER TO AVOID ARREST" AGGRAVATOR WAS INSUFFICIENT TO PROVE IT BEYOND A REASONABLE DOUBT, AND THEREFORE, ITS INCLUSION VIOLATED BOSSE'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS... . . . . . . . . . . . . . . . . . . . . . . 76

A.     Treatment of the Issue Below. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
B.     Allowing the Jury to Consider this Aggravator Violated Bosse's Rights
       to Due Process and a Reliable Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . 78
C.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

## GROUND SIX

DELIBERATE PROSECUTORIAL MISCONDUCT THROUGHOUT THE TRIAL, DEPRIVED BOSSE OF HIS RIGHTS TO A FAIR TRIAL AND RELIABLE SENTENCING, VIOLATING THE EIGHTH AND FOURTEENTH AMENDMENTS.82

A.     First Stage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
       1.     Lack of Remorse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
       2.     Reasonable Doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
       3.     Burden Shifting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
       4.     Right to Refuse Search. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
B.     Second Stage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
       1.     Courtroom Demeanor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
       2.     Sympathy for Victims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
       3.     Life Without Parole Is No Real Punishment. . . . . . . . . . . . . . . . . . 93
C.     Cumulative Effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

GROUND SEVEN

THE CUMULATIVE EFFECT OF ERRORS DEPRIVED BOSSE OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR SENTENCING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . 95

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

## ATTACHMENT LIST

| Attachment | Description |
| --- | --- |
| 1 | Opinion Denying Original Application for Post Conviction Relief in PCD-2013-936 |
| 2 | Tribal Enrollment Verification for Katrina Griffin |
| 3 | Tribal Enrollment Verification for Christian Griffin |
| 4 | Tribal Enrollment Verification for Chasity Hammer |
| 5 | Affidavit of Julie Gardner |
| 6 | Affidavit of Joe Robertson |
| 7 | Form Dated September 19, 2012, signed by Shaun Bosse |
| 8 | Affidavit of David Autry |
| 9 | Affidavit of Jamie Pybas |
| 10 | Affidavit of Michael Morehead |
| 11 | Affidavit of Bobby Lewis |
| 12 | Affidavit of Verna Bosse |
| 13 | Declaration of Jimmy Darnell |
| 14 | Affidavit of Valerie Barnett |
| 15 | Affidavit of Shaun Bosse |
| 16 | Declaration of Heather Steakley |
| 17 | Declaration of Melinda Harvey |
| 18 | Expert Affidavit of Dr. John Matthew Fabian |
| 19 | Affidavit of Mary Bruehl |
| 20 | Affidavit of Vicki Floyd |
| 21 | Affidavit of Dale Anderson |
| 22 | Fact Affidavit of Dr. John Matthew Fabian |
| 23 | Affidavit of Joey Darnell |
| 24 | Affidavit of Chad Mitchell |
| 25 | Professional Services Justification Statement and Approval |

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

### <u>SUPREME COURT CASES</u>

*Booth v. Maryland*, 482 U.S. 496 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66

*Bosse v. Oklahoma*, 137 S. Ct. 1 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 66

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . 67, 75, 76

*Brown v. Sanders*, 546 U.S. 212 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Caldwell v. Mississippi,* 472 U.S. 320 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Chapman v. California*, 386 U.S. 18 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 67

*Choctaw Nation v. Oklahoma,* 397 U.S. 620 (1970). . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Crane v. Kentucky*, 476 U.S. 683 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Darden v. Wainwright*, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 61, 94

*DeCoteau v. Dist. Cty. Court for the Tenth Judicial Dist.*, 420 U.S. 425 (1975). . . . . . . 14

*Dennis v. United States*, 339 U.S. 162 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). . . . . . . . . . . . . . . . . . . 58, 60, 83, 94

*Eddings v. Oklahoma*, 455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Elmore v. Holbrook*, 137 S. Ct. 3 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Evitts v. Lucey*, 469 U.S. 387 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Ex parte McCardle*, 74 U.S. 506 (1868). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Fry v. Pliler*, 551 U.S. 112 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Gardner v. Florida*, 430 U.S. 349 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92-95

*Gonzalez v. Thaler*, 565 U.S. 134 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gray v. Netherland*, 518 U.S. 152 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gregg v. Georgia*, 428 U.S. 153 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Griffin v. California*, 380 U.S. 609 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Hagen v. Utah*, 510 U.S. 399 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Holland v. Florida*, 560 U.S. 631 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Winship*, 397 U.S. 358 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Kalb v. Feuerstein*, 308 U.S. 433 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kotteakos v. United States*, 328 U.S. 750 (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 75

*Lewis v. Jeffers*, 497 U.S. 764 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Lockett v. Ohio*, 438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 61

*Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Maples v. Thomas*, 565 U.S. 266 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Mattz v. Arnett*, 412 U.S. 481 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 20

*Miller v. Pate*, 386 U.S. 1 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Miller-El v. Cockrell*, 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Miller-El v. Dretke*, 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Miranda v. Arizona*, 384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Mooney v. Holohan*, 294 U.S. 103 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Mullaney v. Wilbur*, 421 U.S. 684 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88

*Napue v. Illinois*, 360 U.S. 264 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Nebraska v. Parker*, ___ U.S. ___, 136 S. Ct. 1072 (2016).. . . . . . . . . . . . . 15, 19, 22, 24

*Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450 (1995). . . . . . . . . . . . . . . 16, 17

*O'Neal v. McAninch*, 513 U.S. 432 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68, 72, 76

*Payne v. Tennessee*, 501 U.S. 808 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66, 95

*Porter v. McCollum*, 558 U.S. 30 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 52, 53

*Ring v. Arizona*, 536 U.S. 584 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Romano v. Oklahoma*, 512 U.S. 1 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Rompilla v. Beard*, 545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 44, 46

*Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977).. . . . . . . . . . . . . . . . . . . . . . . . . 15

*Satterwhite v. Texas*, 486 U.S. 249 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 76

*Scott v. McNeal*, 154 U.S. 34 (1894).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Screws v. United States*, 325 U.S. 91 (1945).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Sears v. Upton,* 568 U.S. 945 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962). . . 20

*Solem v. Bartlett*, 465 U.S. 463 (1984). . . . . . . . . . . . . . . . . . . . . 14, 15, 19, 21, 22, 24

*Stern v. Marshall*, 564 U.S. 462 (2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . 28, 43

*Swain v. Pressley*, 430 U.S. 372 (1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Celestine*, 215 U.S. 278 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Chavez,* 290 U.S. 357 (1933).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. McGowan*, 302 U.S. 535 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Rogers*, 45 U.S. (4 How.) 567, 11 L. Ed. 1105 (1846). . . . . . . . . . . 12, 13

*United States v. Young*, 470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 86, 91, 94

*Viereck v. United States*, 318 U.S. 236 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . 83, 84, 93

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . 29, 30, 43, 44, 52, 68

*Williams v. Taylor*, 529 U.S. 362 (2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 44, 52

*Woodson v. North Carolina*, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . . 28, 43, 60

## FEDERAL CIRCUIT COURT CASES

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Anderson-Bey v. Zavaras*, 641 F.3d 445 (10th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . 78

*Bland v. Sirmons*, 459 F.3d 999 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Blevins v. Cessna Aircraft Co.*, 728 F.2d 1576 (10th Cir. 1984).. . . . . . . . . . . . . . . . . . . 93

*Boyd v. Ward*, 179 F.3d 904 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003).. . . . . . . . . . . . . . . . . 90, 94, 95, 96, 97

*Castro v. Oklahoma*, 71 F.3d 1502 (10th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Darks v. Mullin*, 327 F.3d 1001 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*DeRosa v. Workman*, 696 F.3d 1302 (10th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . 73, 75

*Dodd v. Trammell*, 753 F.3d 971 (10th Cir. 2013). . . . . . . . . . . . . . . . . . 67, 69-71, 73-75

*Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 94

*Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Gonzales v. McKune*, 247 F.3d 1066 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Grant v. Trammell*, 727 F.3d 1006 (10th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Hamilton v. Mullin*, 436 F.3d 1181 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*HRI, Inc. v. E.P.A.*, 198 F.3d 1224 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Indian Country, U.S.A. v. Oklahoma*, 829 F.2d 967 (10th Cir. 1987). . . . . . . . . . . . 17, 27

*Lamb v. Oklahoma County District Court*, 229 F. App'x 690 (10th Cir. 2007). . . . . 60, 61

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 91, 95

*Littlejohn v. Royal*, 875 F.3d 548 (10th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 29

*Magnan v. Trammell*, 719 F.3d 1159 (10th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 10

*Mahorney v. Wallman*, 917 F.2d 469 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . 90

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017). . . . . . . . . . . . . . . . . . . 9, 10, 19-23, 24

*Selsor v. Workman*, 644 F.3d 984 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 63

*Tooisgah v. United States*, 186 F.2d 93 (10th Cir. 1950). . . . . . . . . . . . . . . . . . . . . . . . 21

ix

*Underwood v. Royal*, 894 F.3d 1154 (10th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2016).. . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Dodge*, 538 F.2d 770 (8th Cir. 1976).. . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 96

*Welch v. Sirmons*, 451 F.3d 675 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 65

*Willingham v. Mullin*, 296 F.3d 917 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Workman v. Mullin*, 342 F.3d 1100 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Wyoming v. EPA*, 849 F.3d 861 (10th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Young v. Sirmons*, 486 F.3d 655 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## FEDERAL DISTRICT COURT CASES

*Gilchrist v. Hagan*, No. CIV-06-1236, 2007 WL 951749 (D.S.C. Mar. 27, 2007). . . . . . 92

*Underwood v. Duckworth*, No. CIV-12-111-D, 2016 WL 4059162,
   (W.D. Okla. July 28, 2016).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 71, 74, 75

## STATE COURT CASES

*Bosse v. State*, 360 P.3d 1203 (Okla. Crim. App. 2015). . . . . . . . . . . . . . . . . . . . . . 1, 3, 66

*Bosse v. State*, 400 P.3d 834 (Okla. Crim. App. 2017). . . 1, 3, 58-62, 64, 66, 67-68, 70-71,
   74, 75, 77-81, 84-85, 87, 89, 90, 92, 94, 96

*Cravatt v. State*, 825 P.2d 277 (Okla. Crim. App. 1992).. . . . . . . . . . . . . . . . . . . . . . . 8, 12

*Harris v. State*, 164 P.3d 1103 (Okla. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 86

*Livingston v. State*, 907 P.2d 1088 (Okla. Crim. App. 1995). . . . . . . . . . . . . . . . . . . . . . 59

*Russell v. State*, 560 P.2d 1003 (Okla. Crim. App. 1977). . . . . . . . . . . . . . . . . . . . . . . 79, 82

*State v. Klindt*, 782 P.2d 401 (Okla. Crim. App. 1989). . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

x

*Williams v. State,* 572 P.2d 257 (Okla. Crim. App. 1977). . . . . . . . . . . . . . . . . . . . . . . . 86

## FEDERAL STATUTES AND ATTORNEY GENERAL OPINION

18 U.S.C. § 1151. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25

18 U.S.C. § 1151(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 1152. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

18 U.S.C. § 1153. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25 U.S.C. § 1903(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

25 U.S.C. § 1931(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

28 U.S.C. § 2254(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

28 U.S.C. § 2254(d)(1)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

28 U.S.C. § 2254(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

34 U.S.C. § 20912(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

23 U.S. Op. Atty. Gen. 214 (U.S.A.G.), 1900 WL 1001. . . . . . . . . . . . . . . . . . . . . . 22, 23

## STATE STATUTES

Okla. Stat. tit. 21, § 1401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Okla. Stat. tit. 21, § 701.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Okla. Stat. tit. 21, § 701.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## **TREATIES**

1820 Treaty of Doak's Stand, 7 Stat. 210, Oct. 18, 1820. . . . . . . . . . . . . . . . . . . . . . . . 16

1825 Treaty, 7 Stat. 234, January 20, 1825. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1830 Treaty of Dancing Rabbit Creek, 7 Stat. 333, Sept. 30, 1830. . . . . . . . . . . . . . . 16

1837 Treaty of Doaksville, 11 Stat. 573, Jan. 17, 1837. . . . . . . . . . . . . . . . . . . . . 16, 18

1855 Treaty of Washington, 11 Stat. 611, June 22, 1855. . . . . . . . . . . . . . . . . 16, 18, 24

1866 Treaty of Washington, 14 Stat. 769, Apr. 28, 1866. . . . . . . . . . . . . . . . . . . 18, 24

1894 Dawes Commission Report to Congress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## **FEDERAL STATUTES RELATING TO JURISDICTIONAL ARGUMENT**
### **(In Chronological Order)**

Act of Apr. 28, 1866, 14 Stat. 769. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Act of July 27, 1868, 15 Stat. 198. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Act of Mar. 3, 1893, 27 Stat. 645 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Act of June 6, 1900, 31 Stat. 672. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Act of May 27, 1902, 32 Stat. 245. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Act of April 21, 1904, 33 Stat. 189. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Act of March 3, 1905, 33 Stat. 1016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# OTHER GOVERNMENT DOCUMENTS AND PUBLICATIONS
## RELATED TO JURISDICTION ISSUE

*Adult Learning Program*, Chickasaw Nation, https://www.chickasaw.net/ Adult-Learning-Program.aspx (last visited January 28, 2019). . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chickasaw Children's Village*, Chickasaw Nation, https://www.chickasaw.net/ Services/Chickasaw-Children-s-Village.aspx (last visited January 28, 2019). . . . . . . . . 26

Chickasaw Code tit. 17, ch. 2, art. A § 17-201.7, *available at* https://code.chickasaw.net/Title-17.aspx (last visited January 28, 2019). . . . . . . . . . . . 27

Chickasaw Code tit. 5 § 5-201.3, *available at* https://code.chickasaw. net/Title-05.aspx (last visited January 28, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Chickasaw Const. arts. XII, XIII, *available at* https://chickasaw.net/ getattachment/Our-Nation/Government/Chickasaw-Constitution/CN_Constituion_Amended2002.pdf.aspx?lang=en-US (last visited January 28, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Chickasaw Nation Early Childhood and Head Start Program*, Chickasaw Nation, https://www.chickasaw.net/Services/Chickasaw-Nation-Early-Childhood-and-Head-Start-Program.aspx (last visited January 28, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chickasaw Nation Medical Center*, Chickasaw Nation, https://www.chickasaw.net/Our-Nation/Locations/Chickasaw-Nation-Medical-Center.aspx
(last visited January 28, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chokka Chaffa' (One Family)*, Chickasaw Nation, https://www.chickasaw.net/ Services/Chokka-Chaffa%EA%9E%8C-(One-Family).aspx
(last visited January 28, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

https://www. choctawnation.com/sites/default/files/2015/09/29/1855treaty_original.pdf (last visited January 31. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

https://www.britannica. com/topic/ Indian-Removal-Act (last visited January 28, 2019). .17

https://www.chickasaw.net/ Our-Nation/History/Removal.aspx (last visited January 31, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

https://www.chickasaw.net/Our-Nation/ History/Homelands.aspx (last visited January 31, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

https://www.chickasaw.net/Our-Nation/Government/Geographic- Information.aspx (last visited January 31, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

https://www.chickasaw.net/Our-Nation/Resources.aspx (last visited January 31, 2019). . 26

https://www.chickasaw.net/Services/ Behavioral-Health-Services.aspx (last visited January 31, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

https://www.chickasaw.net/Services/Aalhakoffichi-(A-Place-For-Healing).aspx (last visited January 31, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

https://www.chickasaw.net/Services/Batterer's-Intervention-Services.aspx   (last   visited January 31, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

https://www.chickasaw.net/Services/Behavior-Health- Psychiatry.aspx (last visited January 31, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

https://www.chickasaw.net/Services/Chickasaw-Language-revitalization-Program. aspx (last visited January 31, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

https://www.chickasaw.net/Services/Direct-Service-to-Public-Schools.aspx   (last   visited January 31, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

https://www.chickasaw.net/Services/Domestic-Violence-Services.aspx (last visited January 31, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lighthorse Police*, Chickasaw Nation, https://www.chickasaw.net/Our-Nation/ Government/Lighthorse-Police.aspx (last visited January 28, 2019). . . . . . . . . . . . . . . 25

*United States Department of Justice Indian Country Criminal Jurisdiction Chart*, https://www.justice.gov/sites/default/files/usao-wdok/legacy/2014/03/25/Indian%20 Country%20Criminal%20Jurisdiction%20ChartColor2010.pdf (last visited January 29, 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Vocational Rehabilitation*, Chickasaw Nation, https://www.chickasaw.net/Services/ Vocational-rehabilitation.aspx (last visited January 28, 2019). . . . . . . . . . . . . . . . . . . . 26

# OTHER AUTHORITIES

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, *reprinted in* 31 Hofstra L. Rev. 913 (rev. ed. 2003). . . . . . . . . . . . . . . . . . . . . 43, 44

# PROCEDURAL HISTORY

## A.    State Conviction (CF-2010-00213):

Court:          District Court of McClain County, State of Oklahoma.

Case No.:       CF-10-00213.

Charges:        First-Degree Murder (Counts 1-3) (21 O.S. § 701.7); First Degree Arson (Count 4) (21 O.S. § 1401). Offense date: July 23, 2010.

Trial:          Jury trial held October 17, 2012-November 2, 2012. Defendant did not testify.

Result:         Guilty Verdict on all 4 counts. Sentencing: Death verdict on Counts 1, 2, and 3; 35 years in prison and a $25,000 fine on Count 4, all to run consecutively.

Judge:          McClain County District Judge Greg Dixon.

Counsel:        Gary Henry, Mary Bruehl, and Bobby Lewis from the Oklahoma Indigent Defense System (OIDS).

## B.    Direct Appeal (D-2012-1128):

Court:          Oklahoma Court of Criminal Appeals.

Case No.:       D-2012-1128; No Evidentiary Hearing received.

Opinion:        *Bosse v. State*, 360 P.3d 1203 (Okla. Crim. App. 2015), *vacated and remanded Bosse v. Oklahoma*, 137 S. Ct. 1 (2016), *aff'd after remand Bosse v. State*, 400 P.3d 834 (Okla. Crim. App. 2017), *cert denied* 138 S. Ct. 1264 (2018).

Result:         Judgments and Sentences Affirmed.

Counsel:        Michael Morehead, and Jamie Pybas, OIDS.

## C.    Post-Conviction (PCD-2013-360):

Court:          Oklahoma Court of Criminal Appeals.

Case No.:       PCD-2013-360; No Evidentiary Hearing received.

Opinion:        Unpublished opinion denying post-conviction relief, *Bosse v. State,* (Okla. Crim. App. December 16, 2015) (appended as Attachment 1).

Result:         Relief denied.

Counsel:        Wyndi Hobbs, OIDS.

1

REFERENCES to transcripts, records, and exhibits will be designated as follows.[1]

## STATEMENT OF THE CASE

On August 6, 2010, Bosse was charged in McClain County District Court Case No. CF-2010-213 with three counts of Murder in the First Degree, and one count of Arson in the First Degree. (OR 30-31). On March 3, 2011, the State filed a Bill of Particulars, alleging four aggravating circumstances: (1) the murders were especially heinous, atrocious, or cruel; (2) the defendant knowingly created a great risk of death to more than one person; (3) the defendant presents a continuing threat to society; and (4) the murders were committed for the purpose of avoiding a lawful arrest or prosecution. (OR 63).

From September 28, 2012, through November 2, 2012, Bosse was tried by a jury, represented by Gary Henry, Mary Bruehl, and Bobby Lewis. The State of Oklahoma was represented by District Attorney Greg Mashburn, and Assistant District Attorneys Susan Caswell and Lori Puckett. The Honorable Greg Dixon, District Judge, presided.

On October 29, 2012, the jury found Bosse guilty of all counts, (OR 1011-14; Tr. IX 108-09) and assessed punishment at thirty-five years imprisonment and a fine of $25,000 on the arson count. (OR1014; Tr. IX 109). At the conclusion of the sentencing phase, the jury found three aggravating circumstances on all three counts: (1) the murders were especially

---

[1]The trial transcript shall be referenced as "Tr." then by volume and page. The motion hearing transcripts shall be referenced as "month/day/year Tr." followed by page number. The original record shall be referred to by volume as "OR" followed by page number. Trial exhibits shall be referenced as "Def. Ex. #," "St. Ex. #," or "Ct. Ex. #." Finally, exhibits attached to this Petition shall be referred to simply as "Att." followed by the number.

heinous, atrocious, or cruel, (2) during the commission of the murder, the defendant knowingly created a great risk of death to more than one person, and (3) the murders were committed for the purpose of avoiding a lawful arrest or prosecution, (OR 1090; Tr. XII 76-77), and imposed a sentence of death for each count. (OR 1093-95; Tr. XII 77). On December 18, 2012, the court formally sentenced Bosse in accordance with the jury's verdict, with all sentences to run consecutively. (OR 1117-20; Sent. Tr. 8-9).

