# ATTACHMENT 11

*SHAUN MICHAEL BOSSE V. MIKE CARPENTER*

NO. CIV-18-204-R

## AFFIDAVIT OF BOBBY LEWIS

| | | |
|---|---|---|
| **STATE OF OKLAHOMA** | ) | |
| | ) | ss. |
| **COUNTY OF CLEVELAND** | ) | |

Before me, the undersigned Notary, on this 12 day of February, 2019, personally appeared Bobby Lewis, known to me of lawful age, who being by me first duly sworn, on his oath, deposes and says:

1. My name is Bobby Lewis. I am an attorney licensed to practice law in the State of Oklahoma. I have been an attorney with the Oklahoma Indigent Defense System ("OIDS") since I became an attorney in 2005. Currently, I am working in the Homicide Direct Appeals Division of OIDS as appellate counsel. I have been working in this division since I left the Norman Capital Trial Division. I started working in the Norman Capital Trial Division at the end of 2011 or beginning of 2012.

2. The entire time I worked in the Norman Capital Trial Division, it was either in chaos or on the brink of it. When I first started, Matthew Haire was the Division Chief, but everybody knew he was not at work a substantial amount of the time. From my perspective, Investigator Dale Anderson was the one who was actually running the division. Mr. Anderson acted as what is colloquially known as the "ramrod." Not only was he taking the lead role in attempting to get clients to take deals that they were reluctant to take, he also seemed to be supervising the lawyers in the division.

3. As the weeks went by and I became more familiar with the way things were going in the division, I was disappointed by the representation our clients seemed to be getting. The divisional strategy for capital cases was to take a heavy-handed approach in attempting to get the clients to take a deal. The investigators were instrumental in this approach, especially Mr. Anderson. The deal offered was invariably LWOP and the client was invariably not interested. With enough time, however, most of our clients decided to take a plea. This system worked seemingly well until a client either refused a deal or was not offered a deal and we were forced to go toward a trial. Then, it usually became apparent that we were unprepared in some fundamental way.

4. At times, it was like there was a checklist for each case and they were just checking the boxes to ensure they were not found ineffective later, without giving much thought to what was substantively going on. For example, experts would be hired, but no one seemed to be paying any attention to what was being sent to the experts to review. There was no clear system in place for keeping track of what the experts even had in their possession. On more than one occasion this led to confusion in our office.

5. Beginning in February, 2012, the only attorneys left in the Norman Capital Trial Division besides me, were Gary Henry and Mary Bruehl. The three of us were on every single case in

our division.

6. In February, 2012, Gary was promoted to Division Chief. Once he was in charge, he gave each of us general roles to play in our cases. Mary's role tended to focus on writing motions and preparing the mitigation aspects of the cases if they were to be tried. My role in most cases was to spend time with the client, gain their trust, and lead them to choose a sentence less than death, if that option was available. If we had to conduct adversarial hearings, Gary and I tended to handle the courtroom work together, with me doing most of the grunt work.

7. Since Gary had more legal experience than me and was my supervisor, I did what he told me to do. I made myself subservient to Gary.

8. Although we handled a lot of capital cases, most of those were "pled out" to a sentence less than death. Problems tended to arise when a case actually needed to be tried because, as a division, we were disorganized and flew by the seat of our pants. It is fair to say we did not have well-crafted strategies for the most part. This was especially true in the immediate aftermath of all of the other lawyers in the Norman Capital Trial Division being let go.

9. I was put on the Shaun's case very late in the game. I had far less experience than my co-counsel and I saw myself as third-chair attorney. I was approximately 33 years old with less than ten years experience. Mary and Gary were in their 50's, with tons of legal experience between them. I met with Shaun only a couple of times before trial that I recollect. I did not interview any of the witnesses before trial. I only reviewed their witness statements that my investigators prepared. It is fair to say I did not have a complete and fully cohesive understanding of the facts and evidence. Because my understanding of the evidence and case was limited, I depended on Mr. Henry to ensure that the logistics and supervision of the case were well managed. I think Mr. Henry had already been assigned to Mr. Bosse's case for some time before my arrival in the division.

