**\*CAPITAL CASE\***

**No. CIV-18-204-JD**

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

---

**SHAUN MICHAEL BOSSE,**
**Petitioner,**

**-vs-**

**JIM FARRIS, Warden,**
**Oklahoma State Penitentiary,**
**Respondent.**

---

**RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**

---

**JOHN M. O'CONNOR**
**ATTORNEY GENERAL OF OKLAHOMA**

**JOSHUA R. FANELLI, OBA #33503**
**CAROLINE E.J. HUNT, OBA #32635**
**ASSISTANT ATTORNEYS GENERAL**
**313 NE 21st Street**
**Oklahoma City, OK   73105**
**(405) 521-3921; (405) 522-4534 (FAX)**
**Service emails:   fhc.docket@oag.ok.gov**
**joshua.fanelli@oag.ok.gov**
**caroline.hunt@oag.ok.gov**

**ATTORNEYS FOR RESPONDENT**

**October 11, 2022**

## <u>TABLE OF CONTENTS</u>

Page

**STANDARD OF REVIEW** ..................................................................... **5**

**RESPONSE TO PETITIONER'S STATEMENT OF THE FACTS** ....................... **11**

**ARGUMENT AND AUTHORITY** .............................................................. **16**

**<u>GROUND I</u>**

    **PETITIONER'S FIRST HABEAS GROUND HAS BEEN
RENDERED ENTIRELY MOOT BY THE UNITED STATES
SUPREME COURT'S RECENT DECISION IN *OKLAHOMA V.
CASTRO-HUERTA*, 142 S. CT. 2486 (2022)** ................................... **16**

**<u>GROUND II</u>**

    **PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL
CLAIM IS BARRED PURSUANT TO AN INDEPENDENT AND
ADEQUATE STATE PROCEDURAL RULE, AND HE HAS NOT
SHOWN CAUSE AND PREJUDICE OR A FUNDAMENTAL
MISCARRIAGE OF JUSTICE SUFFICIENT TO OVERCOME
THAT PROCEDURAL BAR** ............................................................. **18**

    **A.**    **Procedural Background** ......................................................... **18**

    **B.**    **Argument and Authority** ....................................................... **22**

        *1.*    *Petitioner's ineffective assistance claim is procedurally
barred pursuant to an independent and adequate state
procedural rule* ........................................................... **22**

        *2.*    *Petitioner is unable to show cause to overcome the default* ......... **25**

        *3.*    *Petitioner has not shown a fundamental miscarriage of
justice* ...................................................................... **28**

        *4.*    *Any future arguments to overcome the bar should be
deemed forfeited* .......................................................... **29**

    **C.**    **Conclusion** ........................................................................ **32**

## GROUND III

PETITIONER'S GRUESOME PHOTOGRAPHS CLAIM WAS
NOT EXHAUSTED AS A FEDERAL CLAIM AND, REGARDLESS,
FAILS FOR LACK OF CLEARLY ESTABLISHED FEDERAL LAW.
EVEN ASSUMING THE CLAIM AT STAKE IS PREMISED ON
CLEARLY ESTABLISHED FEDERAL LAW, *ARGUENDO*, THE
OCCA'S REJECTION OF THIS CLAIM WAS NEITHER
CONTRARY TO, OR AN UNREASONABLE APPLICATION OF,
CLEARLY ESTABLISHED FEDERAL LAW ................................. 32

A.      Procedural Background .......................................................... 33

B.      Preliminary Statement Regarding Fair Presentation and
        Merits Adjudication ............................................................... 36

C.      Argument and Authority ........................................................ 45

        1.      *Petitioner's claim fails for lack of clearly established law* ........... 45

        2.      *Alternatively, the OCCA's adjudication of this issue was
                reasonable and not contrary to any Supreme Court law* ............... 46

D.      Conclusion .............................................................................. 62

## GROUND IV

THE OCCA'S FINDING OF HARMLESS ERROR FROM THE
ADMISSION OF IMPROPER VICTIM IMPACT TESTIMONY
WAS LEGALLY AND FACTUALLY REASONABLE ................................. 63

A.      Procedural Background .......................................................... 63

B.      Argument and Authority ........................................................ 67

C.      Conclusion .............................................................................. 79

## GROUND V

THE DECISION OF THE OCCA FINDING SUFFICIENT
EVIDENCE TO SUPPORT THE "MURDER TO AVOID
ARREST" AGGRAVATOR WAS NEITHER LEGALLY NOR
FACTUALLY UNREASONABLE .................................................... 79

**A.**     **Procedural Background** ................................................................ **80**

**B.**     **Argument and Authority** .......................................................... **82**

**C.**     **Conclusion** ................................................................................. **89**

## GROUND VI

**THE DECISION OF THE OCCA REJECTING PETITIONER'S CLAIM OF ALLEGED PROSECUTORIAL ERROR WAS NEITHER CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD** ......................................... **89**

**A.**     **Procedural Background** ............................................................ **90**

**B.**     **Applicable Law** ......................................................................... **91**

**C.**     **Argument and Authority** .......................................................... **93**

       *1.*     *Allegedly emphasizing Petitioner's lack of remorse (Guilt Stage)* .......................................................... **93**

       *2.*     *Allegedly attempting to define reasonable doubt (Guilt Stage)* .......................................................... **96**

       *3.*     *Allegedly engaging in burden-shifting (Guilt Stage)* ..................... **99**

       *4.*     *Allegedly using refusal to consent as proof of guilt (Guilt Stage)* .......................................................... **103**

       *5.*     *Allegedly emphasizing Petitioner's courtroom demeanor (Penalty Phase)* ....................................................... **105**

       *6.*     *Alleged invocation of sympathy (Penalty Phase)* ......................... **108**

       *7.*     *Allegedly diminishing value of life without parole (Penalty Phase)* ....................................................... **113**

**D.**     **Conclusion** ............................................................................... **117**

## GROUND VII

**FOR THE SAKE OF PRESERVATION, RESPONDENT ASSERTS THAT NO CLEARLY ESTABLISHED FEDERAL LAW SUPPORTS PETITIONER'S CLAIM OF CUMULATIVE ERROR. REGARDLESS, THE DECISION OF THE OCCA FINDING NO CUMULATIVE ERROR WAS NEITHER CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD** ............................ 118

    **A.**    **Procedural Background** ........................................................ 119

    **B.**    **Argument and Authority** ...................................................... 120

    **C.**    **Conclusion** .......................................................................... 122

**CONCLUSION** ................................................................................................. 122

**CERTIFICATE OF SERVICE** ........................................................................ 123

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Alberni v. McDaniel*,
   458 F.3d 860 (9th Cir. 2006) ........................................................ 45

*Anderson v. Sirmons*,
   476 F.3d 1131 (10th Cir. 2007) ..................................................... 11

*Aycox v. Lytle*,
   196 F.3d 1174 (10th Cir. 1999) ....................................................... 9

*Baldwin v. Reese*,
   541 U.S. 27 (2004) ........................................................................ 39

*Banks v. Workman*,
   692 F.3d 1133 (10th Cir. 2012) ..................................................... 24

*Banks v. Workman*,
   No. 03-CV-0198-CVE-TLW, 2010 WL 3516839 (N.D. Okla. Sept. 3, 2010) .......... 88

*Beavers v. Saffle*,
   216 F.3d 918 (10th Cir. 2000) ....................................................... 29

*Ben-Yisrayl v. Buss*,
   540 F.3d 542 (7th Cir. 2008) .......................................................... 9

*Black v. Workman*,
   682 F.3d 880 (10th Cir. 2012) ................................................... 9, 29

*Bland v. Sirmons*,
   459 F.3d 999 (10th Cir. 2006) ....................................................... 10

*Booth v. Maryland*,
   482 U.S. 496 (1987) ............................................................... Passim

*Bosse v. Oklahoma*,
   137 S. Ct. 1 (2016) .................................................................. 3, 67

*Bosse v. Oklahoma*,
   No. 17-7232, 138 S. Ct. 1264 (Mem.) ............................................. 3

*Bosse v. Oklahoma*,
   No. 21-5443, 142 S. Ct. 1136 (Mem.) ............................................................... 4

*Brecheen v. Reynolds*,
   41 F.3d 1343 (10th Cir. 1994) ................................................................. 22, 29

*Brecht v. Abrahamson*,
   507 U.S. 619 (1993) ................................................................................. Passim

*Britt v. Embry*,
   No. 07-6058, 302 F. App'x 774 (10th Cir. Dec. 9, 2008) ................................. Passim

*Bromley v. Phillips*,
   No. 13-8018, 528 F. App'x 956 (10th Cir. July 10, 2013) ......................................... 40

*Brown v. Davenport*,
   142 S. Ct. 1510 (2022) ........................................................................... 67, 68

*Brumfield v. Cain*,
   576 U.S. 305 (2015) .................................................................................... 9

*Burt v. Titlow*,
   571 U.S. 12 (2013) ..................................................................................... 8

*Bush v. Carpenter*,
   926 F.3d 644 (10th Cir. 2019) ...................................................................... 120

*Byrd v. Workman*,
   645 F.3d 992 (9th Cir. 2004) .......................................................................... 9

*Cannon v. Gibson*,
   259 F.3d 1253 (10th Cir. 2001) ..................................................................... 11

*Carey v. Musladin*,
   549 U.S. 70 (2006) ...................................................................................... 6

*Cavazos v. Smith*,
   565 U.S. 1 (2011) ...................................................................................... 82

*Chapman v. California*,
   386 U.S. 18 (1967) ............................................................................... Passim

*Coddington v. Royal,*
 No. CIV-11-1457-HE, 2016 WL 4991685 (W.D. Okla. Sept. 15, 2016) ....... 82, 88, 89

*Cole v. Trammell,*
 755 F.3d 1142 (10th Cir. 2014) ............................................................... Passim

*Cole v. Workman,*
 No. 08-CV-0328-CVE-PJC, 2011 WL 3862143 (N.D. Okla. Sept. 1, 2011)............. 60

*Cole v. Zavaras,*
 No. 09-1293, 349 F. App'x 328 (10th Cir. Oct. 16, 2009) ........................................... 38

*Coleman v. Brown,*
 802 F.2d 1227 (10th Cir. 1986) ................................................................... 117

*Coleman v. Johnson,*
 566 U.S. 650 (2012) ...................................................................................... 82

*Coleman v. Thompson,*
 501 U.S. 722 (1991) .............................................................................. Passim

*Cuesta-Rodriguez v. Carpenter,*
 916 F.3d 885 (10th Cir. 2019) ................................................................. 27, 31

*Cummings v. Sirmons,*
 506 F.3d 1211 (10th Cir. 2007) ..................................................................... 11

*Darden v. Wainwright,*
 477 U.S. 168 (1986) ................................................................................ 39, 92

*Darks v. Mullin,*
 327 F.3d 1001 (10th Cir. 2003) ................................................................... 120

*Davis v. Ayala,*
 576 U.S. 257 (2015) ................................................................................ 67, 68

*DeRosa v. Workman,*
 679 F.3d 1196 (10th Cir. 2012) ..................................................................... 72

*Dodd v. Trammell,*
 753 F.3d 971 (10th Cir. 2013) ............................................................... Passim

*Donnelly v. DeChristoforo,*
   416 U.S. 637 (1974) ............................................................................................................... **Passim**

*Dowling v. United States,*
   493 U.S. 342 (1990) .................................................................................................................... **50**

*Duckett v. Mullin,*
   306 F.3d 982 (10th Cir. 2002) ................................................................................................. **47**

*Duncan v. Henry,*
   513 U.S. 364 (1995) ........................................................................................ **37, 38, 40, 104**

*Dunn v. Madison,*
   138 S. Ct. 9 (2017) ...................................................................................................................... **8**

*Duvall v. Reynolds,*
   139 F.3d 768 (10th Cir. 1998) ....................................................................................... **23, 115**

*Early v. Packer,*
   537 U.S. 3 (2002) ....................................................................................................................... **43**

*English v. Cody,*
   146 F.3d 1257 (10th Cir. 1998) .............................................................................................. **24**

*Estelle v. McGuire,*
   502 U.S. 62 (1991) ..................................................................................................................... **45**

*Fairchild v. Trammell,*
   784 F.3d 702 (10th Cir. 2015) .......................................................................................... **27, 28**

*Fero v. Kerby,*
   39 F.3d 1462 (10th Cir. 1994) ................................................................................................ **92**

*Frost v. Pryor,*
   749 F.3d 1212 (10th Cir. 2014) ........................................................................................ **8, 116**

*Gilbert v. Mullin,*
   302 F.3d 1166 (10th Cir. 2002) ........................................................................................ **7, 107**

*Gilson v. Sirmons,*
   520 F.3d 1196 (10th Cir. 2008) ............................................................................................... **6**

*Givens v. Yukins*,
   238 F.3d 420 (6th Cir. 2000) ......................................................... 50, 57

*Gonzales v. Tafoya*,
   515 F.3d 1097 (10th Cir. 2008) ............................................................ 47

*Grant v. Royal*,
   886 F.3d 874 (10th Cir. 2018) ...............................................37, 38, 104

*Grant v. Trammell*,
   727 F.3d 1006 (10th Cir. 2013) ...................................................... 10, 71

*Gray v. Netherland*,
   518 U.S. 152 (1996) ............................................................................. 37

*Griffin v. California*,
   380 U.S. 609 (1965) ........................................................................... 103

*Hackett v. Farris*,
   No. 11-CV-322-GKF-TLW, 2014 WL 4825263 (N.D. Okla. Sept. 25, 2014) ........ 102

*Hamilton v. Mullin*,
   436 F.3d 1181 (10th Cir. 2006) ........................................................ 6, 82

*Hancock v. Trammell*,
   798 F.3d 1002 (10th Cir. 2015) ....................................................Passim

*Hanson v. Sherrod*,
   797 F.3d 810 (10th Cir. 2015) ........................................................... 120

*Harrington v. Richter*,
   562 U.S. 86 (2011) .......................................................................Passim

*Hawkins v. Mullin*,
   291 F.3d 658 (10th Cir. 2002) ............................................................. 51

*Hogan v. Trammell*,
   No. 11-6161, 511 F. App'x 769 (10th Cir. Feb. 20, 2013) ........................................... 24

*Holland v. Allbaugh*,
   824 F.3d 1222 (10th Cir. 2016) ........................................................... 46

*Holley v. Yarborough*,
  568 F.3d 1091 (9th Cir. 2009) ....................................................... 46

*Hooks v. Ward*,
  184 F.3d 1206 (10th Cir. 1999) ................................................. 30, 31

*Hooks v. Workman*,
  689 F.3d 1148 (10th Cir. 2012) ......................................... 11, 47, 122

*Hooper v. Mullin*,
  314 F.3d 1162 (10th Cir. 2002) ............................................. 94, 115

*House v. Hatch*,
  527 F.3d 1010 (10th Cir. 2008) ................................................. 6, 46

*Jackson v. Virginia*,
  443 U.S. 307 (1979) ................................................................. 82, 85

*James v. Gibson*,
  211 F.3d 543 (10th Cir. 2000) .................................................... 107

*Johnson v. Lee*,
  578 U.S. 605 (2016) ..................................................................... 23

*Johnson v. Martin*,
  3 F.4th 1210 (10th Cir. 2021) ....................................................... 45

*Johnson v. Williams*,
  568 U.S. 289 (2013) .............................................. 42, 43, 44, 121

*Kane v. Garcia Espitia*,
  546 U.S. 9 (2005) ........................................................................... 6

*Lamb v. Oklahoma Cnty. Dist. Ct.*,
  No. 06-6222, 229 F. App'x 690 (10th Cir. Apr. 10, 2007) ...... 48, 49, 50, 51

*Le v. Mullin*,
  311 F.3d 1002 (10th Cir. 2002) .................................................... 93

*Littlejohn v. Trammell*,
  704 F.3d 817 (10th Cir. 2013) .................................................... 122

*Lockett v. Trammell,*
  711 F.3d 1218 (10th Cir. 2013) ..................................................... 75

*Lorraine v. Coyle,*
  291 F.3d 416 (6th Cir. 2002) ....................................................... 120

*Magar v. Parker,*
  490 F.3d 816 (10th Cir. 2007) ....................................................... 11

*Malicoat v. Mullin,*
  426 F.3d 1241 (10th Cir. 2005) .................................................... 111

*Martinez v. Ryan,*
  566 U.S. 1 (2012) ......................................................................... 27

*Matthews v. Workman,*
  577 F.3d 1175 (10th Cir. 2009) ..................................................... 92

*McKinney v. Bruce,*
  No. 04-3308, 125 F. App'x 947 (10th Cir. Feb. 7, 2005) .................. 101

*Mitchell v. Gibson,*
  262 F.3d 1036 (10th Cir. 2001) ....................................................... 7

*Moore v. Braggs,*
  No. CIV-20-227-PRW, 2021 WL 8155698 (W.D. Okla. Mar. 26, 2021) ........... 97, 98

*Moore v. Gibson,*
  195 F.3d 1152 (10th Cir. 1999) ............................................... 110, 111

*Murray v. Carrier,*
  477 U.S. 478 (1986) ...................................................................... 25

*Oklahoma v. Castro-Huerta,*
  142 S. Ct. 2486 (2022) ............................................................. 16, 17

*Oliver v. Davis,*
  25 F.4th 1228 (9th Cir. 2022) ........................................................ 10

*Pavatt v. Carpenter,*
  928 F.3d 906 (10th Cir. 2019) ................................................. Passim

*Payne v. Tennessee*,
  501 U.S. 808 (1991) .................................................................................. 3

*Pendleton v. Allbaugh*,
  No. CIV-16-80-C, 2016 WL 4005338 (W.D. Okla. June 24, 2016) ........................... 97

*Phillips v. Williams*,
  No. CIV-08-1248-M, 2010 WL 152139 (W.D. Okla. Jan. 13, 2010) ..................... 101

*Picard v. Connor*,
  404 U.S. 270 (1971) ................................................................................ 10

*Postelle v. Carpenter*,
  901 F.3d 1202 (10th Cir. 2018) ................................................................ 40

*Renico v. Lett*,
  559 U.S. 766 (2010) .................................................................................. 8

*Rhines v. Weber*,
  544 U.S. 269 (2005) ................................................................................ 30

*Rivera v. Illinois*,
  556 U.S. 148 (2009) ....................................................................... 38, 50, 57

*Rodden v. Delo*,
  143 F.3d 441 (8th Cir. 1998) ................................................................ 115

*Romano v. Oklahoma*,
  512 U.S. 1 (1994) ........................................................................ 39, 46, 63

*Rompilla v. Beard*,
  545 U.S. 374 (2005) ................................................................................ 42

*Russell v. Bryant*,
  No. 18-7043, 781 F. App'x 721 (10th Cir. July 11, 2019) ........................... 101

*Rwezaula v. Dowling*,
  No. CIV-17-91-F, 2018 WL 3800056 (W.D. Okla. May 22, 2018) ................. 116

*Sawyer v. Whitley*,
  505 U.S. 333 (1992) ................................................................................ 29

*Selsor v. Workman,*
    644 F.3d 984 (10th Cir. 2011) ............................................................ 77, 78

*Sexton v. Beaudreaux,*
    138 S. Ct. 2555 (2018) ............................................................ 45, 73, 98

*Smallwood v. Gibson,*
    191 F.3d 1257 (10th Cir. 1999) ............................................ 48, 52, 56, 59

*Smith v. Aldridge,*
    904 F.3d 874 (10th Cir. 2018) ................................................................ 9

*Smith v. Duckworth,*
    824 F.3d 1233 (10th Cir. 2016) ......................................................... 121

*Smith v. Sirmons,*
    No. 06-6067, 200 F. App'x 822 (10th Cir. Oct. 17, 2006) ....................... 56

*Spears v. Mullin,*
    343 F.3d 1215 (10th Cir. 2003) .................................................... Passim

*Steele v. Young,*
    11 F.3d 1518 (10th Cir. 1993) .............................................................. 28

*Stone v. Powell,*
    428 U.S. 465 (1976) ............................................................... 103, 104

*Taylor v. Maddox,*
    366 F.3d 992 (9th Cir. 2004) ............................................................... 10

*Thacker v. Workman,*
    678 F.3d 820 (10th Cir. 2012) ...................................... 23, 24, 41, 104

*Thornburg v. Mullin,*
    422 F.3d 1113 (10th Cir. 2005) .................................................... Passim

*Toles v. Higgins,*
    No. CIV-13-273-D, 2016 WL 919947 (W.D. Okla. Feb. 12, 2016) ....... 103

*Trevino v. Thaler,*
    569 U.S. 413 (2013) ........................................................................... 27

*Trice v. Ward,*
   196 F.3d 1151 (10th Cir. 1999) ............................................................. 101

*Tripp v. Whitten,*
   No. CIV-20-246-SLP, 2020 WL 4043987 (W.D. Okla. June 18, 2020) .................... 28

*Trussell v. Bowersox,*
   447 F.3d 588 (8th Cir. 2006) ................................................................ 10

*Tryon v. Farris,*
   No. CIV-19-195-J, 2021 WL 3042664 (W.D. Okla. July 19, 2021) ......................... 28

*Turnstall v. Hopkins,*
   306 F.3d 601 (8th Cir. 2002) ............................................................... 116

*Underwood v. Duckworth,*
   No. CIV-12-111-D, WL 4059162 (W.D. Okla. July 28, 2016) .............. 64, 69, 77, 112

*Underwood v. Royal,*
   894 F.3d 1154 (10th Cir. 2018) .......................................................... Passim

*United States v. Davis,*
   609 F.3d 663 (5th Cir. 2010) ............................................................... 116

*United States v. Farmer,*
   770 F.3d 1363 (10th Cir. 2014) ........................................................... 102

*United States v. Fleming,*
   667 F.3d 1098 (10th Cir. 2011) ............................................................. 96

*United States v. Rivera,*
   900 F.2d 1462 (10th Cir. 1990) ............................................................. 47

*United States v. Russell,*
   411 U.S. 423 (1973) ......................................................................... 92

*Valdez v. Bravo,*
   373 F.3d 1093 (10th Cir. 2004) .............................................................. 7

*Walker v. Martin,*
   562 U.S. 307 (2011) ......................................................................... 23

*Warner v. Workman*,
   814 F. Supp. 2d 1188 (W.D. Okla. 2011) ................................................. 107

*Weeks v. Angelone*,
   528 U.S. 225 (2000) ..............................................95, 98, 102, 111

*Welch v. Sirmons*,
   451 F.3d 675 (10th Cir. 2006) ................................................. 49

*Welch v. Workman*,
   639 F.3d 980 (10th Cir. 2011) ................................................. 72, 73

*White v. Woodall*,
   572 U.S. 415 (2014) ................................................. 8, 105

*Wilder v. Cockrell*,
   274 F.3d 255 (5th Cir. 2001) ................................................. 37

*Williams v. Pettigrew*,
   No. CIV-17-258-RAW-KEW, 2020 WL 5865869 (E.D. Okla. Sept. 30, 2020) ....... 95

*Williams v. Taylor*,
   529 U.S. 362 (2000) ................................................. 6, 7, 51

*Williams v. Trammell*,
   782 F.3d 1184 (10th Cir. 2015) ................................................. 23, 41, 104

*Willingham v. Mullin*,
   296 F.3d 917 (10th Cir. 2002) ................................................. Passim

*Wilson v. Sirmons*,
   536 F.3d 1064 (10th Cir. 2008) ................................................. Passim

*Wood v. Allen*,
   558 U.S. 290 (2010) ................................................. 10

*Woodson v. North Carolina*,
   428 U.S. 280 (1976) ................................................. 62

*Wright v. Van Patten*,
   552 U.S. 120 (2008) ................................................. 120

*Zuniga v. Falk*,
 No. 15-1118, 618 F. App'x 407 (10th Cir. July 10, 2015) ............................................ 37

## STATE CASES

*Bench v. State*,
 431 P.3d 929 (Okla. Crim. App. 2018) ........................................................ 60

*Bosse v. State*,
 360 P.3d 1203 (Okla. Crim. App. 2015) ..................................................... 2

*Bosse v. State*,
 400 P.3d 834 (Okla. Crim. App. 2017) ................................................. Passim

*Bosse v. State*,
 484 P.3d 286 (Okla. Crim. App. 2021) ........................................................ 3

*Bosse v. State*,
 499 P.3d 771 (Okla. Crim. App. 2021) ................................... 4, 21, 22, 119

*Coddington v. State*,
 142 P.3d 437 (Okla. Crim. App. 2006) ........................................................ 82

*Coddington v. State*,
 254 P.3d 684, 705 (Okla. Crim. App. 2011) ............................................... 83

*Cudjo v. State*,
 925 P.2d 895 (Okla. Crim. App. 1996) ...................................................... 106

*Hain v. State*,
 919 P.2d 1130 (Okla. Crim. App. 1996) ..................................................... 57

*Knapper v. State*,
 473 P.3d 1053 (Okla. Crim. App. 2020) ..................................................... 41

*Livingston v. State*,
 907 P.2d 1088 (Okla. Crim. App. 1995) ................................................ Passim

*Lott v. State*,
 98 P.3d 318 (Okla. Crim. App. 2004) ................................................... 83, 85

*Mitchell v. State,*
    424 P.3d 677 (Okla. Crim. App. 2018) ........................................................ 82

*Pickens v. State,*
    19 P.3d 866 (Okla. Crim. App. 2001) .......................................................... 83

*Underwood v. State,*
    252 P.3d 221 (Okla. Crim. App. 2011) ...................................................... 112

*Wackerly v. State,*
    12 P.3d 1 (Okla. Crim. App. 2000) ............................................................. 83

## FEDERAL STATUTES

28 U.S.C. § 2254 ................................................................................... Passim

## STATE STATUTES

OKLA. STAT. tit. 21, § 701.7 (Supp. 2009) .................................................... 2

OKLA. STAT. tit. 21, § 701.12 (2001) ........................................................... 80

OKLA. STAT. tit. 21, § 1401 (2001) ............................................................... 2

OKLA. STAT. tit. 22, § 1089 (2011) ....................................................... 22, 23

## FEDERAL RULES

10TH CIR. R. 32.1 ...................................................................................... 24

FED. R. APP. P. 32.1 .................................................................................. 24

## STATE RULES

Rule 3.14, *Rules of the Oklahoma Court of Criminal Appeals,*
    OKLA. STAT. tit. 22, ch. 18 ........................................................................ 44

## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SHAUN MICHAEL BOSSE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-18-00204-JD** |
| | ) | |
| **JIM FARRIS, Warden,** | ) | **(Capital Case)** |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

The Attorney General of the State of Oklahoma, John M. O'Connor, as well as Joshua R. Fanelli and Caroline E.J. Hunt, Assistant Attorneys General, appearing on behalf of the above-named Respondent, in response to the Petition for Writ of Habeas Corpus on file herein shows the Court as follows:

1.     Petitioner, Shaun Michael Bosse, an inmate in the custody of the Oklahoma State Penitentiary in McAlester, Oklahoma, appearing through counsel, Emma V. Rolls and Katrina Conrad-Legler, has filed with this Court a Petition and Brief in Support seeking federal habeas corpus relief under 28 U.S.C. § 2254, as well as a Motion for Discovery and Brief in Support. *See* Docs. 19, 20.[1] In addition to this Response in Opposition, an Objection to Petitioner's Motion for Discovery will also be separately filed in this Court.

2.     The instant habeas petition challenges a lawful Judgment and Sentence entered on December 18, 2012, in the District Court of McClain County, State of

---

[1] Citations to specific page numbers within documents filed in this Court will be referred to using the original pagination located at the bottom of each page.

Oklahoma, Case No. CF-2010-213, wherein Petitioner was convicted of three counts of First-Degree Murder (Malice Aforethought), in violation of OKLA. STAT. tit. 21, § 701.7(A) (Supp. 2009), and one count of First-Degree Arson, in violation of OKLA. STAT. tit. 21, § 1401(A) (2001), stemming from Petitioner's murder of twenty-four-year-old Katrina Griffin and her two children, eight-year-old C.G. and six-year-old C.H., before setting their trailer home on fire. The jury found the existence of three aggravating circumstances with respect to each of the three murder counts: (1) during the commission of the murder, Petitioner knowingly created a great risk of death to more than one person; (2) that the murder was especially heinous, atrocious, or cruel ("HAC"); and (3) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. Petitioner was sentenced to death on all three murder counts, and thirty-five (35) years imprisonment and a $25,000.00 fine on the arson count, with his sentences ordered to run consecutively.

3.     Petitioner filed a direct appeal of his convictions and sentences under Oklahoma Court of Criminal Appeals ("OCCA") Case No. D-2012-1128. The OCCA subsequently affirmed Petitioner's convictions and sentences, including his death sentences, in a published opinion issued on October 16, 2015. *Bosse v. State*, 360 P.3d 1203 (Okla. Crim. App. 2015) (*Bosse I*). Petitioner's initial application for state post-conviction relief was denied by the OCCA in an unpublished opinion. *Bosse v. State*, No. PCD-2013-360 (Okla. Crim. App. Dec. 16, 2015) (unpublished).