Bosse appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (OCCA), which affirmed the convictions and sentences on October 16, 2016. *Bosse v. State*, 360 P.3d 1203 (Okla. Crim. App. 2015). No 3.11 motion was filed on direct appeal. The United States Supreme Court vacated and remanded for further proceedings, finding error in the admission of improper opinion testimony by victim-impact witnesses. *Bosse v. Oklahoma*, 137 S. Ct. 1 (2016). OCCA again affirmed the convictions and sentences. *Bosse v. State*, 400 P.3d 834 (Okla. Crim. App. 2017), *cert denied* 138 S. Ct. 1264 (2018).

Bosse filed an Original Application for Post-Conviction Relief (APCR) on August 3, 2015. After the State filed a response, OCCA denied relief on December 16, 2015.

On February 20, 2019, Bosse filed, with this Court's permission, *see* Doc. 17, a Second Application for Post-Conviction Relief (Case No. PCD-2019-124).

### STATEMENT OF THE FACTS

This case involves the deaths of Katrina Griffin and her two children, Christian Griffin and Chasity Hammer, who died in their trailer in Dibble on July 23, 2010. Ms. Griffin

and Christian died of multiple stab wounds. Chasity died of smoke inhalation and thermal injury caused when the trailer caught fire.

Due to a seizure disorder, Ms. Griffin did not drive or work outside the home. There were many TVs in the house. (Tr. I 35, 49, 50-53). Ms. Griffin was protective of her belongings and would put her initials, "KRG," on every movie she bought to avoid getting them mixed up if she traded them with anyone. (Tr. I 53). She also kept a list of people to whom she loaned movies. (Tr. I 56). According to her stepmother, Ginger Griffin, she recently was approved to receive disability for her seizure disorder. She had also received back pay, which she used to buy new furniture, TVs, and a laptop. (Tr. I 54-55).

About two weeks before her death, Ms. Griffin met Bosse online. Bosse would come to the trailer, and spent the night a couple of times. (Tr. I 43). On July 17, 2010, Ms. Griffin's cousin, Heather Molloy, and Heather's boyfriend, Henry Price, visited the trailer. (Tr. II 88). Bosse was also there. Heather and Henry stayed until midnight or so, and Bosse remained behind. Everything seemed fine. (Tr. II  91).

On July 22, 2010, Ms. Griffin and Christian noticed some video games were missing. Ms. Griffin suspected Price had stolen them. They called Ms. Griffin's stepmother to see if Christian had left some of them at her house, but she did not have them. (Tr. I 59). After calling Heather about the missing games, Katrina and Bosse went over to Heather's house to search for them. Heather and Henry did not answer the door so they returned home. (Tr. II 92-93). Back at the trailer, Ms. Griffin called a deputy sheriff, who came and took a report

4

about the missing property. When the deputy came to the trailer, Bosse was there. The deputy, who did not notice Bosse acting suspicious or peculiar, left at about 12:30 a.m. on July 23, 2010. (Tr. II 102, 111).

Ginger Griffin left for work at 7 a.m., passing the trailer on the way. She did not notice anything unusual, nor did she see Bosse's vehicle. (Tr. I 63). Shortly before 9 a.m., Daryl Dobbs, who lived down the road, noticed smoke coming from the trailer. He called 9-1-1, then went up to the trailer to see if anyone was home. He banged on the doors and windows. (Tr. I 90-95). Dibble Police Chief Walt Thompson arrived within five minutes. (Tr. I 107, 135). Chief Thompson helped Dobbs bang on the doors and windows. Dobbs opened the front door and smoke rolled out, forcing him back. (Tr. I 142). Within a minute or two of Dobbs opening the front door, flames appeared. (Tr. I 143).

By the time the fire department arrived, approximately three to four minutes after Dobbs and Chief Thompson, they had been alerted to the possibility there were occupants inside. After searching throughout the burning trailer, they found two bodies, later determined to be Katrina and Christian Griffin in the master bedroom. The firefighters then had to leave because the room became too hot. (Tr. I 191; Tr. II  23, 29; Tr. IV 142). Chasity's body was eventually found in the closet of the master bedroom under a pile of debris. (Tr. IV 130). She was burned with soot in her stomach and lungs.

The sheriff's department, with help from the State Fire Marshal and the OSBI, processed the scene. Authorities began searching for Bosse, after they were told by Ms.

Griffin's family members that he and Ms. Griffin were dating. (Tr. I 160-62; Tr. II 123-24).

Bosse's mother saw him at the apartment they shared in Oklahoma City at about 6:00 a.m. on July 23. He left the apartment between 6:15 and 6:30 a.m. and went to Oklahoma City Community College (OCCC), where he logged onto computers at about 7:30 a.m. (Tr. II 151, 187-88; Tr. III 28). Bosse also visited various Oklahoma City-area pawn shops, pawning movies, TVs and VCRs later determined to belong to Ms. Griffin. (Tr. II 128, 146, 167-68, 186, 193, 231, 268).

Bosse received a telephone call at approximately 2:30 p.m. from Detective Dan Huff of the McClain County Sheriff's Office asking him to come to their office. Bosse agreed and met at approximately 4:00 p.m. with Detectives Huff and David Tompkins and OSBI Agent Bob Horn; the interview lasted 50 to 60 minutes and was audio and video recorded. (Tr. II 152, 154-57; State's Exhibit 301).

When Bosse arrived, the detectives noticed blood on his tennis shoes and a scratch on his arm. (Tr. II 174, 203-206; Tr. III 31-32). He told detectives several things about his whereabouts earlier in the day that did not check out. Bosse asked if Ms. Griffin was OK, but did not mention pawning her possessions to the detectives. (Tr. II 210-11, 218; Tr. III 35-37).

Although Bosse refused to let detectives physically search his truck, he did agree to let them photograph its contents. (Tr. II 170-72). They photographed several items of interest, including a laptop computer, several movies, and a Play Station. (Tr. II 232). Ms. Griffin's

family later identified the items in the photographs as her possessions. They also identified receipts for the missing items. (Tr. I 70-73, 77-79; Tr. II 158, 170-72, 220-21, 224-29, 231-32; Tr. III 59-63).

The officers released Bosse, but two hours later, OSBI agents arrested him at the apartment he shared with his mother. When the agents arrived, Bosse was there, along with his mother and brother, Matthew Bosse. (Tr. III 116).

Bosse gave permission for authorities to search his truck, but the property previously photographed was gone, with the exception of some movies, which were found in his bedroom. (Tr. II 188-89; Tr. III 28-30). Agent Akers found pawn tickets inside Bosse's billfold in the truck. When asked about the pawn tickets, Bosse appeared nervous, after which he was arrested. (Tr. II 191; Tr. III 40-44).

Several Oklahoma City-area pawn brokers confirmed Bosse had pawned items identified as belonging to Ms. Griffin. (Tr. III 119-275). During a search of Bosse's apartment, agents found items taken from Ms. Griffin's trailer, as well as blood on his bathroom towels and by his laundry basket. They also found a wadded-up bloody pair of jeans in the back corner of his closet. The DNA tests performed on the jeans and some blood spots on Bosse's shoes linked Bosse to the victims. (Tr. VII 102-11). Fingerprints on items taken from the trailer further linked Bosse to the crime. (Tr. IV 56-64).

Tests conducted by the Bureau of Alcohol, Firearms and Tobacco concluded the fire was set on the living room couch, where it flamed, then smoldered for several hours. (Tr. V

119-20, 142,147; Tr. VI 180). Autopy revealed Ms. Griffin had thermal burns to her entire body, as well as eight stab wounds. Her right hand had defensive wounds. (Tr. II 40; Tr. III 94-98; Tr. IV 156; Tr. V 78-81, 223, 229-30). Medical Examiner Inas Yacoub testified "the sharp force trauma to the neck, because of the bleeding associated with it, including the bleeding inside the airway" was fatal. (Tr. V 226, 231-32). Dr. Yacoub testified Christian "died of multiple stab wounds," (Tr. VI 30), and Chasity died "from smoke inhalation and thermal injury." (Tr. VI 83).

Additional facts will be discussed as they relate to the various propositions of error.

## GROUND ONE
### BECAUSE JURISDICTION FOR INDIAN COUNTRY CRIMES RESTS EXCLUSIVELY IN FEDERAL COURT, OKLAHOMA LACKED JURISDICTION TO PROSECUTE BOSSE, AND HIS CONVICTIONS ARE VOID *AB INITIO.*

Bosse is being held in violation of the Constitution and laws of the United States because the state court that tried him lacked subject-matter jurisdiction. The crimes occurred in Indian Country – namely, within the boundaries of the Chickasaw Reservation. The victims were all members of the Chickasaw Tribe. The crimes were prosecuted by the State of Oklahoma even though Oklahoma courts have long recognized "the State of Oklahoma does not have jurisdiction over crimes committed by *or against* an Indian in Indian Country." *Cravatt v. State*, 825 P.2d 277, 279 (Okla. Crim. App. 1992) (emphasis added) (citing *State v. Klindt*, 782 P.2d 401, 403 (Okla. Crim. App. 1989)). Jurisdiction to prosecute this case is exclusively federal. *The General Crimes Act*, 18 U.S.C. § 1152.

The United States Court of Appeals for the Tenth Circuit recently considered this

issue with regard to a crime that occurred on the Creek Reservation, concluding habeas relief was warranted. *Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017), *cert granted sub nom Royal v. Murphy*, 138 S. Ct. 2026 (2018) (oral argument November 27, 2018). The same result should apply here. While there are some distinctions between the history of the Creek and Chickasaw Reservations, Congress has not disestablished the boundaries of the 1866 Chickasaw Reservation.[2] A writ should issue.

A.  **Principles Set Forth in the Anti-Terrorism and Effective Death Penalty Act (AEDPA) (Such As Exhaustion[3] and Deference) Do Not Apply.**

Oklahoma usurped the federal courts' exclusive jurisdiction by prosecuting a case without jurisdiction. "Subject-matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Because jurisdiction can never be forfeited, it follows that it can be raised for the first time in a federal habeas petition. AEDPA standards therefore should not apply. Congress, through AEDPA, has no authority to curtail this Court's full review of the facts and law relevant to its own jurisdiction. Exhaustion should not be required and review should be *de novo*.

The Tenth Circuit has found it unnecessary to squarely address AEDPA's application

---

[2]Several statutes Oklahoma relied upon in *Murphy* as support for its argument that Congress disestablished the Creek Reservation are statutes that apply to the Five Tribes as a group, which includes the Chickasaw. *See Murphy*, 875 F.3d at 939-48.

[3]In the event the Court believes exhaustion is required, and out of an abundance of caution, Bosse raised this issue in a Second Application for Post-Conviction Relief. Such filing is in no way a concession that exhaustion is required or that AEDPA deference should apply.

to Indian Country jurisdictional issues. *See Murphy*, 875 F.3d at 911-12 (concluding it need not address standard of review because even under AEDPA's deferential standards of review Oklahoma was without jurisdiction); *Magnan v. Trammell*, 719 F.3d 1159, 1164  (10th Cir. 2013) (same). In *Magnan*, one judge found "substantial merit" to the argument federal courts need not defer to the state court adjudication. *Id.* at 1177 (Hartz, J., concurring). A full and complete determination of whether the federal court has exclusive jurisdiction to prosecute Bosse should rest entirely with Article III courts applying *de novo* review.

Common law courts in 1789 had authority to provide habeas relief if the committing court lacked jurisdiction. *Swain v. Pressley*, 430 U.S. 372, 384-85 (1977) (Burger, C.J., concurring in part and concurring in judgment). This historical perspective illustrates "the trial court's jurisdiction has historically been the core consideration of habeas proceedings." *Magnan*, 719 F.3d at 1177 (Hartz, J. concurring).

Reviewing the "core consideration" *de novo*, and without requiring exhaustion, is not inconsistent with AEDPA, which presupposes state courts have jurisdiction to decide federal law issues in the first place. If a state court lacks jurisdiction, then deference to its rulings is wholly unwarranted. *See Ex parte McCardle*, 74 U.S. 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause"); *Scott v. McNeal*, 154 U.S. 34, 46 (1894) (concluding judgment by state court without jurisdiction violates Due Process Clause).

Federal courts' respect for state-court judgments does not apply when state courts act outside their subject-matter jurisdiction. *See Kalb v. Feuerstein*, 308 U.S. 433, 439-40 (1940)

10

(affording no deference to state-court judgment and independently determining jurisdiction was exclusively federal). The Tenth Circuit in a related context said:

> The fundamental constitutional principles supporting independent federal inquiry into the title status of Indian land apply with even greater force to disputes over Indian country jurisdictional status. Jurisdictional status of land implicates not only ownership, but also the core sovereignty interests of Indian tribes and the federal government in exercising civil and criminal authority over tribal territory.

*HRI, Inc. v. E.P.A.*, 198 F.3d 1224, 1245-46 (10th Cir. 2000). Federal courts should determine whether a case falls within their exclusive jurisdiction.

Fundamental concerns about separation of powers reinforce the principle federal courts should be the final arbiter of their own exclusive jurisdiction. Congress does not have plenary power over the mechanisms of judicial review. Indeed, "Article III could. . . [not] preserve the integrity of judicial decision-making if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern v. Marshall*, 564 U.S. 462, 484 (2011).

As such, this Court should decide in the first instance, unburdened by AEDPA, whether Oklahoma had jurisdiction to try Bosse. Because it did not, his conviction is void *ab initio* and a writ must issue.

**B.      Federal Law Provides for Exclusive Federal Jurisdiction over Murders Committed by or Against Indians in Indian Country.**

All murders committed by or against Indians in "Indian Country" are subject to exclusive federal jurisdiction. *See United States Department of Justice Indian Country*

11

*Criminal Jurisdiction Chart*, https://www.justice.gov/sites/default/files/usao-wdok/legacy/

2014/03/25/Indian%20Country%20Criminal%20Jurisdiction%20ChartColor2010.pdf (last

visited January 29, 2019). *See also* 18 U.S.C. § 1152 ("The General Crimes Act"); 18 U.S.C.

§ 1153 ("The Indian Major Crimes Act"). "Indian Country" is defined as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of
> the United States Government, notwithstanding the issuance of any patent,
> and, including rights-of-way running through the reservation....

18 U.S.C. § 1151. Oklahoma has no jurisdiction over any crime committed by or against an

Indian within Indian Country. *See Cravatt,* 825 P.2d at 279 (citing *Klindt*, 782 P.2d at 403).

Therefore, the Court must determine: (1) If the victim or perpetrator is an Indian; and (2) If

the crime occurred in Indian Country.

### C.      The Victims Were Members of the Chickasaw Tribe.

The requirement of establishing the Indian status of the victims is easily satisfied in

this case. Katrina and Christian Griffin, and Chasity Hammer were all members of the

Chickasaw Tribe.

To establish Indian status under federal law, the person whose status is in issue must

(1) have some degree of Indian blood; and (2) be recognized as an Indian by a tribe or society

of Indians or by the federal government. *See United States v. Dodge*, 538 F.2d 770, 786 (8th

Cir. 1976) (citing *United States v. Rogers*, 45 U.S. (4 How.) 567, 11 L. Ed. 1105 (1846)).

Katrina and Christian Griffin, and Chasity Hammer all had some degree of Indian

blood and were recognized by the Chickasaw Nation as tribal members. Specifically, the

Chickasaw Nation has certified that each "possessed a CDIB [Certificate of Degree of Indian Blood] showing her/his degree of . . . Indian Blood" and that each "was recognized as a Chickasaw Nation Citizen." Att. 2 (Tribal Enrollment Verification for Katrina Griffin); Att. 3 (Tribal Enrollment Verification for Christian Joe Griffin); Att. 4 (Tribal Enrollment Verification for Chasity Renea Hammer). Accordingly, under the two-part test recognized in *Rogers* and *Dodge* each of the three victims was an Indian.

> **D.   This Crime, Which Occurred in McClain County, Oklahoma, Was Committed Within the Original Undiminished Boundaries of the Chickasaw Reservation, and Thus, Occurred in Indian Country**.

As noted above, for purposes of determining jurisdiction, § 1151(a) defines "Indian Country" as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation.

The Chickasaw reservation encompasses all or parts of thirteen counties, including all of McClain County. *See* https://www.chickasaw.net/Our-Nation/Government/Geographic-Information.aspx (last visited January 31, 2019).

A thorough review of McClain County land records confirms the land where the offenses occurred was originally allotted directly from the Choctaw and Chickasaw Nations to Mary Roberts and George Roberts. *See* Att. 5 (Affidavit of Julie Gardner). Because the crimes occurred on land located within the boundaries of the Chickasaw Reservation, it occurred in Indian Country and Oklahoma had no authority to prosecute Bosse.

**E.     The 1866 Chickasaw Reservation Was Never Disestablished or Diminished by Congress.**

Only Congress creates reservations and only Congress can disestablish or diminish a reservation. *Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903). Allotment without more does not disestablish or diminish a reservation. *Mattz v. Arnett*, 412 U.S. 481, 497 (1973) (explaining allotment can be "completely consistent with continued reservation status"). Courts do not lightly infer that Congress has exercised its power to disestablish or diminish a reservation. *DeCoteau v. Dist. Cty. Court for the Tenth Judicial Dist.*, 420 U.S. 425, 444 (1975). The "rule by which legal ambiguities are resolved to the benefit of the Indians" is applied to its "broadest possible scope" in disestablishment and diminishment cases. *Id.* at 447.

Courts presume that an Indian reservation continues to exist until Congress acts clearly to disestablish or diminish it. *Solem v. Bartlett*, 465 U.S. 463 (1984) (involving successful federal habeas challenge to state jurisdiction over an attempted rape by member of the Cheyenne River Sioux Tribe). In *Solem*, the Court held:

> The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.

*Id.* at 470 (citing *United States v. Celestine*, 215 U.S. 278, 285 (1909)). Congressional intent to diminish a reservation "will not be lightly inferred," and Congress  must "clearly evince an intent . . . to change . . . boundaries before diminishment will be found." *Solem,* 465 U.S.

at 470 (ellipses in original). Absent evidence of such intent, courts "are bound . . . to rule that diminishment did not take place and that the old reservation boundaries survived." *Id.* at 472.

The framework to determine whether a reservation has been diminished or disestablished is well-settled. *Nebraska v. Parker*, ___ U.S. ___, 136 S. Ct. 1072, 1078 (2016). As with any question of statutory construction, that analysis begins with (1) the text of the statute itself, then (2) the history surrounding passage of the statute, and finally (3) the demographic history and treatment of the lands by the federal, state, and tribal governments. *Solem*, 465 U.S. at 471-72; *Parker*, 136 S. Ct. at 1078-79. In *Parker*, the Court said this third factor is the least probative of the three. *Id.* at 1079-82. Specifically, the Court noted:

> Our cases suggest that such evidence might "reinforc[e]" a finding of diminishment or non-diminishment based on the text. *Mattz*, 412 U.S., at 505, 93 S. Ct. 2245; *see also, e.g., Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 604–605 (1977) (invoking subsequent history to reject a petitioner's "strained" textual reading of a congressional Act). *But this Court has never relied solely on this third consideration to find diminishment*.

*Parker*, 136 S. Ct. at 1081 (emphasis added).

## F.     The Chickasaw Nation's Treaty History.

The original homeland of the Chickasaw people in America consisted of vast lands scattered across parts of southwestern Kentucky, western Tennessee, northern Mississippi and northwestern Alabama. https://www.chickasaw.net/Our-Nation/ History/Homelands.aspx (last visited January 31, 2019). For the first part of their history in Indian Territory, the Chickasaw shared territory with the Choctaw Nation. But in 1855, the Nations entered an agreement to split their shared territory.

In the Treaty of Doak's Stand, Oct. 18, 1820 ("1820 Treaty"), 7 Stat. 210, the Choctaw Nation exchanged "approximately half of its remaining Mississippi lands for a large tract of land in the Arkansas Territory and an even larger one further west," to which it was to remove until it became apparent that at least a portion of the Arkansas Territory land was already occupied by settlers. *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 624 (1970).[4] That "made many of [the Choctaws] doubt that the United States would protect them in their new lands." *Id.* at 625.

To overcome some of those doubts, the Choctaws and the United States entered into the Treaty of Dancing Rabbit Creek, Sept. 30, 1830, 7 Stat. 333 ("1830 Treaty"). That treaty secured "a tract of country west of the Mississippi River" to the Choctaw Nation to "exist as a nation and live on it," *id.* art. 2, and the "jurisdiction and government" over "all the persons and property" within that territory (the "Treaty Territory")." *Id.* art. 4. The 1830 Treaty "provide[s] for the [Nation's] sovereignty within Indian country." *Okla. Tax Comm'n*, 515 U.S. at 466.[5]

Then, in 1837, in the Treaty of Doaksville, Jan. 17, 1837, 11 Stat. 573, the Chickasaw

---

[4]The Choctaws ceded the Arkansas Territory lands granted to them in the 1820 Treaty back to the United States in the Treaty of January 20, 1825, 7 Stat. 234. In so doing, the 1825 Treaty used very clear cession language. Specifically, in Article 1 of the Treaty, "The Choctaw Nation do hereby *cede* to the United States all that portion of the land *ceded* to them by the second article of the Treaty of Doak Stand." Article 2 then provides, "*In consideration of the cession* aforesaid, the *United States do hereby agree to pay* the said Choctaw Nation the sum of six thousand dollars, annually, forever." (emphasis added).