10. Prior to the trial, the lawyers did not meet with or interview any of the witnesses ourselves, that I know of. We had reports from our investigators telling us what the witnesses had said, and we just questioned them from those reports. The only interaction we had with the witnesses themselves before they testified was while we were taking them in from the hallway outside the courtroom . It is possible that Mary or Gary had met with some of the witnesses without me being present.

11. I do not recall being involved in the hiring, directing, or communicating with any of the experts we hired in Shaun's case. I may have had some insignificant tasks delegated to me, in regard to the experts, like picking them up at the airport and driving them to their hotels. For substantive expert issues in the Bosse case, though, Gary or Mary was working with them.

12. From what I observed while working with Gary, it is fair to say he did not direct or

communicate with the experts adequately. Take Shaun's case for a specific example. We could not use two experts we had hired because no one had communicated with these experts about what to cover and not to cover with Shaun. The problem began as soon as the experts were engaged and not given clear parameters. The reason that expert testimony was not presented to Mr. Bosse's jury could have been eliminated by simply providing some guidance to the expert from the outset. This is not an example of a cohesive strategy that included both stages in place before the trial started. The decision not to call the experts was not even made until trial was underway and, possibly, until the first stage was over.

13. I do not remember giving Shaun a form for him to check as to what theory he wanted to pursue at trial. When I was shown this document, it looked like a form I may have drafted, but I cannot say for sure. If I did draft it, it was because I was told to draft it by Gary. This is not something I would have one of my client's sign if I were first chair on a case. But, if I had been lead on this case, I would not have been deciding what strategy to pursue within a few weeks of trial either. Given the overwhelming evidence connecting Shaun to the crime, more focus should have been on mitigation and preparing the mitigation experts. I know I did not focus on second stage. None of the second-stage witnesses I dealt with were prepared prior to their testimony. The only time I met with them was immediately before they took the stand, and I did not prepare them beyond what was discussed in the hall prior to them testifying.

14. I vaguely remember the colloquy Gary had with Shaun at the end of second stage. I seem to recall Gary asking me what all needed to be put on the record to insulate us against claims of ineffectiveness. It is fair to say that Mr. Henry had a preoccupation with being found ineffective and was determined to do whatever he could to avoid such a finding in the future.

15. When Shaun Bosse's case went to trial in October, 2012, this was my first capital case to actually go to trial. All the other cases I had worked on had pled.

16. I recall that Mary had what seemed like anxiety trouble leading up to and during Shaun's trial. Although my memory is not as good as it was, I believe Mary was supposed to do the direct-examination of Shaun's father, Jack Bosse, but at the last minute, she said she couldn't do it. So, I did. I had never met Jack Bosse before and had to present him cold. As you can tell from reading the record, Jack was not an easy witness. There may have been other witnesses Mary decided she could not question, but I cannot recall them now.

17. Before Mary was forced to resign or be fired, I was asked to write a memo in December, 2012, addressing her abilities at her job. This memo expressed the following: Mary was very insecure and would get jealous if I had more contact with Gary than she did; Mary felt she was being excluded from the courtroom by Gary and I, yet she was unable to handle the pressures of the courtroom; Mary was prone to anxiety when she saw a trial or contested hearing on the horizon. I personally saw Mary's anxiety deprive her of the ability to think on her feet. I observed this stress and anxiety as she prepared for Shaun Bosse's case. Mary

got so wound up that she could not focus or interact with others.

18. I was anxious going into Shaun's trial because I was not as familiar with his case as I wanted to be and even though I had met with Shaun a few times, I still did not feel like I knew him.

19. Before Gary Henry left OIDS as my Division Chief, I made complaints about him to his supervisor at OIDS. One complaint in particular was I felt he had lied to a District Attorney in one of our cases and caused us to have a Bill of Particulars attach to a client when one would not have otherwise. Gary and I got into a heated exchange regarding this episode. In my opinion, it is fair to say I thought Gary had a problem with telling the truth during the period we worked together. I have not been around him for years, now, so I have no opinion as to his current penchant for veracity.

20. I swear and affirm that the foregoing statement is true and correct to the best of my ability and recollection.

FURTHER AFFIANT SAYETH NOT.

_____
Bobby Lewis

Subscribed and sworn to me this 12 day of February, 2019.

_____
NOTARY PUBLIC

My commission number is:
05008474

My commission expires:
9/12/21