4.     After his convictions and sentences were affirmed on direct appeal, Petitioner sought and received *certiorari* review from the United States Supreme Court on a challenge

2

to the State's admission of certain victim impact testimony at his trial, under the rubric imposed in *Payne v. Tennessee*, 501 U.S. 808 (1991), and the matter was vacated and remanded back to the OCCA for further consideration. *Bosse v. Oklahoma*, 137 S. Ct. 1 (2016). Subsequently, the OCCA reconsidered the claim in light of the Supreme Court's remand, and issued a substituted published opinion on May 25, 2017, again affirming Petitioner's convictions and sentences, including his death sentences. *Bosse v. State*, 400 P.3d 834 (Okla. Crim. App. 2017) (*Bosse II*), *adhered to on reh'g,* 406 P.3d 26 (Okla. Crim. App. 2017).[2] Petitioner again sought *certiorari* review from the United States Supreme Court, and on March 9, 2018, the petition for writ of *certiorari* was denied. *Bosse v. Oklahoma*, No. 17-7232, 138 S. Ct. 1264 (Mem.) (Mar. 5, 2018) (unpublished).

5.     Petitioner filed a successive application for state post-conviction relief on February 20, 2019, under OCCA Case No. PCD-2019-124, predicated on his claim that the State lacked prosecutorial authority since Petitioner's victims were allegedly Indian and his crimes allegedly occurred within Indian Country, as well as a previously unheard claim that his counsel were ineffective for failing to present his mitigation case a certain way, and a claim of cumulative error. On March 11, 2021, the OCCA issued a published opinion granting Petitioner post-conviction relief on the basis of his Indian Country claim and reversing the case with instructions to dismiss. *Bosse v. State*, 484 P.3d 286 (Okla. Crim. App. 2021). After further litigation, however, on August 31, 2021, the OCCA issued a published order vacating and withdrawing the previous opinion and judgment granting

---

[2] The factual background underpinning this issue is discussed in greater detail below, in Ground IV, *see infra*.

post-conviction relief. *Bosse v. State*, 495 P.3d 669 (Mem.) (Okla. Crim. App. 2021). Then, on October 7, 2021, the OCCA issued a published opinion denying Petitioner's successive application for post-conviction relief, including rejecting his Indian Country claim as well as his claim that his prior counsel were allegedly ineffective for failing to investigate and present history relating to Petitioner's family history and background, and denying his cumulative error claim. *Bosse v. State*, 499 P.3d 771 (Okla. Crim. App. 2021) (*Bosse III*). On February 22, 2022, Petitioner's petition for writ of *certiorari* was denied. *Bosse v. Oklahoma*, No. 21-5443, 142 S. Ct. 1136 (Mem.) (Feb. 22, 2022) (unpublished).

6.      As will be discussed in detail below, some of Petitioner's grounds for relief are not fully exhausted. Respondent explicitly does not waive exhaustion as to any claim. *See* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."). As will be shown, this Court should deny on the merits Petitioner's exhausted grounds, and reject the remainder as procedurally barred.

7.      Counsel for Respondent requested the OCCA to send to the Clerk of this Court all briefs, transcripts, exhibits, original records, and any other relevant filings from Petitioner's direct appeal and post-conviction proceedings by the due date of this response, as an aid to this Court in adjudicating the petition presently at bar. On July 27, 2022, the OCCA issued an Order to Transmit Records in each of Petitioner's cases in that court. This Court received these transmitted records[3] on August 5, 2022. Doc. 47.

---

[3] Citations to the Original Record in state court proceedings will be referred to as (O.R. __). Citations to the transcript of Petitioner's jury trial will be referred to by volume, as

4

8.    Petitioner's habeas petition was filed in this Court on February 22, 2019. Doc. 19. On July 13, 2022, this Court entered an order lifting the stay of proceedings[4] and reimposing the remainder of the briefing schedule previously established, making the instant response initially due on September 12, 2022. *See* Doc. 45. One unopposed thirty-day extension of time was granted by this Court, making this response due on October 12, 2022. *See* Doc. 49. Accordingly, this response is timely filed.[5]

## <u>STANDARD OF REVIEW</u>

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a petition for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

(Tr. [vol. #], __). Citations to exhibits presented by the State at Petitioner's trial will be referred to as (State's Ex. __). Citations to any pleadings filed in state court will be referred to using original pagination.

[4] These proceedings had been previously stayed on April 2, 2019, by order of this Court, pending resolution of Petitioner's Indian Country claim in state court. *See* Docs. 23, 24. As discussed in Ground I, *see infra*, Petitioner's Indian Country claim—and the basis upon which the stay had previously been granted—is now moot and need not be adjudicated. *See* Docs. 42, 44.

[5] As foreshadowed above, simultaneous with the filing of this response, Respondent is also filing an Objection to Petitioner's Motion for Discovery, responding to the discovery requests advanced by Petitioner in Doc. 20.

28 U.S.C. § 2254(d).

Section 2254(d)(1) applies to questions of law and mixed questions of law and fact. *Gilson v. Sirmons*, 520 F.3d 1196, 1233 (10th Cir. 2008); *Hamilton v. Mullin*, 436 F.3d 1181, 1194 (10th Cir. 2006). Furthermore, Section 2254(d)(2) applies to questions of fact. *Hamilton*, 436 F.3d at 1194.

The United States Supreme Court has emphasized that "clearly established Federal law" as used in Section 2254(d) "'refers to the holdings . . . of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). In *Kane v. Garcia Espitia*, 546 U.S. 9 (2005) (per curiam), the Supreme Court also made clear that broad generalizations in its opinions do not justify the circuit and district courts in finding points of law not specified in such opinions to be "clearly established" for AEDPA purposes. The threshold question for this Court on habeas review is whether Petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time his conviction became final. *See House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008). "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*." *Id.* Thus, Supreme Court holdings "must be construed narrowly and consist only of something akin to on-point holdings." *Id.* at 1015. Where there is no clearly established federal law, that ends this Court's inquiry under Section 2254(d)(1). *See id.* at 1017-18 ("The absence of clearly established federal law is dispositive under § 2254(d)(1).").

6

If a clearly established rule of federal law is implicated, however, then this Court must decide whether the state court's decision was contrary to, or an unreasonable application of, that clearly established rule of federal law. *See id.* A state court decision is contrary to clearly established federal law when it reaches a conclusion opposite to that of the Supreme Court on a question of law or decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams*, 529 U.S. at 405-06; *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001).

A state court decision involves an unreasonable application of clearly established federal law when the state court correctly identifies the governing legal principle but applies it to the facts of the particular case in an unreasonable manner. *Valdez v. Bravo*, 373 F.3d 1093, 1096 (10th Cir. 2004); *Gilbert v. Mullin*, 302 F.3d 1166, 1171 (10th Cir. 2002). The Supreme Court has delineated the "unreasonable application" clause as follows:

> In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Williams*, 529 U.S. at 411.

In *Harrington v. Richter*, 562 U.S. 86, 101-02 (2011), the Supreme Court criticized a federal court of appeals for effectively reviewing a petitioner's ineffective assistance of counsel claim *de novo* and then declaring that the state court's decision was an unreasonable application of clearly established federal law. The Supreme Court made clear that "[a] state court's determination that a claim lacks merit precludes federal habeas relief

7

so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101 (quotation marks omitted). The standard set by the AEDPA was meant to be difficult to meet. *Id.* at 102. Thus, a habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. *See also Burt v. Titlow*, 571 U.S. 12, 20 (2013) ("We will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy."). In other words, "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Even a strong case for relief on direct review does not mean that the state court's denial of relief was unreasonable. *Richter*, 562 U.S. at 102.

A habeas petitioner's ability to obtain relief is limited because habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (quotation marks omitted). *See also Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014). The *Richter* standard applies to all three AEDPA inquiries. *See Dunn v. Madison*, 138 S. Ct. 9, 12 (2017) ("[T]he state court's determinations of law and fact were not 'so lacking in justification' as to give rise to error 'beyond any possibility for fairminded disagreement.'"); *White v. Woodall*, 572 U.S. 415, 427 (2014) ("[R]elief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." (quoting *Richter*,

562 U.S. at 103)). And Section 2254 of the AEDPA applies even when there has been a summary denial. *Richter*, 562 U.S. at 99; *see also Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) (holding that a summary decision is an "adjudication on the merits" for purposes of Section 2254(d) where the decision was reached on substantive grounds). And the standard set by AEDPA is even more difficult to meet when the rule established by the Supreme Court is a general one. *Id.* at 101.

As for 28 U.S.C. § 2254(d)(2), "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Byrd v. Workman*, 645 F.3d 992, 1001 (9th Cir. 2004). A state court's factual finding is not unreasonable unless "all '[r]easonable minds reviewing the record' would agree it was incorrect.'" *Smith v. Aldridge*, 904 F.3d 874, 880 (10th Cir. 2018) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

Furthermore, state court determinations of fact "shall be presumed correct" unless Petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Thus, a state court's decision cannot be said to be based on an unreasonable determination of the facts until a petitioner has shown by clear and convincing evidence that the state court's factual determination was incorrect. *See Black v. Workman*, 682 F.3d 880, 896-97 (10th Cir. 2012) (refusing to grant relief under Section 2254(d)(2) because the petitioner had failed to present clear and convincing evidence to rebut a state court's factual finding; *accord Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008) (holding Section

2254(e)(1) "provides the mechanism for proving unreasonableness" under Section 2254(d)(2)); *Trussell v. Bowersox*, 447 F.3d 588, 591 (8th Cir. 2006) (requiring the petitioner to satisfy Section 2254(e)(1) in order to obtain relief under Section 2254(d)(2)); *but see Wood v. Allen*, 558 U.S. 290, 300-01 (2010) (declining to decide the relationship between Section 2254(d)(2) and Section 2254(e)(1)); *Grant v. Trammell*, 727 F.3d 1006, 1024 n.6 (10th Cir. 2013) (same); *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004) (holding that Section 2254(d)(2) applies to challenges based solely on the state court record whereas Section 2254(e)(1) applies when the petitioner relies upon new evidence), *overruling recognized by Oliver v. Davis*, 25 F.4th 1228, 1234 (9th Cir. 2022).

Lastly, this Court generally may not grant relief on a claim for federal habeas corpus relief unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "A claim has been exhausted when it has been 'fairly presented' to the state court." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). "Fair presentation requires more than presenting all the facts necessary to support the federal claim to the state court or articulating a somewhat similar state-law claim." *Id.* (quotation marks omitted). While "[t]he petitioner need not cite book and verse on the federal constitution," he must still have "raised the substance of the federal claim in state court." *Id.* (quotation marks omitted).

"Generally, a federal court should dismiss unexhausted claims without prejudice so that the petitioner can pursue available state-court remedies." *Id.* at 1012. However, if "the court to which the petitioner would be required to present his claims in order to meet the

exhaustion requirement would now find the claims procedurally barred the claims are considered exhausted and procedurally defaulted for purposes of federal habeas relief." *Cannon v. Gibson*, 259 F.3d 1253, 1265 (10th Cir. 2001) (quotation marks omitted). This results in an "anticipatory procedural bar," which means "the federal courts apply [a] procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner had returned to state court to exhaust it." *Anderson v. Sirmons*, 476 F.3d 1131, 1140 n.7 (10th Cir. 2007) (quotation marks omitted).

Procedural default based on an anticipatory procedural bar can be overcome only if a petitioner establishes cause and prejudice or a fundamental miscarriage of justice. *See Cummings v. Sirmons*, 506 F.3d 1211, 1223 (10th Cir. 2007). The "fundamental miscarriage of justice" exception "is a markedly narrow one, implicated only in extraordinary cases where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Magar v. Parker*, 490 F.3d 816, 820 (10th Cir. 2007) (quotation marks omitted, alteration adopted).

Bearing in mind the applicable standard of review derived from the AEDPA, Respondent will address Petitioner's grounds for relief below, *see infra*.

### RESPONSE TO PETITIONER'S STATEMENT OF THE FACTS

In accordance with 28 U.S.C. § 2254(e)(1), this Court must presume that factual determinations made by the state court are correct. *See Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012). Accordingly, Respondent herein reproduces the factual summary as presented by the OCCA in its second direct appeal opinion:

11

On July 23, 2010, Katrina Griffin, her eight-year-old son [C.G.] and her six-year[-]old daughter [C.H.] were found dead in a mobile home near Dibble, where they lived on the same rural property as her father and stepmother, Ginger. Katrina, a single mother, had a seizure disorder and received Social Security disability payments. At the time of her death, she did not drive and she did not have a job. A few months before her death, after receiving SSD payments, Katrina bought furniture, televisions and a laptop computer for the trailer. She spent a lot of time online on her laptop, and she and the children watched movies and television and played video games at home. Katrina put her initials, KRG, on many of her possessions, including video games and movies. Katrina and Bosse met online in early July 2010. Bosse visited Katrina at the trailer several times before her death and stayed overnight at least once. Bosse met Katrina's stepmother, Ginger. One weekend when the children visited their father, Bosse stayed overnight and met Katrina's cousin, Heather Molloy, and Heather's boyfriend, Henry Price. Katrina told Molloy that her relationship with Bosse was the best she'd been in.

On the evening of July 22, 2010, while Bosse was visiting, Katrina realized some of [C.G.]'s video games were missing. Katrina asked Ginger whether [C.G.] had left any games there, and Ginger said he'd taken them home. Katrina talked to her mother, Rebecca Allen, several times that night, beginning at about 10:00 p.m. Katrina said Bosse was with her and the children. Katrina told Allen that she thought Price had taken the games. Katrina tried several times to call and text Molloy without success. Katrina told Allen that Bosse was driving her to Molloy's house, and one text message to Molloy said that Katrina had come over and banged on the door. Eventually Katrina called the McClain County Sheriff's Office. About 11:50 p.m., Deputy Cunningham arrived to take a missing property report. Katrina, the children, and Bosse were there. Katrina told Cunningham that about fifteen video games were missing, and she thought they had been gone since Molloy and Price visited the previous Saturday. Sometime between 12:30 a.m. and 1:00 a.m., Katrina phoned Allen, saying the deputy had left and she was going to bed.

Ginger Griffin left for work on July 23rd at around 7:00 a.m. She looked at Katrina's trailer, but saw neither smoke nor Bosse's truck. At 8:55 a.m. a neighbor, Daryl Dobbs, drove by and saw smoke coming from the top of Katrina's trailer, near the back door. Dobbs called 911 and reported the fire, drove to the trailer, and honked his horn. He tried to open the storm door, but it was jammed, so he walked around the trailer hitting the walls and windows, without response. Dobbs looked into the windows, but could not see anything; it was pitch black. The back door was locked. Dobbs used a garden hose to spray water on the trailer roof above the back door. Later, Dobbs

opened the front screen door and banged on the closed front door. There was a small hole, about the size of a golf ball, in the window to the left of the front door. Neither the front nor back doors were damaged, and there was no smoke from the doors or windows, other than a trickle from the small hole in the front window. Dobbs disconnected the trailer's propane tank and turned off the electricity.

The Dibble police chief, Walt Thompson, responded to the 911 call shortly after 9:00 a.m. He saw smoke coming from the west roof line, near the middle of the trailer. The windows were unbroken, but he could not see inside because the trailer was filled with black smoke. Thompson broke a window at the trailer's far southeast corner, leaned inside, and shouted, but nobody responded. The front door opened when it was touched, and the men on the porch were forced back by heat and heavy black smoke. Both men noticed the smoke was heavier and darker than each one had seen rising from the back of the trailer. Soon flames began to roll out the front door. By this time, they were aware that Katrina and the children might be inside. Dibble volunteer firemen Bill Scott and Mark Palmore arrived, and fought their way through the front door. In heavy smoke, they cleared the two bedrooms and bathroom on the trailer's north end, before running low on oxygen. Washington volunteer firemen Derek Cheek and Gary Bolster, in turn, entered the trailer and began to search the south side through thick black smoke. They extinguished small flames in the living room, kitchen and utility room. The master bedroom door was shut and warm to the touch. The door had a hole in it, which appeared to have been there before the fire started. When Cheek opened it, they saw the bodies of Katrina and [C.G.] on the floor. Heat was building up, and the two had to retreat before finishing their search for [C.H.]. While there were no flames as they left, within fifteen minutes flames appeared. It took firefighters an hour and a half to contain the fire. They focused on suppressing the flames nearest the victims, to preserve what they could of the crime scene.

When firefighters reentered the trailer, the fire had burned significant parts of the master bedroom, including the wall to the closet. The walls in the south part of the trailer were burned, the trailer was filled with charred debris, and the floor decking was saturated with water. The bodies of Katrina and [C.G.] were charred and covered in debris. The fire began in the love seat on the living room's west wall. The State's experts testified it could have burned for at least four hours before Dobbs saw smoke at 8:55 a.m., smoldering until the front door opened to reignite the flames.

[C.H.]'s body, severely charred, was in the closet of the master bedroom, underneath a pile of debris. A chair had been put under the outside knob of

the closet door, preventing it from being opened from the inside. [C.H.] was burned from the waist down—her legs were charred to the muscle and bone was exposed. She had a laceration to her right cheek and blunt force trauma on the right side of her skull. The autopsy showed soot in her stomach and lungs.

Significant blood spatter was on the walls near [C.G.]'s body. His head was partially wrapped in a blanket. He wore underwear and unbuttoned, unzipped jean shorts. He had been stabbed five times in the neck and chest; there was a defensive stab wound on his right forearm, and he had blunt force trauma over his right eyebrow.

Katrina was clothed in a T-shirt, shorts and underwear; her shirt was pulled over her torso and her hands crossed as if she had been dragged. When found after the fire, her legs were laying over [C.G.]'s, and her body was covered in debris. Her body had been partially burned, and there was some indication that it might have been covered with a sheet. She had eight stab wounds to her neck and abdomen, and blunt force trauma to the right side of her head. Her face was charred and her glasses were attached to her burned hair. She had defensive incised wounds on her right palm. Although Katrina was left-handed, her right hand held a knife with the blade pointing backwards, facing her body. Blood on this knife was consistent with Katrina's blood. A pocketknife with a broken blade was found underneath Katrina's body. The pocketknife belonged to [C.G.], and Katrina kept it in her bedroom.

The cause of death for both Katrina and [C.G.] was multiple stab wounds. Neither victim had soot in their noses or mouths, suggesting they were dead before the fire. The cause of death for [C.H.] was smoke inhalation and thermal injury.

As investigators put out the fire and began working at the crime scene on the morning of July 23, Katrina's family members told police that she and Bosse were dating, and authorities began looking for him. Bosse shared an apartment in south Oklahoma City with his mother, Verna. Bosse left the apartment on July 22 at about 8:00 p.m. At about 6:00 a.m. on July 23, Verna saw Bosse getting ready to leave. He left between 6:15 and 6:30 a.m., went to OCCC [Oklahoma City Community College], and logged in to a computer at about 7:30 a.m.

At about 2:30 p.m., McClain County Sheriff's Detective Dan Huff called and asked Bosse to come to the Sheriff's office. At about 4:00 p.m. Bosse met for about an hour with Huff and David Tompkins, and OSBI Agent Bob Horn. Officers saw Bosse had red abrasions on his knuckles. There was blood

on his tennis shoes and a long scratch on his arm. Bosse admitted he was at Katrina's house the previous evening. He talked about the missing games, and said he went with Katrina and the children to Molloy's house about 10:00 p.m. Bosse said he was there when Deputy Cunningham took Katrina's report. He said Katrina wanted him to stay, but he left about 12:30 a.m. on July 23rd, reaching his apartment at 1:30 or 2:00 a.m., and was in bed by 3:00 a.m.

Bosse told investigators that he and Katrina had been dating a few weeks and were not serious. He admitted he spent the night with her a week earlier when the children were gone. He said he'd spent some time there and had been in every room of the trailer. Bosse said Katrina texted him that morning, but he could not retrieve it from his phone. Justine Lyman dated Bosse from early July 2010, until Bosse changed his Facebook status to "in a relationship" with Katrina. At midnight on July 23, Lyman sent Bosse a Facebook message complaining about Katrina. Bosse responded at 7:44 a.m., saying Katrina was a crazy bitch, nothing was going on, and he was dropping Katrina from his friends list. He told Lyman she could check with Katrina to confirm this. Bosse communicated with Lyman and a woman named Sarah by text throughout that day.

Investigators asked to search Bosse's truck. He refused, but let them take photographs of its contents. A laptop with cables, a Bic lighter and DVD case marked "KRG" were in the front floorboards. A PlayStation console, video games, and DVD cases marked "KRG" were in the front and back seat areas. Bosse said the laptop belonged to a friend, but would not give a name. Bosse left the Sheriff's office after 5:00 p.m. Later that day, Ginger identified the laptop, and other items in the photos, as Katrina's. OSBI Agent Akers went to Bosse's apartment on the night of July 23 and asked again to search his truck, and this time Bosse agreed. Akers also noticed Bosse's red knuckles, the scratch and the blood on his shoes. Bosse told Akers he'd been to several places that day, including OCCC and a Walmart, but did not say he went anywhere north of I-240 in Oklahoma City, or mention any pawnshops. Bosse's brother, Matthew, was also in the apartment. Matthew was 6 foot 2 or 3 inches and about 300 pounds, while Bosse was about 5 foot 8 or 9, and about 210 pounds, and the two could not have shared clothing. When Akers searched Bosse's truck, most of the property photographed earlier was gone, though the movies were found in Bosse's bedroom. Investigators searched Bosse's apartment and found items from Katrina's trailer. Stains which might have been blood were on towels and the laundry basket, but only one towel was presumptively tested for blood, and that was not confirmed. A pair of bloody jeans was found in the back of Bosse's closet. DNA tests on the jeans showed genetic profiles from [C.H.] and Bosse. DNA tests of blood on

Bosse's shoes were consistent with [C.H.] (right shoe) and Katrina (left shoe).

Bosse's billfold was in his truck. A rip in the back created a hidden pocket, which held pawn tickets. When Akers asked Bosse if he forgot to mention the pawn tickets, Bosse turned white, and Akers arrested him. Bosse had pawned more than one hundred of Katrina's possessions at seven different Oklahoma City pawnshops on the morning of July 23, while the trailer was still burning. The pawned items included televisions, a game console and VCR or DVD player, as well as several dozen movies and video games. Most of the games and DVDs were marked with the initials "KRG," and sales receipts confirmed that the electronic equipment was Katrina's. Bosse's and Katrina's fingerprints were found on some of the pawned items. A TV remote in Bosse's truck matched one of Katrina's TVs that Bosse pawned. Officers were able to connect the items to Katrina by serial numbers, Katrina's initials, and identification through witnesses.

*Bosse II*, 400 P.3d at 840-43 (paragraph numbers omitted).

Additional facts will be discussed as they become relevant below.

## ARGUMENT AND AUTHORITY

### GROUND I

**PETITIONER'S FIRST HABEAS GROUND HAS BEEN RENDERED ENTIRELY MOOT BY THE UNITED STATES SUPREME COURT'S RECENT DECISION IN *OKLAHOMA V. CASTRO-HUERTA*, 142 S. CT. 2486 (2022).**

In his first ground for relief, Petitioner claimed the State lacked prosecutorial authority over the crimes committed in this case because the offenses occurred within the historical boundaries of the Chickasaw Nation reservation and because the victims were all enrolled members of the Chickasaw Nation at the time of the crimes. Doc. 19, at 8-27. On February 20, 2019, Petitioner received this Court's leave to return to state court to pursue that claim in a successive post-conviction application. *See* Docs. 16, 18. On April 1, 2019,

the parties filed in this Court a Joint Motion for Stay and Abeyance, requesting this Court to hold these habeas proceedings in abeyance pending resolution of Petitioner's Indian Country claim in state court. *See* Doc. 23. That motion was granted on April 2, 2019, and this Court directed the parties to provide routine status updates on this case. *See* Doc. 24.

On July 12, 2022, the parties filed in this Court a Joint Status Report, pursuant to this Court's Order issued on June 29, 2022. *See* Docs. 42, 44. In that report, the parties advised the Court that the United States Supreme Court had decided *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486 (2022), on June 29, 2022. The parties set forth the following:

> The ruling in *Castro-Huerta*—holding unequivocally that the State has jurisdiction over crimes by non-Indians against Indians in Indian Country, *Castro-Huerta*, 2022 WL 2334307, at *3—entirely moots Ground I of the Habeas Petition, as Petitioner has never claimed and does not claim to be Indian, and has only ever claimed and proven that his victims are Indian. The parties hereby agree, and make clear on the record in this case, that Ground I is moot, hereby withdrawn, and will not be addressed further in briefing or by this Court.

Doc. 44, at 2.

Based on this agreement of the parties, Petitioner's first ground is now completely moot and should not be considered by this Court in adjudicating his habeas petition.

## GROUND II

**PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM IS BARRED PURSUANT TO AN INDEPENDENT AND ADEQUATE STATE PROCEDURAL RULE, AND HE HAS NOT SHOWN CAUSE AND PREJUDICE OR A FUNDAMENTAL MISCARRIAGE OF JUSTICE SUFFICIENT TO OVERCOME THAT PROCEDURAL BAR.**

In his second ground for habeas relief, Petitioner contends that his trial counsel was ineffective for failing to present his mitigation case to the jury from a different angle, since trial counsel elected to build the mitigation strategy around Petitioner's development of substance abuse issues over time, rather than select Petitioner's allegedly traumatic childhood and negative family history as the centerpiece of mitigation. Doc. 19, at 28-53. Petitioner faults trial counsel for allegedly falling short in investigating and presenting the mitigation case to the jury, and relatedly faults appellate and post-conviction counsel for failing to raise this issue on direct appeal or in his first post-conviction application. Doc. 19, at 30-33, 37-53. For the reasons discussed below, Petitioner's claim is barred pursuant to an independent and adequate state procedural rule, and Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice to overcome that bar. No relief is warranted for his first ground.

### A.     Procedural Background

At the time Petitioner filed his instant habeas petition, on February 22, 2019, Petitioner also had a successive application for post-conviction relief pending before the OCCA, in which he advanced this present claim, *inter alia*. *See* 2/20/2019 *Successive Application for Post-Conviction Relief – Death Penalty*, at 33-61 (OCCA No. PCD-2019-

18

124) ("*Successive Application*"). In his habeas brief, Petitioner forecasted the likelihood that the OCCA would procedurally default the claim at stake here. Doc. 19, at 30. Petitioner's prescience on this point proved correct, as the OCCA did, in fact, procedurally default this claim when it ultimately adjudicated his successive application on October 7, 2021. The OCCA reached the following conclusions on this issue:

> In his second ground for relief, Mr. Bosse alleges that all of his prior counsel were ineffective, and requests an evidentiary hearing to further develop his claim. He first alleges that a "dysfunctional" trio of trial attorneys failed to conduct reasonable mitigation investigation,[3] adequately prepare witnesses, and utilize mitigation experts. He also argues that trial counsel acted contrary to his interests to avoid future ineffectiveness claims. Mr. Bosse maintains that as a result of their deficient performance, he suffered prejudice in the form of an unreliable sentencing trial that resulted in his sentences of death.

>> [3] Bosse presents with his application a series of affidavits from witnesses to his family history, stating that from an early age Bosse was subjected to ongoing physical (some of it sexual) and mental abuse and neglect from his parents and a grandfather, and cruelty and beatings from his brother; and that he developed a drug problem and mental health problems as a result of these adverse experiences.

> Our cognizance of this claim turns initially on whether it has not and could not have been presented in his earlier post-conviction application because the factual basis was unavailable. [22 O.S.2011,] § 1089(D)(8)(b)(1). A claim is factually unavailable in the sense required here when the facts were "not ascertainable through the exercise of reasonable diligence" on or before the filing of the previous application. *Id.* If the factual basis of the claim was unavailable, the applicant must also show that the error resulted in a miscarriage of justice,[4] that is, either a wrongful conviction or sentence. The proven facts, viewed in light of the evidence as a whole, must "establish by clear and convincing evidence that, but for the alleged error, no reasonable fact finder would have found the applicant guilty of the underlying offense or would have rendered the penalty of death." § 1089(D)(8)(b)(2). Stating these two requirements in the conjunctive "and," the statute procedurally bars review or relief unless the applicant satisfies *both* factual requisites.[5]

[4] This latter requirement is similar to the Supreme Court's "miscarriage of justice" exception allowing limited review of successive, abusive, or procedurally defaulted claims in federal habeas corpus. *See Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) (finding successive habeas challenge to death sentence can obtain otherwise barred relief by showing a miscarriage of justice, i.e., "by clear and convincing evidence that, but for a constitutional error, no reasonable juror" would have found the petitioner eligible for the death penalty); *Schlup v. Delo*, 513 U.S. 298, 326-27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (finding successive habeas ineffectiveness and *Brady* claims were cognizable upon showing that the error more likely than not resulted in miscarriage of justice by the conviction of a factually innocent person).