[5]The Choctaw's right to the reservation granted under the 1830 Treaty was reaffirmed in Article 1 of the 1855 Treaty of Washington ("1855 Treaty"), 11 Stat. 611, June 22, 1855.

Nation secured an undivided one-fourth interest to the Choctaw Territory "on the same terms that the Choctaws now hold it, except the right of disposing of it, (which is held in common with the Choctaws and Chickasaws)." *Id. See also Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465 n.15 (1995); *Choctaw Nation*, 397 U.S. at 626.

Because the Treaty Territory was secured to the Nations by the 1830 Treaty, their right to those lands is protected by federal law. As the term "reservation" simply refers to lands reserved for a tribe over which Congress intended that primary jurisdiction be exercised by the federal and tribal governments, *Indian Country, U.S.A. v. Oklahoma*, 829 F.2d 967, 974 (10th Cir. 1987); *see United States v. McGowan,* 302 U.S. 535, 538-39; (1938); *United States v. Chavez,* 290 U.S. 357, 364 (1933), the Treaty Territory is a reservation. Articles 2 and 4 of the 1830 Treaty make that clear.

At about this same time, Congress passed the Indian Removal Act, on May 28, 1830, which gave the President direct authority to negotiate removal treaties for the "Five Civilized Tribes" from their southeastern homelands to the Indian Territory. https://www.britannica.com/topic/ Indian-Removal-Act (last visited January 28, 2019). The Five Civilized Tribes consisted of the Choctaws, Chickasaws, Cherokees, Creeks/Muscogees, and Seminoles. *See* ch. 209, 27 Stat. 645 (March 3, 1893).

The Chickasaws were among the last tribes to remove to Indian Territory. Though they met with hardship and death during removal, they were spared some of the worst because they had negotiated for more control over their departure and were able to travel

17

during more favorable seasons than people of the other tribes. Most Chickasaws removed to Indian Territory from 1837-1851. Chickasaws originally settled in their own district within Choctaw Territory pursuant to the Treaty of Doaksville. However, in 1856, the Chickasaw separated from the Choctaws and created their own constitution for their separate lands. https://www.chickasaw.net/Our-Nation/History/Removal.aspx (last visited January 31, 2019).

In the 1855 Treaty of Washington, the Choctaws, Chickasaws, and the United States agreed to separate districts within the 1830 boundaries of the Treaty Territory for each Nation, thereby creating a Choctaw District and a Chickasaw District. *See* https://www. choctawnation.com/sites/default/files/2015/09/29/1855treaty_original.pdf (last visited January 31, 2019). The exterior boundaries of the reservation were in no way altered.

Following the Civil War, the Nations entered into the 1866 Treaty of Washington ("1866 Treaty"), Act of Apr. 28, 1866, 14 Stat. 769, in which they "cede[d] to the United States the territory west of the [98th meridian]," *id.* art. 3, modifying only the reservation's western boundary. But, other than that portion ceded back to the United States, "[t]he United States reaffirm[ed] all obligations arising out of treaty stipulations or acts of legislation with regard to the Choctaw and Chickasaw nations" with regard to the remainder of the Nations' territory. *Id.* art. 10.

The borders of the Chickasaw (and Choctaw) Reservation have remained unaltered since this 1866 Treaty.

18

### G.   Application of the *Solem/Parker* Factors Demonstrates That the Chickasaw Reservation Has Not Been Diminished or Disestablished.

#### 1.   Step One – Statutory Text.[6]

The first step in considering reservation disestablishment – the statutory text – is the "most important step" of the *Solem* framework. *Parker*, 136 S. Ct. at 1080. This step requires the examination of the text of the statute purportedly disestablishing or diminishing the reservation. The express statutory language is "[t]he most probative evidence of congressional intent." *Solem*, 465 U.S. at 470. "Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands." *Id.* When such language is combined with language committing Congress to compensate the tribe for its land with a fixed sum, Congress's intent to diminish a reservation is especially clear. *Id.* at 470-71. Restoration of the land to the public domain may also be an indicator of Congressional intent to disestablish or diminish a reservation. *Id.* at 475. *See also Parker*, 136 S. Ct. at 1079.

The Tenth Circuit recently reviewed, in detail, the federal policies and statutes from

---

[6]The ultimate burden of proving disestablishment is on the State. Once Congress has established a reservation, "*Solem* and every case applying it presume that a reservation continues to exist unless Congress has legislated otherwise." *Murphy*, 875 F.3d at 927-28. Thus, in order to overcome that presumption, it is up to the State to identify a statute demonstrating Congress disestablished the reservation it previously created. *See id.* ("The State, repeating the OCCA's mistake in reversing the presumption against disestablishment, argues Mr. Murphy 'failed to present evidence that Congress did not intend disestablishment'. . . .  We will not make the same mistake here.").

the allotment and post-allotment eras as they relate to the Muscogee Creek Nation. *Murphy*, 875 F.3d at 939-48.[7] It did so to provide historical context. The circuit relied primarily on *Indian Country, U.S.A.* to review some of the more significant federal statutes affecting the Five Tribes. In the end, the court identified no statutory text that diminished or disestablished the Creek Reservation. The same is true of the Chickasaw Reservation.

Congress knows how to alter reservation boundaries when that is what it wants to do. These examples of text are "hallmarks" of disestablishment or diminishment demonstrating that Congress knows how to clearly reflect its intent to alter reservation boundaries:

- "[T]he Smith River reservation is hereby discontinued." Act of July 27, 1868, ch. 248, 15 Stat. 198, 221 (cited in *Mattz v. Arnett*, 412 U.S. 481, 504, n.22 (1973) an example of "clear language of express termination").

- The Colville reservation was "vacated and restored to the public domain." Act of July 1, 1892, ch. 140, § 1, 27 Stat. 62, 62-63 (cited in *Mattz*, 412 U.S. at 504, n. 22 (1973), as an example of "clear language of express termination"; and referenced in *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962) as example of diminishment language).

- "[A]ll the unallotted lands within said [Unitah] reservation shall be restored to the public domain." Act of May 27, 1902, ch. 888, 32 Stat. 245, 263 (discussed in *Hagen v. Utah*, 510 U.S. 399, 412 (1994), which noted that "Congress considered Indian reservations as separate from the public domain").

- "[T]he reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby, abolished." Act of April 21, 1904, ch. 1409, 33 Stat. 189, 218 (cited as example of "clear language of express termination" in *Mattz*, 412 U.S. at 504, n.22).

---

[7]In *Murphy*, the Tenth Circuit was specifically considering whether the Creek Reservation had been diminished or disestablished, but many of the statutes it reviewed for that purpose applied equally to the rest of the Five Tribes.

- "Subject to the allotment of land . . . and for the considerations hereinafter mentioned ... [the] Comanche, Kiowa, and Apache Indians hereby cede, convey, transfer, relinquish, and surrender, forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest, of every kind and character, in and to the lands embraced in" an identified tract in Indian Territory. Act of June 6, 1900, ch. 813, art. 1, 31 Stat. 672, 676-77 (discussed in *Tooisgah v. United States*, 186 F.2d 93, 97 (10th Cir. 1950), as example of language "disestablish[ing] the organized reservation").

- Indians "belonging on" the Shoshone or Wind River reservation "do hereby cede, grant, and relinquish to the United States, all right, title, and interest which they may have to all the lands embraced within the said reservation." Act of March 3, 1905, ch. 1452, 33 Stat. 1016, 1016 (described in *Wyoming v. EPA*, 849 F.3d 861, 871 (10th Cir. 2017) as "express language of cession" notwithstanding the absence of the words "sell" or "convey").

*Murphy*, 875 F.3d at 948-49.

There are no statutes that use any of the hallmark language above that would demonstrate congressional intent to alter the Chickasaw Nation reservation's boundaries as they existed after the 1866 Treaty.[8] The Chickasaw reservation remains intact.

## 2. Step Two - Events Surrounding the Enactment of the Allotment Act.

"At step two of the *Solem* analysis, courts consider how pertinent legislation was understood to affect the reservation when it was enacted. Evidence of this contemporary understanding may include the negotiations between the tribe and the federal government, congressional floor debates, and committee reports about the relevant statutes." *Murphy*, 875 F.3d at 954 (citing *Solem*, 465 U.S. at 476-78). "When the statutory text at step one does not

---

[8]In *Murphy*, the State conceded it could not point to any statutory text clearly disestablishing the Creek Reservation. *Murphy*, 875 F.3d at 938-39, 948. Since most of the statutes the State relied upon in *Murphy* apply to all of the Five Tribes, the same concession is expected here.

reveal that Congress has disestablished or diminished a reservation, such a finding requires 'unambiguous evidence' that 'unequivocally reveals' congressional intent." *Murphy*, 875 F.3d at 954 (citing *Parker*, 136 S. Ct. at 1080-81). *See also Solem*, 465 U.S. at 478 ("[I]n the absence of some clear statement of congressional intent to alter reservation boundaries, it is impossible to infer from a few isolated and ambiguous phrases a congressional purpose to diminish [a reservation].").

The *Murphy* court examined all the "Step Two" evidence, *Murphy*, 875 F.3d at 954-60, and found "there is no unequivocal evidence of a contemporaneous understanding that the legislation terminated or redrew the Creek Nation's borders at step two." *Id.* at 960. Because the majority of that evidence was applicable to all of the Five Tribes, the same result applies here.

For example, one such item of evidence of contemporary understanding is an Attorney General opinion from 1900. 23 U.S. Op. Atty. Gen. 214 (U.S.A.G.), 1900 WL 1001.

> [T]he Attorney General explained that the Tribes, even after passage of the Curtis Act, still had the power to exclude intruders and to set the terms upon which non-members could enter the Tribes' lands. *See id.* at 215-18. The opinion said the Tribes could regulate activity within their borders because, although outsiders could purchase town lots, "the legal right to purchase land within an Indian nation gives to the purchaser no right of exemption from the laws of such nation." *Id*. at 217. Tribal laws "requiring a permit to reside or carry on business in the Indian country" were still in effect. *Id.* Non-members grazing cattle or otherwise occupying Indian lands were "simply intruders" who "should be removed, unless they obtain such permit and pay the required tax, or permit, or license fee." *Id*. at 219. The Attorney General concluded the Secretary of the Interior had
>
>> the authority and duty . . . to remove all persons of the classes forbidden by treaty or law, who are there without Indian permit

> or license; to close all business which requires a permit or
> license and is being carried on there without one; and to
> remo[v]e all cattle being pastured on the public land without
> Indian permit or license, where such license or permit is
> required.  *Id*. at 220.

*Murphy*, 875 F.3d at 957-58. Indeed, in that opinion, the Attorney General notes, "*So far as concerns the Choctaw and Chickasaw nations . . .*, this question was passed upon by my predecessor . . . who held (17 Opin. 134) that *such permit and license laws, with their tax, were valid and must be enforced*." 23 U.S. Op. Atty. Gen. at 216 (emphasis added).

> The 1894 Dawes Commission Report to Congress
>
> discussed the Commission's negotiations and explained the Tribes had refused
> to discuss changes "in respect either to their form of government or the
> holdings of their domains." Dep't of the Interior, H.R. Doc. No. 53-1, at
> LIX-LX (3d Sess. 1894). The Commission explained to Congress it had
> proposed allotment after "abandon[ing] all idea of purchasing" tribal lands
> because "*the Indians would not, under any circumstances, agree to cede any
> portion of their lands to the Government*." *Id.* at LVX.

*Murphy*, 875 F.3d at 957 (emphasis added).

Similarly, in its 1900 report to Congress, the Dawes Commission again noted the impossibility of achieving cession from any of the Five Tribes:

> *Had it been possible to secure from the Five Tribes a cession to the United
> States* of the entire territory at a given price, the tribes to receive its equivalent
> in value, preferably a stipulated amount of the land thus ceded, equalizing
> values with cash, *the duties of the commission would have been immeasurably
> simplified*, and the Government would have been saved incalculable expense.
> . . . When an understanding is had, however, of the great difficulties which
> have been experienced in inducing the tribes to accept allotment . . . it will be
> seen how impossible it would have been to have adopted a more radical
> scheme of tribal extinguishment, no matter how simple its evolutions.

Dep't of the Interior, H.R. Doc. No. 56-5, at 9 (2d Sess. 1900) (emphasis added). *See also*

*Murphy*, 875 F.3d at 958.

There is not unequivocal evidence of a contemporary understanding that Congress intended for the Chickasaw Nation's reservation to be diminished or disestablished. Again, the territory remains intact.

### 3. Step Three – Events Subsequent to Enactment of the Allotment Act.

At step three, courts "consider . . . 'federal and local authorities' approaches to the lands in question and . . . the area's subsequent demographic history." *Id.* at 960. *See also Solem*, 465 U.S. at 471; *Parker*, 136 S. Ct. at 1081 (considering tribal presence in contested territory). This step is the least probative of the three and will never support a finding of diminishment on its own. *Id.* Here, though, this step also weighs in favor of a finding the 1866 boundaries of the reservation have been preserved.

The Chickasaw Nation exercises sovereignty under a constitution approved by the Secretary of the Interior, Chickasaw Const. arts. XII, XIII, *available at* https://chickasaw.net/getattachment/Our-Nation/Government/Chickasaw-Constitution/CN_Constituion_Amended2002.pdf.aspx?lang=en-US (last visited January 28, 2019), and governs within the boundaries described in the 1855 and 1866 Treaties. Chickasaw Const. prmbl. Its citizenship is defined by the Constitution, *id.* art. I, and legislative authority is vested in a Tribal Council, elected from districts defined with reference to the Treaty Territory boundaries, *id.* art. VI, §§ 1, 3. Adjudicatory authority is held by the Judicial Department. *Id.* arts. XII, XIII. The Tribal District Court has territorial jurisdiction over "all

24

territory described as Indian Country within the meaning of Section 1151 of Title 18 of the United States Code over which the Chickasaw Nation has authority." Chickasaw Code tit. 5 § 5-201.3, *available at* https://code.chickasaw.net/Title-05.aspx (last visited January 28, 2019). And the Chickasaw Supreme Court has appellate jurisdiction "coextensive with the Chickasaw Nation." *Id.* Amend. V, § 4.

It is clear the Chickasaw Nation continues to exercise sovereign authority over its treaty-guaranteed Reservation lands to this day. The Nation provides governmental services within its Treaty boundaries that benefit both Indians and non-Indians. It maintains a police department that protects public safety, *Lighthorse Police*, Chickasaw Nation, https://www.chickasaw.net/Our-Nation/_Government/Lighthorse-Police.aspx (last visited January 28, 2019), and operates a hospital and health centers. *Chickasaw Nation Medical Center*, Chickasaw Nation, https://www.chickasaw.net/Our-Nation/Locations/Chickasaw-Nation-Medical-Center.aspx (last visited January 28, 2019). The Nation also provides various educational services, including childcare and early childhood programs, *Chickasaw Nation Early Childhood and Head Start Program*, Chickasaw Nation, https://www.chickasaw.net/Services/Chickasaw-Nation-Early-Childhood-and-Head-Start-Program.aspx (last visited January 28, 2019); family support services, *Chokka Chaffa' (One Family),* Chickasaw Nation, https://www.chickasaw.net/Services/Chokka-Chaffa%EA%9E%8C-(One-Family).aspx (last visited January 28, 2019); Adult Education, High School Equivalency certification, *Adult Learning Program*, Chickasaw Nation, https://www.chickasaw.net/Services/Adult-Learning-Program.aspx(last visited January 28, 2019);

vocational rehabilitation programs, *Vocational Rehabilitation*, Chickasaw Nation, https://www.chickasaw.net/Services/ Vocational-rehabilitation.aspx (last visited January 28, 2019); a Chickasaw Language Revitalization Program, https://www.chickasaw.net/Services/ Chickasaw-Language-revitalization-Program. aspx (last visited January 31, 2019); and an Adolescent Treatment Center that offers a "multi-level program" for adolescents and their families." https://www.chickasaw.net/Services/Aalhakoffichi-(A-Place-For-Healing).aspx (last visited January 31, 2019). The Nation also provides direct services to public schools that operate within its boundaries. https://www.chickasaw.net/Services/Direct-Service-to-Public-Schools.aspx (last visited January 31, 2019) Finally, the Nation provides services for substance abuse recovery, family preservation, family violence prevention, https://www.chickasaw.net/Services/Domestic-Violence-Services.aspx (last visited January 31, 2019); https://www.chickasaw.net/Services/Batterer's-Intervention-Services.aspx (last visited January 31, 2019); https://www.chickasaw.net/Services/Behavior-Health- Psychiatry.aspx (last visited January 31, 2019); https://www.chickasaw.net/Services/Behavioral-Health-Services.aspx (last visited January 31, 2019); and a group home for Indian children. *Chickasaw Children's Village*, Chickasaw Nation, https://www.chickasaw.net/Services/ Chickasaw-Children-s-Village.aspx (last visited January 28, 2019).

The Chickasaw Nation drives the economy in south-central Oklahoma; its Chickasaw Nation Industries is wholly owned by the Chickasaw Nation and serves as a holding company with over a dozen subsidiaries engaged in multiple lines of business. https://www.chickasaw.net/Our-Nation/Resources.aspx (last visited January 31, 2019).

26

The Nation also exercises sovereign authority under federal statutes. For example, the Chickasaw Nation maintains a sex offender registry under the Adam Walsh Child Protection and Safety Act, 34 U.S.C. § 20912(a). *See* Chickasaw Code tit. 17, ch. 2, art. A § 17-201.7, *available at* https://code.chickasaw.net/Title-17.aspx (last visited January 28, 2019). And the Nation receives Indian Child Welfare Act grants to operate Indian child and family service programs on or near their Indian country. 25 U.S.C. §§ 1931(a), 1903(10).

All of this, as with the other steps, demonstrate the reservation remains intact.

### H.      Conclusion.

In *Indian Country U.S.A., Inc.*, 829 F.2d at 976, the court recognized tribes retain sovereignty over both their members and their land, and tribal sovereignty is dependent on, and subordinate to, only the federal government. Once Congress creates a reservation, as it did in this case with the Chickasaw Nation in the 1830 and 1866 Treaties, only Congress can diminish that reservation. And Congress can only do so through legislative action. Congress has never extinguished nor diminished the Chickasaw Reservation since the 1866 Treaty.

The crimes in this case were committed on that Reservation, and therefore, in Indian Country. Only the federal court had jurisdiction to prosecute. Bosse's prosecution in state court was void *ab initio* for lack of jurisdiction. A writ should issue. At a minimum, the Court should order an evidentiary hearing.

<u>GROUND TWO</u>

**COUNSEL WERE INEFFECTIVE FOR FAILING TO ADEQUATELY INVESTIGATE BOSSE'S LIFE HISTORY, AND FAILING TO ADEQUATELY PREPARE WITNESSES, WHICH DEPRIVED HIM OF A FAIR AND RELIABLE SENTENCING. DIRECT-APPEAL AND POST-CONVICTION COUNSEL WERE ALSO INEFFECTIVE FOR FAILING TO RAISE THAT ISSUE. THESE FAILINGS ALL VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

**A.      Introduction.**

Bosse's life can best be described as filled with dysfunction. He was raised in a family where dysfunction and abuse were rampant. Then, after being arrested, he was assigned a legal team also beset by dysfunction. His lawyers failed him at every step of the process and left him with little chance of avoiding a death sentence in this emotionally-charged, sympathy-filled case. The Constitution demands better.

The penalty phase of a capital trial is "a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). It ensures capital sentencing is "humane and sensible to the uniqueness of the individual." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). Bosse's penalty phase fell below these constitutional guarantees due to trial counsel's failures.

The United States Supreme Court has time and again dictated relief for defendants who have fallen prey to ineffective assistance of counsel (IAC). In *Strickland v. Washington*, 466 U.S. 668 (1984), the Court made clear that when counsel perform deficiently, resulting in prejudice to their clients, judicial relief is necessary. Despite the fact Bosse's case was a classic second-stage case, insofar as the evidence of guilt in the first stage was overwhelming, trial counsel failed to adequately investigate, present, and marshal compelling

mitigating evidence, leading to a deficient second-stage presentation, which greatly prejudiced Bosse. *See* Att. 6, ¶ 6 (Affidavit of Joe Robertson) ("There is no logical reason why Bosse's case should have been treated as a first-stage case. The energy and focus in that case should have been on preparing the best second-stage case possible").

Although reviewing courts apply a presumption of reasonableness to trial counsel's actions, *see Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000), closer scrutiny applies to performance during the penalty phase of a capital case. *See Littlejohn v. Trammell*, 704 F.3d 817, 859 (10th Cir. 2013). Courts are "compelled to insure the sentencing jury makes an individual decision while equipped with the 'fullest information possible concerning the defendant's life and characteristics,' and must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence." *Mayes*, 210 F.3d at 1288 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). Here, the jury did not have the "fullest information possible" concerning Bosse's life. In fact, the information the jury had was not only incomplete, it was inaccurate.