[5] Because Mr. Bosse requests an evidentiary hearing on this claim, we also consider whether the application and exhibits contain sufficient information to establish by "clear and convincing evidence" the materials are "likely to have support in law and fact to be relevant to an allegation for post-conviction relief." Rule 9.7(D)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2021).

Mr. Bosse's trial counsel ineffectiveness claim could have been raised in earlier proceedings. The factual basis—including the proffered testimony of lay and expert witnesses about mitigating aspects of Mr. Bosse's life history; trial counsel's alleged unethical countermeasures to avoid an ineffectiveness claim; and the evidence of their failure to reasonably investigate or prepare—could have been ascertained with reasonable diligence and presented in his previous post-conviction application, or even on direct appeal. This challenge to trial counsel's effectiveness on the factual basis now asserted is procedurally barred. *Sanchez* [*v. State*], 2017 OK CR 22, ¶ 8, 406 P.3d [27, ] 29.

The related argument that appellate counsel mishandled *this* viable claim[6] of ineffective trial counsel—due to their allegedly erroneous opinions about the effect of Mr. Bosse's on-the-record admission that he was satisfied with trial counsel—also involves a factual basis that was ascertainable with reasonable diligence at the time of the earlier post-conviction application. Appellate counsel made their decision to forego an ineffectiveness claim (on factual grounds like those now asserted) before the direct appeal brief was filed in August, 2014. The facts concerning that decision were ascertainable with

reasonable diligence before or at the time of the first post-conviction application was filed almost a year later in August, 2015. This ground for relief is also procedurally barred. *Id.*

> [6] Appellate counsel *did* raise two other claims of ineffectiveness against trial counsel, challenging their failure to object to a medical examiner's testimony and improper closing argument. *See Bosse v. State*, 2015 OK CR 14, ¶ 84, 360 P.3d at 1234.

Mr. Bosse finally argues that original post-conviction counsel was deficient for omitting the current claim that appellate counsel was deficient for omitting the current claim that trial counsel was deficient.[7] The only additional fact involved is that post-conviction counsel filed the previous application. This claim depends entirely on the same factual basis as the others, which could have been ascertained with reasonable diligence on or before the earlier post-conviction application. This ground for relief is also procedurally barred. *Id.*

> [7] Bosse's first post-conviction application initially *alleged* both trial and appellate counsel's ineffectiveness, but the actual claim presented argued only trial counsel's ineffectiveness for failing to interview a particular witness, and "offer[ed] no factual claim or argument directed at appellate counsel …." *See Bosse v. State*, No. PCD-2013-360, at 2 (Okl.Cr., Dec. 16, 2015) (unpublished).

The foregoing conclusions are sufficient to preclude further review on Mr. Bosse's second ground for relief. However, we also conclude from this record that the facts presented, if proven, when viewed in the light of the evidence as a whole, do not establish clear and convincing evidence that, but for counsel's alleged errors, no reasonable fact finder would have rendered the penalty of death.[8] Mr. Bosse's motion requesting an evidentiary hearing to further develop his new factual claims, and his second ground for post-conviction relief, are therefore denied.

> [8] Mr. Bosse concedes that his guilt in this triple homicide and arson is overwhelming, so there is no issue whether the alleged errors of his prior counsel resulted in wrongful convictions.

*Bosse III*, 499 P.3d at 775-76 (paragraph numbers omitted).

**B.      Argument and Authority**

> **1.      *Petitioner's ineffective assistance claim is procedurally barred pursuant to an independent and adequate state procedural rule.***

Principally, Petitioner's ineffective assistance claim is procedurally defaulted from habeas review since his claim was barred in state court "pursuant to an independent and adequate state procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "The [independent and adequate state ground] doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id.* at 729-30. *See also Brecheen v. Reynolds*, 41 F.3d 1343, 1354 (10th Cir. 1994) ("The law of procedural defaults . . . applies to preclude federal habeas review of claims that have not been adjudicated on the merits by a state court because of noncompliance with a state procedural rule."). Federal habeas review of such a claim is precluded unless Petitioner can show either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) that "a fundamental miscarriage of justice will result if Petitioner's claim is not considered in federal court." *Coleman*, 501 U.S. at 750.

When Petitioner presented his current claim to the OCCA in his successive post-conviction application, the OCCA procedurally barred his claim under the provisions of the Oklahoma Post-Conviction Procedure Act ("PCPA"), OKLA. STAT. tit. 22, § 1089(D) (2011). *Bosse III*, 499 P.3d at 775-76. That statutory sub-section specifically sets forth the following:

> 8. If an original application for post-conviction relief is untimely or if a subsequent application for post-conviction relief is filed after filing an

original application, the Court of Criminal Appeals may not consider the merits of or grant relief based on the subsequent or untimely original application unless:

> a. the application contains claims and issues that have not been and could not have been presented previously in a timely original application or in a previously considered application filed under this section, because the legal basis for the claim was unavailable, or

> b. (1) the application contains sufficient specific facts establishing that the current claims and issues have not and could not have been presented previously in a timely original application or in a previously considered application filed under this section, because the factual basis for the claim was unavailable as it was not ascertainable through the exercise of reasonable diligence on or before that date, and

> (2) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the alleged error, no reasonable fact finder would have found the applicant guilty of the underlying offense or would have rendered the penalty of death.

OKLA. STAT. tit. 22, § 1089(D)(8) (2011).

"State [procedural] rules count as 'adequate' if they are 'firmly established and regularly followed.'" *Johnson v. Lee*, 578 U.S. 605, 606 (2016) (per curiam) (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)); *see also Duvall v. Reynolds*, 139 F.3d 768, 796-97 (10th Cir. 1998) (explaining that a state procedural rule must be "strictly or regularly followed" and applied "evenhandedly to all similar claims"). The Tenth Circuit has repeatedly recognized that the Oklahoma statute relied upon by the OCCA in the proceedings below—Section 1089(D)(8) of the PCPA—is both firmly established and regularly followed. *Pavatt v. Carpenter*, 928 F.3d 906, 929 (10th Cir. 2019) (en banc); *Williams v. Trammell*, 782 F.3d 1184, 1212 (10th Cir. 2015); *Thacker v. Workman*, 678

F.3d 820, 835-36 (10th Cir. 2012) (recognizing "Oklahoma's regular and consistent application of [its] procedural-bar rule in the vast majority of cases" (citation and quotation marks omitted)).

Furthermore, a state procedural rule is independent "if it relies upon state law, rather than federal law, as the basis for the decision." *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998). In that respect, the Tenth Circuit has established that Oklahoma's procedural bar in Section 1089(D)(8) is independent. *Banks v. Workman*, 692 F.3d 1133, 1145-47 (10th Cir. 2012) (comprehensively addressing the habeas petitioner's claim that Oklahoma's procedural bar in Section 1089(D)(8) is intertwined with federal law, and finding that "§ 1089 is a purely state law rule" and is therefore independent for purposes of independent and adequate bar analysis); *Hogan v. Trammell*, No. 11-6161, 511 F. App'x 769, 775 (10th Cir. Feb. 20, 2013) (unpublished)[6] ("Once again, we recently considered this argument and determined that Oklahoma's procedural bar is independent.").

Accordingly, the OCCA's application of Section 1089(D)(8) to procedurally bar Petitioner's ineffective assistance claim in his successive post-conviction application is an independent and adequate state procedural bar for purposes of federal habeas. *See, e.g.*, *Pavatt*, 928 F.3d at 929; *Thacker*, 678 F.3d at 835-36. Petitioner's current ineffectiveness claim is therefore precluded from federal habeas corpus review, unless Petitioner can show

---

[6] This unpublished opinion, and any other unpublished federal opinion hereinafter referred to, is cited for persuasive value pursuant to the Federal Rules of Appellate Procedure and the Tenth Circuit Local Rules, which permit citation to unpublished decisions of federal courts. *See* FED. R. APP. P. 32.1(a); 10TH CIR. R. 32.1(a).

cause and prejudice or a fundamental miscarriage of justice to overcome that default, as discussed in greater detail below, *see infra*.

        **2.**        ***Petitioner is unable to show cause to overcome the default.***

A habeas petitioner can avoid the application of a state procedural bar to his federal claim if he can show cause and prejudice. *See Coleman*, 501 U.S. at 750 ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice."). With respect to cause in particular, the Supreme Court has specifically defined cause as follows:

> [T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that some interference by officials . . . made compliance impracticable, would constitute cause under this standard.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) (internal citations and quotation marks omitted). Whether cause and prejudice exists is a matter of federal law. *Id.* at 489.

Here, Petitioner appears to suggest that he can show cause through ineffective assistance of trial, appellate, and post-conviction counsel. Doc. 19, at 30-33. Specifically, he contends that trial counsel acted unprofessionally and essentially abandoned him "in present[ing] [him] with a form to sign in which [he] ostensibly [was] asked to choose his own trial strategy" and "engaged [him] in an *ex parte* on-the-record colloquy" regarding

counsel's representation. Doc. 19, at 31. Petitioner contends that these actions resulted in direct appeal counsel not raising the present ineffective assistance of trial counsel claims. Doc. 19, at 31-33. Petitioner summarily adds, "Original post-conviction counsel also failed Bosse by failing to raise this issue." Doc. 19, at 33.

Petitioner's focus on appellate counsel is misplaced. Appellate counsel's failure to raise these ineffective assistance of trial counsel claims on direct appeal does not explain first post-conviction counsel's failure to raise them as well. And, moreover, the alleged ineffectiveness of Petitioner's first post-conviction counsel in failing to raise this claim in his original application cannot serve as cause to excuse Petitioner's state court procedural default. Indeed, the Supreme Court has held that the alleged ineffective assistance of counsel in post-conviction proceedings does not establish cause to excuse the procedural default of a claim. *Coleman*, 501 U.S. at 756-57. In so holding, the Supreme Court issued the following reasoning:

> Given that a criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review, it would defy logic for us to hold that Coleman had a right to counsel to appeal a state collateral determination of his claims of trial error.
>
> Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas.

*Id.*

In light of the rule established by the Supreme Court in *Coleman*, Petitioner cannot claim the alleged ineffectiveness of his first post-conviction counsel as cause to excuse his

procedural default on successive post-conviction review.[7] *See Pavatt*, 928 F.3d at 934-35 (addressing capital habeas petitioner's challenge to trial counsel's alleged failure to investigate and present a compelling mitigation case, which was not raised until the petitioner's second application for post-conviction relief and which was therefore barred

---

[7] To be sure, some states are subject to the "*Martinez/Trevino*" rule derived from the Supreme Court's decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). In *Martinez*, the Supreme Court held that if under state law a claim of ineffective assistance of trial counsel must be alleged in a collateral proceeding of initial-review, "a claim of procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez*, 566 U.S. at 17. Then, in *Trevino*, the Supreme Court set forth four requirements for the application of *Martinez* to a particular case:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceedings was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.

*Trevino*, 569 U.S. at 423 (alterations and emphasis in original) (quoting *Martinez*, 566 U.S. at 13-18). Further, the Court in *Trevino* also extended the rule in *Martinez* to circumstances in which state law does not explicitly require an ineffective assistance of trial counsel claim to be raised in collateral proceedings, but, by virtue of its "structure and design . . . make[s] it virtually impossible for an ineffective assistance claim to be presented on direct review." *Id.* at 417 (quotations omitted). This Court has consistently recognized that Oklahoma, however, does not operate under the *Martinez/Trevino* scheme since ineffective assistance claims can be, and indeed must, be raised on direct appeal. *See Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 905 (10th Cir. 2019) ("*Martinez* and *Trevino* don't apply to Cuesta's case, so we can't review his first post-conviction counsel's alleged ineffectiveness."); *Pavatt*, 928 F.3d at 934 ("We are not persuaded that [the *Martinez/Trevino* rule] holds true with respect to Oklahoma's system."); *Fairchild v. Trammell*, 784 F.3d 702, 723 (10th Cir. 2015) ("Defendant's state postconviction application was therefore not an initial-review collateral proceeding under the *Martinez/Trevino* definition of the term.").

under Oklahoma law, holding that "the OCCA's procedural bar ruling precludes federal habeas review of this ineffective assistance of trial counsel claim"); *Fairchild*, 784 F.3d at 723 (considering capital habeas petitioner's claim that initial post-conviction counsel was ineffective for failing to raise claim of ineffectiveness based on failure to present evidence of alleged brain trauma, holding that "ineffective assistance of counsel in the postconviction proceeding cannot establish cause to overcome the procedural bar"); *Spears v. Mullin*, 343 F.3d 1215, 1255 (10th Cir. 2003) ("[I]n any event, ineffective representation in state post-conviction proceedings is inadequate to excuse a procedural default.").

Since Petitioner cannot establish cause to excuse his default, this Court need not address the "prejudice" factor, and the analysis can end here. *See Steele v. Young*, 11 F.3d 1518, 1522 & n.7 (10th Cir. 1993) (after finding the habeas petitioner had failed to show cause to overcome his procedural default, stating: "As Steele [has] not shown cause, we need not discuss whether he has been actually prejudiced."); *Tripp v. Whitten*, No. CIV-20-246-SLP, 2020 WL 4043987, at *3 (W.D. Okla. June 18, 2020) (unpublished) ("Because Mr. Tripp cannot establish the 'cause' element, the Court need not address the 'prejudice' factor."); *Tryon v. Farris*, No. CIV-19-195-J, 2021 WL 3042664, at *6 (W.D. Okla. July 19, 2021) (unpublished) (declining to analyze prejudice prong when the capital habeas petitioner had failed to demonstrate cause to excuse his procedural default).

### 3. *Petitioner has not shown a fundamental miscarriage of justice.*

Alternatively, a habeas petitioner can also overcome an independent and adequate state procedural default by showing that the refusal to hear his claims will result in a "fundamental miscarriage of justice." *See Coleman*, 501 U.S. at 750; *Spears*, 343 F.3d at

1255. This would require Petitioner to demonstrate his factual innocence of the crimes for which he stands convicted—*i.e.*, that no reasonable juror would have found him guilty of the crime or eligible for death absent the error, *see Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000); *Brecheen*, 41 F.3d at 1357, or actual innocence of the death penalty—*i.e.*, that no reasonable juror would have found him eligible for the death penalty under Oklahoma law, *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992).

Here, Petitioner has not attempted to show a fundamental miscarriage of justice, and nor can he. Petitioner does not allege he is actually innocent, let alone proffer new evidence of innocence; indeed, he admits that "the evidence of guilt in the first stage was overwhelming." (Doc. 19, at 28). Moreover, Petitioner's claim—that counsel should have presented additional or different mitigating evidence—does not relate to innocence of the aggravating factors proven by the State and cannot satisfy the "innocence of the death penalty" standard set forth in *Sawyer*. *See Black v. Workman*, 682 F.3d 880, 915-16 (10th Cir. 2012) (capital defendant's claim that his brother should have been permitted to testify in mitigation "about Defendant's horrible childhood, and how Defendant had always looked out for [the brother] and was a father figure to him . . . went only to mitigation," and "its persuasiveness [was] irrelevant to Defendant's eligibility for the death penalty and [could not] support the actual-innocence exception to procedural bar" (quotation marks omitted, alteration adopted)).

### 4. *Any future arguments to overcome the bar should be deemed forfeited.*

Petitioner claims that the Tenth Circuit has treated procedural bar as an "affirmative defense" that Respondent must raise before he is obligated to show cause and prejudice,

hinting that he will raise additional arguments to overcome the bar in his reply. Doc. 19, at 30-31 & n.9. Petitioner conflates independency and adequacy with cause and prejudice. True, the Tenth Circuit said in *Hooks* that procedural bar is an "affirmative defense" that the State must raise, but the issue in *Hooks* was adequacy and when a habeas petitioner received the burden of placing adequacy at issue. *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999). *Hooks* does not apply here. *Hooks* concluded, as to *adequacy*, that "the state is undoubtedly in a better position to establish the regularity, consistency and efficiency with which it has applied" a procedural rule. *Id.* at 1216-17. Cause and prejudice to overcome a procedural bar is an entirely different matter—Petitioner, and not the State, is best situated to allege the specific circumstances that he contends show cause and prejudice or a fundamental miscarriage of justice.

Moreover, this counseled habeas petitioner—represented by a federal public defenders' office that regularly represents Oklahoma capital inmates—is a far cry from the "habeas petitioners, who often appear pro se," about which the Tenth Circuit was concerned in *Hooks*. *Id*. at 1217. Indeed, Petitioner's attorneys here correctly recognized that the OCCA "typically" bars claims raised in successive post-conviction applications and anticipated that this claim would likely be barred. Doc. 19, at 30. There is no reason Petitioner's attorneys could not have raised any and all arguments for overcoming the bar in their habeas petition. To allow them to sit on these arguments until their reply, thereby possibly requiring a sur-reply on the State's part, would undermine one of the key purposes of the AEDPA to reduce delay in capital habeas litigation. *See Rhines v. Weber*, 544 U.S. 269, 276 (2005) ("One of the statute's purposes is to reduce delays in the execution of state

and federal criminal sentences, particularly in capital cases." (quotation marks omitted)). This is especially so given that, when the stay of these proceedings was lifted earlier this year, Petitioner could have, but did not, request to submit supplemental briefing on the bar applied by the OCCA, in October 2021, to his ineffective assistance claim raised in his successive post-conviction application. *See* Doc. 44 (joint status report in which parties agreed that the proceedings, upon the lifting of the stay, could proceed to Respondent's filing of this response).

In addition, it has been more than two decades since *Hooks* was decided; however uncertain the adequacy of Oklahoma's procedural bars at that point, the adequacy of Oklahoma's successive post-conviction bar has at this point been well-established in case after case from the Tenth Circuit. *See, e.g.*, *Pavatt*, 928 F.3d at 929 ("We have repeatedly held that the Oklahoma statute that was relied on by the OCCA in this case—§ 1089(D)(8) of Oklahoma's Post-Conviction Procedure Act—satisfies both adequacy criteria." (quotation marks omitted)); *Cuesta-Rodriguez*, 916 F.3d at 900 ("[A]s Oklahoma points out, we have previously found the Oklahoma procedural bar applied here to be both adequate and independent."). Petitioner's attorneys were on notice that the OCCA would bar their second post-conviction claims based on an independent and adequate procedural bar, and that Respondent would assert that bar here. Respectfully, this Court should conclude that any additional arguments they offer to overcome this bar in their reply are forfeited from consideration. *See Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015). Alternatively, Respondent respectfully reserves the right to seek permission to file

a sur-reply assuming Petitioner raises new arguments for overcoming the bar in his reply that warrant response.

**C.    Conclusion**

For all these reasons, this Court should conclude that Petitioner's second ground for relief is barred from review. Habeas relief should be denied.

<u>**GROUND III**</u>

**PETITIONER'S GRUESOME PHOTOGRAPHS CLAIM WAS NOT EXHAUSTED AS A FEDERAL CLAIM AND, REGARDLESS, FAILS FOR LACK OF CLEARLY ESTABLISHED FEDERAL LAW. EVEN ASSUMING THE CLAIM AT STAKE IS PREMISED ON CLEARLY ESTABLISHED FEDERAL LAW, *ARGUENDO*, THE OCCA'S REJECTION OF THIS CLAIM WAS NEITHER CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW.**

In his third ground for relief, Petitioner challenges the admission of allegedly cumulative and unduly prejudicial photographs of the fatal wounds suffered by the victims at Petitioner's hands. Doc. 19, at 53-64. In particular, Petitioner takes issue with seventeen (17) color photographs depicting the charred remains of Katrina Griffin, C.G., and C.H. at the scene of the crimes and later at the Medical Examiner's Office. Doc. 19, at 54-57. As shown below, Petitioner's claim was not fairly presented to the OCCA as a federal claim, and thus, any federal claim now advanced before this Court is unexhausted and anticipatorily barred. Alternatively, this claim must fail for lack of clearly established federal law, and as such, this Court should find his claim not a cognizable matter for federal habeas corpus review. Regardless, even if this Court finds Petitioner's claim is premised

on clearly established federal law, *arguendo*, the OCCA's determination was neither

contrary to, nor an unreasonable application of, clearly established federal law. Petitioner's

third ground for habeas relief must be rejected accordingly.

## A.     Procedural Background

Petitioner raised a state-law version of Ground Three on direct appeal. 8/6/2014

*Brief of Appellant* at 40-47 (OCCA No. D-2012-1128) ("*Brief of Appellant*"). Specifically,

Petitioner raised this claim entirely based on OCCA case law, save for bookending the

claim with two fleeting references to federal authority, first in the proposition heading and

then in the final sentence of the proposition of error:

**PROPOSITION VII**

**THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING GRUESOME AND INFLAMMATORY PHOTOGRAPHS IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, §§ 7, 9 AND 20 OF THE OKLAHOMA CONSTITUTION.**

. . .

Accordingly, his convictions and sentences of death must be reversed and remanded for a new trial. *See Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

*Brief of Appellant*, at 40, 47. Notably, the substance of Petitioner's argument—*i.e.*,

everything in between the proposition heading and this final sentence—consisted entirely

of state law, without a single citation to a Supreme Court or other federal case or mention

33

of "due process." *Brief of Appellant*, at 40-47.[8] Indeed, Petitioner repeatedly invoked the standard of review and applicable law for the admission of evidence under state law, and did not provide any parallel standard of review or authority for review of a claim that he was denied a fair trial. *See, e.g.*, *Brief of Appellant*, at 40-41 ("To be admissible, the contents of visual evidence such as photographs must be relevant and its probative value must substantially outweigh its prejudicial effect. *Smith v. State*, 737 P.2d 1206, 1210 (Okl.Cr. 1987)."), 41 ("While the admission of photographic evidence is a matter within the trial court's discretion, *Livingston*, 907 P.2d at 1094; here the trial judge abused that discretion . . . ."); 45 ("Central to the balancing scheme contemplated by 12 O.S. 2011, § 2403, is the evaluation of the availability of other evidence to establish the same fact as the challenged evidence."), 46 ("Under the Oklahoma Evidence Code, even relevant evidence maybe excluded . . . .").

The OCCA rejected Petitioner's gruesome photographs claim as follows:

Bosse claims in Proposition VII that the trial court abused its discretion in admitting gruesome and inflammatory photographs in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution. Admission of photographs is within the trial court's discretion. *Mitchell v. State*, 2010 OK CR 14, ¶ 57, 235 P.3d 640, 655. Photographs of a victim may depict the scene of the crime, show the nature, extent and location of wounds, or corroborate the medical examiner's testimony. *Id.* Photographs should not be admitted if their effect is such that the danger of unfair prejudice substantially outweighs their probative value. *Livingston v. State*, 1995 OK CR 68, ¶ 20, 907 P.2d 1088, 1094. This Court has often said that gruesome crimes make for gruesome photographs. *Cole v. State*, 2007 OK CR 27, ¶ 29, 164 P.3d 1089, 1096. This alone will not make them inadmissible, as long as they are not so

_____

[8] In contrast, in a proposition of error challenging the admission of premortem photographs of the victims, Petitioner did expressly argue that the admission of the photographs "violated [his] due process rights to a fundamentally fair trial." *Brief of Appellant*, at 47.

unnecessarily hideous or repulsive that jurors cannot view them impartially. *Hain v. State*, 1996 OK CR 26, ¶ 45, 919 P.2d 1130, 1143; *Livingston*, 1995 OK CR 68, ¶ 20, 907 P.2d at 1094.

The trial court admitted nine photographs of Katrina taken at the scene and two of her taken at the morgue; three photographs of [C.G.] taken at the scene and one of him taken at the morgue; and two photographs of [C.H.] taken at the scene.[5]

> [5] Bosse did not object at trial to two further exhibits which included barely visible portions of [C.H.]'s body covered with rubble, and does not raise admission of those photographs as error on appeal.

Before trial, Bosse objected to State's Exhibit 95 but not to State's Exhibit 65, both pictures of [C.H.], arguing that State's Exhibit 95 was cumulative. The trial court denied that objection but required the State to choose between State's Exhibits 65 and 66. Bosse objected to admission of both photographs at trial. Bosse also moved, before trial began, to exclude several photographs, including some of those raised in this proposition as erroneously admitted, as cumulative and overly prejudicial. That motion was sustained in part and denied in part, and Bosse vigorously objected to admission of the photographs at trial. The photographs were shown to jurors on monitors in the courtroom during the testimony of State witnesses.

The photographs of Katrina's and [C.G.]'s bodies at the scene are extremely disturbing. Both of these victims were dead before the fire began. Any effects the fire had on their bodies were not relevant to their fatal injuries, but those effects do reflect the consequences of Bosse's decision to leave the bodies and set the trailer on fire. While in several of the pictures the bodies are covered in charred material or rubble, none of the photographs show marked or extensive effects of the fire. The photographs are relevant to show the scene and corroborate the medical examiner's testimony. They are not so hideous or repulsive that jurors could not view them impartially. *Anderson v. State*, 1999 OK CR 44, ¶ 38–39, 992 P.2d 409, 421. Bosse also complains of morgue pictures of both these victims, taken after the bodies were cleaned, and before the autopsies were performed. Long cotton-tipped probes are inserted into the victims' stab wounds, showing the location, direction and trajectory of the wounds. Again, these photographs are disturbing. However, they show jurors Bosse's handiwork and corroborate the medical examiner's testimony. The trial court did not abuse its discretion in admitting these exhibits. *Cole*, 2007 OK CR 27, ¶ 28, 164 P.3d at 1096.

The two pictures of [C.H.], by contrast, are, as we said of similar photographs in *Livingston*, "profoundly disturbing .... [and] particularly perturbing." *Livingston*, 1995 OK CR 68, ¶ 18, 907 P.2d at 1094. [C.H.]'s body was badly burned. Parts of her limbs were charred to the bone and fire debris had melted onto her face. We recognize that the photographs were relevant. That does not end our inquiry. As in *Livingston*, these horrible pictures of this six-year-old child "provoke an immediate visceral reaction." *Id*. We cannot say jurors were able to view these two pictures impartially, and find their probative value was substantially outweighed by the danger of unfair prejudice. The trial court abused its discretion in admitting these exhibits. However, this error does not require relief. Considering the entire record, we conclude that these prejudicial photographs did not contribute to the jury's verdict of guilt or determination of sentence. *Cole*, 2007 OK CR 27, ¶ 32, 164 P.3d at 1097; *Mann v. State*, 1988 OK CR 7, ¶ 13, 749 P.2d 1151, 1156. This proposition is denied.

*Bosse II*, 400 P.3d at 853-54 & n.5 (paragraph numbers omitted).

## B.      Preliminary Statement Regarding Fair Presentation and Merits Adjudication

Before this Court, Petitioner argues that the admission of the above-described photographs deprived him of his due process right to a fair trial and a reliable sentencing. Doc. 19, at 53-64. This constitutional claim was never fairly presented to the OCCA and is barred from consideration by this Court. Alternatively, assuming this Court concludes this claim was fairly presented to the OCCA, then it must also presume that the OCCA adjudicated the claim on the merits.

A habeas petitioner who challenges an evidentiary ruling in state court is not automatically entitled to then claim in habeas proceedings that his due process right to a fair trial was violated by the admitted evidence:

If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court

trial denied him the due process of law guaranteed by the Fourteenth
Amendment, he must say so, not only in federal court, but in state court.

*Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam).

Moreover, if a petitioner does wish to exhaust a federal due process claim, the claim
must be "fairly presented to the state court, which means that the petitioner has raised the
substance of the federal claim in state court." *Grant v. Royal*, 886 F.3d 874, 890 (10th Cir.
2018) (quotation marks omitted).  To fairly present a federal due process challenge, "it is
not enough to make a general appeal to a constitutional guarantee as broad as due process
to present the 'substance' of such a claim to a state court."  *Gray v. Netherland*, 518 U.S.
152, 163 (1996). Nor is it sufficient to bookend a state-law claim with conclusory
references to the Constitution:

> A fleeting reference to the federal constitution, tacked onto the end of a
> lengthy, purely state-law evidentiary argument, does not sufficiently alert
> and afford a state court the opportunity to address an alleged violation of
> federal rights. Moreover, to hold that vague references to such expansive
> concepts as due process and fair trial fairly present, and therefore exhaust,
> federal claims is to eviscerate the exhaustion requirement.

*Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001); *see Duncan*, 513 U.S. at 364-66
(holding petitioner, who argued in state court that prior-crime evidence was erroneously
admitted under state law and asked state court to find error was not harmless under state
law, "did not apprise the state court of his claim that the evidentiary ruling of which he
complained was not only a violation of state law, but denied him the due process of law
guaranteed by the Fourteenth Amendment," and instructing that petitioner's argument that
evidence was "irrelevant and inflammatory" and its admission resulted in a "miscarriage
of justice" was not sufficient to signal federal claim); *Zuniga v. Falk*, No. 15-1118, 618 F.