Even a defendant who has committed a brutal and horrific crime can be prejudiced by ineffective counsel. *See Williams v. Taylor,* 529 U.S. 362, 368 (2000) (finding prejudice even where petitioner "brutally assaulted an elderly woman"); *Rompilla v. Beard*, 545 U.S. 374, 397 (2005) (Kennedy, J., dissenting) (characterizing crime as "brutal" where victim was stabbed sixteen times, beaten with a blunt object, gashed in the face with bottle shards, and set on fire); *Wiggins v. Smith*, 539 U.S. 510, 553 n.4 (2007) (Scalia, J., dissenting) (characterizing crime as "bizarre" where elderly victim was found drowned in her bathtub,

missing her underwear, and sprayed with insecticide). While the crimes for which Bosse was convicted were brutal, the evidence presented here is quantitatively and qualitatively different than the mitigation case presented at trial. Bosse was prejudiced by that difference.

Because Oklahoma law requires a unanimous jury to impose the death penalty, *see* Okla. Stat. tit. 21, § 701.11; *Castro v. Oklahoma*, 71 F.3d 1502, 1516 (10th Cir. 1995), Bosse need only demonstrate a reasonable probability at least one juror would have voted for a sentence less than death had the information discovered by subsequent counsel been presented at trial. *See Wiggins*, 539 U.S. at 537. Here, such reasonable probability exists.

## B.    This Court Should Reach the Merits of This Claim.

With the permission of this Court, Doc. 17, undersigned counsel filed a Second APCR in OCCA on February 20, 2019 to exhaust this claim. Although Second APCRs are typically defaulted by OCCA, for the reasons that follow, this one should not be. Even if OCCA were to default the claim, however, it would still be up to Respondent to plead and establish a procedural bar in this Court.[9] In anticipation of Respondent's arguments, should default occur, Bosse sets forth the following preliminary explanation as to why procedural bar would not be appropriate, while reserving the right to brief this issue further in the event

---

[9]"There is no doubt that 'state-court procedural default . . . is an affirmative defense,' and that the state is 'obligated to raise procedural default as a defense or lose the right to assert the defense thereafter.'" *Hooks v. Ward*, 184 F.3d 1206, 1216 (10th Cir. 1999) (quoting *Gray v. Netherland*, 518 U.S. 152, 165-66 (1996)). Only after "the state pleads the affirmative defense of an independent and adequate state procedural bar, [does] the burden to place that defense in issue shift[] to the petitioner." *Hooks*, 184 F.3d at 1217. In the end, "the state bears the burden of proving the adequacy of a state procedural bar in order to preclude federal habeas review." *Id.*

Respondent seeks to bar review of this claim.

For purposes of establishing the claim is not barred, Bosse focuses on two related actions that would establish cause and prejudice for any default because those actions undermined his ability to bring this claim sooner through no fault of his own. First, immediately prior to trial, counsel presented Bosse with a form to sign in which Bosse ostensibly is asked to choose his own trial strategy. Att. 7.[10] Second, at the close of the second-stage evidence, Gary Henry engaged Bosse in an *ex parte* on-the-record colloquy in which he systematically, through a series of mostly leading questions, got Bosse to agree that counsel had done everything required of them and that Bosse was fully satisfied with all of the actions taken and decisions made by counsel during the course of their representation. (Tr. XII 154-60). These actions by Henry were highly improper, unethical, and fell well below the standard of care expected of capital-defense counsel in Oklahoma. They served no legitimate purpose other than to attempt to shield counsel from potential exposure to IAC claims. *See* Att. 8 (Affidavit of David Autry); Att. 6,¶ 8 ("This is not a colloquy a competent, effective capital-defense attorney would ever do with a client. . . . Had I known about this practice sooner, I would have immediately put a stop to it").

Despite being clearly improper, Henry's actions had their desired effect. Bosse's direct-appeal counsel have acknowledged the only reason they abandoned their plan to

---

[10]That counsel had not yet devised a trial strategy a mere 19 days before trial (when they had been representing Bosse for over 2 years) is an important aspect of their ineffective assistance. It is addressed here only with regard to the effect it had on effectively foreclosing Bosse's opportunity to pursue this claim earlier.

pursue an IAC claim was because of those actions, not because of the merits of the claim. Att. 9, ¶ 4 (Affidavit of Jamie Pybas);   Att. 10, ¶ 4 (Affidavit of Michael Morehead). Moreover, both direct-appeal counsel note that Henry "admitted he took these measures because he had previously been accused of IAC and did not want that to happen again." Att. 9, ¶ 3; Att. 10, ¶ 3.

The United States Supreme Court has recognized that an attorney's unprofessional conduct can sometimes be an "extraordinary circumstance" that justifies excusing an otherwise applicable waiver rule. *See Holland v. Florida*, 560 U.S. 631, 649 (2010). As stated by Justice Alito: "Common sense dictates that a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of that word." *Id.* at 659 (Alito J., concurring). *See also Maples v. Thomas*, 565 U.S. 266 (2012) (finding cause for default where counsel abandoned petitioner).

Henry was "not operating as [Bosse's] agent in any meaningful sense of the word" when, in an effort to protect himself against an IAC claim, he led Bosse through a colloquy that subsequent counsel felt precluded them from bringing the claim. Henry effectively abandoned Bosse with regard to Bosse's ability to bring claims otherwise available to him. *See* Att. 8, ¶ 4 ("Counsel's most important professional obligation, especially when a client's life is on the line, is to protect the client's rights and to make as complete a record as possible to allow the client to pursue all available avenues of relief should the trial not end successfully. These lawyers did exactly the opposite of that, and at least on this issue, were actively working against their client's interests"); Att. 6, ¶ 8 ("In my opinion, this colloquy

32

created a conflict of interests between Henry and Bosse and forced Bosse to reveal information that would otherwise be protected by the attorney-client privilege. It appears from this colloquy that Henry was concerned with protecting himself and, to do so, pressured a client into pursuing statements against the client's best interests").[11]

Had Henry not actively worked against Bosse's interests in order to protect his own, direct-appeal counsel would have pursued an IAC claim. But because of Henry's unprofessional abandonment and his undermining of Bosse's interests, they felt prohibited from raising such a claim, and therefore, did not even investigate it. Original post-conviction counsel also failed Bosse by failing to raise this issue.

Undersigned counsel just recently uncovered the full extent of the evidence necessary to bring this claim, and the claim was brought in a timely fashion. Should OCCA default the claim, this Court should find cause and prejudice to overcome that default.

**C.    Factual Background for Claim.**

1.    <u>Family Background.</u>

Shaun Bosse was born into a family full of dysfunction, sexual deviancy, and abuse that went back generations. His parents, Jack and Verna, had son, Matt, eight years before Shaun. Att. 12, ¶ 3 (Affidavit of Verna Bosse). Jack was not home often, but when he was, he subjected Verna and Matt to various types of abuse, including yelling, physical and

---

[11]Henry's co-counsel, Bobby Lewis, confirms this: "Mr. Henry had a preoccupation with being found ineffective and was determined to do whatever he could to avoid such a finding in the future." Att. 11, ¶ 14 (Affidavit of Bobby Lewis).

emotional violence, torturing and killing family pets, and withholding food. *Id.*, ¶¶ 5-9. Although Verna worked a full-time job, Jack would take her paycheck, give her a minimal allowance and control what food she could buy. She was often forced to rely on her parents for support to buy food and clothes for her children. Id., ¶ 7. Verna finally worked up the courage to leave Jack when Shaun was three months old and Matt was eight years old.

Unfortunately, leaving Jack did not end the dysfunction – not even close. Verna and the boys lived in a rented home directly behind Verna's parents, Ruby and Vernon Darnell, in Blanchard, Oklahoma. Verna fell into a deep depression; all she did was work and sleep. She did not have the energy or the will to take care of the home or the boys. Att.13, ¶ 2 (Declaration of Jimmy Darnell); Att. 14, ¶ 18 (Affidavit of Valerie Barnett). The boys were forced to live in filth, with so many dirty dishes and food left in the kitchen that it filled with maggots and roaches. The house smelled so bad that other family members would not go there or let their children go there. Att, 13, ¶ 3; Att. 14, ¶ 19. The boys wore dirty, smelly clothes to school. *Id.*, ¶ 20. When it got too bad, Verna's mother, Ruby, and younger brother, Jimmy, would go over and clean the house. Att, 13, ¶ 3. Shaun's respite was to walk to his grandparent's house.

Unfortunately, Ruby and Vernon's home was no less dysfunctional. Ruby was a strong, outspoken woman who ran the family. And Vernon, a quiet man, was in reality a child molester and cross-dresser. Vernon had several police interactions for cross-dressing (which earned him a dishonorable discharge from the U.S. Army), indecent exposure and masturbating in public, and eventually improperly touching a young niece. Att. 12, ¶¶ 52-53.

For that improper touching, Vernon was placed on probation and had to move out of the house for a period because he was prohibited from having contact with children. *Id.*, ¶ 57; Att. 15, ¶ 25 (Affidavit of Shaun Bosse). No matter where Shaun turned, deviancy and dysfunction were all around.

Shaun's brother, Matt, was an angry child, who grew into an angry and violent adult. He also had unlimited access to Shaun since Shaun's birth. Shaun can remember being abused by Matt – eight years his senior – beginning when he was about five years old. Att. 15, ¶ 6. From as early as Shaun can remember, Matt would tie Shaun's hands behind his back and bind his feet together so he could neither fight back nor run away. *Id.* Then Matt would beat him. Because Matt was in karate and quickly worked his way up to being a black belt, these were not ordinary beatings. And like their dad, Matt was also cruel to animals. Shaun remembers Matt hog-tying their husky, and leaving the dog that way for hours. When he was about five, Shaun once tried to help the dog, so Matt hog-tied Shaun the same way and left him there with the dog. *Id.*, ¶ 31. Given Verna's constant depression, she was not there to protect Shaun from Matt's abuse.

Shaun spent much of his childhood in fear of somehow triggering Matt with the smallest movements and sounds. He could not predict what would set Matt off; it might be chewing too loudly, or making a chair creak, or maybe rolling around too much when he slept. *Id.*, ¶ 7. But whatever the cause, once Matt was triggered, Shaun paid the price. The two brothers shared a room. Shaun remembers Matt would often threaten to kill him during the night, pointing a .22 rifle at Shaun's bed and telling him if he made a sound, Matt would

shoot him. *Id.*, ¶ 9. Both Shaun and Verna remember numerous occasions when Shaun would come into her bedroom in the middle of the night begging to sleep with her. Att. 12, ¶ 21; Att. 15, ¶ 10. Matt also would pull Shaun's pants down, sometimes at home in front of friends, and sometimes in public. Att. 12, ¶ 21; Att. 15, ¶ 10.

Yet another source of trauma and unpredictability in Shaun's life was his relationship with his father, Jack. The boys were supposed to spend every other weekend with him. Sometimes Jack just wouldn't show up. When they did stay with Jack, they were exposed to his unconventional lifestyle; Jack was married to a woman, but also had a male lover, and the three of them lived together as a family. Att. 15, ¶¶ 18-19. Shaun remembers frequent disappointment with his father. He also remembers at least one occasion of waking up in the middle of the night with Jack's hand down Shaun's pants, rubbing his buttocks. *Id.*, ¶ 20.

When Shaun was around eight, Matt finally left the house and joined the Marines. Matt continued on his path of sadistic abuse with a series of wives and step-children. Att. 16 (Declaration of Heather Steakley); Att. 17 (Declaration of Melinda Harvey). Eventually, Matt spent time in prison for violently raping his first wife. Att. 16, ¶¶ 15-16. Eventually, Shaun started playing baseball, and finally found something he was good at. And it got his mother and grandparents out of the house to come watch his games. Although he enjoyed playing baseball, and really excelled at it, he also developed a sense of obligation to keep playing because his family expected him to. Att. 15, ¶ 23.

After getting out of prison, Matt moved back to Blanchard, and Shaun again became the target of his violence. But it wasn't just Shaun; the entire family lived in fear of Matt. Att.

12, ¶ 28.[12] Matt would not hesitate to throw objects or yell at anybody over the slightest things. On one occasion, he even threw his grandmother, Ruby, to the floor. *Id.* at ¶ 38.

Not surprisingly, while in high school, Shaun started using drugs and alcohol as a coping mechanism. Att. 15, ¶ 23. He found it lessened his anxiety and helped him feel more comfortable interacting with other people.

2.   <u>Background of Legal Representation</u>.

Unfortunately, Shaun's family was not the only dysfunctional group he had to deal with. His legal team from OIDS turned out to be just as dysfunctional.

The only constant in Bosse's representation was lead counsel Gary Henry. Until shortly before trial, the legal team consisted of Henry, Vicki Floyd (second chair), and Dale Anderson (investigator). With only months to go before the October 1, 2012 start of the trial, OIDS reorganized the division on February 2, 2012, terminating Floyd and transferring Anderson out of the division. Chaos ensued, much to Bosse's detriment. Att. 11, ¶ 2. After February 2, 2012, only three attorneys remained in the entire division, Henry (who was now Division Chief), Mary Bruehl (who everybody in the division and upper management believed was not capable of performing the duties required of capital-defense counsel[13]

---

[12]Matt has beaten, threatened to kill, and otherwise tormented Shaun, Verna, and countless others in the family. All remain in fear of Matt to this day. *See, e.g.,* Att. 15, ¶ 12; Att. 14, ¶¶ 26-28; Att. 12, ¶ 41; Att. 18, ¶ 13 (Expert Affidavit of Dr. Fabian). Matt's ex-wives, Heather and Melinda, are so scared of Matt, they do not even want him to know what state they live in.

[13]According to OIDS' Executive Director, Joe Robertson: "I had been told several times that
(continued...)

because of her severe anxiety about appearing in court),[14] and Bobby Lewis (who was new to the division and had never tried a capital case). All three were assigned to every case.

Prior to the February, 2012 shake-up, Floyd and Anderson recognized this as a "second-stage case," meaning all efforts should be devoted to developing mitigation for use in the second stage rather than trying to challenge guilt in the first stage. Att. 20, ¶ 3 (Affidavit of Vicki Floyd); Att. 21, ¶ 3 (Affidavit of Dale Anderson). Ms. Floyd and Mr. Anderson were onto something: This was a second-stage case and should have been treated as such.[15] As noted by Anderson, an investigator with OIDS for twenty years:

> In my opinion, Shaun's case was not a first-stage case and I focused my investigation on second stage. During the time I worked on his case, I saw lots of red flags for abuse, possibly sexual, and I believed most of Shaun's problems could have stemmed from his older brother Matthew Bosse. Had I stayed on Shaun's case, I would have continued to thoroughly investigate those areas to develop mitigation evidence.

*Id.* Despite Anderson's informed view of the case, Henry noticed that Bosse had bad teeth and immediately jumped to the conclusion that it was "meth mouth." *Id.* at ¶ 4. In reality,

---

[13](...continued)
[Ms. Bruehl] was not good in the courtroom and would become extremely nervous to the point of freezing up." Att. 6, ¶ 4. Indeed, Ms. Bruehl has acknowledged that right before trial started, she had to go to the emergency room due to symptoms of severe anxiety. Att. 19, ¶ 13 (Affidavit of Mary Bruehl). Bobby Lewis reports the same thing. Att. 11, ¶ 16.

[14]In fact, almost immediately after Bosse's trial, Ms. Bruehl was fired from OIDS "due to her inability to perform as a capital trial lawyer." Att. 6 ¶ 7.

[15]Bobby Lewis recognized this as well: "Given the overwhelming evidence connecting Shaun to the crime, more focus should have been on mitigation and preparing the mitigation experts. I know I did not focus on second stage." Att. 11, ¶ 13.

Bosse has genetically bad teeth, Att. 15, ¶ 29, and it was not "meth mouth." Nonetheless, that inaccurate conclusion was enough to cause Henry to ignore Anderson's plans for a more wide-ranging mitigation case and make methamphetamine use the centerpiece of his mitigation plans. Indeed, the defense team hired two experts to support Henry's erroneous conclusion of "meth mouth." They hired neuropharmacologist Jonathan Lipman and neuropsychologist Matthew John Fabian. In the end, however, they did not use either, opting instead for a mitigation case devoid of expert explanation.[16] Att. 9, ¶ 2; Att. 10, ¶ 2.

After the February 2012 shake-up, preparation for second stage stalled. For example, despite having evaluated Bosse in October, 2011 and January, 2012, Dr. Fabian heard nothing at all from the defense team until receiving a call from Henry in September, 2012 (less than a month before trial). Henry informed Fabian he needed a report, but Henry could not tell him what that report should focus on because the team had not yet decided what trial theory they were planning to pursue. Att. 22, ¶ 10 (Fact Affidavit of Dr. Fabian). Even at this late date, Fabian was not informed that Vicki Floyd, the only member of the team with whom he had previously interacted, was no longer employed at OIDS. He did not learn until immediately before his anticipated testimony that the lawyer now responsible for his

---

[16] As set out in Att. 18 and discussed *infra*, when retained by the trial team, Dr. Fabian was asked to evaluate Bosse and draw conclusions about the effects heavy meth use had on his neuropsychological picture and cognitive functioning. He was not provided detailed information about the complex trauma suffered by Bosse, nor was he asked to offer any opinions about how such trauma impacted Bosse's neuropsychological development. This limitation, dictated by trial counsel, resulted in him drawing incomplete and inaccurate conclusions.

testimony would be Ms. Bruehl. *Id.* at ¶ 11. Ultimately, Dr. Fabian did not testify (despite having left a conference early to fly to Oklahoma) because he would not agree to Henry's demand that he not testify to a certain issue and that he lie about not remembering the same if asked about it on cross-examination. *Id.* at ¶ 12.

Unfortunately, Dr. Fabian's experience was not unique among defense witnesses. The lawyers did not prepare any witnesses. The only time the lawyers met the witnesses was while they were being escorted into the courtroom for their testimony. According to Lewis, "None of the second-stage witnesses I dealt with were prepared prior to their testimony. The only time I met with them was immediately before they took the stand, and I did not prepare them beyond what was discussed in the hall prior to them testifying." Att. 11, ¶ 13. The witnesses have confirmed this as well; none of them knew what they would be asked or how their testimony was applicable to the case. Att. 12, ¶ 65; Att. 13, ¶ 10; Att. 14, ¶ 33; Att. 23, ¶ 19 (Affidavit of Joey Darnell). One particularly egregious example comes from Chad Mitchell: "The first time I met with defense counsel to discuss my testimony was right before I took the witness stand. *They made me think I was their star witness. I had no idea what they were going to ask me*." Att. 24, ¶ 10 (Affidavit of Chad Mitchell) (emphasis added).

The team's dysfunction was on full display in their second-stage presentation. In line with Henry's erroneous belief Bosse had "meth mouth," the team set out to establish Shaun was addicted to meth. They called no experts; rather, they called a parade of family members and others who knew Shaun in different facets of his life. Eleven witnesses were asked about

Shaun's use of drugs,[17] but the only one to testify he ever saw Shaun use drugs was Chad Mitchell. Had counsel actually done what is required of them and talked to their witnesses with a view toward developing an accurate theory, they would have known those witnesses would not support Henry's "meth mouth" theory. The only other evidence the lawyers presented, through many of the same witnesses, was that Shaun was a good, quiet person who was very gentle with kids, and that nobody expected him to commit a crime like this.

The dysfunction of the defense team was not limited to their lack of investigation and preparation; they exhibited dysfunction on a personal level as well. First, their personal dislike of each other and inability to work together were so obvious even the client recognized it: "As far as my attorneys, they did not get along with each other. There was a lot of tension between Gary Henry and Mary Bruehl. They would have disagreements about witnesses or how to do the trial right in front of me. With all of this going on, I did not trust my attorneys, but they were the only attorneys I had." Att. 15, ¶ 3. *See also* Att. 19, ¶ 6.

The entire Norman Capital Trial Division of OIDS "was either in chaos or on the brink of it." Att. 11, ¶ 2. According to Lewis, the division was not concerned about providing effective representation; they simply wanted to make sure they did enough superficially to avoid IAC claims. *Id.* at ¶ 4 ("It was like there was a checklist for each case and they were just checking the boxes to ensure they were not found ineffective later, without giving much thought to what was substantively going on"). As for Mary Bruehl, she clearly

---

[17]They were: Jeffrey Hirschler, Ricky Darnell, Jason Goines, Tony Hancock, Daryl Mitchell, Chad Mitchell, Jack Bosse, Joey Darnell, Jimmy Darnell, Glen Castle, and Matt Bosse.

was not up to the challenge of handling the case either:

> I recall that Mary had what seemed like anxiety trouble leading up to and during Shaun's trial. Although my memory is not as good as it was, I believe Mary was supposed to do the direct-examination of Shaun's father, Jack Bosse, but at the last minute, she said she couldn't do it. So, I did. I had never met Jack Bosse before and had to present him cold. As you can tell from reading the record, Jack was not an easy witness.

*Id.* at ¶ 16. *See also* att. 19, ¶ 13 (acknowledging Bruehl was not ready for trial and went to the hospital for anxiety right before it started).

Clearly, the team did not work together to provide an adequate defense. Rather, they squabbled in front of him, failed to investigate and prepare witnesses, and paraded in a series of unprepared witnesses who undermined rather than advanced the "meth mouth" theory.