App'x 407, 411 (10th Cir. July 10, 2015) (unpublished) (concluding that federal due process claim based on trial court's refusal to sever petitioner's trial from that of his codefendant was unexhausted because, "[a]lthough [the direct appeal] brief cited the Fifth, Sixth, and Fourteenth Amendments at the tail end of his state law argument," this "conclusory reference to a fair trial and the Constitution [was] insufficient to put the state court on notice that [petitioner] was raising a federal constitutional claim" (quotation marks omitted)); *Cole v. Zavaras*, No. 09-1293, 349 F. App'x 328, 331 (10th Cir. Oct. 16, 2009) (unpublished) (holding that some of petitioner's "claims were not presented to the state courts as *federal* constitutional claims" where state post-conviction motion in some instances "state[d] in a conclusory fashion that the alleged error violated [petitioner's] federal constitutional rights, but [the motion] cite[d] no federal case law to support those claims and [did] little to connect the claim with the rights [the motion] alleged were violated" (emphasis in original)); *see also Rivera v. Illinois*, 556 U.S. 148, 158, 160 (2009) ("[E]rrors of state law do not automatically become violations of due process" because "[t]he Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial" (quotation marks omitted)). Put more generally, "[t]o satisfy exhaustion, . . . the habeas petition's focus—as well as the alleged error that it identifies—cannot depart significantly from what the petitioner had presented to the state court." *(Donald) Grant v. Royal*, 886 F.3d 874, 891 (10th Cir. 2018); *cf. Duncan*, 513 U.S. at 366 ("[M]ere similarity of claims is insufficient to exhaust.").

Here, as shown above, Petitioner did not fairly present his current due process claim to the OCCA. Indeed, his Proposition VII on direct appeal did not even contain the phrase "due process," and the most he did was reference the Eighth and Fourteenth Amendments once in his proposition heading and offer unexplained citations to *Darden v. Wainwright*, 477 U.S. 168 (1986), and *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), in the final sentence of the proposition. *Brief of Appellant*, at 40, 47.[9] The substance of his proposition pertained entirely to showing that the admission of the photographs was an abuse of discretion under Oklahoma law. *See Brief of Appellant*, at 40-47. Pursuant to the above-cited case law, Petitioner did not fairly apprise the OCCA that he was raising a federal claim or give that court a fair opportunity to pass upon same; as such, the federal claim he now presents is unexhausted.

Remarkably, Petitioner complains that "[d]espite being raised by Bosse as a constitutional violation . . . , OCCA addressed the claim merely as a state law evidentiary question." Doc. 19, at 59. But to the extent the OCCA failed to discuss a constitutional

---

[9] *Darden* and *Donnelly* are of course cases about prosecutorial error based on improper remarks, not the admission of evidence, *see Darden v. Wainwright*, 477 U.S. 168, 170 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974), so it is unclear how their unexplained citation by Petitioner would have fairly alerted the OCCA to their relevance. Admittedly, the Supreme Court later applied the "analytical framework" from *Donnelly* to a claim that the admission of evidence in a capital sentencing trial violated due process. *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). But the OCCA was not expected to parse through *Donnelly*'s and *Darden*'s citing references to marshal support for any federal claim Petitioner was hinting at. *Cf. Baldwin v. Reese*, 541 U.S. 27, 32 (2004) ("We consequently hold that ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so.").

aspect to this claim, such merely reinforces Respondent's point—no such constitutional angle was fairly presented to that court and that is why the court did not discuss such an angle. *See Postelle v. Carpenter*, 901 F.3d 1202, 1214 n.7 (10th Cir. 2018) ("[I]n concluding the OCCA ignored Postelle's mitigation-based claim, the dissent's position raises the question of whether Postelle fairly presented that claim to the OCCA in the first place."). As the Supreme Court found compelling in *Duncan*, in concluding the petitioner had not exhausted a federal claim in raising a state evidentiary challenge, "[t]he California Court of Appeal analyzed the evidentiary error by asking whether its prejudicial effect outweighed its probative value, not whether it was so inflammatory as to prevent a fair trial." *Duncan*, 513 U.S. at 366; *see also Bromley v. Phillips*, No. 13-8018, 528 F. App'x 956, 958 (10th Cir. July 10, 2013) (unpublished) ("The Wyoming Supreme Court, in its detailed analysis of Bromley's evidentiary error allegation, did not understand him to be raising a due process claim."). Here, too, the OCCA devoted several paragraphs of discussion to this claim but never identified it as a "due process" claim, in contrast to several other claims as to which the court noted Petitioner alleged a "due process" violation. *Compare Bosse II*, 400 P.3d at 853-54, *with id.* at 843, 846, 849, 852, 854. Clearly, this is because the OCCA was not fairly presented a federal due process claim.

Admittedly, the OCCA opened this proposition of error with the statement that "Bosse claims in Proposition VII that the trial court abused its discretion in admitting gruesome and inflammatory photographs in violation of *the Eighth and Fourteenth Amendments to the United States Constitution* and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution." *Bosse II*, 400 P.3d at 853 (emphasis added). However, this

40

reference to the constitutional provisions invoked by Petitioner read more like a parroting of his proposition heading, *see Brief of Appellant*, at 40, than an indication by the OCCA that it viewed Petitioner as having adequately raised a constitutional claim that merited consideration, especially given the OCCA's failure to further discuss any constitutional aspect to Petitioner's claim, *see, e.g.*, *Knapper v. State*, 473 P.3d 1053, 1080 (Okla. Crim. App. 2020) ("[E]ach and every one of these claims is so inadequately developed in Appellant's brief in chief as to be waived from our review, even if they were presented in separate propositions of error. Appellant offers little more than conclusory statements for each claim with little in the way of actual argument and authority in support.").

Petitioner's ground for relief is not only unexhausted but also subject to an anticipatory procedural bar. Petitioner's federal due process claim could have been raised, but was not, on direct appeal along with the state-law challenge to the trial court's evidentiary ruling. Thus, even if Petitioner were now to raise this claim in successive post-conviction proceedings, it would not be considered based on an independent and adequate procedural bar. *See, e.g.*, *Pavatt*, 928 F.3d at 929; *Williams*, 782 F.3d at 1212; *Thacker*, 678 F.3d at 835-36. Petitioner does not acknowledge his failure to exhaust this federal claim or allege cause and prejudice or a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. Accordingly, habeas relief should be denied on this claim based on procedural default.

Alternatively, if this Court finds that Petitioner fairly presented his federal due process claim to the OCCA, then this Court must *presume* that the OCCA adjudicated that

claim on the merits, as to both the guilt and sentencing stages.[10] *See Johnson v. Williams*, 568 U.S. 289, 298-301 (2013) (where a state court opinion expressly addresses some of a defendant's claims but "rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits"). Indeed, *Williams* explained why a federal court may not separately discuss a federal claim when, as here, a defendant raises the claim in cursory fashion within a state-law-focused claim:

> [A] state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim. Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development. State appellate courts are entitled to follow the same practice.

*Id.* at 299 (citations omitted).

Here, too, even assuming the OCCA viewed Petitioner as sufficiently raising a federal due process claim, the OCCA unsurprisingly decided such a claim was nonetheless not worthy of discussion given Petitioner's incredibly cursory argument, consisting of only two oblique references to the claim in his proposition heading and concluding sentence. *See Brief of Appellant*, at 40, 47. And it is clear that the OCCA did not overlook the claim

---

[10] While the Supreme Court has applied *de novo* review to one prong of an ineffective assistance claim where the state court did not reach that prong but did expressly discuss the other prong, *see Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *but see Richter*, 562 U.S. at 98 (presumption of merits adjudication applies "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated"), here the OCCA silently adjudicated the whole of any federal due process claim raised by Petitioner. Petitioner's argument that review should be *de novo* because "OCCA never performed any separate harmless error analysis with regard to the second stage error from these photographs," Doc. 19, at 63 & n.23, should be rejected.

given the OCCA's opening sentence of the proposition of error recognizing that Petitioner raised a constitutional aspect to the claim. *See Bosse II*, 400 P.3d at 853 ("Bosse claims in Proposition VII that the trial court abused its discretion in admitting gruesome and inflammatory photographs in violation of *the Eighth and Fourteenth Amendments to the United States Constitution* and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution." (emphasis added)).

Seemingly in an attempt to overcome the presumption of a merits adjudication, Petitioner observes that "nowhere does OCCA mention 'due process'[11] nor does the court discuss the federal cases [*Darden* and *Donnelly*] cited by Bosse," and "the harmless error analysis employed was not the appropriate test to be used in the case of Constitutional errors." Doc. 19, at 59 (citing *Chapman v. California*, 386 U.S. 18 (1967)). But this tautological argument is really just a complaint that the OCCA *silently* adjudicated this claim—which, as *Williams* indisputably establishes, a state court is fully permitted to do. *See Williams*, 568 U.S. at 300 ("[F]ederal courts have no authority to impose mandatory opinion-writing standards on state courts . . . . The caseloads shouldered by many state appellate courts are very heavy, and the opinions issued by these courts must be read with that factor in mind." (footnote omitted)). Moreover, a state court is not required to cite Supreme Court cases; "indeed," AEDPA "does not even require *awareness* of [the Supreme Court's] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (emphasis in original).

---

[11] Of course the same could be said about Petitioner's direct appeal briefing on this proposition of error.

Put simply, Petitioner's direct-appeal brief raised this claim based almost entirely on state law, and the OCCA thus naturally focused its analysis on state law and the question of whether the trial court had abused its discretion under Oklahoma law in admitting the photographs. *See Bosse II*, 400 P.3d at 853-54. Further, while Petitioner complains that the OCCA failed to apply a *Chapman* harmless-error analysis after allegedly finding a constitutional violation, harmless-error review would be unnecessary if the OCCA had actually found a federal due process violation. *See Spears*, 343 F.3d at 1230 n.9 ("The substantive prejudice component inherent in fundamental-fairness review essentially duplicates the function of harmless-error review." (quotation marks omitted, alterations adopted)). Clearly, the error the OCCA found as to the admission of two post-mortem pictures of C.H. was an error of state law, not a federal due process violation. *See Bosse II*, 400 P.3d at 853-54 ("We . . . find their probative value was substantially outweighed by the danger of unfair prejudice. The trial court abused its discretion in admitting these exhibits.").

Notably, Petitioner filed a petition for rehearing following the OCCA's decision but did not argue that the OCCA had overlooked his federal due process claim. *See generally* 6/14/2017 *Petition for Rehearing and Motion to Recall the Mandate* (OCCA Case No. D-2012-1128); *Williams*, 568 U.S. at 306 (observing, in concluding the petitioner did not overcome the presumption of a merits adjudication, that Williams did not petition the state court for rehearing on grounds that the court had overlooked her federal claim); Rule 3.14(B)(1), *Rules of the Oklahoma Court of Criminal Appeals*, OKLA. STAT. tit. 22, ch. 18 (allowing for a rehearing petition where "[s]ome question decisive of the case and duly

44

submitted by the attorney of record has been overlooked by the Court"). Petitioner has not overcome the presumption that the OCCA adjudicated any federal due process claim on the merits.

Finally, in considering this issue, this Court must constrain itself to the very limited arguments Petitioner offered on direct appeal in support of a due process claim. *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560 (2018) ("[T]he Ninth Circuit effectively inverted the rule established in *Richter*. Instead of considering the arguments or theories that could have supported the state court's summary decision, the Ninth Circuit considered arguments against the state court's decision that Beaudreaux never even made in his state habeas petition." (quotation marks and citation omitted)).

**C.    Argument and Authority**

**1.    *Petitioner's claim fails for lack of clearly established law.***

Even assuming *arguendo* Petitioner exhausted his federal due process claim, same fails for lack of clearly established law. Respondent recognizes that the Tenth Circuit has very recently rejected its argument that a challenge to the admission of gruesome photographs lacks clearly established Supreme Court law. *See Johnson v. Martin*, 3 F.4th 1210, 1230 (10th Cir. 2021). For preservation purposes, however, Respondent submits that *Johnson* was wrongly decided and that the Supreme Court has never clearly established that a challenge to the admission of gruesome photographs is a cognizable due process claim. *See Estelle v. McGuire*, 502 U.S. 62, 70 (1991) (expressly declining to decide whether "it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial"); *Alberni v. McDaniel*, 458

F.3d 860, 863-64 (9th Cir. 2006) (holding that admission of propensity evidence did not entitle petitioner to habeas relief because there is no clearly established Supreme Court precedent holding that the admission of such evidence is a violation of due process); *Holland v. Allbaugh*, 824 F.3d 1222, 1229 (10th Cir. 2016) ("[T]he Ninth Circuit has gone so far as to hold no clearly established Supreme Court law exists with respect to evidentiary claims at all." (citing *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("[The Supreme Court] has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."))); *cf. also Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) ("The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings.").[12]

### 2.    *Alternatively, the OCCA's adjudication of this issue was reasonable and not contrary to any Supreme Court law.*

As a final alternative, the OCCA's rejection of Petitioner's gruesome photographs claim did not run afoul of § 2254(d). Petitioner argues that the "OCCA's opinion denying [him] relief on his due process and reliable sentencing claims was an unreasonable

---

[12] Admittedly, *Romano* also held that "the Due Process Clause of the Fourteenth Amendment . . . applies to the sentencing phase of capital trials," *Romano*, 512 U.S. at 12, and the Tenth Circuit has cited *Romano* as supplying clearly established federal law governing the admission of gruesome photographs in a capital sentencing trial, *see Wilson*, 536 F.3d at 1114. Respectfully, however, the issue in *Romano*—the admission of *irrelevant* evidence regarding Romano's since-overturned death sentence in another case, *Romano*, 512 U.S. at 10—is not "closely-related or similar to," *House*, 527 F.3d at 1016, the issue of *relevant* but potentially overly prejudicial photographs of the defendant's own handiwork in the case at hand. In other words, *Romano* does not clearly establish that photographs of the *corpus delicti*—the very reason the capital trial is occurring—could ever render a trial fundamentally unfair.

application of, and contrary to, clearly established federal law." Doc. 19, at 60. **Petitioner does not raise, and has therefore forfeited, any argument that the OCCA's decision was based on an unreasonable determination of fact under § 2254(d)(2), and no such argument should be considered if later raised by Petitioner in his reply or on appeal.** *See Hancock*, 798 F.3d at 1011. For the reasons below, Petitioner cannot overcome § 2254(d)(1), and this Court must defer to the OCCA's rejection of his federal due process claim.

This Court may not grant relief for a state law evidentiary error unless Petitioner demonstrates error so grossly prejudicial it denied him a fundamentally fair trial. *See Hooks*, 689 F.3d at 1180 (no relief for alleged state law error unless error "was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process" (quotation marks omitted)). "Because a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (quotation marks omitted and alterations adopted) (quoting *United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990)). In considering the issue, this Court defers to the state court's interpretation of state law. *Gonzales v. Tafoya*, 515 F.3d 1097, 1126 (10th Cir. 2008).

The Tenth Circuit has considered various factors in concluding that allegedly gruesome photographs did not render a habeas petitioner's trial fundamentally unfair: (1) the relevance and probative value of the photographs, *Cole v. Trammell*, 755 F.3d 1142, 1165 (10th Cir. 2014); *Wilson v. Sirmons*, 536 F.3d 1064, 1115 (10th Cir. 2008); *Thornburg*

*v. Mullin*, 422 F.3d 1113, 1129 (10th Cir. 2005); *Willingham v. Mullin*, 296 F.3d 917, 928-

29 (10th Cir. 2002); *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999); *Britt v.*

*Embry*, No. 07-6058, 302 F. App'x 774, 778 (10th Cir. Dec. 9, 2008) (unpublished); (2)

whether the photographs corroborate and/or illustrate witness testimony, *Cole*, 755 F.3d at

1165; *Wilson*, 536 F.3d at 1115; *Britt*, 302 F. App'x at 778; (3) whether "the crime itself"

was of a "gruesome character," *Thornburg*, 422 F.3d at 1129; *Smallwood*, 191 F.3d at

1275; *Britt*, 302 F. App'x at 778; and (4) whether there is strong evidence of guilt and/or

ample evidence in support of the aggravating circumstances. *Wilson*, 536 F.3d at 1115;

*Thornburg*, 422 F.3d at 1129; *Britt*, 302 F. App'x at 778.

  Here, the OCCA's rejection of this claim was neither contrary to, nor an

unreasonable application of, clearly established Supreme Court law (assuming such law

exists). It is not entirely clear why Petitioner believes the OCCA's decision is "contrary

to[] clearly established federal law," but he suggests that the OCCA did not consider the

proper question pursuant to *Lamb v. Oklahoma Cnty. Dist. Ct.*, No. 06-6222, 229 F. App'x

690, 694 (10th Cir. Apr. 10, 2007) (unpublished): "As *Lamb* makes clear, the question for

purposes of a federal due process claim is not, as OCCA framed it, whether photographs

are probative, corroborative, or germane. Instead, the issue is whether the prejudicial effect

of the photographs substantially outweighed their probative value." Doc. 19, at 61. In other

words, Petitioner relies on *Lamb* to suggest that the admission of evidence whose probative

value does not substantially outweigh its prejudice will *automatically* violate due process.

Doc. 19, at 61 (quoting *Lamb*, 229 F. App'x at 694 ("[T]his Court has held that federal due

process 'will be satisfied only if the probative value of [the challenged] evidence is . . .

greatly outweighed by the prejudice flowing from its admission." (quoting *Welch v. Sirmons*, 451 F.3d 675, 688 (10th Cir. 2006), *overruled on other grounds by Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009) (en banc)). Petitioner's reliance on *Lamb* is entirely misplaced.

For starters, Tenth Circuit precedent "is not the measuring stick under AEDPA for assessing whether the OCCA acted unreasonably . . . Supreme Court law is." *(Donald) Grant*, 886 F.3d at 944. Worse than not being a Supreme Court case, *Lamb* is not even binding *circuit* precedent. It is an unpublished order denying a certificate of appealability and expressly states, "This order is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value . . . ." *Lamb*, 229 F. App'x at *691 n.\*. *Lamb* also misquotes *Welch*, a red-flagged case that concerned the admission of other crimes evidence, not gruesome photographs. *Welch*, 451 F.3d at 687-88. *Welch* stated:

> [T]he Due Process Clause of the Fourteenth Amendment provides a mechanism for relief when evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair. We have held that this standard will be satisfied only if the probative value of the challenged evidence is greatly outweighed by the prejudice flowing from its admission.

*Welch*, 451 F.3d at 688 (quotation marks and citations omitted, alterations adopted). Inverting the test from showing a due process violation to avoiding one, *Lamb* stated: "[T]his Court has held that federal due process will be satisfied only if the probative value of the challenged evidence is greatly outweighed by the prejudice flowing from its admission." *Lamb*, 229 F. App'x at 694.

Moreover, to the extent that *Lamb* suggested that due process is automatically violated where evidence's probative value does not substantially outweigh its prejudice, it is simply wrong. Probative value versus prejudicial effect is the *state law* test for the admission of evidence. *See, e.g.*, *Livingston v. State*, 907 P.2d 1088, 1094 (Okla. Crim. App. 1995). And "errors of state law do not automatically become violations of due process," as "[t]he Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial." *Rivera*, 556 U.S. at 158, 160 (quotation marks omitted). As the Tenth Circuit has indicated in *published* precedent, the question is not whether evidence's probative value substantially outweighed its prejudicial value, but whether the evidence was "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Wilson*, 536 F.3d at 1114. Indeed, in *Wilson*, the Tenth Circuit found no due process violation where the State admitted *irrelevant* photographs—*i.e.*, photographs with *zero* relevance that clearly could not outweigh the prejudicial effect—indicating that the test Petitioner proposes based on *Lamb* cannot be correct. *Id.* at 1116; *Givens v. Yukins*, 238 F.3d 420, *5 (6th Cir. 2000) (unpublished table decision) ("[O]ur habeas review of the state court's admission of the photographs is under the due process test of fundamental fairness, not the evidentiary standard of merely weighing probative and prejudicial effect." (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)[13]). In sum, with all due respect, *Lamb* is neither relevant nor persuasive.

---

[13] In *Dowling*, the Supreme Court found it unnecessary to determine whether the other crimes evidence at issue had been properly admitted under the federal rules of evidence— rather, the question was whether the defendant's trial had been rendered fundamentally unfair by the evidence's admission. *See Dowling*, 493 U.S. at 352 & n.4. Under Petitioner's

Petitioner offers no other argument that the OCCA's opinion was contrary to clearly established federal law. Furthermore, as explained above, the OCCA silently adjudicated Petitioner's federal due process claim (assuming same was fairly presented). Thus, it is without consequence that the OCCA never explicitly identified the fundamental fairness test applicable to this claim. *See Hawkins v. Mullin*, 291 F.3d 658, 677 (10th Cir. 2002) ("Although Hawkins presented the state appellate court with both state- and federal-law challenges to the trial court's admission of this evidence, the appellate court denied relief, specifically applying only Oklahoma law. Nonetheless, because the federal-law question's merit was before the state appellate court, we defer to that court's decision denying relief, even though the state appellate court did not set forth its specific reasoning on the federal-law claim." (citations omitted)). All in all, Petitioner has not shown that the OCCA applied the wrong test, reached a conclusion opposite to that of the Supreme Court on a question of law, or decided this case differently than the Supreme Court has on materially indistinguishable facts. *See Williams*, 529 U.S. at 405-06.

Nor has Petitioner demonstrated that the OCCA's decision was an unreasonable application of clearly established law. To begin with, as the OCCA found, "[t]he evidence of [Petitioner]'s guilt was strong" and "overwhelmingly connected him to the murders," and there was also strong evidence of the aggravating circumstances. *Bosse II*, 400 P.3d at 856-57, 870. These findings are entitled to a presumption of correctness that Petitioner

---

proposed rule based on *Lamb*, however, the evidence's admissibility under the federal rules of evidence would have been the only question that mattered for due process purposes. Petitioner's proposed rule is clearly misguided.

does not even try to overcome, with one exception,[14] *see* 28 U.S.C. § 2254(e)(1), and the strong evidence in both stages weighs against any determination that the complained-of photographs rendered his trial fundamentally unfair, *Wilson*, 536 F.3d at 1115; *Thornburg*, 422 F.3d at 1129; *Britt*, 302 F. App'x at 778. Furthermore, even without pictures of Petitioner's handiwork, it can fairly be said "the crime itself" was of an exceedingly "gruesome character." *Thornburg*, 422 F.3d at 1129; *Smallwood*, 191 F.3d at 1275; *Britt*, 302 F. App'x at 778. Petitioner brutally murdered a young mother and her two small children, with the evidence suggesting that eight-year-old C.G. attempted to come to his mother's aid armed with only a broken pocketknife. *See Bosse II*, 400 P.3d at 842, 859. After inflicting numerous stab wounds on Katrina and C.G., Petitioner then trapped helpless six-year-old C.H. in a closet and left her to die an unbelievably agonizing death by burning alive. *Id.* at 842, 858. A fairminded jurist could readily conclude that the challenged photographs did not render Petitioner's trial fundamentally unfair.

Turning to the specific photographs at issue, as on direct appeal, Petitioner challenges the admission of State's Exhibits 43-45, 47-50, 52, 53, 65, 87, 89, 92, 94-96 and 98. *Compare* Doc. 19, at 54, with *Brief of Appellant*, at 41. As to the admissibility of the photographs of Katrina and C.G., State's Exhibits 43, 44, 45, 47, 48, 49, 50, 52, and 53, the OCCA found as follows:

> The photographs of Katrina's and [C.G.']s bodies at the scene are extremely disturbing. Both of these victims were dead before the fire began. Any effects the fire had on their bodies were not relevant to their fatal injuries, but those effects do reflect the consequences of Bosse's decision to leave the bodies

---

[14] Petitioner's challenge to the sufficiency of the evidence as to the avoid arrest aggravator is addressed, and shown to be without merit, in Ground V, *infra*.

and set the trailer on fire. While in several of the pictures the bodies are covered in charred material or rubble, none of the photographs show marked or extensive effects of the fire. The photographs are relevant to show the scene and corroborate the medical examiner's testimony. They are not so hideous or repulsive that jurors could not view them impartially.

*Bosse II*, 400 P.3d at 853 (citations and paragraph number omitted).

The OCCA reasonably determined that the photographs of Katrina and C.G. at the scene did not render Petitioner's trial fundamentally unfair. The OCCA made various findings relevant to Petitioner's due process claim that are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1). In particular, the OCCA found that the photographs of Katrina and C.G. were "relevant to show the scene and corroborate the medical examiner's testimony," depicted Petitioner's "handiwork," did not "show marked or extensive effects of the fire," and were not "so hideous or repulsive that jurors could not view them impartially." *Bosse II*, 400 P.3d at 853. These determinations are fully supported by the record, as shown below.

State's Exhibits 43, 44, 45, 47, and 48 depict different angles of Ms. Griffin and C.G.'s bodies as found by firemen and investigators in the master bedroom at the crime scene (Tr. II, 24-26; Tr. IV, 114-17; 10/17/12 Tr. 9-11[15]). State's Exhibit 49 is a close-up photograph of the knife found in Ms. Griffin's right hand (Tr. IV, 118). This photograph was important to help illustrate the State's theory that the knife was placed in the left-handed Ms. Griffin's hand after her death (Tr. III, 90-95; Tr. IV, 118-19, 158-61). State's

---

[15] The transcripts in this case include a transcript entitled "Transcript of Defendant's Objection to Identified State's Photographs," which Respondent refers to by date as "10/17/2012 Tr."

Exhibit 50 is a close-up showing Ms. Griffin's shirt bunched up over her head (Tr. IV, 119). This was important to support the State's theory that Ms. Griffin's body was dragged (Tr. IV, 117). State's Exhibit 52, which depicts Ms. Griffin's body at the crime scene after it was rolled over, was important to show the red-handled knife found underneath and the corresponding imprint on her stomach (Tr. IV, 121-22). This knife is not visible in the other photographs.[16] State's Exhibit 53 was offered to show the position of furniture in the room and shows only Ms. Griffin's hand holding the knife; the trial court ordered the view of C.G.'s body redacted out of this exhibit (Tr. IV, 123; 10/17/12 Tr. 20). State's Exhibit 87 provides an overview of C.G.'s body as found at the crime scene and shows his body's close proximity to a blood-stained wall (Tr. IV, 141-42). State's Exhibit 89 depicts a close-up of the position of the blanket wrapped around C.G.'s head after his body was turned over (Tr. IV, 142).

Given that State's Exhibits 43, 44, 45, 47, 48, 49, 50, 52, 53, 87, and 89 corroborate the testimony regarding the state of the crime scene, including the victims as they were found, as well as the medical examiner's testimony, and do not "show marked or extensive effects of the fire" on the victims' bodies, *Bosse II*, 400 P.3d at 853, a fairminded jurist could agree with the OCCA that they did not render Petitioner's trial fundamentally unfair, *see Cole*, 755 F.3d at 1165; *Wilson*, 536 F.3d at 1115; *Britt*, 302 F. App'x at 778.

---

[16] As described in the OCCA's recitation of the facts, there were two knives found at the scene, *Bosse*, 400 P.3d at 842—the black-handled knife in Katrina's hand and C.G.'s red-handled knife found under her body when she was rolled over (Tr. III, 98; Tr. IV, 161).

As to State's Exhibits 65 and 95—which were, notably, the *only* post-mortem photographs of C.H admitted (other than the two photographs with *barely visible* portions of her body covered with rubble)—the OCCA found as follows:

> The two pictures of [C.H.], by contrast, are, as we said of similar photographs in *Livingston*, "profoundly disturbing .... [and] particularly perturbing." *Livingston*, 1995 OK CR 68, ¶ 18, 907 P.2d at 1094. [C.H.]'s body was badly burned. Parts of her limbs were charred to the bone and fire debris had melted onto her face. We recognize that the photographs were relevant. That does not end our inquiry. As in *Livingston*, these horrible pictures of this six-year-old child "provoke an immediate visceral reaction." *Id*. We cannot say jurors were able to view these two pictures impartially, and find their probative value was substantially outweighed by the danger of unfair prejudice. The trial court abused its discretion in admitting these exhibits. However, this error does not require relief. Considering the entire record, we conclude that these prejudicial photographs did not contribute to the jury's verdict of guilt or determination of sentence. *Cole*, 2007 OK CR 27, ¶ 32, 164 P.3d at 1097; *Mann v. State*, 1988 OK CR 7, ¶ 13, 749 P.2d 1151, 1156.

*Bosse II*, 400 P.3d at 853-54 (paragraph number omitted). A fairminded jurist could agree with the OCCA that these photographs, even if improperly admitted under Oklahoma law, did not render Petitioner's trial fundamentally unfair.

State's Exhibit 65 was the only photograph admitted of C.H.'s body as she was found at the crime scene, and it depicted her placement in relation to the burned debris of the closet and the chair the State theorized was positioned to block the closet door (Tr. IV, 132-33). C.H.'s body was so covered in rubble in State's Exhibit 65 that only parts of her legs, arms, and head were visible (Tr. IV, 133). The State originally offered two such photographs—State's Exhibits 65 and 66—but the trial court made the State choose between them (10/17/2012 Tr. 24, 35). State's Exhibit 95 depicts the charred head and

shoulders of C.H. and was the only photograph depicting her body once investigators had removed the rubble from on top of her and had placed her in a body bag (Tr. IV, 157-58).