Direct-appeal counsel also failed Bosse by not pursuing an IAC claim based on the egregious mishandling of the trial because they incorrectly assumed Henry's self-serving attempts at insulating himself from such a claim precluded them from bringing it. *See* Section B, *supra*. As for original post-conviction counsel, the paltry APCR speaks for itself. Counsel failed to raise any claims cognizable on post-conviction. *See* Att. 1. These failures are perhaps best explained by the way counsel explained her role to Bosse during the only meeting they had: "After I was convicted and on death row, an attorney named Wyndi came to see me once about my post-conviction appeal. *She told me she was working alongside my direct-appeal lawyers*. I did not see her again." Att. 15, ¶ 5 (emphasis added). Clearly, post-conviction counsel saw herself as an extension of the direct-appeal team and did not fulfill her responsibility to provide Bosse with an independent post-conviction investigation.

### D. At Every Stage Counsel Were Ineffective for Failing to Adequately Investigate Bosse's Full Background and Life History or Raise the Issue on Appeal.

Before the February, 2012 purge of the division, it appeared they were on the right track. Vicki Floyd recognized the case as a classic second-stage case, Att. 20, ¶ 3, and hired two experts (although at least one of the two - neuropharmacologist Jonathan Lipman - was unnecessary due to the inaccuracy of Henry's "meth mouth" theory). And investigator Dale Anderson, who also knew this was not a first-stage case, recognized the numerous red flags pointing towards severe trauma and abuse suffered by Bosse. Att. 21, ¶ 3. But once Floyd and Anderson were removed, all meaningful second-stage investigation and preparation ceased. Given this was obviously a second-stage case, counsel's failure to adequately prepare for that "constitutionally indispensable part of the process of inflicting the penalty of death," *Woodson,* 428 U.S. at 304, was inexcusable. Failing to adequately investigate and prepare for the most important part of the trial certainly prejudiced Bosse's right to a fair and accurate sentencing, violating his Sixth, Eighth, and Fourteenth Amendment rights.

### 1. Counsel's Failures Began Immediately and Continued Throughout the Entire Case.

From the outset, experienced capital counsel should have known, given the publicity and emotion surrounding this case, the State would likely seek death. The professional standards to guide capital counsel are set out in the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, ("ABA Guidelines") *reprinted in* 31 Hofstra L. Rev. 913 (rev. ed. 2003)*. See Wiggins,* 539 U.S. at 524; *Strickland*, 466 U.S.

at 688; *Williams*, 529 U.S. at 396; *Rompilla*, 545 U.S. at 374; *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007). Under these Guidelines, "the mitigation investigation should begin as quickly as possible . . . ." *ABA Guidelines*, Guideline 10.7 comment., 31 Hofstra L. Rev. at 1023. The prompt retention of a mitigation expert is critical in conducting an adequate mitigation investigation, which "should comprise efforts to uncover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524.

Despite these clear requirements, counsel did none of them. And this failing went beyond this case; it was the culture of the Norman Capital Trial Division to not treat capital cases with the care they require: "Problems tended to arise when a case needed to be tried because, as a division, we were disorganized and flew by the seat of our pants. . . . [W]e did not have well-crafted strategies for the most part." Att. 11, ¶ 8. The division seemed more concerned with protecting against IAC claims than in actually providing effective representation.[18] *Id.* at ¶ 4. The Executive Director knew about these failings, but did nothing:

> As Executive Director, one concern I had about the Norman Capital Trial Division was that it did not have success in death penalty cases, and I felt like it was due to a failure to properly prepare mitigation cases. Although Gary Henry was promoted to be the new Division Chief, I had reservations about doing so because I was not sure he had the kind of grasp of mitigation needed in capital cases.

---

[18]Lewis's "checklist" observation is borne out in this case. Henry requested funds to hire a mitigation expert. And that request was approved. Att. 25 (Professional Services Justification Statement and Approval Notification). Of course, even this act of box-checking was not done until August 4, 2011, over a year after Henry was appointed to represent Bosse. *Id.* But having checked the required box, Henry then never actually hired a mitigation expert.

Att. 6, ¶ 3.

Despite knowing their obligations in death penalty cases, Bosse's attorneys failed to conduct a satisfactory investigation. They talked to witnesses, but because Henry had already settled on his inaccurate "meth mouth" theory, the investigation was stunted and not designed to discover accurate information. As a result, counsel failed to uncover the extent of the trauma and dysfunction in Bosse's life. This caused them to fail to provide accurate information to Dr. Fabian, which in turn caused Fabian to fail to include that trauma history in his evaluation and conclusions. Because Henry locked into his "meth mouth" theory before the case had been investigated, and failed to hire the mitigation expert he was approved to hire, the truth about Bosse's life was not discovered. The defense was left with their inaccurate and unpersuasive nice-guy meth-addict theory.

This case is quite similar to *Porter v. McCollum*, 558 U.S. 30 (2009), in which the Supreme Court concluded counsel provided ineffective assistance by failing to conduct an adequate mitigation investigation. In *Porter*, "[t]he sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." *Id.* at 32. Counsel's approach here was essentially the same as in *Porter*: They attempted to put on evidence of Bosse's drug use and talked about how quiet and gentle he was. The problem here, as it was in *Porter*, is that counsel failed to conduct an adequate mitigation investigation that would have allowed them to make a reasonable tactical decision as to what the best mitigation strategy would be.

The mere fact counsel's investigation included interviewing several members of

Bosse's family does not save it from being unreasonable. Even an investigation that appears thorough on the surface can be unreasonable if, under the circumstances of the case, it failed to follow logical leads or uncover meaningful mitigation evidence. The Supreme Court found as much in *Rompilla*:

> This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase. None of the sources proved particularly helpful.
>
> The lawyers also spoke with five members of Rompilla's family. . . and counsel testified that they developed a good relationship with the family.

*Rompilla*, 545 U.S. at 381. The Court even acknowledged that "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* at 383. Nonetheless, the Court found Rompilla's lawyers were ineffective because they failed to follow logical leads. *Id.* at 383-84.

Counsel were similarly ineffective here. Although counsel's investigation might appear superficially reasonable, it was not because they ignored obvious signs of Bosse's traumatic upbringing. Dale Anderson, recognized these red flags of trauma and abuse early and knew they were the building blocks for a good mitigation theory. Att. 21, ¶ 3. Despite Anderson's accurate perception of the real mitigation theory, that theory was never investigated or pursued.[19]

---

[19]Once current counsel followed the leads to find the true extent of Bosse's trauma and gave the information to Dr. Fabian, Fabian conducted an accurate and more robust evaluation.

Nor should counsel be deemed effective for having hired experts. First, hiring experts was clearly just another box Henry needed to check off. Counsel's obligation is not satisfied simply by hiring an expert; counsel must also work with the expert to insure the expert fits into the theory. That did not happen in this case, or apparently in the Norman Capital Trial Division in general: "Experts would be hired, but no one seemed to be paying any attention to what was being sent to the experts to review. There was no clear system in place for keeping track of what the experts even had in their possession. On more than one occasion this led to confusion in our office." Att.11, ¶ 4. Fabian confirms the lawyers did not work with him in this case either:

- "My last evaluation of Bosse was on 01/06/2012. I did not hear from anybody on the trial team for about eight months, until Henry called me a few weeks before Bosse's trial commenced. He told me he might need me to testify at trial the following month [and] I would need to potentially prepare two forensic mental health reports . . . . [because] he had not decided what defense theory they were planning on pursuing." Att. 22, ¶ 10.

- "I eventually learned Bosse's second-chair attorney, Vicki Floyd, with whom I had the most contact, had been terminated . . . sometime around February of 2012. I was notified of this when I met with Mary Bruehl the day before my scheduled testimony. . . . I had very little communication from any of [Bosse's trial defense team]." *Id.* at ¶ 11.

- "During the mitigation phase, I was attending a . . . conference in St. Louis. I was told to be on call in case the defense wanted to call me . . . Ms. Bruehl called while I was in St. Louis and told me they wanted me to testify that week. I left the conference and flew . . . to Oklahoma City. I met Ms. Bruehl at a restaurant to prepare . . . at approximately 9:00 p.m. the evening before my anticipated testimony. I had serious concerns about the limited trial preparation in this case." *Id.* at ¶ 12.

Fabian never testified. But counsel's decision not to call him was not "tactical;"

rather, the only reason Henry refused to have him testify was because Fabian would not agree to Henry's demand that he commit perjury:

> [Gary] told me the only way he would allow me to testify would be if I agreed to not mention certain issues in my testimony. I asked Mr. Henry what would happen if I was asked specific questions on cross-examination. He told me I would have to "forget" about what I knew/believed. He was very clear that if I was not willing to "forget" about certain things . . . , he would not call me as a witness. I understood this to mean he wanted me to be dishonest . . . . I told him I was not comfortable with the situation, and he replied that he would not be calling me as a witness.  *Id.* at ¶ 12.

Despite the obvious failures of counsel's unreasonable mitigation investigation, direct-appeal counsel never pursued an IAC claim on that basis. They conducted no extra-record investigation and filed no 3.11 motion. As discussed in Section B *supra*, the only reason direct-appeal counsel did not pursue an IAC claim was because Henry unprofessionally and unethically manipulated the record in an effort to shield himself from such a claim. Appellate counsel wrongly believed Henry's actions "effectively insulated himself from any IAC claim." Att. 9, ¶ 4; Att. 10, ¶ 4. As further discussed in Section B, appellate counsel were incorrect in that conclusion and their decision to abandon a meritorious claim on that basis was unreasonable. In fact, appellate counsel should have recognized that Henry's actions in themselves amounted to IAC. Att. 8, ¶ 5; Att. 6, ¶ 8. Appellate counsel performed deficiently in failing to recognize these issues and pursue them on appeal. Bosse was prejudiced because this claim had a reasonable probability of success. *Evitts v. Lucey*, 469 U.S. 387 (1985).

2. <u>Bosse Was Prejudiced by Counsel's Inadequate Investigation</u>.

All of counsel's failures prejudiced Bosse, depriving him of a fair and reliable

sentencing. Had counsel conducted a reasonable mitigation investigation that allowed them to pursue a more persuasive mitigation theory, the jury would have heard about Bosse's history of complex trauma and, would have learned how that history affected Shaun's development and shaped his future behaviors.

The picture counsel painted of Shaun's life was woefully inadequate. A reasonable investigation would have provided details that could have changed the opinion of at least one juror. For example, counsel missed a wealth of information about how Shaun's older brother, Matt, contributed to his trauma. Witnesses were available who would have educated the jury about Matt's cruel and violent tendencies. One such person was Matt's first wife, Heather Steakley. Att. 16. She was never contacted by Bosse's defense team, but would have been willing to testify. *Id.* at ¶ 30. If she had testified, the jury would have learned Matt had cut her neck and shoulder with a knife, *Id.* at ¶ 5; hit her in the stomach while she was pregnant with his son and told her he hoped she lost the baby, *Id.* at ¶ 6; would "beat the hell out of" her and then demand sex, *Id.* at ¶ 8; "wanted to insert a baseball bat in [her] vagina," *Id.* at ¶ 9; "water-boarded" her in the bathtub and then put a (fortunately empty) gun in her mouth and pulled the trigger, *Id.* at ¶ 15; and raped her (for which he went to prison). *Id.* at ¶¶ 15-16. They also would have heard that Vernon (Shaun's grandfather) had molested Heather's son, Kyle. *Id.* at ¶ 21. Because of counsel's failure to investigate, however, the jury never heard any of this evidence about the true nature of Shaun's environment.

The jury also would have heard from Matt's second wife, Melinda Harvey, who also was never contacted by Shaun's team. She would have been willing to testify. Att. 17, ¶ 52.

Had Melinda testified, the jury would have heard more about how cruel and sadistic Matt was, and how truly dysfunctional the family was. The jury would have learned Matt repeatedly threatened to kill Melinda and her daughter, Marissa, and dump their bodies in an oil field, *Id.* at ¶ 7; Matt is a very violent and angry person who could be set off by the slightest movement or comment, *Id.* at ¶ 9; Matt stabbed her in the hip while she was nursing their infant son, Zack, *Id.* at ¶ 11; Matt put a (thankfully unloaded) shotgun in her mouth and pulled the trigger, (*Id.* at ¶ 12; Matt had forced sex with her and raped her with objects, *Id.* at ¶¶ 14-15; Matt physically abused her daughter, Marissa, sometimes by holding her by her ankles and bashing her head against the floor, *Id.* at ¶¶ 17-22; and Matt killed every dog they ever owned. *Id.* at ¶ 28.[20] The jury also would have learned that in addition to molesting Heather's son, Kyle, Vernon also molested Melinda's daughter, Marissa. *Id.* at ¶ 41.

Now, with a detailed and accurate picture of Bosse's life, Dr. Fabian was able to conduct a more thorough evaluation, and reach more accurate conclusions than allowed at trial. These accurate conclusions would have been persuasive to the jury and helped them understand the forces that shaped Shaun's life. Att. 18. Dr. Fabian affirms that at the time of trial, Bosse's counsel told him the primary issue was Shaun's drug use, and he should focus his evaluation on that issue. *Id.* at ¶ 2. He goes on to note, now that he has been provided more complete and accurate information by current counsel, he realizes the original information was inaccurate and incomplete, which led him to inaccurate conclusions. *Id.* ¶

---

[20]This testimony from Matt's ex-wives would have corroborated information about the same types of torture and abuse Matt inflicted upon Shaun as he was growing up.

3. Dr. Fabian now concludes (as would have been obvious at the time of trial if counsel had conducted a reasonable investigation): "The trauma I now know Shaun experienced as a child provides a more complete and accurate narrative that explains his cognitive deficits, his vulnerability to drug use, and his behavior during the time frame this crime occurred." *Id.*

With accurate and complete information, Dr. Fabian is now able to explain how Shaun's complex trauma would lead him to act impulsively, and cause him to have "exaggerated fear states, hyper arousal, and act[] out in excess to the perceived threat." *Id.* at ¶ 18. He can also explain how his testing demonstrates damage to the hippocampus region of Shaun's brain, which would cause him to "[in]correctly interpret[] stressful and emotional environmental contexts." *Id.* at ¶ 19. Similarly, Dr. Fabian can now explain, due to the effect early complex trauma has on the amygdala and damage demonstrated to Shaun's prefrontal cortex, "individuals, such as Shaun, may exhibit fear, anxiety, and extreme distress even when faced with non-threatening stimuli due to exaggerated and misperceived stressors." *Id.* at ¶ 20.

In short, Dr. Fabian acknowledges that his initial conclusions were inaccurate because counsel presented him with inaccurate and incomplete information. Now armed with accurate and complete information, Dr. Fabian is able to persuasively explain how Shaun's history and upbringing, and the effects those things had on his developing brain, explain the crimes for which he has been convicted and puts them in a totally different light. Based on the lack of explanation at trial, the jury was left no theory other than the one offered by the prosecution – that Bosse intentionally and with premeditation killed Katrina and her children

51

after stealing their property. With Dr. Fabian's thorough evaluation after receiving complete information about Shaun's background, it becomes at least equally plausible Shaun overreacted to what he inaccurately perceived as a threat, after Katrina confronted him about the stolen property. There is a reasonable probability such information would have convinced at least one juror a sentence less than death was appropriate in this case.

Evidence of childhood trauma and abuse frequently has been recognized as important mitigating evidence. *See, e.g., Sears v. Upton*, 561 U.S. 945, 948 (2010) (recognizing mitigating value of emotional abuse by parents, who fought physically and got divorced, and sexual abuse by cousin); *Wiggins*, 539 U.S. at 516–17; *Williams*, 529 U.S. at 395; *see also, e.g., Hooks v. Workman*, 689 F.3d 1148, 1203 (10th Cir. 2012) (defendant's "premature birth, . . . abusive father, frequent moves, educational handicaps, and personal family tragedies" constituted "a life story worth telling"); *United States v. Barrett*, 797 F.3d 1207, 1229-30 (10th Cir. 2016) ("evidence of childhood abuse, neglect and instability can play a significant role in mitigation").

A reasonable investigation would have allowed counsel to tell a much more persuasive story about what led Shaun to being in court getting sentenced for a capital offense. But, because counsel engaged in an unreasonably stunted investigation, they were left with only the unpersuasive and unreasonably incomplete theory they presented.

This case is similar to what the Supreme Court said in *Porter*:

Unlike the evidence presented during Porter's penalty hearing, which left the jury knowing hardly anything about him other than the facts of his crimes, the new evidence described his abusive childhood, . . . the trauma he suffered . . .,

his long-term substance abuse, and his impaired mental health and mental capacity.

*Porter*, 558 U.S. at 33.

### E.   Conclusion.

[N]ot all defendants who commit horrific crimes are sentenced to death. Some are spared by juries. The Constitution guarantees that possibility: It requires that a sentencing jury be able to fully and fairly evaluate "the characteristics of the person who committed the crime." *Gregg v. Georgia*, 428 U.S. 153, 197 (1976). That guarantee is a bedrock principle on which our system of capital punishment depends, and it is a guarantee that must be honored . . . .

*Elmore v. Holbrook*, 137 S. Ct. 3, 11 (2016) (Sotomayor, J., dissenting). Such guarantees must be honored especially for defendants like Bosse, whose life has been marked by extensive mitigating circumstances that might convince a juror to choose life over death. Only after hearing such facts can jurors properly make the weighty decision whether such person is entitled to mercy.

Bosse did not receive effective assistance of counsel in the critical sentencing stage, on appeal or post-conviction. A writ should issue.

### GROUND THREE
**THE ADMISSION OF CUMULATIVE AND HIGHLY PREJUDICIAL PHOTOGRAPHS DURING THE GUILT AND PENALTY PHASES VIOLATED BOSSE'S RIGHTS TO DUE PROCESS AND A RELIABLE SENTENCING AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS.**

In violation of Bosse's rights to due process and a fair sentencing, the trial court admitted cumulative and gruesome photographs of Katrina and Christian Griffin and Chasity Hammer. The quantity and characteristics of the photographs admitted over defense objection crossed the line of what was relevant; instead, the photographs entered the territory of what

53

was unconstitutionally prejudicial to Bosse under the dictates of the Eighth and Fourteenth Amendments.[21]

### A.    The Photographs.

Prior to trial, defense counsel moved to prohibit the State's use of seventeen color photographs that were unduly prejudicial and cumulative, and deprived Bosse of a fair trial and sentencing. (OR 437-39; M.Tr. 10/17/12 9-37). The court overruled those objections and admitted the exhibits, consisting of gruesome photographs of the charred remains of the victims taken at the trailer on the morning they were discovered and later at the Medical Examiner's Office. The trial court admitted all seventeen photographs – St. Ex. 43-45, 47-50, 52, 53, 65, 87, 89, 92, 94-96 and 98. To make matters worse, the photographs were not only admitted and discussed, but also prominently displayed for the jury on monitors in the courtroom.One of the monitors was directly in the line of sight of the grieving and very emotional surviving family members. (Tr. VI 4-5) (objecting that the "monitor that half of the jury is using to look at the autopsy pictures is right in line with the victims' family, and whenever the jury is looking at those pictures . . . we had, I think, a stepmother and a natural mother sitting right back there behind the monitor showing emotion").The photographs were all gruesome and unfairly prejudicial, and cumulative of other less prejudicial evidence.

---

[21]Although the exhibits at issue were admitted during the first stage of Bosse's trial, the State explicitly incorporated all first-stage evidence into the second stage, (Tr. X 51), violating Bosse's rights to a fair sentencing and impacting the guilt-stage determinations.

     1.   <u>Katrina Griffin</u>.

State's Exhibit 43 depicted the charred body of Katrina Griffin on the floor of the master bedroom, surrounded by burned rubble. (M.Tr. 10/17/12; Tr. II 24, 39-40; Tr. IV 114). Similarly, State's Exhibit 44 showed the burned body of Katrina Griffin in the master bedroom, but this one also contained the body of Christian Griffin, with both bodies buried in rubble. (M.Tr. 10/17/12; Tr. IV 108, 114). Exhibit 45 is a photograph of Katrina's legs over Christian's legs, surrounded by the rubble. (M.Tr. 10/17/12; Tr. IV 108, 115). Exhibits 47 and 48 both showed Katrina Griffin's charred body. In these photographs, Katrina is seen with a knife in her hand and her shirt pulled over her head. Exhibit 48 shows a close-up of Katrina's charred body with her breasts exposed. (Tr. IV 108, 116-17, 123). The jury also saw Exhibit 50, depicting Katrina Griffin's face, with her shirt bunched up around the top of her body and her eyeglasses askew on her body, (Tr. IV 22, 108, 119-20), and Exhibit 52, a photograph of Katrina's body at the scene after she was rolled onto her back.

The State also showed graphic autopsy photographs of Katrina. (St. Ex. 96 and 98). The medical examiner used these photographs along with Exhibits 162 and 163 – diagrams illustrating the various wounds to Ms. Griffin's body. (Tr. V 227, 237-38). Exhibit 96 showed Katrina Griffin after her body was unclothed and cleaned, and depicts cotton-tipped probes protruding from each of the wounds on her face, neck and torso. (Tr. V 227). Exhibit 98 was a photograph of the stab wound and thermal injuries to Katrina's back. (Tr. V 233). Although the court admitted exhibits 96 and 98 over defense counsel's renewed objections, counsel had no objection to the admission of the two diagrams. Especially when combined

with the medical examiner's testimony, the diagrams depicted the same information in a far less grotesque fashion. (Tr. V 228).