As the OCCA found, these "photographs were relevant" to show C.H.'s fatal injuries, *Bosse II*, 400 P.3d at 853; *see also id.* at 858 ("[C.H.] died of smoke inhalation and thermal injury—that is, she burned to death."), which weighs against a finding that their admission rendered Petitioner's trial fundamentally unfair, *Cole*, 755 F.3d at 1165; *Wilson*, 536 F.3d at 1115; *Thornburg*, 422 F.3d at 1129; *Willingham*, 296 F.3d at 928-29; *Smallwood*, 191 F.3d at 1275; *Britt*, 302 F. App'x at 778. The photographs further corroborated and illustrated the testimony regarding the state of C.H.'s body when discovered at the scene and the State's theory that Petitioner closed C.H. up in a closet (Tr. IV, 132-33, 157-58). *See Cole*, 755 F.3d at 1165; *Wilson*, 536 F.3d at 1115; *Britt*, 302 F. App'x at 778; *see also Smith v. Sirmons*, No. 06-6067, 200 F. App'x 822, 826-27 (10th Cir. Oct. 17, 2006) (unpublished) (finding admitted photographs "demonstrated the location, condition, and position of the victim's body at the scene of the shooting and corroborated testimony regarding the circumstances of the murder"). Again, State's Exhibits 65 and 95 were the *only* post-mortem photographs of C.H. admitted, and Petitioner cites no case under similar circumstances holding that the State should not have been permitted, as a requirement of fundamental fairness, to admit *any* post-mortem photographs of a murder victim—the *corpus delicti*.

Petitioner makes much of the fact that the OCCA found the admission of State's Exhibits 65 and 95 to be error under Oklahoma law. Doc. 19, at 61-62. But as already shown above, the fact that the OCCA found these photographs to be overly prejudicial

under state law does not automatically mean Petitioner's trial was rendered fundamentally unfair for federal due process purposes. *See Rivera*, 556 U.S. at 158, 160; *Wilson*, 536 F.3d at 1114; *Givens*, 238 F.3d 420 at *5. Indeed, the OCCA correctly recognized as much in proceeding to find that, "[c]onsidering the entire record, . . . these prejudicial photographs did not contribute to the jury's verdict of guilt or determination of sentence." *Bosse II*, 400 P.3d at 854.

Similarly, Petitioner complains that the OCCA found that the "jurors would not be 'able to view those two pictures impartially,'" and yet denied relief. Doc. 19, at 62 (quoting *Bosse II*, 400 P.3d at 853). But again, this language from the OCCA was part of its consideration under *state* law as to the *prejudicial* effect of the photographs versus their probative value. *See Bosse II*, 400 P.3d at 853 ("[G]ruesome crimes make for gruesome photographs. This alone will not make them inadmissible, as long as they are not so unnecessarily hideous or repulsive that jurors cannot view them impartially." (citing *Hain v. State*, 919 P.2d 1130, 1143 (Okla. Crim. App. 1996) (citations omitted)); *Hain*, 919 P.2d at 1143 ("When the probative value of photographs is outweighed by their prejudicial impact on the jury—that is, the evidence tends to elicit an emotional rather than rational judgment by the jury—then they should not be admitted into evidence."). At bottom, Petitioner believes that the OCCA's finding of error under state law should have been sufficient to find his trial was rendered fundamentally unfair, but this is not the law. *See Cole*, 755 F.3d at 1166 (rejecting habeas petitioner's argument that the OCCA unreasonably concluded that autopsy photograph of baby was "*potentially* prejudicial" and

improperly admitted, but "then a few sentences later held the trial's errors could not have *conceivably* impacted the sentencing decision" (quotation marks omitted)).

As to the final set of complained-of photographs, State's Exhibits 92, 94, 96, and 98, the OCCA held:

> Bosse also complains of morgue pictures of both these victims [Ms. Griffin and C.G.], taken after the bodies were cleaned, and before the autopsies were performed. Long cotton-tipped probes are inserted into the victims' stab wounds, showing the location, direction and trajectory of the wounds. Again, these photographs are disturbing. However, they show jurors Bosse's handiwork and corroborate the medical examiner's testimony. The trial court did not abuse its discretion in admitting these exhibits.

*Bosse II*, 400 P.3d at 853 (citations and paragraph number omitted).

State's Exhibit 92 is a side-profile of C.G.'s head and neck that depicts the wounds observed by the medical examiner after the blanket was removed from C.G.'s head (Tr. IV 143-44). The medical examiner used State Exhibit's 94 and 96 to depict the trajectory of stab wounds suffered by Ms. Griffin and C.G., as the photographs present the cleansed wounds of both victims using Q-tip sticks inserted into each wound (Tr. V, 233-37; Tr. VI, 14-15, 20-22). Notably, State's Exhibit 94 is zoomed in on C.G.'s injuries such that the child's face is not visible, greatly diminishing any impact of the photograph. State's Exhibit 98 is a face-down photograph of Ms. Griffin's body depicting a stab wound on her back (Tr. V, 233).

The record clearly supports the OCCA's finding that State's Exhibits 92, 94, 96, and 98 "show jurors Bosse's handiwork and corroborate the medical examiner's testimony." *Bosse II*, 400 P.3d at 853. As relevant and corroborative of the medical examiner's testimony, a fairminded jurist could agree with the OCCA that these exhibits

did not render Petitioner's trial fundamentally unfair. *See Cole*, 755 F.3d at 1165; *Wilson*, 536 F.3d at 1115; *Thornburg*, 422 F.3d at 1129; *Willingham*, 296 F.3d at 928-29; *Smallwood*, 191 F.3d at 1275; *Britt*, 302 F. App'x at 778.[17]

Petitioner argues that the challenged photographs were particularly unfair as to his sentencing stage because they were allegedly not relevant to prove the HAC aggravating circumstance. Doc. 19, at 61-63. In support, Petitioner relies on *Spears v. Mullin*. Doc. 19, at 63. As a sister court previously explained, the circumstances of *Spears* are unique and distinguishable:

> Cole's reliance on *Spears* to argue that the admission of the photographs rendered the sentencing stage of his trial fundamentally unfair is misplaced. In *Spears*, the Tenth Circuit determined that the admission of photographs depicting injuries that occurred, or likely occurred, after the victim lost consciousness to support the heinous, atrocious, or cruel aggravator rendered the petitioner's sentencing proceeding fundamentally unfair. 343 F.3d at 1227-28. The circuit court ruled that, because the injuries depicted occurred after the victim lost consciousness, those injuries were not relevant to the aggravator, which requires conscious suffering. *Id.* Important to the *Spears* ruling was the fact that the prosecution waited until the second stage to introduce the photographs. The court recognized that the photographs were the primary aggravating evidence and noted, "By contrast, the State introduced comparatively innocuous photographs at the first stage, seeming to deliberately await the second stage to present the more gruesome

---

[17] Petitioner also asserts, in cursory fashion, that "[t]he photographs"—presumably all seventeen that he challenges—"were not only cumulative to other evidence, including testimony, reports, and diagrams, they were also gratuitously gruesome." Doc. 19, at 60. The Tenth Circuit has rejected a claim that "photographs, [a] crime scene video and diagrams" were unfairly cumulative where they "all provided the jury with different perspectives of the crime scene and were used by witnesses to illustrate different aspects of their testimony." *Wilson*, 536 F.3d at 1116-17. Here, as the State has shown above as to each challenged exhibit, a fairminded jurist could conclude that each one depicted different perspectives of the victims and their wounds and illustrated the witnesses' testimony. Nothing in the Constitution entitled Petitioner to, as he suggests, a trial in which the State admitted zero photographs of his handiwork merely because same was also evidenced by "testimony, reports, and diagrams."

photographs solely for their shock value." *Id.* Unlike in *Spears*, the challenged photographs here (State's Exs. 7-9) show injuries that occurred while [B.C.] was conscious and, thus, do support the heinous, atrocious, or cruel aggravator. Moreover, these photographs were introduced in the first stage and were relevant to show the nature of the injuries and cause of death.

*Cole v. Workman*, No. 08-CV-0328-CVE-PJC, 2011 WL 3862143, at *36 n.17 (N.D. Okla. Sept. 1, 2011) (unpublished).

Here, too, like in *Cole* and unlike in *Spears*, all of the challenged photographs were admitted in *first* stage and were relevant to show the cause and manner of death and to corroborate the testimony regarding the state of the victims when found, as explained at length above (Tr. II, 24-26; Tr. III, 90-95; Tr. IV, 114-19, 121-23, 132-33, 141-44, 157-61; Tr. V, 233-37; Tr. VI, 14-15, 20-22). Indeed, the OCCA found that even State's Exhibits 65 and 95, though ultimately so prejudicial they should not have been admitted, were nevertheless "relevant." *Bosse II*, 400 P.3d at 853. Thus, this is not a case such as *Spears* where the State sat on graphic photographs until the second stage and then admitted them close in time to the jury's sentencing deliberations. While the State here did move to incorporate all first-stage evidence into the second stage (Tr. X, 112), such was actually unnecessary under Oklahoma law, *Bench v. State*, 431 P.3d 929, 977 (Okla. Crim. App. 2018) ("Although wholly unnecessary, defense counsel explicitly moved to introduce all of the defense's evidence from the first stage of the trial into evidence in the second stage of the trial."). Thus, Petitioner's due-process argument necessarily implies that the State was required, at the outset of the sentencing stage, to withdraw exhibits that were relevant in the first stage but not strictly relevant in second stage and request that the jury be

instructed not to consider those exhibits in sentencing. Nothing in *Spears* or any case that Respondent can locate demands so much of the State to comport with due process.

In any event, Petitioner misunderstands the record and the evidence in suggesting that these photographs were not relevant to the HAC aggravating circumstance. As to Ms. Griffin and C.G., Petitioner notes the OCCA's observation that "[b]oth of these victims were dead before the fire began" and "[a]ny effects the fire had on their bodies were not relevant to their fatal injuries," and argues therefrom that the photographs of these victims had "zero" relevance to the second stage. Doc. 19, at 63. Petitioner ignores that the complained-of photographs also depicted these victims' *stab* wounds and those injuries *did* evidence conscious physical suffering. As the OCCA found in upholding the sufficiency of the evidence as to the HAC aggravator as to Ms. Griffin and C.G.:

> The term "heinous' means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others. The State had the burden to show beyond a reasonable doubt that Bosse inflicted either torture, including great physical anguish or extreme mental cruelty, or serious physical abuse on each victim; in cases of great physical anguish or serious physical abuse, the victim must have experienced conscious physical suffering before death. . . .

> Katrina had eight separate stab wounds. She bled into her airway and lungs. Death would have taken anywhere from minutes to hours, during which time her body diverted blood to her vital organs. Katrina also had incised wounds to her hand consistent with defensive wounds inflicted by grabbing or holding a knife blade. The stab wounds on her arms were also consistent with defensive wounds, inflicted while Katrina was conscious and trying to protect herself. Katrina was most likely conscious when these were inflicted. Katrina had also suffered blunt force trauma to the right side of her head. When Katrina's body was found, her legs were laying across [C.G.]'s legs. [C.G.] had five stab wounds. Two of the injuries to his neck, and the wound to his chest, damaged major veins and caused significant bleeding. Like Katrina, [C.G.]'s body diverted blood to vital organs, which would have

61

taken some time. The stab wound to [C.G.]'s arm was consistent with a defensive wound received when he was consciously trying to defend himself. He also had blunt force trauma to the head. . . .

*Bosse II*, 400 P.3d at 858-59 (quotation marks, citations, and paragraph numbers omitted).

The State could not show photographic evidence of the stab wounds that caused conscious physical suffering without also displaying photographic evidence of the fire damage to Ms. Griffin and C.G.'s bodies. If Petitioner wished it to be otherwise, then he should not have set fire to his victims' home after he fatally stabbed them. *See id.* at 853 (". . . but those effects do reflect the consequences of Bosse's decision to leave the bodies and set the trailer on fire").

As to C.H., Petitioner utterly fails to acknowledge that the two photographs of her were relevant to prove conscious physical suffering, as she literally burned to death:

[C.H.] had blunt force trauma to her head, which may or may not have rendered her unconscious. Her blood was found on Bosse's right shoe. She was put in the master bedroom closet, and the doorknob was blocked from the outside with a chair. She was in the closet when the trailer was set on fire. Evidence showed that depletion of oxygen would have incapacitated [C.H.] in sixteen to fifty minutes. [C.H.]'s brain was swollen, her tissues showed she had been exposed to high levels of carbon monoxide, she had soot in her airways, esophagus and stomach, and her body was charred. [Medical examiner] Dr. [Inas] Yacoub testified that the soot in [C.H.]'s stomach indicated she tried to cough out the smoke and swallow it, and that [C.H.] could not have done this if she were unconscious. [C.H.] died of smoke inhalation and thermal injury—that is, she burned to death.

*Id.* at 858.[18]

_____

[18] Without further elaboration, Petitioner states that "[t]he Eighth and Fourteenth Amendments demand a higher degree of reliability and scrutiny in capital cases," citing to the syllabus of *Woodson v. North Carolina*, 428 U.S. 280, 280 (1976). Doc. 19, at 60. *Woodson*, which struck down a mandatory death sentencing scheme based on the Eighth Amendment's requirement of individualized sentencing in capital cases, is inapposite.

**D.     Conclusion**

For all these reasons, this Court should deny habeas relief on Ground III.

## GROUND IV

**THE OCCA'S FINDING OF HARMLESS ERROR FROM THE ADMISSION OF IMPROPER VICTIM IMPACT TESTIMONY WAS LEGALLY AND FACTUALLY REASONABLE.**

In his fourth ground for relief, Petitioner claims the admission of improper death recommendations at the penalty phase of trial was harmful error. Doc. 19, at 64-76. Specifically, Petitioner attacks the State's elicitation of death recommendations from Rebecca Allen (Ms. Griffin's mother), Ginger Griffin (Ms. Griffin's stepmother), and Johnny Griffin (Ms. Griffin's father). Doc. 19, at 64, 69-76. As discussed below, the OCCA's conclusion that the admission of these individuals' death recommendations was harmless beyond a reasonable doubt was legally and factually reasonable. Nor has Petitioner met the habeas standard for showing prejudice. Accordingly, no relief is warranted for Petitioner's fourth ground.

**A.     Procedural Background**

On direct appeal, the OCCA denied relief on this claim as follows:

In his second subproposition, Bosse claims that the three victim impact witnesses should not have been allowed to offer their opinions asking for a

---

*Woodford*, 428 U.S. at 301-05. While the qualitative differences in death as punishment require greater reliability in capital sentencing through "consideration of the character and record of the individual offender and the circumstances of the particular offense," *id.* at 304, Petitioner does not point to a Supreme Court case applying such a heightened standard to the admission of evidence in a capital sentencing. Indeed, *Romano* held that "[t]he Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings." *Romano*, 512 U.S. at 12.

death sentence. Bosse has not challenged the appropriateness or admission of the contents of the three victim impact statements themselves, other than the sentence recommendation. Bosse objected to this evidence at trial, preserving the issue for review. While this Court has previously rejected this claim, holding that this evidence is admissible under *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), those holdings are hereby overruled. *Bosse v. Oklahoma*, 580 U.S. ——, 137 S.Ct. 1, 196 L.Ed.2d 1 (2016). We find that the witnesses should not have been allowed to recommend to the jury a sentence of death. *Bosse*, 137 S.Ct. at 2.

However, this finding does not conclude our analysis. We reject Bosse's claim that this error requires reversal and resentencing. Bosse's reliance on *Brown v. Sanders* is misplaced; while jurors may consider it in determining an appropriate sentence, victim impact evidence is not a *Sanders* "sentencing factor" comparable to Oklahoma's aggravating circumstances or capital eligibility requirements. *Malone v. State*, 2013 OK CR 1, ¶ 87, 293 P.3d 198, 221-22; *Brown v. Sanders*, 546 U.S. 212, 220, 126 S.Ct. 884, 892, 163 L.Ed.2d 723 (2006). We have repeatedly held that victim impact evidence does not constitute an extra aggravating circumstance, additional to those provided by the Legislature. *Martinez v. State*, 2016 OK CR 3, ¶ 66, 371 P.3d 1100, 1116; *Cargle v. State*, 1995 OK CR 77, ¶ 76, 909 P.2d 806, 828 (evidence of aggravating circumstances must be admitted before victim impact evidence may be given). As the Supreme Court's remand in *Bosse* made clear, this error is subject to harmless error analysis. *Bosse*, 137 S.Ct. at 2-3. We review the trial court's decision to determine whether this constitutional error was harmless beyond a reasonable doubt. *See, e.g.*, *Robinson v. State*, 2011 OK CR 15, ¶ 12, 255 P.3d 425, 430; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

For guidance in conducting this analysis, we turn to the Tenth Circuit, the federal appellate court which reviews Oklahoma capital cases. The Tenth Circuit has reviewed this issue in several capital cases appealed from this Court. In all but one, the court found the error harmless.[6] In a recent decision, the District Court for the Western District of Oklahoma comprehensively set forth factors used by the Tenth Circuit in determining whether a victim's family's sentence recommendation was harmless. *Underwood v. Duckworth*, 2016 WL 4059162 (W.D.Ok., July 28 2016) (appeal pending). These factors are (1) the quantity and nature of the recommendations, (2) presence of limiting instructions regarding victim impact testimony, (3) the surety of guilt, and (4) the overwhelming evidence in support of aggravating circumstances when weighing whether a sentence recommendation was harmless. *Id*. at 18. Taken together, these factors offer a reasoned framework for determining whether an improper victim impact statement recommending

a death sentence contributed to the jury's sentencing verdict. We adopt these factors as we consider whether the error in this case was harmless, and for consideration in future cases.

> [6] In an additional case, the Tenth Circuit generally referred to improper victim impact evidence, without specifically discussing a sentence recommendation, and found the "improper" evidence harmless. *Willingham v. Mullin*, 296 F.3d 917, 931 (10th Cir. 2002). In another case, the court noted that there was no actual sentence recommendation, referring to the testimony as "enigmatic", and found no error in this Court's ruling that it was admissible. *Turrentine v. Mullin*, 390 F.3d 1181, 1201 (10th Cir.[] 2004).

Three victim impact witnesses testified for the State. Katrina's mother, father, and stepmother each testified about the impact on them of the deaths of Katrina, [C.H.], and [C.G.]. As we noted above, Bosse does not contest admission of the content or substance of any of this testimony, other than the death sentence recommendation. The record shows that the testimony was, as it was intended to be, emotionally affecting, and that each statement left some jurors and spectators in tears. Bosse argues that this emotional testimony exacerbated the effect of the recommendations for death. However, the record shows that any emotional effect on jurors was the result of the witnesses' descriptions of the impact of the crimes and would have occurred whether or not there had been a recommended sentence. Furthermore, each witness was limited to a one-word sentence recommendation. The prosecutor asked Ginger Griffin about each victim separately, and she thus replied "death" three times. The trial court warned the prosecutor against that form of questioning, limiting the testimony to a single recommendation. Rebecca Allen and Johnny Griffin each stated the word "death" once, when asked whether they had a recommendation for sentence as to all three victims. We do not doubt that this single word, repeated five times, had an effect on the jury. However, the witnesses neither explained their request, nor pleaded with jurors for a death sentence. We note that, of the twenty-three witnesses who testified in mitigation for Bosse, sixteen of his friends and family said his life had value to them, and fourteen specifically asked jurors to let Bosse live.

Jurors were given the Oklahoma Uniform Jury Instruction regarding victim impact evidence. This instruction specified that jurors' consideration of victim impact evidence must be limited to a moral inquiry into Bosse's culpability, not an emotional response. Jurors were told victim impact evidence was neither itself an aggravating circumstance nor proof of any

aggravating circumstance, and did not affect the State's burden to prove at least one aggravating circumstance beyond a reasonable doubt. They were told they could not consider the victim impact evidence until they had (a) found proof of at least one aggravating circumstance beyond a reasonable doubt, by evidence independent of the victim impact evidence, and (b) further found that evidence in aggravation outweighed their finding of one or more mitigating circumstances. OUJI-CR 2d 9-45. This instruction correctly informed jurors of the limitations on their consideration of victim impact testimony. We require trial courts to use the uniform jury instructions if they state the applicable law. *Mitchell v. State*, 2016 OK CR 21, ¶ 24, 387 P.3d 934, 943.

Turning to the third and fourth factors, the circumstantial case against Bosse was very strong. He does not claim that insufficient evidence supported his convictions. Our discussion of the substantive issues he raises regarding the first stage of trial describes the breadth and quantity of the evidence against Bosse. Furthermore, we find in Propositions XI and XII that sufficient evidence supported the jury's findings that the murders were heinous, atrocious or cruel, and were committed to avoid arrest. The evidence clearly showed that Bosse had been stealing from Katrina, and committed these murders to avoid the consequences of that crime. As we discuss in Proposition XI, overwhelming evidence supports the conclusion that all three murders were heinous, atrocious or cruel.

Three witnesses gave a simple one-word recommendation that Bosse receive death. Jurors were properly instructed on the use of the appropriately admitted victim impact evidence. The case for guilt, and the evidence to prove the aggravating circumstances found by the jury, was very strong. This provides a stark contrast to the single Oklahoma case where the Tenth Circuit found this error was not harmless. There, the improper sentence recommendations were numerous and emotionally laden, the proof of aggravating circumstances was weak, and the defendant's guilt was not clear-cut. *Dodd v. Trammell*, 753 F.3d 971, 997-99 (10th Cir. 2013). Considering all the factors, we find that the improperly admitted sentence recommendations did not contribute to the jury's recommended sentences of death, and were harmless beyond a reasonable doubt. *Miller*, 2013 OK CR 11, ¶ 197, 313 P.3d at 994; *Robinson*, 2011 OK CR 15, ¶ 12, 255 P.3d at 430; *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.

*Bosse II*, 400 P.3d at 855-57 & n.7 (paragraph numbers omitted).

**B.      Argument and Authority**

The Eighth Amendment prohibits victim's family members from testifying about their opinions regarding the appropriateness of punishment in capital cases. *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016); *Booth v. Maryland*, 482 U.S. 496 (1987). Thus, the relevant question here is whether the admitted death recommendations were harmful. On direct appeal, harmlessness is measured by the standard prescribed in *Chapman v. California*, 386 U.S. 18 (1967), pursuant to which constitutional error must be harmless beyond a reasonable doubt. *Davis v. Ayala*, 576 U.S. 257, 267 (2015). In contrast, to be entitled to *habeas* relief based on a constitutional error, a petitioner must show that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, this Court may grant relief only if it "has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Ayala*, 576 U.S. at 268 (quotation marks omitted). "There must be more than a 'reasonable possibility' that the error was harmful." *Id.* (quoting *Brecht*, 507 U.S. at 637).

Additionally, where, as here, the state court held on direct review that the constitutional error at issue was harmless, such that it has adjudicated a constitutional claim on the merits, a federal court on habeas review may not grant relief unless the state court "applied *Chapman* in an objectively unreasonable manner." *Id.* (quotation marks omitted); *Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022) (confirming that, "[a]fter a state court determines that an error at trial did not prejudice a criminal defendant," a federal court may not grant habeas relief unless it finds both *Brecht* and AEDPA satisfied). In other words,

the harmlessness determination itself must be unreasonable, either because the state court's decision was contrary to, or an unreasonable application of, clearly established federal law or because it was based on an unreasonable determination of the facts. *Ayala*, 576 U.S. at 269-70; *see also* 28 U.S.C. § 2254(d). "And a state-court decision is not unreasonable if 'fairminded jurists could disagree on its correctness.'" *Ayala*, 576 U.S. at 270 (quoting *Richter*, 562 U.S. at 101) (quotation marks omitted, alteration adopted).   Accordingly, Petitioner must show that the OCCA's "decision to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103).

Here, as an initial matter, Respondent must correct Petitioner's misguided notion that the State carries the burden to show harmlessness on this issue. Doc. 19, at 67. As *Davenport* recently made abundantly clear, *Petitioner*, and not the State, carries the burden as to *both Brecht* and AEDPA:

> *Brecht* effectively inverted *Chapman*'s burden. Rather than require the prosecution to prove that a constitutional trial error is harmless, *Brecht* held that a state prisoner seeking to challenge his conviction in collateral federal proceedings must show that the error had a substantial and injurious effect or influence on the outcome of his trial. . . .
>
> Today, then, a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests. The Sixth Circuit erred when it held Mr. Davenport to just one of these burdens.

*Davenport*, 142 S. Ct. at 1519, 1524 (quotation marks and citations omitted).

Petitioner does not explain which provisions of § 2254(d) he invokes, but he repeatedly claims the OCCA's decision was unreasonable, seemingly legally and factually. Doc. 19, at 64, 66, 68, 76. **Petitioner does not raise, and has therefore forfeited, any argument that the OCCA's decision was contrary to clearly established federal law under § 2254(d)(1), and no such argument should be considered if later raised by Petitioner in his reply or on appeal.** *See Hancock*, 798 F.3d at 1011. For the reasons below, Petitioner has not carried either his burden under *Brecht* or his burden of showing the OCCA's *Chapman* analysis was legally or factually unreasonable.

This Court previously explained the factors the Tenth Circuit considers as to a *Brecht* analysis of improper death recommendations: "(1) quantity and nature of the recommendations, (2) limiting instructions regarding victim impact testimony, (3) the surety of guilt, and (4) the overwhelming evidence in support of aggravating circumstances when weighing whether a sentence recommendation was harmless." *Underwood v. Duckworth*, No. CIV-12-111-D, 2016 WL 4059162, at *18 (W.D. Okla. July 28, 2016) (unpublished). On appeal, the Tenth Circuit's decision in *Underwood* tracked this Court's analysis.

*Underwood v. Royal*, 894 F.3d 1154, 1179 (10th Cir. 2018), explained that to determine whether death recommendations "had a substantial and injurious effect on the jury's sentencing decision, [this Court] must consider them in the overall context of the trial and the record as a whole," including "all of the aggravating and mitigating evidence" (quotation marks omitted). *Underwood* first considered the death recommendations themselves, such as whether they were concise or extensive. *Underwood*, 894 F.3d at 1181.

*Underwood* further considered whether the jury was properly instructed by the trial court on the proper role of victim-impact evidence and noted the general presumption that juries follow limiting instructions. *Id.* Next, *Underwood* considered the strength of the State's evidence of guilt. *Id.* at 1182. Lastly, *Underwood* analyzed the strength of the State's aggravating case and whether the defense's mitigation case was "sufficiently compelling as to put [the court] in grave doubt as to the *Booth* error's harmlessness." *Id.* (quotation marks omitted).

As a final matter, *Underwood* explained the rare circumstance in which death recommendations warranted habeas relief:

> This court has held that the admission of unconstitutional victim sentence recommendations required reversal under the *Brecht* standard in only one case: *Dodd v. Trammell*, 753 F.3d 971 (10th Cir. 2013). Before *Dodd*, "no prior panel of this court ha[d] ruled that victim recommendations of the death penalty required reversal." *Id.* at 997. The *Dodd* panel acknowledged ten previous decisions holding "that such testimony was harmless." *Id.* It cited three factors warranting a different result in that case: (1) "the sheer volume of [the unconstitutional] testimony," which included a "drumbeat" of seven death recommendations; (2) that the jury did not find the HAC aggravator or the continuing threat aggravator;[16] and (3) that the defendant's guilt "was not as clear cut" as in previous decisions, due to the prosecution's sole reliance on circumstantial evidence. *Id.* at 997-98. Based on these factors, the panel found itself "in grave doubt about the effect of the error on the jury's sentencing decision" and held that "the admission of the sentence recommendations in this case was not harmless." *Id.* at 999 (citations and quotations omitted).

> [16] The *Dodd* panel noted that in seven of the ten decisions it reviewed, the jury found the HAC aggravator and that, in two of the remaining three decisions, the jury found the continuing threat aggravator. 753 F.3d at 998. And "[i]n the only case in which the jury did not find either [of these] aggravator[s], the two victim statements did not expressly refer to the defendant being put to death; instead, they both simply stated without embellishment that they agreed with the prosecution's

> recommended sentence." *Id.* (alterations omitted) (quoting
> *Selsor*, 644 F.3d at 1027).

*Underwood*, 894 F.3d at 1178-79 & n.16 (footnote and select quotation marks omitted). It

bears emphasis that here, unlike in these prior cases, the OCCA acknowledged the

constitutional error and performed a harmless error analysis, meaning Petitioner faces the

double burden of both *Brecht* and showing that *no fairminded jurist* could agree with the

OCCA's *Chapman* analysis.