The interplay of the diagrams, photographs and testimony exemplifies the problem. The medical examiner first displayed the diagrams, testifying in detail about each of the stab wounds suffered by Ms. Griffin prior to the fire and the thermal injuries she sustained as a result of the fire. (Tr. V 228-33). After describing these stab wounds in detail and using the diagrams to illustrate where they were and how they occurred, the State then displayed Exhibits 96 and 98 to have the expert repeat the testimony and once again discuss the stab wounds and burns on Katrina's body. (Tr. V 233-37).

### 2.    Christian Griffin.

The same pattern was used with photographs of Christian Griffin. Over defense objection, the State introduced photographs (St. Ex. 87, 89, and 92) depicting Christian's wounds. (Tr. IV 21, 136-37). Exhibit 87 depicted Christian's charred body in the corner under the window. (Tr. IV 141-42). Exhibit 89 showed him after he was rolled onto his back by the medical examiner's investigator. (Tr. IV 142). A blanket had been wrapped around his head and his arm appeared to be in full rigor mortis. (Tr. IV 142). Exhibit 92 was a close-up view of the injuries on Christian's neck. (Tr. IV 143-45).

Then, just like with Katrina Griffin, the medical examiner used non-prejudicial diagrams of Christian's injuries followed by a highly inflammatory photograph to repeat the same testimony. Specifically, Exhibit 161, a diagram of Christian's body, was used by Dr. Yacoub to describe these specific injuries, including all the thermal injuries. (Tr. VI 16-20).

After Dr. Yacoub described the wounds and pointed out their location on the diagram, the State, over Bosse's renewed objection, displayed Exhibit 94, a photograph taken at the morgue depicting the stab wounds to the left side of Christian's neck and the left upper front aspect of his chest after his body was cleaned. (Tr. VI 15-16). Once again, Dr. Yacoub placed cotton-tipped probes inside each of the stab wounds. (Tr. VI 14-15). Other than having their passions inflamed, the jury learned nothing new from the photograph.

　　　　　3.　　Chasity Hammer.

The State repeated the same prejudicial and cumulative practice with Chasity Hammer. First, it introduced two photographs of Chasity's charred body. (St. Ex.s 65, 95). Exhibit 65 showed Chasity's body as she was discovered in the closet of the master bedroom. (Tr. IV 21, 108, 132-34). The photograph purports to show Chasity's body face-up in the closet covered by debris with parts of her legs and arms and some of her head visible. Much of the debris melted onto her face. (Tr. IV 133). Using exhibit 160, a body diagram, Dr. Yacoub testified about Chasity's cause of death. She used the diagram to show the burns, thermal injuries, and blunt force injury to Chasity's body in a much less grotesque manner. (Tr. VI 78-80). Even though the diagram covered everything needed for a full understanding of the injuries, the State displayed exhibit 95, a horrific picture of Chasity's burned body, over defense counsel's objection. (Tr. IV 136; Tr. VI 76-77). The jury was exposed again to this gruesome picture while Dr. Yacoub described her findings, including the fact that something had melted onto the left side of Chasity's face during the fire. (Tr. VI 77).

57

B.     **The Due Process Violation.**

1.     Treatment of the Issue Below.

On direct appeal, Bosse argued the admission of irrelevant, cumulative, and gruesome photographs during both stages of trial violated his right to due process as well as a reliable sentencing in violation of the Eighth and Fourteenth Amendments. *See* Brief of Appellant, Case No. D-2012-1128, at 45-47 (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Despite denying relief, OCCA was clearly disturbed by the photographs.

With regard to the photographs of Katrina and Christian, OCCA noted, "The photographs of Katrina's and Christian's bodies at the scene are *extremely disturbing*." *Bosse*, 400 P.3d at 853 (emphasis added). The court went on to note:

> Both of these victims were dead before the fire began. Any effects the fire had on their bodies were not relevant to their fatal injuries.... The photographs are relevant to show the scene and corroborate the medical examiner's testimony. They are not so hideous or repulsive that jurors could not view them impartially.

*Id.* OCCA similarly found the photographs at the morgue with cotton swabs stuck into the wounds "disturbing." *Id.* Despite the "extremely disturbing" and "disturbing" nature of the photographs, however, OCCA upheld their admission as not an abuse of discretion concluding the photographs demonstrated "Bosse's handiwork" and corroborated the medical examiner's testimony. *Id.*

OCCA's treatment of the photographs of Chasity was slightly different. The court

found these pictures to be "'profoundly disturbing . . . and particularly perturbing.'" *Id.* (quoting *Livingston v. State*, 907 P.2d 1088, 1094 (Okla. Crim. App. 1995)). The court also found that "these horrible pictures of the six-year-old child 'provoke an immediate visceral reaction.'" *Bosse*, 400 P.3d at 853 (quoting *Livingston*, 907 P.2d at 1094). Holding it was an abuse of discretion to admit these photographs, OCCA stated:

> We cannot say jurors were able to view these two pictures impartially, and find their probative value was substantially outweighed by the danger of unfair prejudice. The trial court abused its discretion in admitting these exhibits.

*Bosse*, 400 P.3d at 853-54. Despite this strong rebuke of the trial court, however, OCCA inexplicably found the error to be harmless, while offering no analysis to support that finding. The entirety of the court's discussion of harmlessness is contained in one single sentence: "Considering the entire record, we conclude that these prejudicial photographs did not contribute to the jury's verdict of guilt or determination of sentence." *Id.* at 854. Despite being raised by Bosse as a constitutional violation, as noted above, OCCA addressed the claim merely as a state law evidentiary question. This is clear from two facts: First, nowhere does OCCA mention "due process" nor does the court discuss the federal cases cited by Bosse. Second, the harmless error analysis employed was not the appropriate test to be used in the case of Constitutional errors. *See Chapman v. California*, 386 U.S. 18, 24 (1967) (holding "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt").

Because OCCA never adjudicated the federal constitutional claim clearly raised by

Bosse, this Court is not constrained by the requirements of AEDPA and should review this claim de novo. *See Young v. Sirmons*, 486 F.3d 655, 663 (10th Cir. 2007) (citing *Spears v. Mullin*, 343 F.3d 1215, 1225 (10th Cir. 2003)). In the alternative, should this Court conclude OCCA did decide the federal claim, albeit *sub silencio*, then OCCA's opinion denying Bosse relief on his due process and reliable sentencing claims was an unreasonable application of, and contrary to,  clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

2.    Denial of Due Process and Reliable Sentencing.

The Eighth and Fourteenth Amendments demand a higher degree of reliability and scrutiny in capital cases. *Woodson*, 428 U.S. at 280. "When, as here, habeas petitioners challenge the admission of photographic evidence as violative of the Constitution, this court considers 'whether the admission of evidence . . . so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process.'" *Spears,* 343 F.3d at 1226 (citing *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994)). This premise holds true for the first stage of capital trials as well. *See Donnelly,* 416 U.S. at 643.

The photographs were not only cumulative to other evidence, including testimony, reports, and diagrams, they were also gratuitously gruesome. As OCCA recognized, the photographs ranged from "disturbing" to "extremely disturbing" all the way to "profoundly disturbing ... and particularly perturbing" and would "provoke an immediate visceral reaction." *Bosse*, 400 P.3d at 853. In *Lamb v. Oklahoma County District Court*, 229 F. App'x 690 (10th Cir. 2007), the Tenth Circuit held when addressing a due process challenge to a

state court's admission of photographs, a reviewing court should

> review the [state court's] determination of this claim to determine whether its decision is a reasonable application of federal due process principles. In this context, this Court has held that federal due process "will be satisfied only if the probative value of [the challenged] evidence is . . . greatly outweighed by the prejudice flowing from its admission."

*Id.* at 694 (citing *Welch v. Sirmons*, 451 F.3d 675, 688 (10th Cir. 2006)).

As *Lamb* makes clear, the question for purposes of a federal due process claim is not, as OCCA framed it, whether photographs are probative, corroborative, or germane. Instead, the issue is whether the prejudicial effect of the photographs substantially outweighed their probative value.[22] And in this case, the clear answer to that question is yes. In fact, OCCA found as much. As noted, OCCA found those photographs "extremely disturbing" and "profoundly disturbing ... and particularly perturbing." *Bosse*, 400 P.3d at 853. With regard to the photographs of Chasity, OCCA explicitly found "[t]heir probative value was substantially outweighed by the danger of unfair prejudice." *Id.* That is the definition of a due process violation as set forth above. The admission of these photographs therefore denied Bosse his right to due process and a fundamentally fair trial. *See Darden,* 477 U.S. at 181.

But as devastating as these photographs were to Bosse's first-stage rights (and they were), the significance of these photographs was even greater in the critical sentencing stage. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (finding the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is

---

[22]OCCA's clear failure to understand the critical constitutional inquiry demonstrates the decision's inherent unreasonableness. 28 U.S.C. § 2254(d)(1).

imposed"). The problem is not merely the photographs were highly inflammatory, although they certainly were. The greater problem is the introduction of these photographs allowed the jury to infer the injuries depicted were evidence establishing the heinous, atrocious, or cruel (HAC) aggravator, giving the State an unfair advantage.

OCCA's conclusion the admission of the photographs of Chasity was harmless is beyond unreasonable. The photographs were so horrific that OCCA correctly concluded they would "provoke an immediate visceral reaction." *Bosse*, 400 P.3d at 853. As such, OCCA acknowledged the jurors would not be "able to view those two pictures impartially." *Id.* This is precisely the type of passion and prejudice that violates due process and leads to unreliable sentencing results.

OCCA unreasonably found no error in the admission of the photographs of Katrina and Christian. The jury was instructed that to find the HAC aggravating circumstance, it must find "the murder was preceded by either torture of the victim or serious physical abuse of the victim." (Instruction No. 5, OR 1060). Further, the jury was instructed conscious physical suffering of the victim was a prerequisite for a finding of serious physical abuse or great physical anguish, an element of torture. *Id.* Although the cumulative and gruesome photographs indeed depicted the injuries sustained by the victims in the fire, OCCA clearly acknowledged: "Both of these victims [Katrina and Christian] were dead before the fire began. Any effects the fire had on their bodies were not relevant to their fatal injuries." *Bosse*, 400 P.3d at 853.

62

As the court noted in *Spears*, "That [the victim] suffered serious physical abuse in the common sense of the term is not in doubt. Rather, the question under Oklahoma law is whether the photographs were relevant to show *conscious* physical suffering." 343 F.3d at 1226-27. *See also Willingham v. Mullin*, 296 F.3d 917, 929 (10th Cir. 2002) (noting that when a "victim dies or loses consciousness early on in an assault, photographs of all of [his] injuries might involve irrelevant and/or unduly prejudicial material at the penalty phase, since the [HAC] aggravator focuses on the *conscious* suffering of the victim"). What the State lacked on the core element of conscious suffering, these photographs were meant to supply.

Finally, OCCA never performed any separate harmless error analysis with regard to the second stage error from these photographs.[23] While the photographs might have had some marginal relevance in the first stage, as OCCA found, the question in the second stage was different. In the second stage, the question was no longer whether Bosse was guilty of murder; the question was whether the State could prove the aggravators it alleged. And by acknowledging that both Katrina and Christian were dead before the injuries portrayed in those photographs occurred, OCCA had to recognize the relevance to the second stage of those photographs was zero. Given the lack of relevance, the prejudice caused by the introduction of the photographs clearly substantially outweighed any potential value. The acknowledged visceral reaction to those photos demonstrates as much.

---

[23]Such failure would provide another reason why this court should review the issue de novo.

### C.      Conclusion.

Bosse was denied his due process rights under the Fourteenth Amendment and his

rights to a reliable sentencing under the Eighth Amendment. A Writ should issue.

### GROUND FOUR
**THE IMPROPER ADMISSION OF VICTIM IMPACT TESTIMONY REQUESTING SENTENCES OF DEATH, VIOLATED BOSSE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

### A.      Argument and Authority.

The last three witnesses the State presented in the sentencing stage were Rebecca

Allen (Katrina's mother), Ginger Griffin (Katrina's stepmother), and Johnny Griffin

(Katrina's father). (Tr. X 197-223). Each delivered a prepared victim impact statement and

then concluded their testimony by recommending the jury sentence Bosse to death. (Tr. X

201-02, 211-12, 223).[24] Defense counsel objected to the recommendations both before and

during trial. (OR 772-83; Tr. X 8-13, 195-96, 202-03, 214). The recommendations for death

exceeded the bounds of constitutionally permissible victim impact evidence. Although

OCCA correctly found the sentence recommendations constituted error (following a remand

by the Supreme Court), it unreasonably determined the error was harmless. *See Bosse*,  400

P.3d at 855.

---

[24]After each witness read their prepared statement, a prosecutor asked for a recommendation as to an appropriate punishment, and each responded "Death." (Tr. X 201-02, 211-12, 223). Prosecutor Puckett asked Ms. Griffin for three separate sentence recommendations – one per victim – to which she responded, "Death," all three times. (Tr. X 211-12).

### B.    Constitutional Error.

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court found "the introduction of a VIS [victim impact statement] at the sentencing phase of a capital murder trial violates the Eighth Amendment." In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Supreme Court modified *Booth*'s complete bar on victim impact evidence. Specifically, *Payne* overruled *Booth*'s prohibition on "evidence about the victim and about the impact of the murder on the victim's family." *Id.* However, the holding in *Payne* extended no further; *Booth*'s prohibition on "family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence" remained intact. *Id*. at 830 n.2.

Adhering to this Supreme Court precedent, the Tenth Circuit has long recognized it is constitutional error for a victim's family member to make a sentencing recommendation:

> The Supreme Court's decision in *Payne* and our own post-*Payne* cases clearly establish that it is a violation of the Eighth Amendment to allow a victim or a victim's family member to comment, during second-stage proceedings, on the appropriate sentence for a capital defendant.

*Selsor v. Workman*, 644 F.3d 984, 1026-27 (10th Cir. 2011) (citing *Welch v. Workman*, 607 F.3d 674, 695 (10th Cir. 2010)). Here, the witnesses' recommendations that Bosse be sentenced to death clearly ran afoul of *Booth* and *Payne*.

### C.    State Court Decision.

Bosse raised this constitutional violation on direct appeal. Despite acknowledging the Tenth Circuit's disagreement with its "repeated[] reject[ion] [of] this claim," OCCA "decline[d] the invitation to reconsider our consistent position on this issue." *Bosse v. State*,

360 P.3d 1203, 1226 (Okla. Crim. App. 2015).

On certiorari from OCCA's opinion, however, the Supreme Court reaffirmed *Booth*'s "prohibition on characterizations and opinions from a victim's family members about the crime, the defendant, and the appropriate sentence." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016). The Supreme Court declared OCCA was "wrong to . . . conclude that *Payne* implicitly overruled *Booth* in its entirety" and noted, "Our decisions remain binding precedent until we see fit to reconsider them." *Id.* (citations omitted). The Supreme Court vacated OCCA's judgment and remanded. *Id.* at 3.

Having been so clearly rebuked by the Supreme Court, OCCA finally admitted "the witnesses should not have been allowed to recommend . . . a sentence of death," overruling its prior holdings allowing such recommendations. *Bosse*, 400 P.3d at 855. "As the Supreme Court's remand in *Bosse* made clear, this error is subject to harmless error analysis." *Id.* (citing *Bosse*, 137 S. Ct. at 2-3). OCCA then determined "the improperly admitted sentence recommendations . . . were harmless beyond a reasonable doubt." 400 P.3d at 857.

### D.    Harmless Error Analysis.

The Supreme Court and OCCA both found the sentencing recommendations were improper. This Court must now determine whether these unconstitutional recommendations were harmless. OCCA unreasonably erred in concluding they were.

On direct appeal, OCCA applied the correct harmless-error standard when it "review[ed] the trial court's decision to determine whether this constitutional error was

66

harmless beyond a reasonable doubt." *Id.* at 855; *see Chapman*, 386 U.S. at 24. On habeas review, a different standard applies: This Court must determine if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *Dodd v. Trammell*, 753 F.3d 971, 997 (10th Cir. 2013).

Even on habeas review, the burden of proving harmlessness remains with the State. In *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995), the Supreme Court clarified that under *Brecht*, "the petitioner must win" cases at the margins. The Court held:

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, *or if one is left in grave doubt*, the conviction cannot stand.

*Id.* at 437-38 (quoting *Kotteakos*, 328 U.S. at 764-65). "[W]hen a court is 'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . . as if it affected the verdict.'" *Fry*, 551 U.S. at 121 n.3 (quoting *O'Neal*, 513 U.S. at 435).

Thus, this Court must consider the error in light of "all that happened" at Bosse's trial. *O'Neal*, 513 U.S. at 437-38. This Court's inquiry must not be limited to whether, absent the

sentencing recommendations, Bosse would still have been sentenced to death. *See id.* Instead, the Court must consider whether the pleas for death "substantially influenced" the jury's sentencing verdicts. *Id.* at 736. Moreover, because a death verdict must be unanimous, even one juror can preclude a death sentence. *See Wiggins*, 539 U.S. at 537. Here, it is impossible to conclude "with fair assurance" the unconstitutional sentence recommendations made by Ms. Allen, Mr. Griffin, and Ms. Griffin did not substantially influence at least one juror's decision to sentence Bosse to death. *See id.*; *O'Neal*, 513 U.S. at 437-38. If the Court finds itself "in virtual equipoise" as to the harmlessness of the sentence recommendations, it must find the error not to be harmless. *O'Neal*, 513 U.S. at 435.

In *Underwood v. Duckworth*, No. CIV-12-111-D, 2016 WL 4059162, at *18 (W.D. Okla. July 28, 2016), this Court set out four factors "[t]he Tenth Circuit considers" to determine whether a sentence recommendation was harmless: "(1) quantity and nature of the recommendations, (2) limiting instructions regarding victim impact testimony, (3) the surety of guilt, and (4) the overwhelming evidence in support of aggravating circumstances." In Bosse's case, OCCA "adopt[ed] these factors as [it] consider[ed] whether the error . . . was harmless." *Boss*e, 400 P.3d at 856. Following its consideration of these four factors, OCCA unreasonably found the error harmless.

First, the quantity and nature of the recommendations prohibit a reasonable finding of harmlessness. There were numerous requests for death: The three victim impact witnesses recommended death *five separate times*. As OCCA explained:

> The prosecutor asked Ginger Griffin about each victim separately, and she thus replied "death" three times. The trial court warned the prosecutor against that form of questioning, limiting the testimony to a single recommendation. Rebecca Allen and Johnny Griffin each stated the word "death" once, when asked whether they had a recommendation for sentence as to all three victims.

*Id.* Apparently, the trial court was concerned about the quantity and nature of the repeated requests for death, as the court "warned the prosecutor against that form of questioning." (Tr. X 213). OCCA even acknowledged the impact of the repeated recommendations: "We do not doubt that this single word, *repeated five times*, had an effect on the jury." *Id.* (emphasis added). The Tenth Circuit found as much in *Dodd v. Trammell*, 753 F.3d 971, 997 (10th Cir. 2013). In that case, the Tenth Circuit reversed a death sentence due to sentence recommendations by family members, finding the error was not harmless, based in large part on the sheer number of requests:

> We are at least in equipoise. Our doubts begin with the peculiarity ("chutzpah" may be a better word) of the State's argument in this appeal. It contends that the victims' sentencing recommendations did not have a substantial effect on the sentence even though it went to the extraordinary length of eliciting that recommendation from six, and perhaps seven, of the eight witnesses it called at the sentencing phase of the trial. One family member included her recommendation of the death sentence in the statement she read to the jury. The other six completed their statements and then were asked only one further question by the prosecutor, "Do you have a specific recommendation that you would like to offer the jury on punishment," [citations omitted], or the equivalent. This presentation of victim requests for the death penalty was not a one-off or a mere aside. It was a drumbeat.

*Id.* As in *Dodd*, the family members here read prepared statements and then concluded their testimony by responding to a question by the prosecutor seeking a sentence recommendation; the prosecutor elicited only one or two fewer recommendations for death than the six or

69

seven elicited in *Dodd*. The family's five separate recommendations for death were not "a one-off or a mere aside," but were instead "a drumbeat," as in *Dodd*. *Id.*

In addition to the large quantity of recommendations for death, the nature of the recommendations prohibits a reasonable finding of harmlessness. OCCA found although there were five separate requests for death, "the witnesses neither explained their request, nor pleaded with jurors for a death sentence." *Bosse*, 400 P.3d at 856. However, each of the witnesses read a victim impact statement leading up to their specific request – or *requests*, in the case of Ms. Griffin – for death. (Tr. X 197-223). Contrary to OCCA's determination that the witnesses did not explain their requests, in their prepared statements culminating in their recommendations, they provided lengthy and emotional explanations for these recommendations, at times explicitly referring to Bosse. For example, Ms. Allen concluded her statement: "We have lost three of our beloved children due to the evil choices that Shaun Bosse has made. There's no second chance, no going back, gone but not forgotten. . . . Our lives will never be the same, and I miss them all every day." (Tr. X 201). Mr. Griffin concluded his statement:

> I know my children were fighters, and I know they fought all the way to the end. I will never be able to understand how anyone can take another person's life more or less [sic] an innocent child. Because of him [Bosse], I have to visit my children at the cemetery. I don't get to hold them in my arms and tell them I love them. I don't get to play with them anymore and watch them grow up.