Petitioner has not met either burden. First, as to the death recommendations

themselves, the OCCA made the following presumptively correct findings:

> The record shows that the testimony was, as it was intended to be,
> emotionally affecting, and that each statement left some jurors and spectators
> in tears. Bosse argues that this emotional testimony exacerbated the effect of
> the recommendations for death. However, the record shows that any
> emotional effect on jurors was the result of the witnesses' descriptions of the
> impact of the crimes and would have occurred whether or not there had been
> a recommended sentence. Furthermore, each witness was limited to a one-
> word sentence recommendation. The prosecutor asked Ginger Griffin about
> each victim separately, and she thus replied "death" three times. The trial
> court warned the prosecutor against that form of questioning, limiting the
> testimony to a single recommendation. Rebecca Allen and Johnny Griffin
> each stated the word "death" once, when asked whether they had a
> recommendation for sentence as to all three victims. We do not doubt that
> this single word, repeated five times, had an effect on the jury. However, the
> witnesses neither explained their request, nor pleaded with jurors for a death
> sentence.

*Bosse II*, 400 P.3d at 856 (paragraph number omitted). Given that the death

recommendations were concise and did not involve explanations or pleading, this factor

weighs in favor of harmlessness under *Brecht* and certainly under the deferential AEDPA

standard. *See, e.g.*, *(John) Grant v. Trammell*, 727 F.3d 1006, 1017 (10th Cir. 2013) (noting

that the death recommendations lacked "embellishment" but also observing that "[t]his

court has held far more extensive pleas to lack the required 'substantial and injurious' effect on a jury's verdict when the evidence against the defendant at sentencing was strong"); *DeRosa v. Workman*, 679 F.3d 1196, 1236 (10th Cir. 2012) (ruling harmless a statement that "[o]ur family has suffered enough because of this man. My family pleads with you to give the death penalty."); *Welch v. Workman*, 639 F.3d 980, 1000 (10th Cir. 2011) (ruling harmless a statement that "[w]e can now only put our faith first in God and then our courts, and you, the jury. And I would beg you, please, don't let this happen to another family. And, again, I say I feel that he should be imposed the death penalty.").

Petitioner argues that this first factor weighs in his favor because the "five" death recommendations were a "drumbeat" as in *Dodd*. To the contrary, the "drumbeat" in *Dodd* resulted from "six, and perhaps seven, of . . . eight *witnesses*" offering death recommendations, *Dodd v. Trammell*, 753 F.3d 971, 997 (10th Cir. 2013) (emphasis added), in contrast to *three* witnesses in this case, *Bosse II*, 400 P.3d at 856. While one witness, Ms. Griffin's step-mother, said "death" three times, the trial court commendably instructed the State not to use that form of questioning (Tr. X, 212). At the very least, a fairminded jurist could agree that the three to five recommendations in this case were not equivalent to the six to seven in *Dodd*.

Petitioner also suggests the OCCA was unreasonable to find that the witnesses did not explain their death recommendations, claiming that they, "in their prepared statements culminating in their recommendations, . . . provided lengthy and emotional explanations for these recommendations, at times explicitly referring to Bosse." Doc. 19, at 70. To begin with, this argument may not be considered by this Court in its AEDPA review of the

72

OCCA's *Chapman* analysis because Petitioner did not make this argument to the OCCA. *See Beaudreaux*, 138 S. Ct. at 2560. Notably, Petitioner offered only about a page and a half to the OCCA on why the death recommendations were allegedly harmful, instead focusing most of his brief on the argument that *Booth* error is impervious to harmless-error review. 2/7/2017 *Appellant's Supplemental Brief Following Remand from the United States Supreme Court* at 4-6 (OCCA No. D-2012-1128) ("*Appellant's Supplemental Brief*"). As to the nature of the recommendations, Petitioner actually conceded they were "simple plea[s] for death" but argued they were nonetheless harmful in light of other factors. *Appellant's Supplemental Brief*, at 5.

In any event, Petitioner confuses explanation of why a witness desires a death sentence with ordinary victim impact testimony. While here the three witnesses certainly offered testimony about the impact of the murders on them, they offered only the single-word answer of "death" to the prosecution's inquiry of their punishment recommendation (Tr. X, 202, 212, 223). Explanation of why a death sentence is desired would include, for example, a witness's statement that "justice to us is no less than the death penalty" and that death is required to make sure "this [does not] happen to another family." *Welch*, 639 F.3d at 1000. This type of explanation or elaboration simply did not happen in this case.

Petitioner also suggests the OCCA unreasonably found that "the record shows that any emotional effect on jurors was the result of the witnesses' descriptions of the impact of the crimes and would have occurred whether or not there had been a recommended sentence." *Bosse II*, 400 P.3d at 856; Doc. 19, at 71-73. To the contrary, the OCCA's observation was quite reasonable, and at the very least Petitioner has offered no clear and

convincing evidence to rebut it. *See* 28 U.S.C. § 2254(e)(1). The substance of the victim

impact testimony, **which Petitioner does not challenge as improper**, included a number

of heart-wrenching details that were far more likely to have caused any tears[19] than single-

word death recommendations:

- How two of the grandparents were called "Papaw" and "Mamaw" by the children, and the grandparents had lost not only the grandchildren but their daily routine of dropping off and picking up the kids every day at school and doing various activities with them (Tr. X, 204-05, 217-18). How "Papaw" "was unable to work for two years after my babies were killed" and could hardly stand to go to work or come home without the usual routine of transporting, and spending time with, the kids (Tr. X, 221).

- The children's love of reading, swimming, fishing, water skiing, and climbing, and the unfinished clubhouse "Papaw" had been building for them at the time of their deaths (Tr. X, 199, 205-07, 217-18). "The clubhouse was pretty extravagant. I put carpet and electricity. Nothing was too good for my babies," "Papaw" explained (Tr. X, 218).

- C.G.'s position as "Papaw's" "little helper," and how "Papaw" had recently taught him to run the lawnmower and weed-eater (Tr. X, 218).

- How the grandparents planned to show C.G. how to "slalom ski" the weekend after he was killed but that "[n]ext weekend never came" (Tr. X, 207).

- How C.G. loved "being tickled by his mom" and "[h]e would laugh so hard he would just slobber all over himself" (Tr. X, 200). Further, how C.G. loved and protected his mother and would remind her daily to take her seizure medication (Tr. X, 200).

- C.G.'s love of all sports and his excitement over basketball camp, which he never got to finish because of his murder (Tr. X, 207-08).

---

[19] The trial court noted, "Let the record reflect that there are people that are -- I hear sniffing and I recognize people wiping their eyes and there's tears. I don't hear an abundant noise of crying, bawling of that sort. At this point, they're very subdued, but, yes, there is some crying coming -- ." (Tr. X, 214).

- C.H.'s love of music, dance, making people laugh, and her tomboy side and bravery in doing things like pick up bullfrogs (Tr. X, 201, 208-09). How "[s]he was quick to give hugs and kisses to let you know she loved you" (Tr. X, 201).

- C.H's pain at losing her great-grandfather and how she wrote a song honoring him at only five years old (Tr. X, 201).

- The Christmas the grandparents surprised the kids with four-wheelers (Tr. X, 209-10). That "holidays are so empty and no longer have meaning for us. We will never have kids to watch decorate and hunt Easter eggs over and over and over again. . . . No kids to fill our home with Christmas cheer and to see those beautiful smiling faces as they open their presents." (Tr. X, 210-11).

- C.G. and C.H.'s close bond and protectiveness over each other and how C.H. would stand up to anyone hurting her "bubba" (Tr. X, 218-19).

In sum, the jury heard about the impact of the murders on the lives of three extraordinarily devoted and actively involved grandparents whose daily routines centered around the children. As their step-grandmother put it,

> Those kids were mine and Pawpaw's life. Katrina, [C.G.] and [C.H.] were the only kids Johnny and I had. Now it's just he and I alone. Every day we walk outside our home just to be faced with the empty spot on our property where the kids' home once sat.

(Tr. X, 211). A fairminded jurist could readily agree with the OCCA that these details, and not the death recommendations, were the cause of any tears on the parts of the jurors. *See Lockett v. Trammell*, 711 F.3d 1218, 1239 (10th Cir. 2013) ("The most emotional and expressive part of the Neimans' statement was constitutionally permissible: statements about the effect the murder had on them as a family, about their daughter's unique and positive qualities, and about how much they missed her.").

Relatedly, Petitioner argues that, "[e]ven if the admissible victim impact testimony alone was enough to cause the jurors' emotional response, the reality is that it did not stand

alone; the jury heard it in conjunction with the improper death recommendations." Doc. 19, at 72. But Petitioner forgets the OCCA's finding, relevant to the second *Underwood* factor, that the jurors were instructed on the proper use of victim impact testimony, including that their "consideration of victim impact evidence must be limited to a moral inquiry into Bosse's culpability, not an emotional response." *Bosse II*, 400 P.3d at 856. While Petitioner contends that this Court should doubt whether the jury followed that instruction given that they wiped away a few tears during the victim impact testimony (Tr. X, 214); Doc. 19, at 74, the jury had not yet received the instruction at that time. A fairminded jurist could agree that by the time the second stage concluded and the jury instructions were read, *three days* after the victim impact testimony, any emotional response among the jurors had subsided and they were able to follow their instructions (Tr. XIII, 10).

Third, as to the strength of guilt, *Underwood*, 894 F.3d at 1182, the OCCA found "the circumstantial case against Bosse was very strong," *Bosse II*, 400 P.3d at 856. Petitioner does not attempt to rebut this finding and appears to concede that this third factor weighs against him. Doc. 1, at 74.

Fourth, Petitioner does not contest half of the final *Underwood* factor, whether the defense's mitigation case was "sufficiently compelling as to put [the court] in grave doubt as to the *Booth* error's harmlessness." *Underwood*, 894 F.3d at 1182 (quotation marks omitted); Doc. 19, at 74-76. Indeed, such a position would conflict with his second ground for relief, in which he claims that trial counsel presented an "unpersuasive" mitigation case. Doc. 19, at 52. While Respondent does not agree with that characterization regarding

counsel's performance, suffice it to say Petitioner has abandoned and forfeited any attempt to show this portion of the fourth *Underwood* factor weighs in his favor. *See Hancock*, 798 F.3d at 1011.

Petitioner does, however, contend that the State's aggravating case was not sufficiently strong to show harmlessness of the *Booth* error. Doc. 19, at 74-75. Petitioner has not overcome the OCCA's presumptively correct findings on this issue:

> [W]e find in Propositions XI and XII that sufficient evidence supported the jury's findings that the murders were heinous, atrocious or cruel, and were committed to avoid arrest. The evidence clearly showed that Bosse had been stealing from Katrina, and committed these murders to avoid the consequences of that crime. As we discuss in Proposition XI, overwhelming evidence supports the conclusion that all three murders were heinous, atrocious or cruel.

*Bosse II*, 400 P.3d at 856-57 (paragraph number omitted). Here, Petitioner challenges the strength of only one of these aggravators, avoid arrest, but Respondent shows below in Ground Five that his arguments fail.

Furthermore, while Petitioner emphasizes that the jury rejected continuing threat, the jury *did* find *three* aggravators, including HAC, an incredibly significant aggravator in the Tenth Circuit's body of case law examining *Booth* errors. *See Underwood*, 894 F.3d at 1181 ("The existence of the HAC aggravator in itself provides a relatively strong basis for the death penalty as compared to the other aggravating circumstances (apart from the continuing threat aggravator)."); *id.* at 1179 n.16 ("The *Dodd* panel noted that in seven of the ten decisions it reviewed, the jury found the HAC aggravator . . . ."); *see also Selsor v. Workman*, 644 F.3d 984, 1027 (10th Cir. 2011) (finding *Booth* error harmless where, although jury did reject continuing threat, it did find two other aggravators); *Underwood*,

No. CIV-12-111-D, 2016 WL 4059162, at *18 ("Petitioner attempts to counter this damning evidence by pointing out that the jury rejected the continuing threat aggravator. But as *Dodd* recognized, the especially heinous, atrocious, or cruel aggravator is a vital one, so much so that the Tenth Circuit has found a sentence recommendation harmless although the jury only found that single aggravator.").

The evidence of HAC here was not just strong, it was overwhelming. As described in more detail by the OCCA, the State showed that "each victim experienced conscious physical and mental suffering," and likely "saw the other victims attacked[,] subject[ing] them to extreme mental cruelty and anguish." *Bosse II*, 400 P.3d at 858. "[C.H.] was alive and conscious as she was hit in the head, locked in the closet, and the trailer was set on fire," and after that she burned alive. *Id.* Ms. Griffin and C.G. engaged in a life-or-death struggle with Petitioner, with little C.G. attempting to protect his mother with only a broken pocketknife, and Petitioner ultimately inflicted multiple, painful stab wounds on each victim, which took "anywhere from minutes or hours" to kill them. *Id.* at 858-59. The great risk of death aggravator was particularly potent given that Petitioner killed three victims, two of whom were young children. *See Selsor*, 644 F.3d at 1027 (emphasizing in harmlessness analysis as to *Booth* error that "the evidence presented by the prosecution overwhelmingly supported the two aggravating circumstances found by the jury," including great risk of death).

Petitioner argues that "just as in *Dodd*, the aggravators the jury did find added little beyond the findings of guilt." Doc. 19, at 75 (quotation marks omitted). Petitioner's appeal to *Dodd* is unpersuasive. In *Dodd*, the jury rejected both continuing threat *and* HAC. *Dodd*

*v. Trammell*, 753 F.3d 971, 998 (10th Cir. 2013). Furthermore, "[t]he prior-felony aggravator was based on a felony committed 11 years before the murders (and 18 years before the trial), when Defendant was 16." *Id.* In contrast, Petitioner's jury found three of four aggravating circumstances alleged, including HAC. Moreover, his case did not involve weak evidence of guilt as in *Dodd*. *Id.*[20]

## C.   Conclusion

For all these reasons, this Court should conclude that Petitioner has satisfied neither his burden under *Brecht* nor his burden under AEDPA. Habeas relief should be denied on Ground IV.

## GROUND V

**THE DECISION OF THE OCCA FINDING SUFFICIENT EVIDENCE TO SUPPORT THE "MURDER TO AVOID ARREST" AGGRAVATOR WAS NEITHER LEGALLY NOR FACTUALLY UNREASONABLE.**

In his fifth ground for relief, Petitioner contends there was insufficient evidence to support the "murder to avoid arrest" aggravating circumstance. Doc. 19, at 76-82. Specifically, Petitioner claims the OCCA's adjudication of this issue was an unreasonable determination of law and fact under 28 U.S.C. § 2254(d), since, according to Petitioner, there was no direct evidence to show Petitioner had stolen property from the Griffin family prior to the murders at issue. Doc. 19, at 79-81. As discussed below, the OCCA's

---

[20] Petitioner's suggestion that this Court should send a message to prosecutors by applying a tougher harmless-error standard is outdated. Doc. 19, at 75-76. In this very case, the Supreme Court has already corrected the OCCA's misunderstanding of *Booth*.

conclusion on this issue was neither an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts in light of the record. No relief is warranted for Petitioner's fifth habeas ground.

## A.      Procedural Background

The State alleged four aggravating circumstances as to Petitioner's murders on Counts I-III: (1) the murder was HAC; (2) during the commission of the murder, Petitioner knowingly created a great risk of death to more than one person; (3) at the present time there exists a probability that Petitioner will commit criminal acts of violence that would constitute a continuing threat to society; and (4) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution (O.R. 63, 111-14). *See also* OKLA. STAT. tit. 21, § 701.12 (2001) (outlining series of statutory aggravating circumstances under Oklahoma law). After the State rested at the penalty phase of trial, Petitioner interposed a demurrer to each alleged aggravator (Tr. X, 224-28).

As relevant to this ground, Petitioner lodged the following argument regarding the "murder to avoid arrest" aggravator in his demurrer: "As far as the murder committed for the purposes of avoiding arrest, again, there has not been any evidence except for inferences and arguments from the district attorney that's reason for the motive of these murders, and we would enter a demurrer" (Tr. X, 225-26). The trial court overruled Petitioner's demurrer on each of the four aggravating circumstances (Tr. X, 228). By their verdicts, the jury found three of the four above-mentioned aggravators on Counts I-III, omitting only the "continuing threat" aggravator from their verdict forms (O.R. 1090-92; Tr. XIII, 76-77).

Weighing these aggravators against the mitigating evidence, the jury returned a verdict of death on all three murder counts (O.R. 1093-95; Tr. XIII, 77-78).

On direct appeal, Petitioner challenged the sufficiency of the evidence supporting the "murder to avoid arrest" aggravating circumstance, claiming the jury's finding deprived him of his rights under state and federal law. *See Brief of Appellant*, at 82-84. The OCCA denied relief on this issue, announcing the following reasoning, rooted heavily in the factual record:

> Bosse claims in Proposition XII that the evidence was insufficient to prove the "murder to avoid arrest" aggravating circumstance beyond a reasonable doubt in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution. Bosse's demurrer to this evidence was overruled at trial. The State had to show that Bosse committed a predicate crime, separate from the three murders, and that the killings were done to avoid arrest or prosecution for that predicate crime. *Coddington*, 2011 OK CR 17, ¶ 46, 254 P.3d at 705. The defendant must intend, not just to commit the predicate crime, but to eliminate a witness to that crime by killing the victim. *Smith v. State*, 2013 OK CR 14, ¶ 59, 306 P.3d 557, 576; *Lott*, 2004 OK CR 27, ¶ 117, 98 P.3d at 348. The defendant's intent, which may be proved by circumstantial evidence, is crucial to proof of this aggravating circumstance. *Coddington*, 2011 OK CR 17, ¶ 48, 254 P.3d at 706; *Lott*, 2004 OK CR 27, ¶ 116, 98 P.3d at 348.
>
> The State alleged that the predicate crime was Bosse's theft of the Griffins' personal property. On July 22, 2010, Katrina discovered that fifteen video games were missing from the trailer. Katrina suspected that a friend, Henry Price, had stolen the games. Before calling the sheriff, Katrina persuaded Bosse to take her to her friend Heather M[o]lloy's house in search of Price that night. When she could not find M[o]lloy, Katrina called the sheriff's office to report the theft. Bosse was present at Katrina's trailer when Deputy Cunningham took Katrina's report. Price, contacted after the murders, denied stealing the video games. The day after the crime, Bosse had a PlayStation game console, Wii, televisions, laptop computer, DVDs and video games from Katrina's trailer. At the time of his arrest on the evening of July 23, Bosse had pawned some of these items; others were in his truck or apartment. Bosse attempted to conceal his possession and disposal of all these items

from law enforcement. In addition, mitigating evidence from Bosse's family included testimony that for several years Bosse had stolen money and property from close friends and family members. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Bosse committed all three murders to avoid arrest or prosecution. *Easlick*, 2004 OK CR 21, ¶ 15, 90 P.3d at 559. This proposition is denied.

*Bosse II*, 400 P.3d at 859 (paragraph numbers omitted).

## B.   Argument and Authority

"[E]vidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Coleman v. Johnson*, 566 U.S. 650, 654 (2012) (alteration adopted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). *See also Mitchell v. State*, 424 P.3d 677, 682 (Okla. Crim. App. 2018) (sufficiency test under Oklahoma law mirrors, and is based upon, federal *Jackson* sufficiency standard); *Coddington v. State*, 142 P.3d 437, 455 (Okla. Crim. App. 2006) (applying the same). In habeas corpus proceedings, sufficiency claims "are subject to two layers of judicial deference"—the deference afforded the original trier of fact, and the deference due the state court under Section 2254(d). *Johnson*, 566 U.S. at 651. Indeed, because of this double deference, "*Jackson* claims face a high bar in federal habeas proceedings." *Id.*; *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (federal court may overturn sufficiency determination only if the state court's decision was objectively unreasonable).

When reviewing the sufficiency of an aggravating circumstance, a federal court will look to Oklahoma's substantive law to weigh that aggravator's defined criteria. *Hamilton*, 436 F.3d at 1194; *Coddington v. Royal*, No. CIV-11-1457-HE, 2016 WL 4991685, at *22

82

(W.D. Okla. Sept. 15, 2016) (unpublished). Under Oklahoma law, the "murder to avoid arrest" aggravator requires the State to prove the petitioner "committed a predicate crime, separate from [the] murder, and killed . . . to avoid arrest or prosecution for that predicate crime." *Coddington v. State*, 254 P.3d 684, 705 (Okla. Crim. App. 2011); *see also Pickens v. State*, 19 P.3d 866, 883 (Okla. Crim. App. 2001). "[A] defendant's intent is critical to a determination of whether he killed to avoid arrest or prosecution." *Wackerly v. State*, 12 P.3d 1, 14 (Okla. Crim. App. 2000). Furthermore, the determination of a defendant's intent may be gleaned from circumstantial evidence. *Lott v. State*, 98 P.3d 318, 348 (Okla. Crim. App. 2004); *Pickens*, 19 P.3d at 883.

Here, testimony was heard from Deputy Kent Cunningham with the McClain County Sheriff's Office that in the late evening of Thursday, July 22, 2010, Katrina Griffin made a police report describing the alleged larceny of fifteen (15) PlayStation video games from her mobile home (Tr. II, 100-02). Petitioner was aware that this police report was made, since he later admitted in his videotaped interview that he was in Ms. Griffin's living room when she made the police report (State's Ex. 301).[21] Ms. Griffin informed police that the video games at issue went missing after Heather Molloy and Henry Price were over for a visit the previous Saturday (Tr. II, 103). Based on voicemails Ms. Griffin left for Ms. Molloy on the evening of July 22, 2010, Ms. Griffin initially suspected Mr. Price had stolen the games from her trailer that prior weekend (Tr. II, 93, 103).

---

[21] Indeed, though Deputy Cunningham did not, in his direct examination testimony, identify Petitioner as present when the police report was made, Petitioner's counsel suggested in cross-examination of Deputy Cunningham that it was "my client that night" present when the report was made (Tr. II, 111).

In fact, Petitioner, Ms. Molloy, and Mr. Price had all been present at Ms. Griffin's mobile home that previous Saturday night, and all had taken part in drinking beer, listening to music, and playing video games (Tr. II, 89-91, 127-30). Ms. Griffin's minor children were not at the mobile home that night and were instead with their father (Tr. II, 88). As the evening wrapped up, Ms. Griffin walked Ms. Molloy and Mr. Price to their car and saw them on their way (Tr. II, 130). Ms. Molloy recalled that Petitioner remained behind at the trailer after they had departed (Tr. II, 91). In an interview with police, Petitioner admitted that he had spent the night at Ms. Griffin's trailer about a week prior when her children were away, that he had spent a considerable amount of time at Ms. Griffin's trailer, and that he had been inside every room in her trailer home (State's Ex. 301).

Mr. Price was called as a witness at Petitioner's trial and flatly denied stealing the video games Ms. Griffin had reported missing (Tr. II, 130). Ginger Griffin spoke with C.G. in the early evening of July 22, 2010, and C.G. asked Ginger whether he had left any video games at her house. Ginger responded that he had not, and reminded C.G. that he had taken his games home with him; Ms. Griffin got on the line and asked Ginger that same question (Tr. I, 59).

The jury also heard extensive evidence that, on the day of the murders in this case, Petitioner pawned and/or possessed a PlayStation video game console, televisions, a laptop computer, DVDs, and a Wii video game console and associated games stolen from Ms. Griffin's mobile home, including items with Ms. Griffin's "K.R.G." initials marked thereon (Tr. I, 53-54; Tr. II, 223-28; Tr. III, 35, 42-48, 57-63, 126, 143, 159-63, 187, 206-07, 223, 267; Tr. IV, 32-64, 191-92, 204-06; State's Exs. 113-23, 168, 182, 193). Petitioner

lied to police about ownership of the laptop computer found on the floorboard of his truck at the McClain County Sheriff's Office, and Petitioner disposed of that physical evidence following the interview (Tr. II, 232, 244-47; Tr. III, 29-30). Furthermore, Petitioner lied about his whereabouts after the murders, failing to mention to police that he had pawned Ms. Griffin's property at seven (7) different Oklahoma City pawnshops that morning (Tr. III, 28-29, 44). Moreover, Petitioner kept two pawn receipts for Ms. Griffin's property, with his signature on them, concealed in a hidden compartment in his billfold wallet (Tr. III, 42-48; State's Exs. 168, 182). Tellingly, when Petitioner was confronted with the pawn tickets discovered by police, Petitioner "went as white as your shirt" (Tr. III, 44).

Accordingly, viewing this evidence in the light most favorable to the State, as the *Jackson* standard requires, the above-discussed evidence allowed any rational trier of fact to find, beyond a reasonable doubt, that Petitioner committed the murders in this case to avoid arrest or prosecution for his theft of Ms. Griffin's video games the Saturday previous. *See Johnson*, 566 U.S. at 654. Indeed, Petitioner had the opportunity, means, and motive to steal the PlayStation games, which went missing after Mr. Price and Ms. Molloy left on that Saturday evening. The jury could reasonably infer that Ms. Griffin eventually discovered that it was Petitioner, in fact, who had stolen the games for which she had reported missing in her police report, and a fatal confrontation ensued. Such an inference is especially reasonable given that Petitioner knew of the police report, that Mr. Price denied stealing the games, and that Petitioner later hastily pawned Ms. Griffin's property while the fire in Ms. Griffin's trailer continued to burn. *See Lott*, 98 P.3d at 348 (intent to kill in order to avoid arrest or prosecution can be derived from circumstantial evidence).

Further, evidence was presented during the penalty phase that Petitioner had stolen money and property from family members and close friends in the years leading up to these murders, and that, relatedly, Petitioner still had money to spend, despite not being gainfully employed (Tr. XI, 193, 203-05, 214, 231-32, 242; Tr. XII, 37, 43-44, 86, 127, 147). Petitioner had an argument with his brother about two weeks before the murders that "probably . . . would have been" related to Petitioner stealing from their mother and the family as a whole (Tr. XII, 43). Despite having no job, Petitioner's brother recalled Petitioner usually having money, which suggested that Petitioner was engaged in stealing from others (Tr. XII, 37, 44). This evidence further informed the jury's determination that Petitioner committed the murders in this case to avoid arrest or prosecution for his decision to pilfer Ms. Griffin's personal property from her mobile home just days prior.

Likewise, Petitioner's murder of C.G was part and parcel of his murder of Katrina Griffin, as the evidence demonstrated that C.G.'s last act of life was an effort to defend his mother from Petitioner's violent and brutal attack. In that sense, Ms. Griffin's legs were found draped over C.G.'s legs, her shirt was bunched up over her head, her hands and arms were crossed, and her body was stretched on its side, as if dragged into her final resting place (Tr. IV, 115-17, 124-25; Tr. V, 223; State's Ex. 47). C.G.'s broken-bladed pocketknife was recovered from underneath Ms. Griffin's deceased body (Tr. IV, 121-22; State's Ex. 52). Both bodies suffered multiple stab wounds, including defensive wounds, and showed blunt force trauma to the head (Tr. V, 223-40; Tr. VI, 13-30). Neither body was found with soot in the mouth or nose, which showed that neither was alive at the time the fire raged (Tr. V, 223; Tr. VI, 14). Petitioner's own defensive wounds, such as the

scratch on his arm and the abrasions on his knuckles, supported the inference that Petitioner attacked Ms. Griffin and C.G. prior to the fire and was met with resistance (Tr. II, 170, 174, 203-06; Tr. III, 31-35, 227-28). Nearby, C.H. was found locked in the closet, where she had burned alive (Tr. IV, 130-34, 157; Tr. V, 82-83; Tr. VI, 31-35, 60-61, 65-66, 83). Forensic testing could not exclude C.H.'s DNA profile from Petitioner's blue jeans later found inside Petitioner's closet, and a swab of blood taken from Petitioner's right shoe showed C.H. as the major DNA contributor (Tr. II, 206; Tr. III, 81; Tr. IV, 182-83; Tr. VII, 66-67, 69-72, 104, 106, 108-09).

Once Petitioner murdered Ms. Griffin to conceal his theft of their personal property, it stands to reason that Petitioner then murdered C.G. and C.H. to escape culpability for the murder of Ms. Griffin, to which the children were direct witnesses. Indeed, the State's forensic pathologist opined that Ms. Griffin's cause of death was multiple sharp force trauma, that C.G.'s cause of death was multiple sharp force trauma, and that C.H.'s cause of death was a combination of smoke inhalation and thermal injury (Tr. V, 247; Tr. VI, 30, 83). The manner of death for all three victims was homicide (Tr. V, 248; Tr. VI, 30, 84). Further, ATF Agent Billy Magalassi concluded that the fire in this case was incendiary in nature, was intentionally set to conceal a crime scene, and was consistent with a burn period of at least four (4) hours in duration (Tr. V, 147-50).

Petitioner now boldly claims that "the most logical inference from an accurate view of the evidence is that Bosse did not steal that property." Doc. 19, at 80. Petitioner again tries to pin the blame for stealing Ms. Griffin's property on Henry Price. Doc. 19, at 80 & n.29. What Petitioner leaves entirely unaddressed, however, is the evidence showing

Petitioner busied himself pawning Ms. Griffin's items at more than a half-dozen Oklahoma City pawnshops as the trailer fire continued to burn with the victims' bodies inside. Petitioner's claim that Mr. Price, and not Petitioner himself, stole Ms. Griffin's property, is completely unreasonable and strains a credible view of the record. Instead, the OCCA reasonably determined that, based on the evidence and the natural inferences drawn therefrom, Petitioner had stolen Ms. Griffin's property, murdered Ms. Griffin and her children to avoid answering for his theft, and then sloppily attempted to discard the stolen goods to cover his tracks. *See Bosse II*, 400 P.3d at 859. Furthermore, the jury was entitled to believe Mr. Price's testimony that he did not steal the games (Tr. II, 130).