(Tr. X 222).

In their testimony culminating in requests for death, all three witnesses clearly

"explained their request[s]." *Bosse*, 400 P.3d at 856. Similarly, in *Dodd*, six of the seven witnesses who requested a death sentence "completed their statements and then were asked only one further question by the prosecutor, 'Do you have a specific recommendation that you would like to offer the jury on punishment,' or the equivalent." 753 F.3d at 997. The resulting recommendations were not found to be harmless in that case, and this Court should find the same here.

Here, as in *Dodd*, it was "not just the sheer volume of such testimony." *Id.* at 998. The record confirms that the "nature of the recommendations" was extremely emotional. *Underwood*, 2016 WL 4059162 at *18. During their testimony, Ms. Allen's "voice . . . cracked extremely," and Ms. Griffin "actually broke down and cried several times on the stand." (Tr. X 214). The record shows that at least eight members of the jury – jurors 4 and 6-12 – cried noticeably during the testimony, to the point that before the second victim impact witness, the trial court decided to "put a box of tissues in front so that the jurors don't have to wipe [tears] on their clothes." (Tr. X 202-03, 213-14, 223). Members of the audience were also "sobbing" "audibly" during the testimony. (Tr. X 202, 214, 223). *Cf. Underwood v. Royal*, 894 F.3d 1154, 1181 (10th Cir. 2018) (finding harmless error where "the offending [victim impact] statements were relatively brief and emotionally restrained").

OCCA conceded, "The record shows that the testimony was, as it was intended to be, emotionally affecting, and that each statement left some jurors and spectators in tears." *Bosse*, 400 P.3d at 856. However, OCCA further concluded, "[T]he record shows that any

71

emotional effect on jurors was the result of the witnesses' descriptions of the impact of the crimes and would have occurred whether or not there had been a recommended sentence." *Id.* This conclusion contradicted OCCA's later admission, "We do not doubt that this single word ["Death"], repeated five times, had an effect on the jury." *Id.* Besides, it is immaterial whether the "emotional effect on jurors . . . would have occurred *whether or not there had been a recommended sentence*." *Id.* (emphasis added). Again, the Supreme Court requires that "if one cannot say, with fair assurance, after pondering all that happened *without stripping the erroneous action from the whole*, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *O'Neal*, 513 U.S. at 437-38 (emphasis added). Thus, this Court should not consider the error here apart from its context: After hearing the relatives' emotional testimony, the final testimony the jury heard from each was their recommendation that Bosse be put to death. Even if the admissible victim impact testimony alone was enough to cause the jurors' emotional response, the reality is that it did not stand alone; the jury heard it in conjunction with the improper death recommendations. It is impossible to say "with fair assurance" that the judgment of one juror was not "substantially swayed by the error." *Id.*

Moreover, nothing in the record supports OCCA's contention that "any emotional effect on jurors was the result of the witnesses' descriptions of the impact of the crimes and would have occurred whether or not there had been a recommended sentence." *Bosse*, 400 P.3d at 856. In fact, the record shows the opposite, reflecting the jury's contemporaneous

emotional displays immediately following each family member's request for death. The logical inference is that the requests caused, or at least contributed to, the jurors' emotional responses, which were noted immediately after each request. Based on the record, it is illogical to conclude, as OCCA somehow did, that "any emotional effect on jurors was the result of the witnesses' descriptions of the impact of the crimes." *Id.*[25]

As noted by Judge Lucero, "Only the most callous individual would be unaffected by a plea from a woman whose parents were brutally murdered. This is the reason such testimony is not permitted by the Constitution, and it is the reason Oklahoma prosecutors continue to elicit such statements." *DeRosa v. Workman*, 696 F.3d 1302, 1306 (10th Cir. 2012) (denying rehearing en banc) (Lucero, J., dissenting). In this case, the sentence recommendations were even more egregious than that of one "woman whose parents were brutally murdered." *Id.* Here, the jury heard the pleas of not just one, but *three*, family members, who had lost not just two, but *three*, family members (including two children).

Here, as in *Dodd*, the prosecutors clearly believed the family's requests for death would assure a death verdict. This is evidenced by their repeated questions soliciting such requests, eliciting an admonishment by the trial court, and by their reaction to the

---

[25]Notably, defense counsel pointed out: "At the beginning of [Mr. Griffin's testimony], it did not seem like they were as emotional. *Towards the end* as Mr. Griffin became very, very emotional *in the last half of his victim impact*, the audience['s] . . . sobbing increased too, as well as the jury's." (Tr. X 223) (emphasis added). The trial court responded, "I don't disagree with your assessment." *Id.*

admonishment.[26] In *Dodd*, the Tenth Circuit recognized, "For this court to decide that such testimony did not have a substantial effect on the jury would be to impugn the expertise of a very experienced and highly successful prosecutor, whose firsthand knowledge of Oklahoma capital juries far exceeded what we could possibly acquire." 753 F.3d at 997.

Regarding the second *Underwood* factor – "limiting instructions regarding victim impact testimony" – OCCA correctly concluded the jury received the Oklahoma Uniform Jury Instruction regarding victim impact evidence. *Bosse*, 400 P.3d at 856 (citing *Underwood*, 2016 WL 4059162 at *18). This instruction, in part, "specified that jurors' consideration of victim impact evidence must be limited to a moral inquiry into Bosse's culpability, not an emotional response."*Bosse*, 400 P.3d at 856. This Court should have grave doubts about whether the jury followed this instruction given the jury's undisputed and perceptible emotional response to the victim impact evidence, as noted repeatedly in the record. *Id.*

Evaluating this case under the third *Underwood* factor – "the surety of guilt" – OCCA was correct that Bosse "does not claim that insufficient evidence supported his convictions." *Id.* (citing *Underwood*, 2016 WL 4059162 at *18). However, the fourth and final *Underwood* factor – "overwhelming evidence in support of aggravating circumstances" – does not support a finding of harmlessness. 2016 WL 4059162 at *18. The jury rejected the

[26]Mr. Mashburn stated, "I understand your ruling . . . but I do believe it's appropriate to ask because it's individual consideration for each crime – I understand the ruling, but I'm just saying for the record why I believe it's appropriate." (Tr. X 214-15).

continuing threat aggravating circumstance. (Tr. XIII 75-77).[27] It found only that Bosse knowingly created a great risk of death to more than one person; that each murder was heinous, atrocious, or cruel; and that each murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. (Tr. XIII 75-77). OCCA noted the strength of the evidence in support of these factors. *Bosse*, 400 P.3d at 856-57.[28] *But see* Ground Five, *infra* (challenging the sufficiency of the evidence to support the murder to avoid arrest aggravator). However, critically, just as in *Dodd*, "the aggravators the jury did find added 'little beyond the findings of guilt.'" *Underwood*, 2016 WL 4059162 at *18 (quoting *Dodd*, 753 F.3d at 998).

Furthermore, dissenting from the Tenth Circuit's denial of en banc rehearing on the issue of improper victim impact sentence recommendations in *DeRosa*, Judge Lucero wrote:

> In this case and its predecessors, we have focused on the existence of aggravating-factor findings. But in *Kotteakos v. United States*, the case that gave birth to the *Brecht* standard, the Court declared that the harmless-error inquiry "cannot be merely whether there was enough [evidence] to support the result." . . . This advisement necessarily carries additional weight in capital sentencing proceedings, where jurors retain discretion to impose a life sentence regardless of the presence of aggravating factors. *See Satterwhite v.*

---

[27]Notably, the Tenth Circuit has "characterized a petitioner's potential for continued dangerousness, even if incarcerated, as 'perhaps [the] most important aggravating circumstance' that juries consider in weighing the death penalty." *Littlejohn v. Royal*, 875 F.3d 548, 564 (10th Cir. 2017) (quoting *Grant v. Trammell*, 727 F.3d 1006, 1017 (10th Cir. 2013).

[28]Regardless of the strength of the evidence supporting the aggravators, a death sentence was not inevitable. "Under Oklahoma law, a jury is free to decline to impose the death penalty even if it finds that the aggravating circumstances outweigh the mitigating circumstances." *Duvall v. Reynolds*, 139 F.3d 768, 789-90 (10th Cir. 1998) (citations omitted).

*Texas*, 486 U.S. 249, 258 (1988) (acknowledging that harmless-error inquiry "in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer"). The panel emphasizes the heinousness of the murders at issue – a regrettably common feature of our death penalty jurisprudence – while overlooking the actual harm that resulted from the error. Yet under *Brecht*, we must focus on "whether the error itself had substantial influence." [citation omitted] "Even those guilty of the most heinous offenses are entitled to a fair trial." *Screws v. United States*, 325 U.S. 91, 107 (1945). The fact that a capital defendant committed a horrible crime cannot be an excuse to repeatedly ignore constitutional errors at sentencing.

696 F.3d at 1305-06 (Lucero, J., dissenting). Judge Lucero found that "[b]y applying a toothless form of harmless error analysis that focuses on the reprehensibility of the crime rather than the impact of the improper [victim impact] testimony, we only embolden those who would commit further constitutional violations." *Id.* at 1303. This Court should end this practice here by giving teeth to its harmless error analysis and focusing not on the nature of Bosse's crime, but instead on the impact of the improper sentence recommendations elicited by "win-at-all-costs" prosecutors.

At a minimum, the Court should have grave doubt as to the effect of the five unconstitutional sentencing recommendations. *O'Neal*, 513 U.S. at 438. "[O]ne cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error." *Id.* at 437. OCCA was unreasonable in determining this error was harmless. A writ should issue.

### GROUND FIVE
**THE EVIDENCE SUPPORTING THE "MURDER TO AVOID ARREST" AGGRAVATOR WAS INSUFFICIENT TO PROVE IT BEYOND A REASONABLE DOUBT, AND THEREFORE, ITS INCLUSION VIOLATED BOSSE'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.**

The State alleged Bosse murdered Katrina and Christian Griffin and Chasity Hammer

76

for the purpose of avoiding lawful arrest or prosecution. (OR 63-64; 113-14). At the close of the State's second-stage evidence, Bosse demurred to the aggravator because the State failed to prove it beyond a reasonable doubt. (Tr. X 225-26). The court overruled that demurrer. (Tr. X 228). By allowing the aggravator to stand despite insufficient evidence to support it, the court violated Bosse's Eighth and Fourteenth Amendment rights.

### A.    Treatment of the Issue Below.

Bosse argued on direct appeal the evidence presented at trial was insufficient as a matter of law to support the "murder to avoid arrest" aggravator, and its inclusion, therefore, violated his rights under the Eighth and Fourteenth Amendments (as well as the State Constitution). *See* Brief of Appellant, Case No. D-2012-1128, at 82-84. *See also Bosse*, 400 P.3d at 859 (acknowledging federal Constitutional basis for Bosse's claim).

Bosse based his appellate attack on two separate but related arguments: First, he argued "There was no evidence Bosse had taken anything from Ms. Griffin prior to these murders nor was there any evidence that discovery of this alleged crime precipitated the homicides." Brief of Appellant at 83. Second, he urged, "[t]here is simply no way to know beyond a reasonable doubt, based on the evidence presented at trial, that Bosse killed [the victims] with the intent to avoid arrest or prosecution. Any attempt to attribute an intent to murder for the purpose of eliminating witnesses to the facts as presented would be pure speculation. . . ." *Id.* at 84.

OCCA, in the two paragraphs it took to dispose of this claim, did not address either

of these arguments. The entirety of the court's factual analysis of this claim is as follows:

> The State alleged that the predicate crime was Bosse's theft of the Griffins' personal property. On July 22, 2010, Katrina discovered that fifteen video games were missing from the trailer. Katrina suspected that a friend, Henry Price, had stolen the games. Before calling the sheriff, Katrina persuaded Bosse to take her to her friend Heather Molloy's house in search of Price that night. When she could not find Molloy, Katrina called the sheriff's office to report the theft. Bosse was present at Katrina's trailer when Deputy Cunningham took Katrina's report. Price, contacted after the murders, denied stealing the video games. The day after the crime, Bosse had a PlayStation game console, Wii, televisions, laptop computer, DVDs and video games from Katrina's trailer. At the time of his arrest on the evening of July 23, Bosse had pawned some of these items; others were in his truck or apartment. Bosse attempted to conceal his possession and disposal of all these items from law enforcement. In addition, mitigating evidence from Bosse's family included testimony that for several years Bosse had stolen money and property from close friends and family members. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Bosse committed all three murders to avoid arrest or prosecution.

*Bosse*, 400 P.3d at 859. Based on that analysis, OCCA denied Bosse's claim. That decision was factually and legally unreasonable.

> **B.    Allowing the Jury to Consider this Aggravator Violated Bosse's Rights to Due Process and a Reliable Sentencing.**

In assessing whether the evidence was sufficient, courts "first determine the elements of the offense and then examine whether the evidence suffices to establish each element." *Anderson-Bey v. Zavaras*, 641 F.3d 445, 448 (10th Cir. 2011). In capital cases, the aggravating factors, which are necessary to the imposition of the death penalty, "operate as the functional equivalent of an element of a greater offense." *Ring v. Arizona*, 536 U.S. 584, 609 (2002). To satisfy the requirements of due process, the evidence presented at trial, when

78

viewed in the light most favorable to the prosecution, must be sufficient to allow "a rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See also Lewis v. Jeffers*, 497 U.S. 764, 782 (1990) (noting the *Jackson* standard for determining sufficiency "appl[ies] with equal force to federal habeas review of a state court's finding of aggravating circumstances").

To prove the "murder to avoid arrest" aggravator, the State had to prove beyond a reasonable doubt "Bosse committed a predicate crime, separate from the three murders, and that the killings were done to avoid arrest or prosecution for that predicate crime." *Bosse*, 400 P.3d at 859. It is not enough just to prove Bosse committed the predicate offense; the State also had to prove he intended "to eliminate a witness to that crime by killing the victim." *Id.* This is so because "[t]he defendant's intent, which may be proven by circumstantial evidence, is crucial to proof of this aggravating circumstance." *Id. See also Fox v. Ward*, 200 F.3d 1286, 1301 (10th Cir. 2000) (noting that "[t]o support the finding of this aggravating circumstance, the focus is on the defendant's intent, whether proved by the defendant's own statement or through circumstantial evidence"); *Boyd v. Ward*, 179 F.3d 904, 923 (10th Cir. 1999). In making these determinations, "the law must concern itself with facts and evidences, not vaporous speculations." *Russell v. State*, 560 P.2d 1003, 1004 (Okla. Crim. App. 1977) (citing *Dennis v. United States*, 339 U.S. 162 (1950)).

OCCA's conclusions the State had proven both a predicate offense and that Bosse had the requisite intent were both based on unreasonable interpretations of the facts. *See* 28 U.S.C. § 2254(d)(2). There was certainly ample evidence from which a rational jury could

find Bosse had committed a theft of property from the Griffins. But nowhere in the trial was there any evidence Bosse had stolen anything from the Griffins prior to the time of the murders. In fact, the prosecutor herself, in discussing one of the other alleged aggravating factors summed it up perfectly: In discussing Chasity's experience being trapped in the closet, the prosecutor stated, "And she's in there for awhile *because he's gathering up all the stuff that he wants to steal* before he lights that fire." (Tr. XIII 13) (emphasis added). Thus, even the State realized the theft of the property found in Bosse's possession likely did not precede the murders. And if the theft did not precede the murders, then escaping arrest for that not-yet-committed offense could not have been the intention for the murders.

Rather than deal with this inconvenient fact, OCCA just speculated (or rather, concluded the jury could have speculated) Bosse must have stolen the property earlier in the week (something Katrina had blamed on her cousin's boyfriend, Henry Price).[29] This conclusion is unreasonable because there is no evidence to support it; in fact, the most logical inference from an accurate view of the evidence is that Bosse did not steal that property.

What the evidence showed was that Ms. Griffin noticed some games missing from her trailer after her cousin, Heather Molloy, and Heather's boyfriend, Henry Price, had been there several days before the murders. She made this discovery on July 22, and after she and Bosse were unable to locate Heather and Henry to confront them about the thefts, Ms. Griffin and

---

[29]The only attempt OCCA made to analyze whether Price was the thief was to note that when contacted *after the murders*, he denied it. *Bosse*, 400 P.3d at 859. Apparently, no investigation was done to determine whether Price still had the property or whether he had pawned it himself. The police and OCCA just took him at his word.

Bosse called the police to report it. A McClain County Deputy Sheriff arrived to take the report. Bosse was present the whole time the deputy was, and the deputy noticed nothing unusual or suspicious about Bosse's behavior. (Tr. II 88-89, 92-93, 102, 111). No evidence was presented that any of the specific items reported stolen to the deputy were ever found in Bosse's possession or that he had pawned any of this specific property. Thus, there was no evidence Bosse had stolen anything from Ms. Griffin prior to July 22, and his actions in the presence of law enforcement while discussing the theft were not those of a guilty person.

Nor were Bosse's actions the day after the murders consistent with someone so worried about being charged with stealing games he would commit three capital murders to avoid being charged with misdemeanor theft. As OCCA noted, within hours of the murders, Bosse visited several pawn shops, using his own identity, pawning a number of items stolen from the trailer on the night of the murders. What he did not have time to pawn, law enforcement found in either his truck or his apartment. In other words, the evidence clearly showed Bosse made no effort to conceal the fact he was in possession of property stolen from the trailer.[30] There was no evidence from which a jury could conclude beyond a reasonable

_____

[30]OCCA's statement "Bosse attempted to conceal his possession and disposal of all these items from law enforcement," *Bosse*, 400 P.3d at 859, is an unreasonable view of the facts. The State is likely to argue, as they did at trial, Bosse's refusal to allow a search of his truck was evidence he was trying to conceal stolen property. First, if his motivation for "refusing consent" was to conceal that the truck contained stolen property, the reason for that motivation would have been that his possession of the property linked him to the murders. That fact does nothing to prove he would have committed three capital murders for the purpose of avoiding arrest for a misdemeanor. But more importantly, despite refusing a physical search of his truck, Bosse did allow the officers to photograph everything visible inside the truck, so he certainly was not preventing them from seeing that he had stolen

(continued...)

doubt Bosse committed three murders to avoid being charged with misdemeanor theft.

### C.      Conclusion.

Because OCCA misunderstood the facts presented and engaged in the "vaporous speculation," *Russell*, 560 P.2d at 1004, courts are forbidden to engage, its finding of sufficient evidence to support this aggravator was unreasonable. The "murder to avoid arrest" aggravating factor should have been stricken. The Supreme Court has made clear that

> [a]n invalidated sentencing factor . . . will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

*Brown v. Sanders*, 546 U.S. 212, 220 (2006). The fact Bosse stole items from the trailer cannot be given aggravating weight under any of the other sentencing factors alleged in this case. Bosse's death sentences therefore cannot stand. A Writ must issue.

## GROUND SIX
## DELIBERATE PROSECUTORIAL MISCONDUCT THROUGHOUT THE TRIAL, DEPRIVED BOSSE OF HIS RIGHTS TO A FAIR TRIAL AND RELIABLE SENTENCING, VIOLATING THE EIGHTH AND FOURTEENTH AMENDMENTS.

The prosecution crossed multiple ethical and legal boundaries, asserting arguments calculated to deprive Bosse of a fair trial and reliable sentencing. While both parties are given wide latitude in arguing evidence and reasonable inferences therefrom, this discretion is not unfettered. Instead, arguments rendering a trial fundamentally unfair are viewed as

---

[30](...continued)
property in it. Furthermore, the fact he pawned all of these items in his own name, using his own identity, and without trying to alter his appearance certainly undermines any claim he was attempting to conceal his actions from detection.

having produced unreliable results, requiring relief. *Donnelly*, 416 U.S. at 646. *See also Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

**A.   First Stage**.

1.   <u>Lack of Remorse</u>.

While the loss of any life is tragic, the loss of a child's life can easily incite devastation, anger, and a desire for revenge. But the law prohibits juries from relying on those emotions in reaching their verdict, so courts place limits on counsel to prevent from inciting them. *See Viereck v. United States*, 318 U.S. 236, 247-48 (1943).

Experienced prosecutors have learned what works with Oklahoma juries. And, even when the law precludes them from pursuing emotionally charged arguments, some prosecutors forge ahead with such tactics anyway. Painting a defendant as totally lacking remorse is one such tactic because it does nothing more than fuel anger or disgust. Prosecutors have utilized this tactic successfully.

Over defense objections, the State argued Bosse lacked all remorse. (Tr. II 168-69; OR 270-71; M. Tr. 9/4/12 at 28-30). Specifically, the prosecutor elicited an opinion from a key detective that Bosse apparently did not respond with appropriate remorse upon learning of the death of the victims. (Tr. II 168).