Taken as a whole, the OCCA's conclusion that sufficient evidence supported the aggravating circumstance of murder to avoid arrest or prosecution was an entirely reasonable adjudication of this claim and should warrant no relief on habeas review. *See Coddington*, 2016 WL 4991685, at *23 (upholding the OCCA's rejection of capital habeas petitioner's challenge to the sufficiency of the "murder to avoid arrest or prosecution" aggravator, recognizing the reality that the petitioner could have stolen money from the victim and fled but instead chose to beat the victim to death in order to avoid arrest or prosecution, an arrest or prosecution which would have, in all likelihood, resulted had the petitioner left the murder victim alive as a surviving witness to the robbery); *Banks v. Workman*, No. 03-CV-0198-CVE-TLW, 2010 WL 3516839, at *46 (N.D. Okla. Sept. 3, 2010) (unpublished) (finding the evidence presented at trial reasonably supported a conclusion that the capital habeas petitioner murdered the victim in order to avoid arrest or prosecution for kidnapping and rape where physical evidence linked the petitioner to the

victim's violent assault, ultimately upholding sufficiency of the avoid-arrest aggravator on federal habeas review).

## C.   Conclusion

In sum, Petitioner has fallen short of showing how the OCCA's adjudication of this issue on the merits was unreasonable, legally or factually. *See* 28 U.S.C. § 2254(d).[22] Indeed, for the reasons described in detail above, at least some fairminded jurists could agree that the OCCA's determination on this issue was correct. *See Richter*, 562 U.S. at 103. Accordingly, the OCCA's rejection of Petitioner's sufficiency challenge as to the "murder to avoid arrest" aggravator must be upheld. *See Johnson*, 566 U.S. at 654; *Coddington*, 2016 WL 4991685, at *23. No habeas relief is warranted here.

## <u>GROUND VI</u>

**THE DECISION OF THE OCCA REJECTING PETITIONER'S CLAIM OF ALLEGED PROSECUTORIAL ERROR WAS NEITHER CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD.**

In his sixth ground for relief, Petitioner takes issue with various instances of alleged prosecutorial error throughout his trial, contending that such alleged irregularities robbed him of a fair trial and a reliable sentencing. Doc. 19, at 82-95. Specifically, Petitioner

---

[22] **Petitioner does not raise, and has therefore forfeited, any argument that the OCCA's decision was contrary to clearly established federal law under § 2254(d)(1), and no such argument should be considered if later raised by Petitioner in his reply or on appeal.** *See Hancock*, 798 F.3d at 1011.

complains that the prosecutors, during the guilt stage of trial: (1) allegedly drew attention to Petitioner's lack of remorse for the crimes; (2) allegedly improperly attempted to define reasonable doubt for the jury; (3) allegedly attempted to shift the burden of proof to the defense; and (4) allegedly used Petitioner's refusal to consent to a search of his vehicle as substantive proof of guilt. Doc. 19, at 83-90. Petitioner also attacks the prosecutors' conduct during the penalty phase, including: (1) allegedly improperly drawing attention to Petitioner's courtroom demeanor; (2) allegedly attempting to invoke sympathy for the victims; and (3) allegedly diminishing the significance of life imprisonment without the possibility of parole as a punishment option. Doc. 19, at 90-94. Petitioner claims the cumulative effect of these identified errors warrants relief from his convictions and sentences. Doc. 19, at 94-95. As discussed below, the OCCA reasonably rejected relief on all exhausted aspects of this claim. Furthermore, one component of Petitioner's claim—*i.e.*, that the prosecutor improperly relied upon Petitioner's refusal of consent—is unexhausted since it was not raised as a prosecutorial error claim below, is subject to an anticipatory procedural bar, and should be rejected by this Court. Taken together, for the reasons described more fully below, Petitioner's request for a writ of habeas corpus must be denied in its entirety. Each of Petitioner's sub-claims will be taken up in turn.

## A.    Procedural Background

On direct appeal, Petitioner complained of various instances of alleged prosecutorial error at both stages of his trial, which he claimed deprived him of his constitutional rights to a fair trial and a reliable sentencing proceeding. *Brief of Appellant*, at 64-74. The OCCA addressed each of the prosecutorial error sub-claims raised by Petitioner on the merits and

concluded that Petitioner's claim of prosecutorial error, when taken as a whole, warranted no relief. The OCCA's overarching summary of the applicable law, before breaking into discussion of each sub-point, was as follows:

> In Proposition X, Bosse claims that the prosecution engaged in deliberate misconduct during both stages of trial, depriving him of his rights to a fair trial and reliable sentencing hearing in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II, sections 7, 9 and 20 of the Oklahoma Constitution. Both parties have wide latitude in closing argument to argue the evidence and reasonable inferences from it. *Coddington*, 2011 OK CR 17, ¶ 72, 254 P.3d at 712. We will not grant relief for improper argument unless, viewed in the context of the whole trial, the statements rendered the trial fundamentally unfair, so that the jury's verdicts are unreliable. *Miller v. State*, 2013 OK CR 11, ¶ 116, 313 P.3d 934, 974. We review a trial court's decisions concerning argument for an abuse of discretion. *Underwood v. State*, 2011 OK CR 12, ¶ 75, 252 P.3d 221, 250. Bosse objected to some statements; we review the others for plain error. *Id.* at ¶ 122, 313 P.3d at 976. Plain error is an actual error, that is plain or obvious, and that affects a defendant's substantial rights, affecting the outcome of the trial. *Barnard*, 2012 OK CR 15, ¶ 13, 290 P.3d at 764.

*Bosse II*, 400 P.3d at 862-63 (paragraph number omitted). The OCCA then went on to address each of Petitioner's specific sub-claims, which are each discussed in the various sections below. *Bosse II*, 400 P.3d at 863-65. Ultimately, after resolving each claim of error, the OCCA announced: "No prosecutorial misconduct prejudiced Bosse, and this proposition is denied." *Bosse II*, 400 P.3d at 865.

## B.     Applicable Law

The controlling standard for measuring alleged prosecutorial error was established by the United States Supreme Court in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). To prevail on a claim based on improper remarks by the prosecutor, a petitioner must show that the remarks "so infected the trial with unfairness as to make the resulting conviction a

denial of due process." *Id.* at 643-44. *See also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (reaffirming *Donnelly*'s holding that "[t]he relevant question" in addressing a prosecutorial error claim "is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process" (quotation marks omitted)); *Matthews v. Workman*, 577 F.3d 1175, 1186 (10th Cir. 2009).

A prosecutor's remarks are not to be viewed in isolation, but should be taken in the context of the entire trial. *Donnelly*, 416 U.S. at 645; *see also Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994) ("To view the prosecutor's statements in context, we first look at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution."). The mere fact that a prosecutor may have made some inappropriate comments does not warrant relief, so long as the petitioner received a fair trial. *See Matthews*, 577 F.3d at 1186. A proceeding is rendered fundamentally unfair under the Due Process Clause only if it is "shocking to the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432 (1973).

On this issue, Petitioner's task is made even more difficult by application of the "AEDPA's forgiving lens." *See Matthews*, 577 F.3d at 1186. In that respect, the AEDPA's deferential standard is even more difficult to meet for remarks, such as some of those alleged here, which do not implicate a specific constitutional right. *See Richter*, 562 U.S. at 101 (holding that the AEDPA's standard is even more onerous when the rule established by the Supreme Court is a general one). Likewise, trial counsel's failure to object to some of the comments and conduct at issue is also a relevant consideration when this Court is

tasked with weighing fundamental fairness. *See Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002).

## C.      Argument and Authority

### 1.      *Allegedly emphasizing Petitioner's lack of remorse (Guilt Stage).*

First, Petitioner takes issue with the prosecutor's reference, in guilt stage closing argument, to Petitioner's apparent lack of emotion upon learning of the deaths of the victims during his police interview. Doc. 19, at 83-85. In Petitioner's recorded interview with police, Detective Huff with the McClain County Sheriff's Office said to Petitioner, "You are very silent about the fact that all three [victims] are deceased. It must make you sad," to which Petitioner responded, "Yes, uh-huh. More in awe if anything" (State's Ex. 301). In his direct examination testimony, Detective Huff explained that he rhetorically asked Petitioner whether he was sad at the news of the victims' deaths in order to weigh the sincerity of Petitioner's emotion (Tr. II, 168). Over objection to this testimony, Detective Huff explained that Petitioner's "response was unusual in my opinion" (Tr. II, 168-69). The trial court cautioned the prosecutor from venturing further into that line of questioning, and the prosecutor moved on with his direct examination of Detective Huff (Tr. II, 169).

Then, in the State's first and second closing arguments at the guilt stage, the prosecutors referenced Detective Huff's testimony on this point, and specifically, Detective Huff's observation that Petitioner's lack of reaction to learning of the deaths of Ms. Griffin and the children was, in Detective Huff's view, an unusual response (Tr. IX, 30, 32, 93).

At no point during the prosecutors' remarks on this issue did defense counsel lodge a contemporaneous objection (Tr. IX, 30, 32, 93).

Petitioner challenged this line of argument on direct appeal, claiming the prosecutor's use of Detective Huff's testimony was an impermissible remark on Petitioner's alleged lack of remorse for his crimes. *Brief of Appellant*, at 64-65. The OCCA rejected this claim, finding the following:

> First, he argues the prosecutor improperly commented on his lack of remorse for the crimes. Detective Huff testified that, during his interview, Bosse had an unusual reaction when asked if he was sad about the victims' deaths. The trial court overruled Bosse's objection but noted that the topic was close to an improper discussion of remorse, and the prosecutor moved on to another line of questioning. In closing, the prosecutor argued that Bosse's initial reaction—a long, calm silence—was not normal. The prosecutor later asked what Bosse could have meant by his eventual reply, "I'm more in awe." In second closing, the prosecutor argued that there was "some kind of emotional connection" missing from this statement, and one would expect, if Bosse had not committed the crime, that he would be "a little bit upset" by the deaths. Bosse did not object to these comments and has waived all but plain error as to them. These are not comments on Bosse's lack of remorse. Rather, they are reasonable inferences from the evidence of Bosse's reaction to news of the victims' deaths.

*Bosse II*, 400 P.3d at 863 (paragraph number omitted).

The OCCA's adjudication of this sub-issue is neither contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d). The Tenth Circuit has recognized that "[a] prosecutor may comment on and draw reasonable inferences from evidence presented at trial." *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005). *See also Hooper v. Mullin*, 314 F.3d 1162, 1172 (10th Cir. 2002) ("The prosecutor properly may comment on the circumstances of the crime made known to the jury during trial. The prosecutor also

possesses reasonable latitude in drawing inferences from the record." (internal citations omitted)). In this case, the prosecutors' remarks made in both closing arguments at the guilt stage were derived directly from Detective Huff's direct examination testimony detailing his observations during his police interview with Petitioner (Tr. II, 168-69). The prosecutors' comments in closing, when taken in context, were fair inferences from Detective Huff's testimony on Petitioner's reaction to learning the news of the victims' deaths, which was probative of his guilt for their murders, and were not impermissible remarks on Petitioner's alleged lack of remorse. *See Williams v. Pettigrew*, No. CIV-17-258-RAW-KEW, 2020 WL 5865869, at *17 (E.D. Okla. Sept. 30, 2020) (unpublished) (finding prosecutor's allegedly improper comments on the habeas petitioner's lack of remorse were not improper, given that the challenged argument was derived from trial evidence of the petitioner's remorseless behavior).

Moreover, the jury was given Oklahoma Uniform Jury Instruction ("OUJI") 9-1, which informed the jury that it was entitled to draw reasonable inferences from the testimony and exhibits introduced at trial (O.R. 991 ("You may make deductions and reach conclusions which reason and common sense lead you to draw from the fact which you find to have been established by the testimony and evidence in the case.")). "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Thus, the jury was entitled to draw an inference about Petitioner's lack of reaction during Detective Huff's testimony, even without the prosecutors' allegedly improper argument. *See Williams*, 2020 WL 5865869, at *17.

Moreover, the OCCA's decision aligns with Supreme Court precedent, inasmuch as the prosecutors' allegedly erroneous remarks did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643-44. The evidence of Petitioner's guilt in murdering Katrina Griffin, C.G., and C.H., and in setting fire to their mobile home was, taken as a whole, overwhelming and amply established by the testimony and exhibits adduced at trial. Indeed, elsewhere in Petitioner's habeas brief, Petitioner admits his guilt at first stage was "overwhelming." *See* Doc. 19, at 28 (recognizing that "the evidence of guilt in the first stage was overwhelming"). In that sense, the alleged impropriety of the prosecutors' comments did not result in a fundamentally unfair proceeding, and the OCCA's decision was consistent with federal law. *See United States v. Fleming*, 667 F.3d 1098, 1106 (10th Cir. 2011) ("We need not decide whether the prosecutor's comment . . . was improper, because even if it were, [the defendant] has not demonstrated that the statement violated his substantial rights."). No relief is warranted for this sub-claim of error.

## 2. *Allegedly attempting to define reasonable doubt (Guilt Stage).*

Second, Petitioner complains the prosecutor allegedly attempted to impermissibly define reasonable doubt by arguing that such a burden does not mean "beyond all doubt." Doc. 19, at 85-86. In particular, during the State's first closing at the guilt stage, the prosecutor made the following argument:

> I ask you to think what is reasonable? Our burden of proof is beyond a reasonable doubt; not beyond all doubt at all but beyond a reasonable doubt. If you believe that [ATF Investigators] Billy Magalassi and Jamie Lord risked their professional reputation, their career to make up information to give to you, then okay.

(Tr. IX, 47). This remark was met with no objection from defense counsel.

Petitioner challenged this comment on direct appeal, claiming the prosecutor erroneously attempted to define reasonable doubt by offering the contrapositive—*i.e.*, what reasonable doubt "was not." *Brief of Appellant*, at 65-66. The OCCA, reviewing this issue for plain error based on defense counsel's failure to object, reaffirmed that the prosecutor's comment was not error:

> Bosse next complains that the prosecutor impermissibly defined reasonable doubt by arguing that it was not "beyond all doubt." Bosse did not object to this statement and we review for plain error. There is none. We have held that it is not error to use this phrase in discussing reasonable doubt. *Myers v. State*, 2006 OK CR 12, ¶ 57, 133 P.3d 312, 329.

*Bosse II*, 400 P.3d at 863 (paragraph number omitted).

In this case, the prosecutor's remark that "beyond a reasonable doubt" did not equate to "beyond all doubt" was a permissible line of argument, since the prosecutor did not attempt to define reasonable doubt, and instead merely recognized that the State's burden did not stretch to the absolute. *See Thornburg*, 422 F.3d at 1130 ("[T]o state that 'beyond a reasonable doubt' does not mean beyond 'a shadow of a doubt or all doubt' was not a constitutional violation."); *Moore v. Braggs*, No. CIV-20-227-PRW, 2021 WL 8155698, at *9 (W.D. Okla. Mar. 26, 2021) (unpublished) (denying habeas relief on claim that prosecutor improperly defined reasonable doubt, finding instead that the prosecutor simply clarified the "well-established principle that not all doubt is reasonable" (citation and internal quotation marks omitted)); *Pendleton v. Allbaugh*, No. CIV-16-80-C, 2016 WL 4005338, at *4 (W.D. Okla. June 24, 2016) (unpublished) (finding prosecutor's comment

on reasonable doubt during *voir dire* did not impermissibly define the phrase, but instead was intended to assess whether the jury panel could meaningfully apply the reasonable doubt standard as the law requires). Further, the jury was administered OUJI 10-4, which explained that the State unequivocally carries the burden of proof beyond a reasonable doubt (O.R. 972 ("The State has the burden of presenting the evidence that establishes guilt beyond a reasonable doubt.")). This Court should presume the jury in this case followed its instructions. *See Weeks*, 528 U.S. at 234.

The OCCA's adjudication of this sub-issue was entirely reasonable, and Petitioner has not shown how the prosecutor's challenged remarks rendered his trial fundamentally unfair or prejudiced his right to a presumption of innocence so as to effectively deny him that constitutional right. *Dodd*, 753 F.3d at 911; *Thornburg*, 422 F.3d at 1130. *See also Moore*, 2021 WL 8155698, at *9 (recognizing that the OCCA's resolution of a reasonable-doubt prosecutorial error claim "is entitled to deference" and that, since the prosecutor's remarks did not render the habeas petitioner's trial fundamentally unfair, the petitioner had failed to show how the OCCA's adjudication of the issue was contrary to, or an unreasonable application of, clearly established federal law). No relief is warranted for this sub-claim.[23]

---

[23] Before the OCCA, Petitioner offered only a single paragraph of argument on this sub-claim, asserting only that the State improperly attempted to define reasonable doubt, *Brief of Appellant*, at 65-66; he did not argue, as he does now, that "the prosecutors framed the meaning of the term with reference to the integrity of the State's witnesses" or that "the prosecutors' actions here should be viewed through the lens of the pattern and practice of misconduct in Oklahoma" (Doc. 19, at 85-86). These latter arguments are not properly before this Court. *See Beaudreaux*, 138 S. Ct. at 2560.

### 3.     *Allegedly engaging in burden-shifting (Guilt Stage).*

Third, Petitioner takes issue with certain remarks made by the prosecutor during the State's second closing argument drawing attention to Petitioner's lack of alibi or reasonable explanation for his whereabouts during the crimes in question, as well as a comment on Petitioner's failure to send forensic items for independent laboratory testing. Doc. 19, at 86-88. For the reasons discussed below, Petitioner has failed to show how the OCCA's determination warrants relief in federal habeas corpus. *See* 28 U.S.C. § 2254(d).

In context, defense counsel's closing argument advanced a two-fold attack on the State's case—*i.e.*, that the State's timeline in showing Petitioner's whereabouts was faulty, and that the State's forensic testing was artificially contrived to meet a desired conclusion (Tr. IX, 53-68). Specifically, defense counsel claimed that the State had failed to show that Petitioner was even at the crime scene during the time in question (Tr. IX, 54 ("I submit to you, folks, that this all boils down to was he there when the fire started? And I submit to you folks, I don't know who it was, but I know who it wasn't. Shaun Bosse wasn't there.")). And defense counsel repeatedly denigrated the legitimacy of the State's forensic testing of the blood found on Petitioner's clothing and the test-fires utilized by the ATF Lab (Tr. IX, 63 ("Are we going to decide a man's fate on a math formula? . . . At some point, it's mumbo jumbo and guesswork.")); (Tr. IX, (referring to the results of the ATF test fires as "poppycock" and "contrived")).

Therefore, the prosecutor tailored his response argument in second closing to rebutting both theories of defense, as articulated by defense counsel in his own closing. First, the prosecutor noted that Petitioner had "nothing to prove his whereabouts" during

the time of the crimes, and the prosecutor argued that the jury need not "help him

manufacture his defense" (Tr. IX, 70-72). Objections to this argument were twice overruled

(Tr. IX, 70-72). Then, the prosecutor pivoted his argument to remind the jury that the

defense could have, but chose not to, send out the forensic items for independent testing at

another laboratory (Tr. IX, 79-80). Defense objection to that argument was initially

overruled; when the prosecutor re-stated the State's burden of proof but continued his

argument in that vein, however, the trial court sustained the defense objection, holding the

State could not overtly fault the defense for failing to do something (Tr. IX, 81). The trial

court overruled the defense's request for a mistrial but immediately admonished the jury,

and the prosecutor moved on with his argument (Tr. IX, 81-82).

Petitioner challenged these remarks on direct appeal as improper burden-shifting.

*Brief of Appellant*, at 66-67. The OCCA denied relief on the merits, holding the following:

> Bosse argues that the prosecutor shifted the burden of proof to the defense.
> Discussing Bosse's alibi, the prosecutor argued that, even taking into account
> the testimony of Detective Huff and Bosse's mother, Bosse had shown
> nothing other than his own statements to prove his whereabouts during the
> time the crime could have been committed. In closing, defense counsel had
> argued that [ATF Investigator] Lord's experiments were contrived and
> conducted in such a way as to fit the State's timeline. The prosecutor argued
> in reply that defense counsel had not shown that law enforcement and Lord
> ever agreed to "fix" the timeline to fit Bosse's guilt, but that Bosse wanted
> jurors to infer this in order to help manufacture his defense. Bosse's
> objections to these comments were overruled. These statements were not
> error. Where the defense has not offered evidence on an issue, the prosecutor
> may argue that the evidence is uncontroverted. *Myers*, 2006 OK CR 12, ¶ 61,
> 133 P.3d at 329; *Fite v. State*, 1993 OK CR 58, ¶ 21, 873 P.2d 293, 297.
> Neither of these comments shifted the burden of proof to Bosse. Bosse claims
> the prosecutor erred in commenting that he could have independently tested
> the DNA evidence. Bosse's objection was overruled. This comment was not
> error, as the State may note that a defendant had access to, and did not test,
> evidence. *Myers*, 2006 OK CR 12, ¶ 61, 133 P.3d at 329. The prosecutor then

noted that the State had the burden of proof, but argued that the defense should not argue about the test results when Bosse had the chance to test this evidence himself. Bosse's objection was sustained and the jury was admonished, but his request for a mistrial was denied. Given that the prosecutor prefaced the comment by stating the correct burden of proof, no mistrial was necessary, and the trial court's action cured any error. *Johnson v. State*, 2013 OK CR 12, ¶ 16, 308 P.3d 1053, 1057.

*Bosse II*, 400 P.3d at 863-64 (paragraph number omitted).

The OCCA's rejection of Petitioner's claim on this sub-issue was entirely reasonable and should warrant no relief on federal habeas. *See* 28 U.S.C. § 2254(d). Indeed, the OCCA reasonably found the prosecutor's emphasis on the strong and "uncontroverted" evidence of Petitioner's guilt to be proper and not error. *See Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999) (acknowledging that a prosecutor may properly comment on a defendant's failure to present evidence or call witnesses); *Russell v. Bryant*, No. 18-7043, 781 F. App'x 721, 727 (10th Cir. July 11, 2019) (unpublished) (affirming that the prosecution may comment on the defendant's failure to produce evidence so long as such evidence would have come from witnesses other than the defendant himself); *McKinney v. Bruce*, No. 04-3308, 125 F. App'x 947, 950 (10th Cir. Feb. 7, 2005) (unpublished) (recognizing that "during closing a prosecutor may properly comment that evidence is not contradicted or rebutted, so long as the prosecutor does not create the impression that only the defendant could rebut the evidence").

In the case at hand, the prosecutor's statements to that effect were based directly on the compelling and convincing evidence of Petitioner's culpability of these crimes and were not an attempt at shifting the burden of proof to the defense. *See Phillips v. Williams*, No. CIV-08-1248-M, 2010 WL 152139, at *11-12 (W.D. Okla. Jan. 13, 2010)

(unpublished) (addressing the habeas petitioner's challenge to the prosecutor's alleged "burden-shifting" argument in closing, *inter alia*, concluding that "[i]n view of the overwhelming evidence of Petitioner's guilt presented at his trial," coupled with the fact that defense counsel invited some of the issues in question, "none of the allegations of prosecutorial misconduct rendered Petitioner's trial fundamentally unfair").

Nor was there error in the prosecutor's mention that the defense could have tested, but chose not to, the forensic evidence on his own. Despite the objection from defense counsel, the prosecutor correctly reminded the jury of the State's burden of proof, and the trial court's admonishment to that effect remedied any error arguably stemming from the prosecutor's allegedly improper statements. *See Hackett v. Farris*, No. 11-CV-322-GKF-TLW, 2014 WL 4825263, at *7 (N.D. Okla. Sept. 25, 2014) (unpublished) (considering habeas petitioner's challenge to prosecutor's alleged attempt at burden shifting by arguing in closing that the "only evidence" had been presented by the State, finding the prosecutor's clarification that the burden remained with the State "served to cure any misunderstanding regarding the burden of proof" and concluding that "Petitioner fails to demonstrate that his trial was rendered fundamentally unfair by the prosecutor's comments").

Further, the jury was fully instructed that the State carried the burden of proving Petitioner's guilt beyond a reasonable doubt (O.R. 972). *See Weeks*, 528 U.S. at 234. That the jury was correctly instructed as to the State's burden of proof is curative of any error stemming from the prosecutor's challenged remarks. *See United States v. Farmer*, 770 F.3d 1363, 1370-71 (10th Cir. 2014) (finding trial court's instruction that government carried the burden of proof cured any error in prosecutor's comment that the defendant could have

102

tested the evidence on his own for fingerprints); *Toles v. Higgins*, No. CIV-13-273-D, 2016 WL 919947, at *11 (W.D. Okla. Feb. 12, 2016) (unpublished) (holding trial court's proper instruction on burden of proof was "curative" of any alleged error stemming from the prosecutor's burden-shifting).

Since Petitioner has not shown how the OCCA's determination on this issue was contrary to, or an unreasonable application of, clearly established federal law, nor has he shown how the OCCA's adjudication of this issue was based on an unreasonable determination of fact, Petitioner's claim for habeas relief on this basis must be rejected. *See* 28 U.S.C. § 2254(d). No relief should be accorded for this sub-issue.

### 4. *Allegedly using refusal to consent as proof of guilt (Guilt Stage).*

Fourth, Petitioner argues that the prosecution improperly commented on his refusal of consent to search his truck (Tr. II, 170-72). Doc. 19, at 88-90. This sub-claim does not warrant habeas relief.

For starters, Petitioner's current presentation of this sub-claim within the rubric of prosecutor error is unexhausted. On direct appeal, Petitioner raised this sub-claim as a freestanding Fourth Amendment claim and did not include it within his prosecutorial error proposition. *Brief of Appellant*, at iii, 19-28; *Bosse*, 400 P.3d at 847 ("Bosse is not making a Fifth Amendment claim here. Rather, he suggests that the principle in *Griffin* [*v. California*, 380 U.S. 609 (1965) (holding that prosecutors cannot comment on a defendant's exercise of the Fifth Amendment privilege against self-incrimination, using it as substantive evidence of guilt),] should apply equally in the Fourth Amendment context."). Seemingly to avoid the *Stone v. Powell* bar on the consideration of Fourth

Amendment claims in habeas, Petitioner has now recast this claim as a prosecutorial error sub-claim. *See Stone v. Powell*, 428 U.S. 465, 494 (1976) ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." (footnote omitted)). Petitioner's recast claim is unexhausted. *See Duncan*, 513 U.S. at 366 ("[M]ere similarity of claims is insufficient to exhaust."); *(Donald) Grant*, 886 F.3d at 891 ("To satisfy exhaustion, . . . the habeas petition's focus—as well as the alleged error that it identifies— cannot depart significantly from what the petitioner had presented to the state court.").

Petitioner's recast claim is not only unexhausted but also subject to an anticipatory procedural bar. Petitioner's prosecutorial error sub-claim based on his Fourth Amendment challenge could have been raised, but was not, on direct appeal along with the Fourth Amendment claim itself. Thus, even if Petitioner were now to raise this sub-claim in successive post-conviction proceedings, it would not be considered based on an independent and adequate procedural bar. *See, e.g.*, *Pavatt*, 928 F.3d at 929; *Williams*, 782 F.3d at 1212; *Thacker*, 678 F.3d at 835-36. Petitioner does not acknowledge his failure to exhaust this sub-claim or allege cause and prejudice or a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. Accordingly, habeas relief should be denied on this sub-claim based on procedural default.

Alternatively, even assuming that Petitioner fairly presented this sub-claim to the OCCA, it fails for lack of clearly established Supreme Court law. As the OCCA reasoned in denying relief on Petitioner's Fourth Amendment claim, "[t]here is no binding law on

whether a prosecutor violates a defendant's constitutional right by using a defendant's refusal to consent to a warrantless search as substantive evidence of guilt." *Bosse*, 400 P.3d at 847. And even now Petitioner cites to no Supreme Court law prohibiting such evidence. Rather, it appears that he once again argues for an extension of *Griffin* from the Fifth Amendment to the Fourth Amendment context. Doc. 19, at 89. But, "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *White v. Woodall*, 572 U.S. 415, 426 (2014). Petitioner has failed to carry his burden of showing that the prosecutor's comments were improper under clearly established Supreme Court law, and habeas relief must be denied on this sub-claim.

### 5.   *Allegedly emphasizing Petitioner's courtroom demeanor (Penalty Phase).*

Fifth, Petitioner attacks the prosecutor's allegedly improper emphasis placed on Petitioner's courtroom demeanor during the State's first closing argument at the penalty phase of trial proceedings. Doc. 19, at 90-91. For the reasons discussed herein, Petitioner's claim falls short of showing how the OCCA's resolution of this issue warrants relief under the AEDPA. *See* 28 U.S.C. § 2254(d).