The prosecution argued in closing that after Detective Huff "says, well, I need to tell you Katrina Griffin and her kids are dead, [Bosse] just sits there. A normal reaction from a

stranger would be different than his reaction, and he claims that she's a girlfriend and that he likes the children." (Tr. IX 30). The prosecution argued: "And remember when the detective said to him, you don't seem sad. He said, no, I'm more in awe. What does that mean? In awe of what?" (Tr. IX 32).

By arguing Bosse lacked remorse, the prosecution was inflaming the juror's passions. "I mean, surely there's some kind of an emotional connection[31] there that you would think – if you weren't the one that did it, that you would be a little bit upset that all three are gone." *Id*. The only purpose for this argument was to inflame the passions of the jurors. However, when presented with this issue on appeal, OCCA concluded the prosecution's comments were "not comments on Bosse's lack of remorse. Rather, they are reasonable inferences from the evidence of Bosse's reaction to news of the victims' deaths." *Bosse*, 400 P.3d at 863. This was an unreasonable determination, both as to fact and law.

The Supreme Court has made clear jurors must make determinations based on evidence, not emotions. *See, e.g.*, *Viereck*, 318 U.S. at 247. Statements like the prosecution's lack-of-remorse argument here are "wholly irrelevant to any facts or issues in the case" and are intended "to arouse passion and prejudice," rather than encourage the jury to decide the case based solely on the evidence. *Id*. OCCA deemed these arguments "reasonable inferences from the evidence," but offers nothing to explain that conclusion, and the record indicate the

---

[31]As noted in Ground Two, counsel was ineffective for failing to investigate and present evidence of Bosse's neurological impairment and history of complex trauma. Had jurors had this information, they would have had an accurate explanation for Bosse's flat affect.

84

contrary. When these arguments were presented, even the trial court recognized the comments were close to an improper discussion of remorse. (Tr. II 169). And, as evidenced throughout the trial, lack of remorse was a deliberate, repeated theme. (Tr. XIII 17 ("[You] heard no evidence of any remorse. He didn't even flinch like y'all did and I did when the photographs of those victims were put up on the TV")). Given that the Supreme Court prohibits such tactics, *United States v. Young*, 470 U.S. 1, 8 n.5 (1985), OCCA's conclusion the comments were permissible was unreasonable and contrary to law. The remorse argument was clearly meant to mislead the jurors and inflame their emotions, undermining Bosse's constitutional right to a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The unnecessary and unreasonable commentary undoubtedly affected the jury's ability to fairly evaluate what evidence was presented.

2.   Reasonable Doubt.

The prosecution also improperly tried to define reasonable doubt for the jurors: "I ask you to think what is reasonable? Our burden of proof is beyond a reasonable doubt; not beyond all doubt at all but beyond a reasonable doubt." (Tr. IX 47).

Because reasonable doubt is self-explanatory, attempts to define it tend to confuse the jury. Although defense counsel did not object, the definition itself amounted to plain error. OCCA, however, "held that it is not error to use this phrase in discussing reasonable doubt." *Bosse*, 400 P.3d at 863. This determination is contrary to controlling law.

In defining reasonable doubt, the prosecutors framed the meaning of the term with reference to the integrity of the State's witnesses: "If you believe that Billy Magalassi and

Jamie Lord risked their professional reputation, their career to make up information to give to you, then okay." (Tr. IX 47). Such a tactic encourages the jury "to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18-19. And, there is no reason to give the prosecution the benefit of the doubt as to the argument's intent or effect. Rather, the prosecutors' actions here should be viewed through the lens of the pattern and practice of misconduct in Oklahoma. *See Miller-El v. Cockrell*, 537 U.S. 322, 346-47 (2003) (factoring in the "culture of the District Attorney's Office in the past"); *Miller-El v. Dretke*, 545 U.S. 231, 263-64 (2005) (drawing on history of prosecutors' office). Oklahoma prosecutors have notoriously stretched beyond ethical bounds to gain an advantage. *See Le v. Mullin*, 311 F.3d 1002, 1029 (10th Cir. 2002) (Henry J., concurring) ("An experienced prosecutor should know better—especially considering the frequent criticism of his tactics by both state and federal courts—and should be willing to follow the law he has sworn to uphold. The prosecution's actions in this case suggest defiance of Oklahoma courts and disregard for Oklahoma law."); *Harris v. State*, 164 P.3d 1103, 1113-14 (Okla. Crim. App. 2007); *Williams v. State,* 572 P.2d 257 (Okla. Crim. App. 1977).

3.   Burden Shifting.

In line with its other improper tactics, the prosecution also attempted to shift its burden of proof to Bosse. Referencing Bosse's alibi, the prosecution argued: "But he's got nothing to prove his whereabouts between there and there besides his claim to the police. He's got nothing." (Tr. IX 70). "He wants you to help make that up with him, and that's not your job to help him manufacture his defense." (Tr. IX 71-72). And, again, the prosecutor

suggested the defense had not met its burden of proof by choosing not to send evidence out for independent testing: "[W]e don't know what's on that when they had the chance to do it themselves." (Tr. IX 79-80).

The defense objected to each attempt at burden-shifting, but the court overruled every objection. (Tr. IX 71, 72, 79-80). Finally, the prosecutor persisted in the argument too long and the court sustained counsel's renewed objection, yet overruled a motion for mistrial. (Tr. IX 80-81). And, even though the court eventually gave a weak admonishment (Tr. IX 81), the damage to Bosse's right to a fair trial was already cemented.

OCCA unreasonably concluded the prosecution's "statements were not error" and did not shift the burden of proof. *Bosse*, 400 P.3d at 863. The court reasoned that a "prosecutor may argue that the evidence is uncontroverted." *Id*. Specifically, "the State may note that a defendant had access to, and did not test, evidence." *Id*. "Given that the prosecutor prefaced the comment by stating the correct burden of proof, no mistrial was necessary, and the trial court's action cured any error." *Id.*. This conclusion is contrary to clearly established federal law and an unreasonable determination of fact. 28 U.S.C. § 2254(d)(1)(2).

It is a fundamental principle that the state alone bears the burden of proof in a criminal trial. *See, e.g.*, *In re Winship*, 397 U.S. 358, 362-63 (1970) (noting the government must prove each element of the charged crime); *Mullaney v. Wilbur*, 421 U.S. 684, 697 (1975) (noting a state cannot require a defendant to prove the absence of a fact necessary to constitute a crime). Accordingly, prosecutors must refrain from making burden-shifting arguments that suggest the defendant has an obligation to produce any evidence or to prove

their innocence. *Winship*, 397 U.S. at 364.

Here, OCCA focused solely on the prosecutor's statement that the defense chose not to have evidence tested. And, even then, the court found the statement harmless because it was prefaced by the correct burden of proof. However, the court may not look to comments in isolation; rather, it must look to the comments in context. In addition to telling the jurors that the defense chose not to have evidence tested, the prosecutors also told the jurors multiple times that the defense needed help in fabricating a defense. This has never been the standard. *See Mullaney*, 421 U.S. at 697. Prosecutors know this and choose to use this tactic because they know it works. The overall effect of this tactic rendered Bosse's trial fundamentally unfair.

### 4.   Right to Refuse Search.

Early in the investigation, Det. Huff called Bosse and asked if he would be willing to talk. Bosse immediately agreed to talk. During the interview, Det. Huff asked Bosse about his truck and said authorities might want to search it. Huff asked another officer, Det. Tompkins, to prepare a consent form for the search. Bosse refused because he did not want anything taken out of his truck. After Huff explained nothing would be taken, Bosse consented to photographs of the truck and its interior. (Tr. II 170-72; St. Ex. 210).

The State repeatedly used Bosse's refusal to consent as evidence of guilt. It argued "he had every right to say no, but the reason he said no is because he's hiding evidence from them, and that's not commenting on his right to refuse." (Tr. II 139). The prosecution also argued the evidence was relevant to show Bosse knew he would be incriminated because a

search would reveal stolen property. (Tr. II 6-7). The onslaught continued:

- "[Bosse] says. I'll do whatever I can to help you . . . Oh, can we search your truck? Sure. I'll do whatever I can to help, oh, no, you can't search my truck. You-guys can look in there and take pictures but you can't search it. So can't search points to him again." (Tr. IX 91-92).

- "So if I'm a suspect, I'm going to have to start making sure I'm not giving them any more evidence by not letting them search my truck . . . . If I'm a suspect, I've got to start backing off of what I'm going to let them do and not do. He knows her stuff is sitting in his pickup outside." (Tr. IX 92-93).

Yet, the court overruled Bosse's repeated requests to exclude reference to his refusal to consent. (Tr. II 140-41).

Under the Fourth Amendment, Bosse had every right to refuse consent. And, the Fifth Amendment affords a privilege against compelled self-incrimination. A defendant's incriminating statement may only be admissible if made voluntarily. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The prosecutors' use of Bosse's exercise of these fundamental rights as evidence of guilt was misconduct of the most basic sort, and deprived him of a fair trial.

OCCA acknowledged "[i]t is settled that prosecutors cannot comment on a defendant's exercise of the Fifth Amendment privilege against self-incrimination, using it as substantive evidence of guilt." *Bosse*, 400 P.3d at 847 (citing *Griffin v. California*, 380 U.S. 609, 614 (1965)). OCCA also noted most jurisdictions – including the Tenth Circuit – have extended this analysis to the Fourth Amendment context. *Bosse*, 400 P.3d at 848.

Despite finding the prosecutors had clearly violated Bosse's rights by using his right to refuse consent against him, OCCA found the error harmless. *Id.* at 851. This determination was unreasonable. Where, as here, a prosecutor's misconduct invades a specific

constitutional right, the court reviews the misconduct with heightened scrutiny. *See*, *e.g.*, *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985). When prosecutorial misconduct infringes a specific constitutional right, "a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair." *Mahorney v. Wallman*, 917 F.2d 469, 472 (10th Cir. 1990). This is such a case. The prosecution repeatedly used Bosse's privileged refusal to consent to a search of his truck to impute guilt to Bosse.

**B.      Second Stage.**

The arguments at the earlier stage of trial established a foundation for continued unfairness well into the sentencing phase. *Cargle v. Mullin*, 317 F.3d 1196, 1207-08 (10th Cir. 2003) (holding misconduct in culpability phase can spill over and infect penalty phase).

1.      <u>Courtroom Demeanor</u>.

Similar to the first stage, the prosecution continued to attack the defense. During one of its second-stage closing arguments, the prosecution called on the jury to observe Bosse's courtroom demeanor as a sign of his lack of remorse. "And what we also know and what you can consider in determining whether somebody is a threat is that we saw and heard no evidence of any remorse. He didn't even flinch like y'all did and I did when the photographs of those victims were put up on the TV." (Tr. XIII 17).

Although the court sustained Bosse's objection and admonished the jury to disregard the comments on the "defendant's demeanor," the admonishment did not undo the harm. (Tr. XIII 22). Yet, on appeal, OCCA concluded the admonishment did indeed "cure[] any error." *Bosse*, 400 P.3d at 863. "The record does not support Bosse's argument otherwise,

particularly as jurors did not find that Bosse would present a continuing threat to society." *Id*. This was an unreasonable determination as to fact and law.

Bosse's silence was insufficient to demonstrate lack of remorse. While a prosecutor may argue reasonable inferences, "[i]t is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." *Young*, 470 U.S. at 8 n.5. The prosecution's argument was a blatant attempt to mislead the jury. *See also Le*, 311 F.3d at 1015, 1021 ("Personal attacks by a prosecutor are improper."). These comments deprived Bosse of his right to a fair and reliable sentencing hearing.

2.     Sympathy for Victims.

From the beginning of trial, the prosecutors sought to arouse emotion for the victims and their families and friends. That tactic was brought two-fold during second stage closing arguments. The prosecutor implored the jury to put themselves in the place of the victims and imagine what they were thinking and feeling during the time leading up to their deaths.

> [K]illings like this, they're not quiet. They are not clean. Screams of pain as that knife is slicing into your body, screams of anguish for what's happening for your children. Screams of sheer terror as they realize what's happening to them and that they're going to die. They were reaching. They were grabbing. They were grabbing knives. . . . You do not want to die that day, and you sure don't want your children to die that day.

(Tr. XIII 44).

The content of this argument was bad enough, but over counsel's objection, (Tr. XIII 45), the trial court allowed the prosecutor to make it while thrashing on the floor acting out the scene of the murder. (Tr. XIII 65. *See also* Tr. XIII 66 ("[W]e note for the record that

ever since the prosecutor started talking about the alleged attack, he's been laying [on] the floor hollering, gesturing wildly with his arms in a way that mimics someone making a knife attack. . . . Record so noted.")). This was truly outrageous conduct.

These types of arguments and demonstrations have been shown repeatedly to distract jurors from relevant issues and instead to arouse their passions. *See, e.g., Bland v. Sirmons*, 459 F.3d 999, 1028 (10th Cir. 2006). By focusing on the alleged thoughts of the victims, the prosecutor reached beyond the record to appeal to the jurors' sympathies and inflame their passions. This is contrary to law. Jurors are called upon to objectively, and with reason, impose a fair sentence. *Gardner v. Florida*, 430 U.S. 349, 358 (1977).

OCCA concluded the trial court did not abuse its discretion in overruling Bosse's objections to the prosecution's arguments and theatrics. *Bosse*, 400 P.3d at 864. In doing so, the court divided the claim into two questions – "the appropriateness of the argument itself and the prosecutor's actions in making the argument." *Bosse*, 400 P.3d at 864. It was only in isolating these inquiries, that the court escaped the harm caused by their combination. Such an analysis is contrary to controlling law and an unreasonable determination of fact.

Had the court reviewed the facts as a whole instead of piecemeal, it would have concluded this type of conduct deprived Bosse of his right to a fair sentencing. "In [this type of] argument, jurors are urged to place themselves in the position of a party, a victim, or a victim's family member and decide the case from that perspective." *Gilchrist v. Hagan*, No. CIV-06-1236, 2007 WL 951749 at *29 (D.S.C. Mar. 27, 2007). These arguments have long

92

been "universally" condemned, *Blevins v. Cessna Aircraft Co.*, 728 F.2d 1576, 1580-81 (10th Cir. 1984), because they shift the jury's focus away from the evidence into pure emotion, undermining the fairness and integrity of the sentencing process. *Gardner*, 430 U.S. at 358.

The combined purpose of the improper argument and and even more improper theatrics was "to arouse passion and prejudice." *Viereck*, 318 U.S. at 247. OCCA's decision finding no error was unreasonable.

3.   Life Without Parole Is No Real Punishment.

The State ended its second-stage case by arguing anything less than a death sentence would mean Bosse was not being held accountable. If he was sentenced to life without parole, there would be no "extra consequences" for his actions.

> Don't let him manipulate you because, ladies and gentlemen, I submit to you if you give him life without parole, then he has succeeded in manipulating you. . . . And he can go to prison, and he can sit on his bunkbed and his feet can swing off the bunkbed, and he can say, I got them too.

(Tr. XIII 64).

> Once he chooses to kill Katrina and then keep going to Christian, *there has to be extra consequences*. Once he chooses to kill Chasity after that in the closet and burn her alive, *there has to be extra consequences*. If you give him life without parole for killing Katrina, then he's locked up without parole. Then if you give him life without parole for Christian, he's locked up for life without parole. No extra consequences. If you then give him life without parole for killing Chasity, then he's locked up without parole. No extra consequences.

(Tr. XIII 68) (emphasis added). The prosecution was allowed to continue over objection:

> I submit to you, ladies and gentlemen, that he should not get the benefit of slaughtering three people at one time. I submit to you that he shouldn't get the same punishment for all three as he would for one.

93

(Tr. XIII 69).

This was error. In concluding the trial court did not abuse its discretion, however, OCCA said the "State's argument was neither a misstatement of law nor of the facts. The prosecutor's request for extra consequences was based on the evidence." *Bosse*, 400 P.3d at 865. This was an unreasonable determination of facts and contrary to controlling law.

There is no requirement that an Oklahoma jury must impose death. Capital juries have always had complete discretion to impose a non-death sentence. *Duvall*, 139 F.3d at 789-90. Yet, when a prosecutor inserts his or her opinion on death being necessary for "extra consequences," jurors no longer feel the freedom to do their duty without imposing death. *See generally Young*, 470 U.S. at 18-19. To assert these types of arguments are anything other than a deliberate manipulation is a thinly veiled excuse. Relief should have been granted. The Writ should issue.

### C.    Cumulative Effect.

As discussed, there were multiple instances of prosecutorial misconduct spanning both phases of trial. Each of these instances constitutes error worthy of relief. However, even if this Court disagrees, the combined effect of the errors demands relief. Misconduct in the culpability phase can and did spill over and infect the penalty phase so that together the misconduct infected the entire proceedings with unfairness. *Cargle*, 317 F.3d at 1207-08. *See also Darden*, 477 U.S. at 181; *Gardner*, 430 U.S. at 358; *Donnelly*, 416 U.S. at 643. And, together these arguments did nothing other than improperly distract and inflame the jurors'

94

sympathies for the victims and their family.

This was a tragic case. Yet, the Constitution requires that emotion not dictate Bosse's fate. "Arguments that improperly encourage the jury to impose a sentence of death based on considerations of sympathy for the victims may constitute due process error." *Le*, 311 F.3d at 1015 (citing *Payne*, 501 U.S. at 831). The prosecutors' arguments here shifted the jury's focus from the evaluation of the evidence to emotion, and this in turn, undermined the fairness and integrity of the sentencing phase. *Gardner*, 430 U.S. at 358.

A Writ should issue.

## GROUND SEVEN
## THE CUMULATIVE EFFECT OF ERRORS DEPRIVED BOSSE OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR SENTENCING UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

Even if none of the previously discussed errors, viewed in isolation, necessitates reversal of Bosse's conviction and sentence, the combined effect of these errors deprived him of a fair sentencing and requires the sentence to be reversed. *Cargle v. Mullin*, 317 F.3d 1196, 1200 (10th Cir. 2003). Specifically, the cumulative effect of all of the errors and omissions at the trial and mitigation phases resulted in an invalid death sentence. *See Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (finding that when assessing cumulative error, only first-stage errors are relevant to the conviction, but all errors are relevant to the ultimate sentence).

It is well recognized a reviewing court, presented with established errors at trial, must consider the cumulative impact of those errors in light of the totality of the evidence properly

presented to the jury. *Gonzales v. McKune*, 247 F.3d 1066, 1077 (10th Cir. 2001) (vacated on grounds of exhaustion); *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990). Non-errors do not count in a cumulative analysis; however, error plus whatever form of prejudice or harm is associated with that particular error obviously need not be established for a violation to count in cumulation. Where error plus prejudice is present in the case of an individual error, relief would be warranted for that error alone. *Cargle*, 317 F.3d at 1207. The Tenth Circuit has explained the "cumulative-error analysis merely aggregates all the errors . . . found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Hamilton v. Mullin*, 436 F.3d 1181, 1196 (10th Cir. 2006) (quoting *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003)). The cumulative error analysis applies to such legally diverse claims as ineffective-assistance and juror-misconduct claims. *Cargle*, 317 F.3d at 1206-07.

Here, to name a few, are some of the errors that could have, at a minimum, cumulated to deprive Bosse of his Constitutional guarantees of a fair trial and reliable sentencing hearing: On direct appeal, OCCA found three errors, but concluded they were all harmless. Specifically, the court found as error: (1) the prosecution's use of Bosse's refusal to consent to a search of his truck, *Bosse*, 400 P.3d at 851; (2) the admission of two "profoundly disturbing and particularly perturbing" photographs of the charred remains of Chasity Hammer, *Id.* at 853-54; and (3) the improper admission of sentence recommendations from victim impact witnesses, *Id.* at 857. In addition to those errors already found by OCCA, this

Court should also consider any error found in any of the claims raised in this Petition.

OCCA's decision on this claim is contrary to and an unreasonable application of clearly established federal law and an unreasonable determination of the facts as Bosse has demonstrated in his Petition. Where OCCA does not cumulate *all* the errors ultimately found, the Tenth Circuit has held federal review is *de novo*. *Cargle*, 317 F.3d at 1224.

If this Court finds none of the errors set forth in this Petition, when considered individually, necessitates the granting of habeas relief, the Court should find the cumulative effect of all the errors described herein deprived Bosse of his Constitutional right to a fair trial and reliable sentence. This Court should grant the writ.

## CONCLUSION

The Writ should issue for all the above reasons.

Respectfully submitted,


*s/Michael W. Lieberman*
MICHAEL W. LIEBERMAN, OBA #32694
SARAH M. JERNIGAN, OBA #21243
Assistant Federal Public Defenders
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102
Telephone: (405) 609-5975
Facsimile: (405) 609-5976
michael_lieberman@fd.org
sarah_jernigan@fd.org

Attorneys for Petitioner
Shaun Michael Bosse

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd  day of February, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant:

Jennifer Dickson, Assistant Attorney General
jenny.dickson@oag.ok.gov
fhc.docket@oag.ok.gov
*Attorney for Respondent*

*s/Michael W. Lieberman*
MICHAEL W. LIEBERMAN

98