In the State's first closing argument at the penalty phase, in the context of arguing that Petitioner posed a continuing threat to society, the prosecutor briefly mentioned how the jury saw no signs or evidence of Petitioner's remorse (Tr. XIII, 15-17). Specifically, the prosecutor argued the following: "He didn't even flinch like y'all did and I did when the photographs of those victims were put up on the TV" (Tr. XIII, 17). Defense counsel objected and a bench conference ensued (Tr. XIII, 17-18). After a discussion among the

parties, the trial court took a brief recess to research the issue further (Tr. XIII, 18-19). Then, the parties reconvened for additional argument, and the trial court ultimately sustained Petitioner's objection (Tr. XIII, 19-21). The trial court then admonished the jury to disregard the State's comment on Petitioner's demeanor, and the prosecutor moved on with another line of argument (Tr. XIII, 22).

On direct appeal, Petitioner challenged the prosecutor's remark on Petitioner's alleged lack of remorse, claiming that such a statement deprived him of his constitutional right to a fair and reliable sentencing proceeding. *Brief of Appellant*, at 68. The OCCA rejected relief on this sub-issue, reaching the following conclusions:

> He first claims that the prosecutor improperly commented on his courtroom demeanor. In support of the charge that Bosse would present a continuing threat to society, the prosecutor argued that one indicator of continuing threat was a lack of remorse, and noted that Bosse did not flinch when the photographs of the victims were displayed. Bosse's objection was sustained and jurors admonished to disregard any comment on Bosse's demeanor. This cured any error. *Johnson*, 2013 OK CR 12, ¶ 16, 308 P.3d at 1057. The record does not support Bosse's argument otherwise, particularly as jurors did not find that Bosse would present a continuing threat to society.

*Bosse II*, 400 P.3d at 864 (paragraph number omitted).

The OCCA's rejection of relief on this issue was neither contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of fact. *See* 28 U.S.C. 2254(d). As to each murder, the State alleged four aggravating circumstances, including the probability that Petitioner would constitute a continuing threat to society (O.R. 63; 111-14). Under Oklahoma law, a defendant's lack of remorse is one factor a jury may consider in support of the continuing threat aggravator. *See Cudjo v. State*, 925 P.2d 895, 902 (Okla. Crim. App. 1996). The Tenth Circuit has

repeatedly acknowledged the intersection of remorse and the continuing threat aggravator under Oklahoma law. *See, e.g.*, *Gilbert v. Mullin*, 302 F.3d 1166, 1182 (10th Cir. 2002) (upholding sufficiency of continuing threat aggravator based on prior pattern of escalating criminal conduct); *James v. Gibson*, 211 F.3d 543, 559 (10th Cir. 2000) ("Because a person who acts with utter disregard for human life likely will do so again, attitude is an important factor."). The OCCA's refusal to accord relief for the prosecutor's remorse-based argument at the penalty phase was entirely reasonable. *See Warner v. Workman*, 814 F. Supp. 2d 1188, 1235-36 (W.D. Okla. 2011) (upholding the OCCA's rejection of capital habeas petitioner's challenge to prosecutor's lack-of-remorse argument at the penalty phase when such was used to support continuing threat aggravator).

Regardless, as the OCCA observed, the jury did not, on any of the three murder counts, sustain the State's continuing threat allegation (O.R. 1090-92; Tr. XIII, 76-77). *See also Bosse II*, 400 P.3d at 864 ("The record does not support Bosse's argument otherwise, particularly as jurors did not find that Bosse would present a continuing threat to society."). Indeed, of the four aggravators alleged on each murder count, continuing threat was the only aggravating circumstance the jury did not find (O.R. 1090-92; Tr. XIII, 76-77). Thus, the prosecutor's argument certainly did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process," particularly when the prosecutor's purpose in making that argument—to secure the continuing threat aggravator—was ultimately unsuccessful with the jury. *See Donnelly*, 416 U.S. at 643-44; *cf. Willingham*, 296 F.3d at 927 (on federal habeas, observing that admission of allegedly improper evidence was harmless but further noting that "the primary focus of this evidence—the

continuing threat aggravator—was not found by the jury in any event"). All told, no relief is warranted here.

### 6.    *Alleged invocation of sympathy (Penalty Phase).*

Next, Petitioner claims the State allegedly attempted to invoke sympathy during both closing arguments at the penalty phase, both in the verbal argument heard from the prosecutors and by one prosecutor's physical body language exhibited during argument. Doc. 19, at 91-92. The OCCA's decision to deny relief on this issue was carefully reasoned and should warrant no relief on federal habeas review. *See* 28 U.S.C. § 2254(d).

As background, during the State's first closing argument at the penalty phase, one of the prosecutors described in detail the terror and anguish the victims experienced as they suffered gratuitous violence at Petitioner's hands, specifically related to the evidence of sharp trauma and knife-inflicted wounds (Tr. XIII, 44). That argument was based directly on the forensic pathologist's testimony, including evidence of the pain and suffering experienced by Ms. Griffin and C.G. as they were stabbed repeatedly by Petitioner and left to die, and such argument was presented to the jury in furtherance of the HAC aggravator (O.R. 1060 (OUJI 4-73, which defines the elements and criteria of the HAC aggravating circumstance)). Defense counsel's contemporaneous objection to that argument was overruled by the trial court (Tr. XIII, 45).

Subsequently, in second closing, another prosecutor again emphasized the victims' suffering and the mortal stab wounds inflicted by Petitioner on Ms. Griffin and C.G. (Tr. XIII, 65). Defense counsel objected and noted for the record that the prosecutor was allegedly "laying in [sic] the floor hollering, gesturing wildly with his arms in a way that

mimics someone making a knife attack" (Tr. XIII, 66). The trial court again overruled

Petitioner's objection to the challenged argument (Tr. XIII, 66).

Later on, at Petitioner's formal sentencing hearing after his jury trial, the prosecutor

made some brief argument to the trial court in an effort to "clean up the record" on his

allegedly improper physical behavior during second closing argument at the penalty phase

(Sent. Tr. 4). In that respect, the prosecutor made the following announcement:

> During closing argument, one of the last objections as we were wrapping up,
> [defense counsel] had objected to me during my closing and made a record
> about the Mitchell case. I don't believe that I responded to that, and I just
> want to clean up the record so that the wrong impression is not left with the
> Court of Criminal Appeals.
>
> At the time that that objection was made, I was in the courtroom showing
> how the victims' bodies were presented in the trailer home. I was not doing
> some of the things that were in the Mitchell case. I was not over by the
> defendant. I was not yelling, screaming, jumping up and down in his face.
>
> I just don't want that to be the—what is left on the record because I didn't
> respond to that, no, I wasn't doing that. So I just wanted to make the record
> clear that the objection was, at the point in time, when I was showing how
> Katrina Griffin was laying in her bedroom floor at the time that [C.G.] was
> being attacked, and that was—I just want to clean that up for the record.

(Sent. Tr. 4). Defense counsel stood on his prior argument, and the trial court recognized

that the record had been so noted (Sent. Tr. 4-5).

On direct appeal, Petitioner complained that the prosecutors' allegedly emotional

argument and physical behavior in making such argument elicited improper sympathy for

the victims. *Brief of Appellant*, at 70-71. The OCCA reasonably denied relief on this issue,

reaching the following conclusions:

> Bosse claims that prosecutors improperly encouraged jurors to sympathize
> with the victims. The prosecutor described what the victims might have been

thinking and feeling as the crimes were committed. The record shows the prosecutor was gesturing and becoming emotional during the speech. The trial court overruled Bosse's objection. During second closing, the prosecutor described the attack in detail, without explicitly asking jurors to imagine themselves in that situation. The record shows that during this argument the prosecutor lay on the floor "hollering, gesturing wildly with his arms in a way that mimics someone making a knife attack." Bosse's objection was overruled. This claim actually presents two issues—the appropriateness of the argument itself and the prosecutor's actions in making the argument. We have held a prosecutor may ask jurors to put themselves in a victim's place while describing the victim's experience, as long as the argument is based on the evidence. *Browning v. State*, 2006 OK CR 8, ¶ 37, 134 P.3d 816, 839; *Malicoat v. State*, 2000 OK CR 1, ¶ 31, 992 P.2d 383, 401; *Hooper v. State*, 1997 OK CR 64, ¶¶ 52-53, 947 P.2d 1090, 1110. The argument here was not improper. Turning to the second issue, we have distinguished emotional, physical argument which is directed specifically at the defendant (and thus improper) from theatrics which are properly directed to the jury, and which illustrate otherwise-proper argument. *Underwood*, 2011 OK CR 12, ¶ 75, 252 P.3d at 250. This is the case here. The trial court did not abuse its discretion in overruling Bosse's objections to this argument. *Id.*

*Bosse II*, 400 P.3d at 864 (paragraph number omitted).

The OCCA's adjudication of this issue was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of fact in light of the record. *See* 28 U.S.C. § 2254(d). With respect to the first challenged aspect of the prosecutor's closing argument, relating to inference about what the victims thought and felt as Petitioner inflicted his violence against them, such argument was reasonably based on the evidence and was not improper. *See Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999) ("The prosecution's speculations about what happened to the victim were reasonable possible inferences based on the evidence."). Indeed, the State's forensic pathologist described the brutal trauma each victim suffered in various ways. This included the eight (8) total stab wounds Ms. Griffin suffered to her cheek, chin, neck, arm,

back, and abdomen, which resulted in her aspirating and, in essence, drowning in the blood which flooded her airways (Tr. V, 223-24, 229-30, 232, 239-40). Testimony also detailed five (5) total stab wounds to C.G.'s neck, upper left chest, and finger, as well as blunt force trauma to his right eyebrow, with blood also found in his airways (Tr. VI, 13-14, 27). And testimony revealed soot in C.H.'s stomach, airways, and esophagus, which she likely coughed out until she could no longer do so, discoloration of internal tissue from carbon monoxide toxicity, and "severe and deep and extensive" thermal injury from the fire (Tr. VI, 35, 60, 79-80). The prosecutor's mention of what the victims might have been thinking and feeling during the crimes was therefore based directly on the evidence of their injuries and was not improper. *See Moore*, 195 F.3d at 1172. Again, the jury was instructed that it may draw reasonable inferences from the evidence presented at trial (O.R. 991). *See Weeks*, 528 U.S. at 234.

Furthermore, on the second component of this claim, relating to the prosecutor's alleged physical theatrics in expressing his closing argument, the OCCA reasonably found the prosecutor had properly directed his argument to the jury, and not towards Petitioner himself. *See Bosse II*, 400 P.3d at 864. This is especially true, given the clarity the prosecutor further shed on the issue at the formal sentencing hearing (Sent. Tr. 4). Again, the prosecutor's argument was directly based on the forensic pathologist's testimony about the nature of the wounds received by the victims, especially the multiple stab wounds suffered by Ms. Griffin and C.G. at Petitioner's hands, and the prosecutor's physical demonstration of those wounds did not deprive Petitioner of a fundamentally fair sentencing proceeding. *See Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005)

(upholding the OCCA's rejection of relief based on prosecutor's guilt stage rebuttal argument attempting to reenact the viewpoint of the victim, which the OCCA found to be "theatrical" but not unduly prejudicial, finding the OCCA reasonably observed that "the statements made by the prosecutor as to Mr. Malicoat's abusive conduct and the extent of Tessa's injuries are supported by evidence in the record"); *Underwood v. State*, 252 P.3d 221, 249-50 (Okla. Crim. App. 2011) (finding no error in the prosecutor's emotional closing argument, including the prosecutor's actions in "prancing around" before the jury and "screaming" at them, concluding that, under state law, such conduct was "properly directed to the jury" and not to the appellant himself, and that although the comments were delivered with emotion, "no one could deny that emotionally-charged evidence had been presented in this trial"); *Underwood*, No. CIV-12-111-D, 2016 WL 4059162, at *23 ("This Court does not find [the OCCA's] conclusion unreasonable. Prosecutors should strive to avoid injecting emotionalism into sensitive cases like this, but the record does not reflect that the prosecutor crossed the line, and the argument did not infect the trial with unfairness."). As a whole, therefore, the decision of the OCCA on this sub-issue must be upheld, and no habeas relief should be accorded here.[24]

---

[24] Petitioner's complaint that the OCCA improperly examined this claim "piecemeal" is unsupported by citation to any clearly established Supreme Court law. Doc. 19, at 92. Moreover, insofar as the OCCA found neither the prosecutor's remarks nor his physical movements improper, it did not need to consider "the harm caused by their combination." Doc. 19, at 92.

### 7.      *Allegedly diminishing value of life without parole (Penalty Phase).*

Finally, Petitioner attacks the prosecutor's argument in second closing urging the jury to impose the death penalty since a sentence of life imprisonment without the possibility of parole would offer no "extra consequences" for his decision to murder three people. Doc. 19, at 93-94. The OCCA's rejection of relief on this issue was reasonable and must be upheld, for the reasons discussed below. *See* 28 U.S.C. § 2254(d).

During the State's second closing argument, the prosecutor cautioned the jury not to let Petitioner manipulate them into imposing a life without parole sentence, and repeatedly argued that a sentence less than death would present no additional consequences for Petitioner's murder of multiple victims (Tr. XIII, 64, 68, 69). The prosecutor's argument was initially met without objection (Tr. XIII, 64), but Petitioner eventually lodged an objection as to improper personal opinion, which was overruled (Tr. XIII, 69). Petitioner's request for an admonishment to the jury was also overruled (Tr. XIII, 69). The prosecutor again repeated the phrase "extra consequences" twice more, without objection from the defense (Tr. XIII, 69).

On direct appeal, Petitioner challenged the prosecutor's allegedly improper argument regarding "extra consequences" for Petitioner's triple murder and the suggestion that a life without parole sentence did not amount to punishment for his crimes. *Brief of Appellant*, at 71-73. The OCCA rejected relief on this issue, offering the following reasoning:

> Bosse claims the State argued that life without parole did not amount to punishment. The record does not support this claim. The prosecutor urged jurors not to let Bosse manipulate them into recommending a sentence less

113

than death. Bosse did not object. The argument was based on evidence that Bosse's family and friends said he was manipulative, and was not error. The prosecutor argued that life without parole amounted to "no extra consequences," and that the way in which the victims were killed deserved extra consequences. As we discuss above, Bosse's objection was sustained when the prosecutor argued that Bosse should not get the benefit of slaughtering three people at once, but his request to admonish the jury was overruled. Bosse did not object when the prosecutor repeated the statement, argued Bosse should not get the same punishment for three as he would for one, and asked twice for extra consequences. Bosse relies on an Illinois case in which the prosecutor argued that, based on Illinois law, the defendant would automatically receive life without parole for two victims, so anything less than death would give the defendant five free murders. The Illinois Supreme Court found this was inflammatory, inaccurate as a statement of law, and not supported by the evidence. *People v. Kuntu*, 196 Ill.2d 105, 256 Ill.Dec. 500, 752 N.E.2d 280, 403 (2001). This case is distinguishable. Bosse's jurors were not faced with automatic imposition of any penalty, and had taken an oath to consider all three punishment options available in Oklahoma. The State's argument was neither a misstatement of law nor of the facts. The prosecutor's request for extra consequences was based on the evidence. The trial court did not abuse its discretion in overruling Bosse's objections. *Underwood*, 2011 OK CR 12, ¶ 75, 252 P.3d at 250.

*Bosse II*, 400 P.3d at 865 (paragraph number omitted).

The OCCA's determination on this issue was reasonable and must be upheld. For starters, the prosecutor's urging the jury not to manipulate them into returning a sentence less than death was reasonably based on evidence presented at the penalty phase, including testimony heard that Petitioner was a manipulative liar who at times took advantage of his friends and family (Tr. XI, 176, 179, 183, 193, 197, 205, 214, 231; Tr. XII, 36, 86, 147). The OCCA's recognition that the prosecutor's statement was based on the evidence presented is a factual finding entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1). Indeed, the OCCA specifically refuted Petitioner's reading of the record, announcing that "[t]he record does not support [Petitioner's] claim." *Bosse II*, 400 P.3d at

865. And a prosecutor may argue reasonable inferences to the jury based on the evidence introduced at trial, which is what the prosecutor did here in urging the jury to carefully weigh the appropriate sentence for Petitioner. *See Hooper*, 314 F.3d at 1172 (agreeing with the OCCA and the federal district court that prosecutor's challenged remarks were "reasonable inferences drawn from the record" and constituted "a fair comment on the evidence"); *Duvall*, 139 F.3d at 795 (prosecutors afforded some latitude in drawing inferences from trial evidence). The prosecutor's caution to the jury against manipulation in its sentencing decision did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *See Donnelly*, 416 U.S. at 643-44.

Moreover, the OCCA reasonably rejected the second component of Petitioner's sub-claim, namely, that a sentence less than death would fail to give full credit for the lives of all three murder victims. Again, the prosecutor's challenged argument was based directly on the evidence at trial, which overwhelmingly showed Petitioner murdered all three victims with malice aforethought before setting fire to the victims' trailer house. *See Hooper*, 314 F.3d at 1172. The prosecutor's reference to "extra consequences" was simply a reminder to the jury, when affixing the appropriate sentence for murder, that Petitioner had committed three counts of first-degree murder, each of which carried up to death as a possible punishment, and that additional murders should warrant additional punishment. *See Rodden v. Delo*, 143 F.3d 441, 447 (8th Cir. 1998) ("In context, the prosecutor's statements about the second murder being free *urged the jury to impose additional*

*punishment for the additional crime.*" (emphasis added)).[25] Indeed, the jury had been

previously given OUJI 9-6A at the guilt stage, which cautioned them to give separate

consideration for each of Petitioner's offenses, meaning the jury knew that each charge

warranted distinct and independent consideration in reaching their verdicts (O.R. 996).[26]

*Cf. also Rwezaula v. Dowling*, No. CIV-17-91-F, 2018 WL 3800056, at *7 (W.D. Okla.

May 22, 2018) (unpublished) (recognizing that the OCCA properly instructed the jury to

weigh each count separately, observing that "[t]here is no indication in the record that the

jury was confused or that the jurors improperly conflated the evidence for each of

Petitioner's charges"). Moreover, great risk of death to more than one person is an

aggravating circumstance under Oklahoma law, and an aggravator that the jury found in

---

[25] Respondent also notes that courts have reached different conclusions on the propriety of this line of argument. *See United States v. Davis*, 609 F.3d 663, 687 (5th Cir. 2010) (recognizing that "[c]ourts have divided on the question of whether" a prosecutor may permissibly argue that extra crimes warrant extra consequences, and collecting cases on the split). That courts have diverged on this issue is ample evidence that at least some fairminded jurists could agree that the prosecutor's remarks to this effect did not amount to constitutional error. *See Richter*, 562 U.S. at 103 (requiring a state prisoner to show the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"); *Frost*, 749 F.3d at 1223 (reaffirming that a writ of habeas corpus shall not issue unless there is "no possibility" of disagreement among fairminded jurists (citation and quotation marks omitted)); *Turnstall v. Hopkins*, 306 F.3d 601, 611 (8th Cir. 2002) (noting that where different courts disagree on an issue, "it is difficult to say the [state] court's decision is contrary to, or involved an unreasonable application of, clearly established federal law"). At the very least, no Supreme Court precedent clearly establishes that a prosecutor may not, from a standpoint of fundamental fairness, argue to the jury that a defendant should be held distinctly accountable for each murder for which he stands convicted.

[26] Although that instruction was given at the guilt stage of trial proceedings, the jury was instructed at the penalty phase that they "must consider all the previous instructions that apply together with these additional instructions," meaning that instruction to the jury was still relevant and in effect (O.R. 1074).

this case, so the prosecutor was entitled to argue to the jury the heavy aggravating weight that should be given to the fact that Petitioner killed more than one person. *See Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir. 1986) (holding that prosecutors may comment on the aggravating circumstances and the evidence in support thereof).

Viewing the challenged comments in the context of the entirety of the record, including the strength of the evidence against Petitioner and the overwhelming proof that Petitioner callously murdered three distinct victims in this case, coupled with the fact that the jury was bound to consider each punishment separately, the prosecutor's argument did not infect Petitioner's trial with fundamental unfairness. *See Donnelly*, 416 U.S. at 643-45. The OCCA's adjudication of this sub-issue was reasonable under the AEDPA, and no habeas relief is necessary here. *See* 28 U.S.C. § 2254(d).

## D.     Conclusion

For the reasons outlined and discussed above, the OCCA reasonably concluded that none of the prosecutor's complained-of remarks or behavior so infected Petitioner's trial with unfairness that his convictions or sentences amounted to a denial of constitutional due process. *Bosse II*, 400 P.3d at 862-65; *see also Donnelly*, 416 U.S. at 643-44. Furthermore, as addressed in sub-section 4, *see supra*, Petitioner's present claim that the prosecutor's improper reference to his lack of consent to search—in reality, a Fourth Amendment challenge housed in a prosecutorial error shell—is unexhausted but subject to an anticipatory procedural bar, which this Court should deny outright. Taken together, Petitioner's claim of prosecutorial error is meritless.

In sum, because Petitioner received a fair trial, and because the OCCA's decision on all exhausted components of his prosecutorial error claim does not present an "extreme malfunction" in Oklahoma's criminal justice system, Petitioner is not entitled to any habeas relief. *See Richter*, 562 U.S. at 102 (holding that federal habeas corpus is a "guard against extreme malfunction in the state criminal justice system," rather than "a substitute for ordinary error correction through appeal"). Accordingly, Petitioner's sixth ground for habeas relief must be rejected entirely.

## GROUND VII

**FOR THE SAKE OF PRESERVATION, RESPONDENT ASSERTS THAT NO CLEARLY ESTABLISHED FEDERAL LAW SUPPORTS PETITIONER'S CLAIM OF CUMULATIVE ERROR. REGARDLESS, THE DECISION OF THE OCCA FINDING NO CUMULATIVE ERROR WAS NEITHER CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD.**

In his seventh and final ground for relief, Petitioner argues the cumulative effect of the errors raised warrants relief, since the articulated errors, when considered in the aggregate, allegedly deprived Petitioner of a fair trial and proper sentencing. Doc. 19, at 95-97. As shown below, the OCCA reasonably denied relief on this claim on direct appeal. On his final ground, Petitioner's request for a writ of habeas corpus should be denied accordingly.

A.      **Procedural Background**

On direct appeal, Petitioner argued that cumulative error at trial denied him a fair

and impartial trial. *Brief of Appellant*, at 92-93. In particular, Petitioner asked the OCCA

to weigh each individual error articulated throughout his brief for the aggregate effect of

such alleged errors on his convictions and sentences. Petitioner supported his claim with

citations to both Oklahoma and federal caselaw. *Brief of Appellant*, at 92-93. The OCCA

denied relief on this claim, initially holding the following:

> In Proposition XV, Bosse claims the accumulation of errors deprived him of
> a fair trial and sentencing. He argues that individual trial errors, taken
> together, require relief. We found only one error in the preceding
> propositions. We determined in Proposition VII that two photographs of
> Chasity's burned body should not have been admitted. However, we found
> admission of those photographs was harmless beyond a reasonable doubt.
> Where a single error has been addressed, there is no cumulative error. *Bell v.
> State*, 2007 OK CR 43, ¶ 14, 172 P.3d 622, 627. Bosse's trial was fairly
> conducted. *Brumfield v. State*, 2007 OK CR 10, ¶ 37, 155 P.3d 826, 840. This
> proposition is denied.

*Bosse II*, 400 P.3d at 866 (paragraph number omitted).[27]

After Petitioner moved for rehearing, the OCCA granted rehearing to readdress this

claim but again denied relief:

> Bosse correctly notes that our resolution of Proposition XV omitted a portion
> of the Court's analysis. In addressing Bosse's claim of cumulative error, the
> Opinion notes the Court had found only one error in previous propositions,
> and determined that error was harmless beyond a reasonable doubt. 2017 OK
> CR 10, ¶ 93, __ P.3d __. The Court found error in both Proposition VII
> [gruesome photographs] and Proposition IX [victim impact death
> recommendations], and found both errors harmless beyond a reasonable
> doubt. Cumulative error does not require relief where the errors, considered

---

[27] Petitioner also raised a cumulative error claim in his successive post-conviction
application, *Bosse III*, 499 P.3d at 776, but here he limits his focus to the OCCA's
cumulative error decision made on direct appeal. Doc. 19, at 96.

together, do not affect the outcome of the proceedings. *Postelle v. State*, 2011 OK CR 30, ¶ 94, 267 P.3d 114, 146. Proposition XV is **DENIED.**

07/24/2017 *Order Withdrawing Mandate, Granting Petition for Rehearing and Denying Relief, and Issuing Mandate* at 2 (OCCA No. D-2012-1128).

**B.     Argument and Authority**

The Tenth Circuit has rejected the argument that cumulative error analysis is not supported by clearly established federal law. *See Hanson v. Sherrod*, 797 F.3d 810, 852 n.16 (10th Cir. 2015) ("[W]hen a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the right to a fair trial and due process'" (quoting *Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003))). However, for the sake of preservation, Respondent maintains that there is no clearly established federal law on this issue and that the Tenth Circuit's reliance on general principles of "the right to a fair trial and due process," *see id.*, is improper pursuant to *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (recognizing that there can be no clearly established federal law where no decision of the Supreme Court "squarely addresses the issue"). *See, e.g.*, *Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019) ("Although we are bound by Tenth Circuit precedent on this issue, we note, in passing, that the Supreme Court has never recognized the concept of cumulative error. And, because there is no 'clearly established Federal law' on this issue, we question whether a state appellate court's rejection of a cumulative error argument can justify federal habeas relief under the standards outlined in § 2254(d)."); *Lorraine v. Coyle*, 291 F.3d 416, 447

(6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Smith v. Duckworth*, 824 F.3d 1233, 1255 (10th Cir. 2016) (quotation marks omitted). "The cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Id.* (quotation marks omitted).

Here, Petitioner is not entitled to any relief on his cumulative error claim. As an initial matter, Section 2254(d) deference applies to the OCCA's rejection of Petitioner's cumulative claim on direct appeal because it adjudicated the claim on the merits. Although the OCCA did not cite the United States Constitution or any federal cases in deciding this claim, this Court must presume that the OCCA adjudicated the federal aspect of Petitioner's claim on the merits. *See Johnson*, 568 U.S. at 298. Therefore, Section 2254(d) deference should apply.

Moreover, the OCCA's decision rejecting Petitioner's cumulative error claim on direct appeal was neither contrary to, or an unreasonable application of, clearly established Supreme Court law, nor based on an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d). Petitioner contends that he has shown cumulative error based on "(1) the prosecution's use of Bosse's refusal to consent to a search of his truck," "(2) the admission of two 'profoundly disturbing and particularly perturbing' photographs of the charred remains of [C.H.]"; and "(3) the improper admission of sentence recommendations from

victim impact witnesses." Doc. 19, at 96. But this Court may consider in its cumulative error analysis only *constitutional* errors. *See Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013) ("In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors."). Respondent has previously demonstrated that the prosecution's use as substantive evidence of Petitioner's refusal to grant consent to search is not error under any Supreme Court law, and that the OCCA found only *state* law error as to the admission of the post-mortem photographs of C.H. *See* Grounds III(B) and VI(C)(4). The only remaining error is the death recommendations, and Respondent demonstrated above that Petitioner had not carried his burden of showing prejudice on that issue. *See* Ground IV(B). With no other errors to cumulate, Petitioner's cumulative error claim must fail. *See Hooks*, 689 F.3d at 1194-95 (cumulative error analysis applies only where there are two or more constitutional errors).

**C.    Conclusion**

As a whole, this Court must deny relief on Petitioner's claim of cumulative error. The OCCA's rejection of Petitioner's cumulative error argument on direct appeal was neither contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts in light of the state court record. *See* 28 U.S.C. § 2254(d). No relief is necessary for Petitioner's seventh and final ground.

## <u>CONCLUSION</u>

Based on the above and foregoing law and reasoning, federal habeas corpus relief is unwarranted. Petitioner's petition for federal habeas corpus relief should therefore be denied in its entirety by this Court.

Respectfully submitted,

**JOHN M. O'CONNOR**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ JOSHUA R. FANELLI**
**JOSHUA R. FANELLI, OBA #33503**
**CAROLINE E.J. HUNT, OBA #32635**

**ASSISTANT ATTORNEYS GENERAL**

**OKLAHOMA ATTORNEY GENERAL'S OFFICE**
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
(405) 522-4423 (Voice)
(405) 522-4534 (Fax)
Service email: fhc.docket@oag.ok.gov

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

**X**      I hereby certify that on this 11th day of October, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Emma V. Rolls
Katrina Conrad-Legler
Office of the Federal Public Defender
Western District of Oklahoma
Capital Habeas Unit
215 Dean A. McGee, Suite 707
Oklahoma City, Oklahoma 73102

s/ JOSHUA R. FANELLI

123